

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - x
LAYOTA NEWKIRK,

                    Plaintiff(s),

       -against-

COUNTY OF SUFFOLK, CHRISTOPHER A. MC COY, in his
official and individual capacities, and MARK PAV,
in his official and individual capacities,

                  Defendant(s).

- - - - - - - - - - - - - - - - - - - - - - - - - x

              100 Veterans Memorial Highway
              Hauppauge, New York
              March 11, 2020
              10:58 a.m.

        DEPOSITION of MARK PAV, one of the
Defendants, taken by Plaintiff, pursuant to Federal
Rules and Regulations and Agreement, held at the
above-noted time and place, before Lisa Conway, a
Stenotype Reporter and Notary Public within and for
the State of New York.



2

```
1
2    A P P E A R A N C E S:
3
4
5         EGAN & GOLDEN, LLP
                   Attorneys for Plaintiff
6                  96 South Ocean Avenue
                   Patchogue, New York 11772
7         BY:    BRIAN T. EGAN, ESQ.
          BY:    CHRISTOPHER A. BIANCO
8
9
10
          MICHAEL J. BROWN, P.C.
11                 Attorney for Plaintiff
                   320 Carleton Avenue, Suite 2000
12                 Central Islip, New York 11722
13
14
15        DENNIS M. BROWN
                   Corporation Counsel
16                 Attorney for Defendants
                   100 Veterans Memorial Highway
17                 Hauppauge, New York 11788
          BY:    BRIAN MITCHELL, Assistant County
18                 Attorney
19
20
21
22
23
24
25
```

3

1

2                    S T I P U L A T I O N S

3

4         IT IS HEREBY STIPULATED AND AGREED by and

5    between the attorneys for the respective parties

6    herein, that filing, sealing and certification shall

7    be and the same are hereby waived.

8

9         IT IS FURTHER STIPULATED AND AGREED that all

10   objections, except as to form of the question, shall

11   be reserved to the time of the trial.

12

13        IT IS FURTHER STIPULATED AND AGREED that the

14   within deposition may be signed and sworn to before

15   any officer authorized to administer an oath, with

16   the same force and effect as if signed and sworn to

17   before the Court.

18

19

20

21

22

23

24

25

4

```
 1
 2    M A R K    P A V,    the Defendant herein, having
 3               first been duly sworn by the notary Public,
 4               was examined and testified as follows:
 5    EXAMINATION BY
 6    MR. BROWN:
 7         Q    State your name for the record, please.
 8         A    Mark Pav.
 9         Q    State your address for the record, please.
10               MR. MITCHELL:   Your business address.
11         A    30 Yaphank Avenue, Yaphank, New York
12    11980.
13               MR. BROWN:   Let's mark these.
14               (One-page document entitled
15               Violation Information was received and
16               marked Plaintiff's Exhibit 1 for
17               identification, as of this date.)
18               (Two-page document entitled Suffolk
19               County Prisoner Activity Log was received
20               and marked Plaintiff's Exhibit 2 for
21               identification, as of this date.)
22               (One page of emails was received and
23               marked Plaintiff's Exhibit 3 for
24               identification, as of this date.)
25               (One-page entitled Suffolk County
```

5

                              MARK PAV

 1
 2              Prosecution Worksheet was received and
 3              marked Plaintiff's Exhibit 4 for
 4              identification, as of this date.)
 5      Q    Officer Pav, good morning.  My name is
 6  Michael Brown.  I'm the attorney for the Plaintiff.
 7  I'm going to be asking you a series of questions.
 8  I need a couple of things done.  Number one is
 9  you need to wait until I ask the question before you
10  give your response.  Everything that you do respond
11  to must be verbal because the court reporter is
12  taking everything down so she can't take down a nod
13  of the head or a gesture with your hands, so you need
14  to verbalize all your answers, okay?
15      A    Okay.
16      Q    Also if there's any time you want a break,
17  whether it's a bathroom break, you want to speak to
18  Mr. Mitchell, just let me know, but I ask that if
19  there's a pending, open question, you just give an
20  answer before we take that break.
21              Fair enough?
22      A    Fair.
23      Q    How long have been a member of the Suffolk
24  County Police Department for?
25      A    Approximately 10 years.

6

1                         MARK PAV

2        Q    When did go you go to the academy?

3        A    June of 2010.

4        Q    When did you graduate the academy?

5        A    January of 2011.

6        Q    Prior to Suffolk County, were you Nassau

7   County Corrections?

8        A    Yes.

9        Q    How long were you there for?

10       A    Close to four years.

11       Q    When did you start with Nassau County?

12       A    October of '06.

13       Q    When did you end?

14       A    June of '10 when I went into the police

15   academy.

16       Q    What was the reason for leaving Nassau

17   County Corrections to come to Suffolk County Police

18   Department?

19       A    To become a police officer.

20       Q    You indicated you graduated the academy in

21   January of 2011?

22       A    Yes.

23       Q    Where were you first assigned?

24       A    First Precinct patrol.

25       Q    Since graduating the academy to as you sit

7

1                        MARK PAV

2    here today, have you left of the First Precinct?

3          A     No.

4          Q     Have you been reassigned from patrol to any

5    other boroughs within the first precinct?

6          A     Yes.

7          Q     How long were you on the First Precinct

8    patrol for?

9          A     Until September of 2016.

10         Q     Then after September of 2016, where were

11   you assigned?

12         A     I'm sorry?  Say that again.

13         Q     You said you were in the First Precinct

14   patrol through September of 2016?

15         A     Correct.

16         Q     Just so I'm clear, in September of 2016,

17   where were you reassigned?

18         A     First Precinct crime section.

19         Q     How long were you in crime -- is it crime

20   control?

21         A     There's three different factions of the

22   crime section.

23         Q     Which faction were you assigned to?

24         A     The community support unit.

25         Q     How long were you there for?

8

1                    MARK PAV

2        A    From September of 2016 to September 2018.

3        Q    In September of 2018, where were you

4    reassigned?

5        A    First Precinct gang task force.

6        Q    Is that where you are today?

7        A    No.

8        Q    How long were you in the task force for?

9        A    Until January of 2019.

10       Q    In January 2019, where were you assigned?

11       A    Precinct crime section.

12       Q    When you say crime section, was there a

13   specific unit?

14       A    We're called precinct crime section, so the

15   whole umbrella of the 120 command is called crime

16   section.  The unit that I'm part of now is called

17   crime section.

18       Q    That's under crime control?

19       A    Crime control unit, I guess.

20       Q    You're still assigned to that section

21   today?

22       A    Correct.

23       Q    Let me go to when you were on patrol

24   through 9/16.  What were your responsibilities?

25       A    Patrol functions, answering 911 calls,

9

1                          MARK PAV

2    proactive policing and just general patrol of the

3    neighborhoods that I was assigned to.

4         Q    Did you ride with a partner or by

5    yourself?

6         A    Both.

7         Q    Were you assigned a specific sector?

8         A    At one point I was assigned to sector 117,

9    which was a single car operator zone.

10        Q    Where is 117?

11        A    Copiague.

12        Q    Go ahead.  I'm sorry.

13        A    I worked that for approximately a year and

14   then I was assigned to the North Amityville area

15   double upped, working with a partner until I was

16   transferred to CSU.

17        Q    North Amityville, what car were you in

18   there?

19        A    110.

20        Q    Was it two tours or midnights?

21        A    They're all two tours.

22        Q    Then you were transferred, you said, in

23   September 2016?

24        A    Correct.

25        Q    You were assigned to the crime section

1                          MARK PAV

2    community support unit?

3         A     Correct.

4         Q     What were your responsibilities there?

5         A     Our responsibilities were to go to parades,

6    funerals and community-oriented police function that

7    was going on.  When there wasn't community events

8    going on, we would be a more proactive arrest and

9    ticket unit.  If there was a problem area with a stop

10   sign, we would sit on it, any community complaints,

11   we would handle.

12        Q     So you were not assigned a specific

13   sector?

14        A     Correct.

15        Q     Would your locations change by the tour?

16        A     Yes, we can go anywhere within the First

17   Precinct confines.

18        Q     Who would make the decision on a daily

19   basis where you would go?

20        A     If there was no complaint or community

21   event we had to be assigned to, our sergeant or

22   supervisor would let us patrol anywhere within the

23   confines.  It wasn't a specific area to patrol on a

24   specific day.

25        Q     When you say you would patrol, was it a

```
 1                          MARK PAV
 2      marked unit or unmarked unit?
 3           A      Marked unit.
 4           Q      Low profile or sector car?
 5           A      We did have low profiles.  We did have
 6      unmarked cars.  I was majority in a marked car, in
 7      uniform.
 8           Q      Were you assigned a partner?
 9           A      Yes, I was.
10           Q      Who was your partner?
11           A      Christopher McCoy.
12           Q      How long were you with Officer McCoy as a
13      partner?
14           A      From the time I was transferred to CSU, so
15      September of 2016 until the day of the incident or a
16      month after the incident.
17           Q      Through April of '17?
18           A      Correct.
19           Q      So you were partners with McCoy from 9/16
20      through and including April of '17?
21           A      Correct.
22           Q      Prior to 9/16, did you know McCoy?
23           A      Yes.
24           Q      How did you know McCoy?
25           A      We were assigned to the same squad, patrol
```

12

1                           MARK PAV

2   squad, so he worked in Wyandanch in sector car 105

3   for, I don't know how long he was assigned there, and

4   I was assigned to sector car 110, so we both relieved

5   out of the precinct, so I would see him on a daily

6   basis.

7        Q    You said your relief point was the

8   precinct?

9        A    Correct.

10       Q    You were working the same tours?

11       A    Correct.

12       Q    Where is the 105 car in relation to the 110

13   car, is it adjacent or something else?

14       A    The 105 car covers Wyandanch.

15       Q    And the 110?

16       A    North Amityville, Copiague.

17       Q    How many sectors between the two of you?

18       A    One to two depending which way you take.

19   We were close.

20       Q    Other than seeing him at the relief -- and

21   that means picking up your car and getting out of the

22   car at the end of tour, right?

23       A    Correct.

24       Q    Would you see him at any other point in

25   time during your tour?

1                      MARK PAV

2          A    It wouldn't be unheard of, but it wasn't a

3    daily event, so if they needed help, something was

4    going on up in Wyandanch, vice versa, something was

5    going on in North Amityville, it wouldn't be uncommon

6    for us to see each other, back each other up.   It

7    wouldn't be uncommon for us to see each other at the

8    precinct if we had arrestees.   They were a proactive

9    car and the partner I was working with, we were

10   proactive too, so...

11         Q    When you say proactive, what do you mean by

12   proactive?

13         A    I guess high arrest numbers.

14         Q    How often would you see McCoy on a tour,

15   for instance, on one shift, would you see him

16   necessarily?

17         A    We would see him in the beginning and most

18   likely at the end of tour.

19         Q    Okay.

20              How about during the tour?

21         A    It wasn't uncommon if we saw each other

22   throughout the tour, but it wasn't a daily basis.   It

23   wasn't, you know, I'm working right next to him and

24   we saw each other every day.

25         Q    Did you socialize with him?

1                          MARK PAV

2          A     Hello, goodbye.

3          Q     Did you go to functions with him?

4                 MR. MITCHELL:  I object.

5                 You can answer.

6          A     I've gone to functions with him, but

7     nothing like friends or family barbecues.  So, we

8     have a First Precinct brotherhood club, which is our

9     fraternal organization.  We have events throughout

10    the year.  Every once in a while I would see Chris at

11    those.

12         Q     Did you go out with him out of work?

13         A     No.

14         Q     You didn't go socialize in terms of bars or

15    go to a movie or go to dinner or anything of that

16    nature?

17         A     No.

18         Q     Had you ever been to his house?

19         A     No.

20         Q     Has he ever been to your house?

21         A     No.

22         Q     Are you married?

23         A     Yes.

24         Q     Was your wife friendly with McCoy's wife?

25         A     They met once at an engagement party, but

15

MARK PAV

1
2  besides that, no other conversation.
3       Q    Did they ever go out together?
4       A    No.
5       Q    Do you have kids?
6       A    I do now.
7       Q    Does McCoy have kids?
8       A    Yes.
9       Q    Did your kids ever get together?
10           MR. MITCHELL:  I object.
11           You can answer.
12      A    My kid wasn't living when me, Chris McCoy
13  were partners, so the answer is no.
14      Q    Your child was born after that?
15      A    Correct.
16      Q    Did you go to the academy with McCoy?
17      A    No.
18      Q    9/26 is when you became partners with
19  McCoy?
20      A    Yes, 9/16.
21      Q    I'm sorry, September of 2016?
22      A    Correct.
23      Q    How many days of the week would you be
24  together?
25      A    Five.

16

                              MARK PAV

1

2       Q    So you worked five days on and how many

3   days off?

4       A    Two.

5.      Q    Was it Monday through Friday?

6       A    Tuesday through Saturday.

7       Q    How long were your tours, not including

8   overtime?

9       A    Eight hours.

10      Q    Did you work overtime?

11      A    Yes.

12      Q    Would you work overtime every day?

13      A    No.

14      Q    So you were together with McCoy from 9/2016

15  until April of 2017 for five days every week other

16  than when you took days off?

17      A    Correct.

18      Q    You rode in the same car with him during

19  that entire time?

20      A    If we weren't assigned to patrol, so three

21  times every month we had to get assigned to patrol.

22  If I was assigned patrol one day, that doesn't mean

23  Chris was assigned the same day, so...

24      Q    Other than the three times a month when you

25  were assigned to patrol, all the other times, other

17

1                          MARK PAV

2    than sick days or vacations, you would be together?

3          A    Correct.

4          Q    It would be the two of you in a police

5    car?

6          A    Correct.

7          Q    Would you take your meals together?

8          A    Yes.

9          Q    Would you take your breaks together?

10         A    Yes.

11         Q    March 16th of 2017, you were working that

12   day?

13         A    March?

14         Q    16th.

15         A    Yes.

16         Q    The date of this incident?

17         A    Yes.

18         Q    Okay.

19              What was your tour that day?

20         A    8:00 in the morning until 4:00 in the

21   afternoon.

22         Q    What were your responsibilities on that

23   day?

24         A    There was no community events going on that

25   day so we would just out in the road, patrolling the

```
 1                      ·        MARK PAV
 2    Town of Babylon area.
 3         Q    When you say patrolling, did anybody direct
 4    you to patrol that particular area?
 5         A    No.
 6         Q    Who made the decision to patrol that
 7    area?
 8         A    We did.
 9         Q    When you say "we," was it a joint
10    decision?
11         A    Yes, myself and Chris McCoy.
12         Q    When did you determine that you were going
13    to patrol that area, that day or some other day?
14         A    That day.  Day-by-day basis.  Usually
15    whoever is driving -- I was driving that day.  The
16    driver usually makes the determination where we go
17    unless the passenger or partner decides hey, I want
18    to go sit on this, this is a complaint, this is
19    something I want to work on, so...
20         Q    So you made the decision that day of where
21    you were going to patrol?
22         A    Correct.
23         Q    What lead you to make the decision; in
24    other words, why did you patrol Babylon that day?
25         A    It was the Town of Babylon, so it
```

19

1                    MARK PAV

2   encompasses all the towns in Babylon, but no

3   particular decision, just made a right turn and went

4   up Straight Path.  There was no thought behind it.

5        Q    Were you in a marked unit?

6        A    Yes.

7        Q    Were you in uniform?

8        A    Yes.

9        Q    McCoy, the same thing?

10       A    Correct.

11       Q    When you say uniform, standard Suffolk

12  County police officer uniform?

13       A    Correct.

14       Q    What were your responsibilities that day?

15       A    Same as I told you before.  We were just

16  patrolling the Town of Babylon, so it was either to

17  write tickets or make a proactive arrest.  There was

18  no community event or complaint to take care of that

19  day.

20       Q    All right.

21            So at some point, you're aware of why we're

22  here, you pulled over a vehicle?

23       A    Correct.

24       Q    Immediately before that, where were you, do

25  you remember?

1                          MARK PAV

2        A    No.

3        Q    What was the first thing you observed about

4   the vehicle Ms. Newkirk was in?

5        A    I don't remember the exact details what

6   brought our attention to that vehicle.  I don't know

7   if it was a suspicious vehicle or if there was a

8   traffic violation, but we end up making a traffic

9   stop on the vehicle that Ms. Newkirk was in.

10       Q    Before you made this stop, do you recall

11  where you were, what location you were at?

12       A    We were in Wyandanch.

13       Q    Do you remember if your vehicle was sitting

14  somewhere, if it was moving?

15       A    No, I don't.

16       Q    So you were just driving your vehicle in

17  Wyandanch?

18       A    Correct.

19       Q    You weren't sitting on any house in

20  particular?

21       A    Not that I recall, no.

22       Q    Did you see Ms. Newkirk come out of any

23  house?

24       A    No.

25       Q    How about the driver of the vehicle, did

21

1                          MARK PAV

2    you see him come out of any house?

3          A    No.

4          Q    How about a deli, did you see him come out

5    of a deli?

6          A    No.

7          Q    So as you're driving?  You were the

8    driver?

9          A    Correct.

10         Q    And McCoy was the passenger?

11         A    Correct.

12         Q    You said that you observed the vehicle?

13         A    Correct.

14         Q    Tell me what you observed about the

15   vehicle.

16         A    I don't remember if it was a vehicle and

17   traffic violation.  I don't recall what exactly

18   brought our attention to that vehicle, but we ended

19   up making a vehicle and traffic stop on the

20   vehicle.

21         Q    Did you write any summonses for the stop?

22         A    No.

23         Q    Did McCoy write any summonses for the

24   stop?

25         A    No.

22

1                          MARK PAV

2        Q     Do you know what probable cause is?

3        A     Yes.

4        Q     What is probable cause?

5              MR. MITCHELL:  I'll object.

6              You can answer.

7        A     It gives you the reason to proceed into a

8    criminal matter.  Obviously, we need reasonable

9    suspicion if there was a crime or a vehicle and

10   traffic violation to make that traffic stop.  I'm not

11   a thousand percent sure which one it was.  I don't

12   know if we observed something or there was a vehicle

13   and traffic stop.  It had to be one or the other.

14   I'm not exactly sure what it was.

15       Q     So you're telling us you pulled the vehicle

16   over, but you don't know why you pulled the vehicle

17   over?

18       A     Correct.

19             MR. MITCHELL:  Is it fair to say you

20             don't recall why you pulled the vehicle

21             over?

22             THE WITNESS:  Correct.

23             MR. MITCHELL:  All right.

24       Q     If you pull a vehicle over, Officer, do you

25   make notes of why you pulled a vehicle over?

23

1                          MARK PAV

2        A    It's documented in the traffic stop data.

3        Q    That would be -- there's an initial for

4   that, right?  Is it called -- are there initials for

5   that, the data?  T stop?

6        A    Correct.

7        Q    What is T stop?

8        A    Whenever you make a traffic stop, you're

9   responsible to put in data of the person you pulled

10   over and the reason why you pulled them over and the

11   disposition for it.

12        Q    Who you pull over, the reason for pulling

13   them over and the disposition?

14        A    Yes.

15        Q    What does that mean, what happens to the

16   case?

17        A    Yes.

18        Q    This T stop, is that a computer?

19        A    Yes.

20        Q    You enter it manually?

21        A    Yes.

22        Q    Did you do that for this?

23        A    No.  So, the driver is responsible for,

24   obviously, driving the vehicle.  The passenger when

25   we worked in a double car was responsible for

1                    MARK PAV

2    recording keeping and traffic stop data, and working

3    the computer would be recordkeeping.

4               MR. MITCHELL:  Did you make a T stop

5          entry yourself?

6               THE WITNESS:  No.

7         Q    Did you know if McCoy made a T stop

8    entry?

9         A    There was a T stop entry made on our

10   computer.

11        Q    Was that at the time of the stop?

12        A    It was within the time that we were there.

13   I don't know if it was the beginning of the stop, the

14   middle of the stop or right before we pulled away

15   from the stop.

16        Q    So the T stop entry, does it say why you

17   pulled the vehicle over?

18        A    It's supposed to.

19        Q    Does it say why you pulled the vehicle

20   over?

21        A    No.

22        Q    When you say it's supposed to, meaning

23   somebody has to enter it?

24        A    Correct.

25        Q    If it's not entered, it wouldn't show?

```
1                          MARK PAV
2        A     Correct.
3        Q     Do you know why it was not entered?
4        A     I cannot speak for Officer --
5               MR. MITCHELL:  Do you know why?
6               THE WITNESS:  No.
7               MR. MITCHELL:  Just listen to his
8               question.  Go ahead.
9        Q     But you're indicating there was a T stop
10  entry?
11       A     Yes.
12       Q     How do you know that there's nothing about
13  why the vehicle was pulled over?
14       A     Because I went to internal affairs and
15  there's no records for that entry.
16       Q     At this point you were McCoy's partner for
17  about six months?
18       A     Correct.
19       Q     When you would make a stop, when would the
20  T stop data be entered?
21       A     During the stop.
22       Q     Before you got out of your vehicle?
23       A     No, when we complete the stop.
24       Q     When you say complete the stop, after
25  everything is done?
```

```
 1                            MARK PAV
 2        A     Correct.
 3        Q     So in other words, you would both be back
 4   in the vehicle, sitting?
 5        A     Correct.
 6        Q     Because everything is finished?
 7        A     Correct.
 8        Q     Whether you have an arrestee in the back or
 9   not, whether summonses were issued or not --
10        A     If we had an arrestee, it would be after
11   the arrestee's done, so we could pay attention to
12   what's going on in the car, not just bury our heads
13   into a computer.
14        Q     You mean after he's lodged?
15        A     Yes.
16        Q     Okay.
17              He's your partner, right?
18        A     Correct.
19        Q     Do you have conversations about what is
20   being put into the T stop?
21        A     We have had, yes.
22        Q     You mean you work it tandem, right?
23        A     Yeah.
24        Q     You're both investigating whatever you're
25   investigating?
```

```
 1                        MARK PAV

 2        A     Correct.

 3        Q     So when you finally enter data into the

 4   T stop, am I correct in saying you have a

 5   conversation about what you had just done?

 6        A     Sure.

 7                   MR. MITCHELL:  I object.

 8                   You can answer.

 9        A     Yes.

10        Q     When was this T stop data entered; do you

11   remember?  Or whatever data was entered in regards to

12   this on the T stop, when was it done?

13        A     The day, March 16th.

14        Q     After Ms. Newkirk was lodged?

15        A     No.  The data that puts it over the

16   computer that we're stopped is done prior -- it's

17   done during the vehicle and traffic stop.  The full

18   data of the disposition of it, who was stopped, the

19   driver, the age, the sex, the race and the

20   disposition, if there were tickets written or an

21   arrest, is usually done after the traffic stop is

22   done.

23        Q     I want to focus, Officer, about why the car

24   was pulled over for a minute.

25        A     Okay.
```

28

1                      MARK PAV

2        Q    When would that information be entered?

3        A    After the traffic stop is completed,

4   disposition.  We're admonished for whatever

5   violations or tickets were written for whatever

6   violations.

7        Q    When would that have been written, I'm

8   trying to ascertain?

9        A    After the arrest.

10       Q    After the arrest?

11       A    Correct.

12       Q    After she was lodged?

13       A    Correct.

14       Q    So you said there was T stop data, but it

15  wasn't complete?

16       A    Correct.

17       Q    Who entered the T stop data for this

18  case?

19       A    McCoy.

20       Q    Do you know when McCoy entered the T stop

21  data?

22       A    No.

23       Q    The T stop data, does it have to be entered

24  in the computer in the vehicle?

25       A    No, you can do it on a desktop computer.

29

1                          MARK PAV

2          Q    From the precinct?

3          A    Correct.

4          Q    Or from anywhere else for that matter?

5          A    I believe from the precinct.  I'm not sure

6     exactly where else you can do it.  I know you can do

7     it from the precinct.

8          Q    Do you know specifically when McCoy entered

9     the data?

10         A    No.

11         Q    Did you have an opportunity to review the

12    T stop data on this case at any point in time as

13    you're sitting here today?

14         A    Yes.

15         Q    When did you review that?

16         A    I've met with the county attorneys before

17    and there's a lack of information on the T stop data

18    of why we pulled over the subject.

19         Q    Do you have a memo book for this case?

20         A    No, I do not.

21         Q    Are you required to have a memo book?

22         A    Yes.

23         Q    So why is it you don't have a memo book for

24    this case?

25         A    I did not keep a memo book for that day.

30

1                         MARK PAV

2        Q     Do you keep a memo book for every day that

3   you're on patrol?

4        A     Yes.

5        Q     Is this the only day that you can remember

6   that you don't have a memo book page for?

7        A     No.

8        Q     What other days did you not have a memo

9   book page for?

10       A     I don't remember the specific days, but

11  there's other days that I don't have a memo book page

12  when I was assigned to the community support unit.

13       Q     How long have you been a member of the

14  police department, 10 years?

15       A     Correct.

16       Q     Out of the 10 years, how many times were

17  you on duty that you don't have a memo book page

18  for?

19       A     I don't have a specific number.

20       Q     More than five?

21       A     Yes.

22       Q     More than 10?

23       A     I don't have a specific number.

24       Q     Somewhere more than five, but you don't

25  know if it's up to 10?

31

```
 1                        MARK PAV
 2       A    I don't have a specific number.
 3       Q    By the way, were you disciplined for not
 4   having a memo book page?
 5                  MR. MITCHELL:  I object to the form.
 6                  You can answer.
 7       A    No, I haven't gotten my disciplinary --
 8                  MR. MITCHELL:  You mean in relation to
 9             this event or just in general?
10                  MR. BROWN:  Both.
11                  MR. MITCHELL:  In relation to this
12             event, have you received any discipline up
13             to today in relation to anything having to
14             do with event?
15                  THE WITNESS:  No.
16       Q    Is there a disciplinary action pending
17   against you still?
18       A    I went to an internal affairs interview.  I
19   haven't gotten the written disciplinary --
20       Q    Decision?
21       A    Decision, there we go.
22       Q    So it's still open?
23       A    Correct.
24       Q    Other than you telling us today about not
25   having a memo book page on other dates, have you ever
```

32

1                    MARK PAV

2    been disciplined for that?

3         A    No.

4         Q    Did anybody know that you didn't have a

5    memo book page in the past, for those other days?

6                    MR. MITCHELL:  I object to the form.

7                    You can are answer.

8         A    No.

9         Q    So you don't recall why you pulled the

10   vehicle over, but you pulled the vehicle over?

11        A    Correct.

12        Q    Who activated the emergency lights?

13        A    I did.

14        Q    Did you activate a siren?

15        A    No.

16        Q    So you made the decision to activate the

17   emergency lights?

18        A    Correct.

19        Q    Did McCoy and you have a conversation

20   before you did that?

21        A    I don't recall if we did or didn't.  We had

22   some sort of conversation throughout the day.  I

23   don't recall if there was a conversation before.

24        Q    I'm talking specifically about before you

25   decided to activate the emergency lights.

33

1                        MARK PAV

2        A    We might have, we might not have.  I don't

3    remember.

4        Q    At what point did you notice this vehicle;

5    in other words, how long of --

6                    MR. BROWN:  Withdrawn.

7        Q    Where were you when you first noticed this

8    vehicle?

9        A    We were on the side street of Wyandanch off

10   of Straight Path.

11       Q    A side street off of Straight Path?

12       A    Correct.

13       Q    Were you driving your vehicle, or were you

14   stopped?

15       A    I don't recall if I was driving or stopped

16   when I first observed the vehicle.

17       Q    You said you don't recall what attracted

18   you to this vehicle?

19       A    No.

20       Q    Had you seen the occupants of the vehicle

21   prior to making the stop?

22       A    No.

23       Q    Did you know if there were males or females

24   in the car?

25       A    No.

34

MARK PAV

1

2    Q    How far of a distance were you from the

3    vehicle when you first observed it?

4    A    I don't remember how close or far away the

5    vehicle was from us.

6    Q    Do you remember what direction of travel

7    the vehicle was going?

8    A    East.

9    Q    Do you recall what path of travel your

10   vehicle was going, if at all?

11   A    Before the stop, east because we were

12   behind him.

13   Q    Okay.

14        The side street, do you know the name the

15   side street?

16   A    I believe it's Doe.

17   Q    D-O-E?

18   A    Yeah.

19   Q    Is it a residential street?

20   A    Correct.

21   Q    Are there commercial buildings there?

22   A    No.

23   Q    Any deli's or anything like that?

24   A    Straight Path is about two blocks away, I

25   believe, so there's commercial buildings and deli's

1                          MARK PAV

2      on Straight Path in the relative area.

3           Q     But on Doe?

4           A     No.

5           Q     Was there a reason you were on Doe; in

6      other words, did you get any complaints?

7           A     No.

8           Q     So now you have a vehicle in front of you.

9      How far of a distance from the vehicle were you?

10          A     When?

11          Q     When you first observed it.

12          A     I don't recall how far away the vehicle was

13     when we first observed it.

14          Q     Was the street a two-way street?

15          A     Yes.

16          Q     Were there road markings like a fog line, a

17     center divide line, any of those?

18          A     Not that I recall.

19          Q     Do you know if the vehicle was speeding?

20          A     I don't recall why we pulled over the

21     vehicle.

22          Q     I'm just asking you --

23          A     If I knew it was speeding?

24                MR. MITCHELL:  He's trying to refresh

25                your recollection.

```
 1                    MARK PAV
 2           Is that fair to say, Counsel?
 3           MR. BROWN:  Yes.
 4           MR. MITCHELL:  So in other words, does
 5      this help you remember, because I am going
 6      to object because he has answered more than
 7      one time that he doesn't recall the reason
 8      why they stopped it when he first observed
 9      the vehicle.  On the other hand, if you're
10      trying to refresh his recollection, I'll
11      permit him to answer the question.
12           MR. BROWN:  Right.  In addition to
13      that, other than the fact that he may not
14      remember, I'm still permitted to ask if
15      there was a violation.
16           MR. MITCHELL:  You can ask him
17      anything you want.  I'm just going continue
18      to object and I may get to the point of
19      directing him not to answer, however, if
20      the reason you're going back to is for the
21      purpose of trying to refresh his
22      recollection because maybe you will jog his
23      memory, I'm not going to object to that.
24           MR. BROWN:  Thank you.
25 CONTINUED EXAMINATION BY
```

1                      MARK PAV

2   MR. BROWN:

3       Q    Do you recall if the vehicle was

4   speeding?

5       A    No.

6       Q    Do you recall if the vehicle was

7   maintaining its lane of travel?

8       A    No.

9       Q    Do you recall if the vehicle failed to

10  signal?

11      A    No.

12      Q    Do you recall if the vehicle was driving

13  erratically?

14      A    No.

15      Q    Do you recall if there was any odor of

16  marijuana coming from the vehicle?

17      A    No.

18      Q    Do you recall if the vehicle was being

19  operated in a suspicious manner at all?

20      A    I don't recall exactly what brought our

21  attention to the vehicle, if it was reasonable

22  suspicion that something was going on or if there was

23  a vehicle and traffic violation that occurred.

24      Q    You didn't write any summonses?

25      A    Correct.

38

1                        MARK PAV

2        Q     And there's no memo book page?

3        A     Correct.

4        Q     And there's nothing in T stop?

5        A     Correct.

6        Q     Is there any other place that it would be

7  noted or be required to be noted?

8        A     No.

9        Q     Okay.

10             So you activate your emergency lights,

11  Officer, and did the driver pull the vehicle over?

12       A     Yes.

13       Q     Without hesitation?

14       A     Correct.

15       Q     To the right or left, where?

16       A     To the right.

17       Q     Did you follow behind the vehicle?

18       A     Yes.

19       Q     Tell me what the first thing you did was.

20       A     We approached the vehicle.  McCoy was on

21  the passenger side.  I was on the driver's side.  I

22  asked for the driver's identification, insurance card

23  and registration.  We got Ms. Newkirk's personal

24  information.

25       Q     When you say "we," who asked her for the

39

```
 1                          MARK PAV
 2    information?
 3         A    Officer McCoy.
 4         Q    So you approach the driver and McCoy
 5    approached the passenger?
 6         A    Correct.
 7         Q    By the way, if you had noticed a vehicle
 8    and traffic law infraction, are you required to write
 9    a summons?
10         A    No.
11         Q    Is that something that is discretionary?
12         A    Yes.
13         Q    Did you write her for a 221.05?
14         A    Yes.
15         Q    Is that also discretionary?
16         A    Yes.
17         Q    That's a violation of the Penal Law,
18    correct?
19         A    Correct. '
20         Q    Why is it that you decided to charge her
21    with the 221.05 but not issue a summons to the driver
22    for any vehicle and traffic law infractions?
23              MR. MITCHELL:  I object, but you can
24              answer.
25         A    I don't have a reasoning why we arrested
```

1                          MARK PAV

2    her for the 221.05 and not write a traffic infraction

3    ticket.

4        Q    Well, you utilized discretion in not

5    writing a summons?

6        A    Correct.

7        Q    You don't know what lead you to use the

8    discretion and not issue a summons for the vehicle

9    and traffic law infraction?

10       A    Correct, I don't know if -- we go back to

11   why we pulled over the car.  I don't know if was a

12   vehicle and traffic law infraction or if there was

13   reasonable suspicion that they were coming from a

14   drug house or not.  So for me to tell you why I had

15   discretion of not writing a summons to somebody, I

16   can't tell you if they even committed an infraction

17   or if they were coming from a drug house and gave us

18   reasonable suspicion to go interview them.

19       Q    When you say reasonable suspicion for

20   coming from a drug house --

21       A    Or drug-prone location.  I'm sorry.

22       Q    What is a drug house?

23       A    What is a drug house?

24       Q    Yes.

25       A    Something that has gotten numerous

1                     MARK PAV
2    complaints, numerous drug arrests coming and going
3    from the house.  Behind the deli on Straight Path,
4    right adjacent to where we were, that's a community
5    complaint for a drug-prone location where there's
6    been numerous, numerous arrests for narcotics.  So
7    like I said, I don't remember exactly where the car
8    came from.  I don't remember if there was an
9    infraction committed or if he was warned and
10   admonished for an infraction and the discretion was
11   there.
12        Q    Now, you said a drug house where there were
13   complaints and arrests coming out of?
14        A    Correct.
15        Q    You said you don't know if they left a drug
16   house?
17        A    Correct.
18        Q    If somebody left a drug house, do you
19   believe that that gives you reasonable suspicion to
20   pull the vehicle over?
21        A    No.
22        Q    So what is it about leaving a drug house
23   that would lead you to have reasonable suspicion in
24   pulling the vehicle over?
25                  MR. MITCHELL:  I'll object.

42

1                          MARK PAV

2                    You can answer.

3         A    If I saw some sort of hand-to-hand

4    transaction.

5         Q    Do you recall seeing a hand-to-hand

6    transaction action that day?

7         A    No.

8         Q    Is there anything else about somebody

9    leaving a drug house that would cause you to develop

10   reasonable suspicion in pulling them over?

11        A    No.

12        Q    So now you indicated you approached the

13   driver and McCoy approached the passenger?

14        A    Correct.

15        Q    You ask for information from the driver?

16        A    Correct.

17        Q    And McCoy was on the other side of the

18   vehicle?

19        A    Correct.

20        Q    Did you hear what he was doing?

21        A    I know he was talking to the passenger.

22   No.

23        Q    How far away from you is McCoy?

24        A    I would say five, six feet.

25        Q    The width of the car?

43

1                         MARK PAV

2        A    Yes.

3        Q    Was the radio on in the car?

4        A    Not that I recall.

5        Q    So McCoy had a conversation with the

6   passenger?

7        A    Correct.

8        Q    You don't recall what he was saying to the

9   passenger?

10       A    No.

11       Q    Do you recall the passenger talking to

12  him?

13       A    I don't recall any exact conversation that

14  was going on or if there was conversation.

15       Q    Did you have a conversation with the driver

16  other than to ask him for the insurance, license,

17  registration?

18       A    No.

19       Q    Did he produce it?

20       A    Yes.

21       Q    After he produced it, did you go walk back

22  to your car?

23       A    Yes.

24       Q    Did McCoy walk back to the car at the same

25  time?

44

1                          MARK PAV

2         A     Yes.

3         Q     Did he also have in his hand any type of

4    identification?

5         A     He might have, he might not have.  I'm not

6    sure.

7         Q     You don't recall if he had anything in his

8    hand?

9         A     No.

10        Q     When you go back to your car?  Did you get

11   into the car?

12        A     Yes.

13        Q     Did McCoy get in at the same time?

14        A     Yes.

15        Q     What happened when you got back in the

16   car?

17        A     We ran the driver through New York State

18   DMV system through our computer and we checked the

19   passenger for any local warrants.

20        Q     Now, to check the passenger, would you need

21   a name?

22        A     Yes.

23        Q     Would you also need a date of birth?

24        A     No.

25        Q     You just can run the name itself?

45

1                          MARK PAV
2        A    Yes.
3        Q    Okay.
4             Who checked the driver, you or him?
5        A    I don't know who used the computer.  He's
6    the one sitting in the passenger seat, so...
7             MR. MITCHELL:  Are you saying you
8             don't remember?
9             THE WITNESS:  Correct.
10            MR. MITCHELL:  Just tell him that.
11       Q    Who checked the passenger?
12       A    I don't remember.
13       Q    The computer, is it a swivel computer in
14   the car?
15       A    Yes.
16       Q    So it's accessible to both the driver and
17   the passenger?
18       A    Yes.
19       Q    But you don't recall who checked?
20       A    No.
21       Q    After you checked, what was the next thing
22   that happened?
23       A    We observed that the passenger had three
24   outstanding warrants.
25       Q    That's Ms. Newkirk?

```
 1                        MARK PAV
 2        A     Correct.
 3        Q     What did you do then?
 4        A     We approached the vehicle.  I gave the
 5   driver back his information, and we notified
 6   Ms. Newkirk that she had three outstanding
 7   warrants.
 8        Q     How long did it take you from getting the
 9   identification to going back to your car?
10        A     Short time.  I would say if it was more
11   than a minute, it's a lot of time.
12        Q     Other than asking the driver for his
13   identification, registration, insurance, did you have
14   any other conversation with him?
15        A     Not that I recall.
16        Q     Did you ask him why he was coming from a
17   certain location?
18        A     I could have, I could have not.  I don't
19   recall the conversation I had with him.
20        Q     This incident came on your radar when the
21   FBI contacted you?
22        A     Correct.
23        Q     That was April 6th or so?
24        A     Yes.
25        Q     That's three weeks after the incident?
```

47

1                              MARK PAV

2          A     Correct.

3          Q     How many shifts did you work from

4    March 16th until the FBI contacted you?

5          A     If it's three weeks, safe to say 15.

6          Q     At the point the FBI contacted you, did

7    that cause you to start thinking in your head about

8    every detail of this case?

9          A     Yes.

10         Q     I assume the FBI never contacted you

11   before?

12         A     No.

13         Q     You learned about all the things that are

14   alleged here, right?

15         A     Eventually, yes.

16         Q     When the FBI contacted you and you started

17   recollecting to the best of your ability, is that

18   safe to say?

19         A     Yes.

20         Q     At that point in time, you still were

21   unable to determine what it was that caused you to

22   pull the vehicle over?

23         A     Correct.

24         Q     You're still unable to determine what if

25   any conversations you had?

```
 1                         MARK PAV

 2        A    Correct.

 3        Q    When you got in the car and after you ran

 4   the two people, how much time did it take you to go

 5   back to the vehicle?

 6                   MR. MITCHELL:  Object to the form.

 7                   You can answer.

 8        A    It was a short time.  I don't know exactly

 9   how long it took.

10        Q    Was it five seconds, was it a minute, five

11   minutes, something else?

12        A    I would say under five minutes.

13        Q    During the five minutes, what was being

14   said between you and McCoy?

15        A    I don't recall the conversation.

16        Q    Did he say anything about the passenger of

17   the vehicle to you?

18        A    We discussed that she had warrants.

19        Q    Other than warrants, did he make any

20   comments about the passenger in the vehicle?

21        A    No.

22        Q    Did he make any comments about the color of

23   her skin?

24        A    No.

25        Q    Did he make any comments about anything
```

49

1                      MARK PAV

2    sexual in nature, in regards to the female?

3         A    No.

4         Q    So now you walk back to the car.  Did you

5    go to the driver's side or the passenger side or

6    something else?

7         A    I went back to the driver's side.

8         Q    What did you do or say to the driver?

9         A    I gave her back her information.  I don't

10   remember the conversation I had with her.

11        Q    Was there a conversation?

12        A    I don't remember if there was a

13   conversation.

14        Q    Did she ask you why she was pulled over?

15        A    I don't recall any conversation that I had

16   with her or the content of the conversation.

17        Q    Did McCoy go on the passenger side?

18        A    Yes.

19        Q    Did McCoy have a conversation with the

20   passenger?

21        A    You would have to ask McCoy.  I don't

22   know.

23        Q    I know, but you're within five feet?

24        A    Right.

25        Q    So I'm just asking you --

1                          MARK PAV

2        A    I'm sure there was some sort of

3   conversation.

4        Q    So you don't what he said or what she

5   said?

6        A    Correct, I don't remember the extent of the

7   conversation.

8        Q    What is the next thing that happened?  Does

9   she get out of the car?

10       A    Yes.

11       Q    How did she get out of the car?

12       A    She had to be made aware she had the

13  warrants and was being locked up.

14       Q    So who told her that?

15       A    McCoy.

16       Q    So you heard that?

17       A    I didn't tell her.

18            MR. MITCHELL:  He's asking if you

19            heard Officer McCoy say that to her?

20            Listen to what he's asking you and just

21            answer the question.

22            THE WITNESS:  Okay.

23       Q    Officer, I'm asking you if you heard --

24            MR. BROWN:  Withdrawn.

25       Q    You said McCoy made Newkirk aware of the

1                              MARK PAV

2    warrants?

3         A     Correct.

4         Q     Did you hear that?

5         A     No.

6         Q     So how do you know he made her aware of the

7    warrants?

8         A     I don't remember the exact conversation, so

9    I'm assuming he made her aware of the warrants

10   because that's the only reason for her to come out of

11   the vehicle.

12        Q     When you say that's the only reason for her

13   to come out of the vehicle, he could tell her to exit

14   the vehicle without saying anything about a warrant,

15   right?

16        A     Correct.

17        Q     I'm asking you what he said to her.  Did

18   you hear what he said to get her out of the car?

19        A     No.

20        Q     She got out of the car?

21        A     Correct.

22        Q     When she got out of the car, did the driver

23   leave?

24        A     No.

25        Q     He stayed in that spot?

52

1                          MARK PAV

2        A    Correct.

3        Q    Did there come a time when the driver

4   left?

5        A    Yes.

6        Q    How long a time period would be until he

7   left?

8        A    When we transported Ms. Newkirk, that's

9   when he left.

10        Q    Did he leave because you told him to

11   leave?

12        A    I didn't tell him to leave.  He was free to

13   go.

14        Q    Did you say to him you can leave?

15        A    I don't remember exact conversation, but I

16   typically, yes, I would tell him he's free to go.

17        Q    That's what you normally do?

18        A    Correct.

19        Q    Do you remember what you said to him?

20        A    No.

21        Q    Did McCoy say anything to him?

22        A    I don't know.

23        Q    So now McCoy, you believe, told her to get

24   out of the car?

25        A    Correct.

53

1                           MARK PAV

2          Q     You didn't hear any conversation?

3          A     There was conversation.  I don't remember

4     the extent of the conversation.

5          Q     How long did the conversation last?

6          A     I don't recall.

7          Q     She gets out of the car?

8          A     Correct.

9          Q     Where does she go?

10         A     She's on the passenger side of her vehicle,

11    and there was a conversation about her warrants, and

12    she said -- at that point I went to the passenger

13    side of the vehicle.

14         Q     Just so I understand, the intent is to

15    arrest her?

16         A     Correct.

17         Q     So your focus is on her --

18         A     At this point.

19         Q     -- and your partner?

20         A     Yes.

21         Q     The driver did nothing wrong other than

22    possibly coming out of a drug house or violated a

23    vehicle and traffic infraction that you didn't write

24    him a summons for?

25               MR. MITCHELL:  Object to the form.

54

1                          MARK PAV

2                    You can answer.

3        A    Correct.

4        Q    So you're not concerned with him?

5        A    At this point, no.

6        Q    When you say you came over to the side of

7   the car that McCoy was on, by the front or the back?

8        A    The front passenger --

9        Q    I'm asking how you got over to the side.

10       A    I went around the front.

11                   MR. MITCHELL:  Forgive me.  When you

12              say you went around the front of the

13              vehicle, do you mean the vehicle that

14              Ms. Newkirk was in?

15                   THE WITNESS:  Correct.

16                   MR. MITCHELL:  Okay, go ahead.

17       Q    Your car is parked directly behind?

18       A    Correct.

19       Q    Is your car off to the side?  When I say

20   off to the side, staggered a little so it gives you

21   that protection in between the two vehicles, or

22   not?

23       A    Yes.

24       Q    So you walk over around the front of the

25   Newkirk vehicle and then walk over to the front

55

```
 1                          MARK PAV
 2   passenger side?
 3        A    Correct.
 4        Q    From the moment she stepped out until you
 5   got around to that side, how much time elapsed?
 6        A    Short time.  I would approximate a minute
 7   if not less.
 8        Q    It took you from a minute to go from --
 9             MR. BROWN:  Withdrawn.
10        A    From the point that she got out of the car,
11   because there was a conversation that ensued --
12        Q    Between her and McCoy?
13        A    Correct.
14        Q    But you approached the driver and gave his
15   information right back to him, correct?
16        A    Correct.
17        Q    And McCoy is telling her to get out of the
18   car?
19        A    Correct.
20        Q    It took you about a minute to walk around
21   the front of the car to where McCoy was?
22        A    It would be less than a minute, but yeah.
23   They were outside the car.  From the time -- yes, it
24   was a minute or less.  I don't remember exactly how
25   long.
```

56

1                    MARK PAV

2       Q    Other than you giving the driver his

3   information back, was there any delay before you

4   started to walk to the other side of the vehicle?

5       A    No.

6       Q    You knew that he was going to make the

7   arrest?

8       A    Correct.

9       Q    So you walk around and when you got there,

10  where was McCoy and where was Newkirk?

11      A    They were by the front passenger door.  The

12  door was open.  She's outside.

13      Q    How far from Newkirk was McCoy?

14      A    About a foot.

15      Q    What was being said?

16      A    She said her warrants are not valid, that

17  she has a warrant recall sheet in her pocketbook,

18  which was on the floorboard of the passenger seat.

19      Q    What did McCoy say to her?

20      A    We had a conversation together.

21      Q    So you were involved in the conversation?

22      A    Correct, at this point.

23      Q    So tell us what was said.

24      A    We said if you could produce the recall

25  sheets, that obviously we wouldn't arrest her.  She

57

```
 1                        MARK PAV
 2    retrieves the bag from the car and produces
 3    paperwork, but they weren't the warrant recall
 4    sheets.
 5         Q    What did she give you?
 6         A    DMV paperwork.
 7         Q    When you say DMV paperwork, what exactly
 8    was it?
 9         A    I don't recall exactly what it was, but it
10    wasn't a Suffolk County warrant recall.
11         Q    She says I have it in my pocketbook and you
12    permit her to retrieve the pocketbook?
13         A    Correct.
14         Q    How long did that take?
15         A    Seconds.
16         Q    Up to this point, was she searched at
17    all?
18         A    No.
19         Q    Was she frisked at all?
20         A    No.
21         Q    So now she gets the pocketbook, she shows
22    you the DMV forms?
23         A    Uh-uh.
24              MR. MITCHELL:  You have to say yes or
25              no.
```

58

```
 1                      MARK PAV
 2      A    Yes.  I'm sorry.
 3      Q    You and McCoy look at it?
 4      A    Correct.
 5      Q    It's not what she claims it is?
 6      A    Correct.
 7      Q    What do you do then?
 8      A    At that point I'm not exactly sure what
 9  transpires from that point.  She's eventually brought
10  back to the back of our vehicle.  I go back to the
11  driver and let him know that he's free to leave and
12  that Ms. Newkirk is going to be arrested for the
13  warrants that she has and that what she's claiming
14  that she has, the warrants recall, isn't the proper
15  paperwork to show that the warrants were vacated.
16      Q    Do you have a further conversation with the
17  driver?
18      A    Yes.
19      Q    What was the further conversation?
20      A    That was it.  I go back to the driver.
21      Q    But after what you just said, did he just
22  leave then?
23      A    Yes.  When I walk away from the car, he
24  left.
25               MR. MITCHELL:  Forgive me.  This is
```

59

1               MARK PAV
2          just for my clarification.  You mentioned
3          just now that the paperwork that she had
4          was not sufficient and that was what you
5          were saying to the driver?
6               THE WITNESS:  Correct.
7               MR. MITCHELL:  Okay, that's fine.
8     Q    Then the driver left?
9     A    Yes, he eventually left.
10    Q    You said after she produced that, McCoy
11 eventually brought her back to the back of the car?
12    A    Correct.
13    Q    What was going on before he eventually
14 brought her to the back of the car?
15    A    I don't recall exactly what was going on.
16    Q    Well, you were there, right?
17    A    Yes.
18    Q    This was your partner?
19    A    Correct.
20    Q    Had he put her in handcuffs yet?
21    A    No.
22    Q    You said that nobody had frisked or
23 searched her when she got out of the car?
24    A    Correct.
25    Q    From a police officer's standpoint, you

60

1                          MARK PAV

2    still don't know if she has a weapon on her; am I

3    right?

4          A    Correct.

5          Q    At what point did anybody frisk or search

6    her?

7          A    I don't know.  I did not frisk or search

8    her.

9          Q    But until you know that a subject is

10   frisked or searched, are your eyes still on your

11   partner?

12         A    No.  At that point I don't deem that she's

13   a threat to my partner.

14         Q    When you say you don't deem she's a threat,

15   what do you mean by that?

16         A    At that point I don't feel -- I don't

17   personally feel that she causes my partner any

18   substantially risk or harm.

19         Q    So if somebody has a weapon that is

20   secreted on them, you would not know about the

21   weapon, right?

22         A    Right.

23         Q    And you deem them a threat?

24         A    Correct.

25         Q    Until you know that there's a weapon?

```
 1                          MARK PAV
 2         A     Correct.
 3         Q     So as Ms. Newkirk is standing there with
 4   McCoy, you said you didn't deem her a threat and
 5   that's based on what?
 6         A     Just her demeanor, just knowing Chris and
 7   what situations I feel comfortable that he can and
 8   cannot handle.
 9         Q     At this point, it's your position that you
10   hadn't seen a frisk or a search?
11         A     Correct.
12         Q     And it was at this point when you turned
13   your attention away from McCoy and Newkirk to go back
14   to the driver?
15         A     Correct.
16         Q     When you were done with the driver, what
17   did you do then?
18         A     I went back into the car.  Ms. Newkirk was
19   in the back seat of our vehicle.
20         Q     So she was already in the car?
21         A     Correct, by the time I went back to our
22   vehicle.
23         Q     So you said you left the side where Newkirk
24   and McCoy were?
25         A     Correct.
```

62

1                      MARK PAV

2        Q     Did you walk around the front or the

3   back?

4        A     The front.

5        Q     You told the driver that she was being

6   arrested?

7        A     Yes.

8        Q     For warrants?

9        A     Yes.

10       Q     And that he was free to leave?

11       A     Yes.

12       Q     Anything else you said to him?

13       A     Not that I can recall.

14       Q     Anything else that he said to you?

15       A     Not that I can recall.

16       Q     So how long did that conversation take, 10

17   seconds, five seconds or more?

18       A     I would say approximately a minute is fair

19   to say.

20       Q     So a minute.  So, you said to him she's

21   being arrested for warrants?

22       A     Correct.

23       Q     That sentence, right?

24       A     I don't know if it was that exact sentence.

25   I know I explained to him what was going on.

```
1                         MARK PAV
2        Q    What do you mean?  What was it that you
3    said to him?
4                  MR. MITCHELL:  I object to the form.
5                  You can answer.
6        A    I don't remember the exact conversation.  I
7    remember in sum and substance I told him the
8    situation that was going on, she had active warrants,
9    she claimed she had a warrant recall sheet, we
10   reviewed it, it wasn't the paperwork that was
11   necessary to have the warrants vacated and that she
12   was going to be arrested for that and that she would
13   be going to court the next day.
14       Q    What you just said took all of maybe 12, 15
15   seconds?
16                 MR. MITCHELL:  I object.
17                 You can answer.
18       Q    Would you agree?
19       A    Yes.
20       Q    So other than saying what you just said,
21   there was no other conversation with him?
22       A    I'm not sure the response or back and
23   forth, the pause in between the responses.
24       Q    It's your testimony that by the time you
25   were done with him and told him to leave, McCoy
```

1                          MARK PAV

2    already had Newkirk in the car?

3         A    Correct.

4         Q    And she was handcuffed?

5         A    Correct.

6         Q    Do you know if McCoy searched or frisked

7    Newkirk?

8         A    No.

9         Q    Did you ever have a conversation with him

10   about whether he searched or frisked her?

11        A    No.

12        Q    So you don't have any type of conversation

13   with your partner about she's okay or she has nothing

14   on her or nothing like that?

15        A    No.

16        Q    Is that on this particular day, or is that

17   always when you are with McCoy?

18        A    Every situation changes, so it wouldn't be

19   every particular day.

20        Q    Okay.

21             There are times with McCoy when you would

22   discuss if somebody had something on them, if

23   somebody didn't have something on them?

24        A    Yes.

25        Q    How often would you do that?

65

1                        MARK PAV

2        A    I don't have the exact how often.  Every

3   situation was different, so it was also dependent on

4   the situation.

5        Q    Just so I understand, you don't know at

6   this point, meaning when you go back to the car,

7   whether she was actually frisked?

8        A    Correct.

9        Q    Or searched?

10       A    Correct.

11       Q    And she was in handcuffs?

12       A    Correct.

13       Q    In the back or the front?

14       A    The back.

15       Q    If she had a weapon on her, would you be

16   concerned about that?

17             MR. MITCHELL:  At what point?

18       Q    When she was in your car?

19       A    Yes.

20       Q    It's your position that you never spoke to

21   McCoy about whether she was frisked or searched?

22       A    Correct.

23       Q    So as a result of you being concerned, what

24   did you do?

25       A    I wasn't concerned that -- in my eyes, she

66

MARK PAV

1
2   didn't pose a threat.

3       Q    When you found out she had warrants, were

4   you made aware at that very moment what the warrants

5   were for?

6       A    Yes.

7       Q    It tells you on your computer?

8       A    Correct.

9       Q    So where was she placed in your vehicle?

10      A    The rear passenger seat.

11      Q    And McCoy then got into the front

12  passenger?

13      A    Correct.

14      Q    You got into the driver's seat?

15      A    Correct.

16      Q    What is the procedure for Suffolk County in

17  terms of transporting a prisoner; do you know?

18      A    If it's a one person car, the arrestee is

19  supposed to be sitting in the front passenger seat.

20  If it's a two man car, the arrestee is supposed to be

21  sitting in the rear passenger seat and the partner is

22  supposed to be sitting behind the driver in the

23  rear.

24      Q    Why is it placed that way?

25      A    Safety.

67

1                           MARK PAV

2       Q     Safety of who?

3       A     Both the prisoner and the officers.

4       Q     Do you remember her clothing?

5       A     No.

6       Q     Do you remember if she had a jacket?

7       A     It was March --

8                   MR. MITCHELL:  Do you remember?

9       Q     Don't speculate.  Do you remember her

10   having a jacket?

11      A     No.

12      Q     Was it cold that day?

13      A     I don't recall.

14      Q     Don't guess.  We know March is usually

15   cold, but I'm asking if you remember.

16      A     No.

17                  MR. MITCHELL:  It's pretty nice

18            today.

19                  MR. BROWN:  True.

20      Q     So you don't recall?

21      A     No.

22      Q     Do you recall Newkirk making any noises

23   during the arrest, not conversation, but any noises

24   during the arrest process?

25      A     No.

68

1                          MARK PAV

2          Q     Do you recall the sound of a zipper on a

3     jacket?

4          A     No.

5          Q     Or a zipper?

6          A     No.

7                MR. MITCHELL:   Forgive me.  At what

8                point in time?

9          Q     During the arrest, before she was put in

10    the car?

11         A     No.

12         Q     When she got out of the car, you mentioned

13    she was standing by the front passenger side of the

14    vehicle?

15         A     Correct.

16         Q     From that moment until you noticed her in

17    the back of your vehicle, did you see her position

18    change at all?

19         A     Yes.

20         Q     When was that?

21         A     When we were talking to her, we ended up

22    walking in between our two vehicles.

23         Q     This is when you were discussing --

24         A     So, she grabs her pocketbook.  She gets the

25    paperwork from her pocketbook and it wasn't the

```
 1                      MARK PAV
 2    correct warrant recall sheet.  At that point we walk
 3    in between our two vehicles.  We put her pocketbook
 4    on the hood of our vehicle, so her pocketbook is
 5    there, and I walk back to the driver and let him know
 6    what is going on, that she's going to be arrested.
 7         Q    So when you were having the conversation
 8    with the driver, McCoy and Newkirk were in between
 9    the two vehicles?
10         A    When I left them to go back to the driver,
11    they were.  By the time I got back to our car,
12    Newkirk was being put into the back of our vehicle,
13    handcuffed.
14         Q    When you turned around to walk to the
15    driver, did you have any view of McCoy or Newkirk?
16         A    I could see them, but I didn't look over to
17    them.
18         Q    And they were still positioned in between
19    the two vehicles?
20         A    When I left them, they were.  By the time I
21    got back to my car, they were at the back.  She was
22    being put into the back of our vehicle.
23         Q    During the period when you left McCoy and
24    Newkirk to go to the driver, you said you could still
25    see McCoy and Newkirk out your peripheral vision?
```

70

1                    MARK PAV

2        A     When I left them, they were in between our

3    two vehicles.  She was made aware that the warrant

4    recall sheet was not good, the warrants weren't

5    vacated, she didn't have the proper paperwork.  When

6    I left, McCoy starting bringing her to the side of

7    our vehicle and put her in the back of the vehicle.

8        Q     Was she cuffed that the point?

9        A     No.

10       Q     So you turned to go to the driver?

11       A     Correct.

12       Q     You saw McCoy start bringing Newkirk to the

13   back of your car?

14       A     Correct.

15       Q     She was uncuffed?

16       A     Correct.

17       Q     How is he bringing her to the back of your

18   car?

19       A     They're walking.

20       Q     Did he have his hands on her?

21       A     Not that I can recall.

22       Q     Does he grab her by her elbow or arm or

23   anything like that?

24       A     Not that I can recall.

25       Q     Did he say anything to her in terms of to

1                          MARK PAV

2    go to the back?

3         A    Not that I know of.

4         Q    So, now you saw them walking to the back of

5    your car and you were going to the front passenger

6    driver's side --

7         A    Yes.

8         Q    -- of the other vehicle?

9         A    Yes.

10        Q    Did you lose sight of them at that point?

11        A    That was the last time I saw her until

12   she's in the back seat of our car.

13        Q    So when you turned around and saw McCoy and

14   Newkirk again, was he placing her in the car, or was

15   she already in the car?

16        A    She was halfway into the back seat of our

17   car, so yes, he was placing her into our vehicle.

18        Q    It's your testimony that you didn't see him

19   place his hands on her to frisk or search her?

20        A    Correct.

21        Q    Did you say anything to the effect of wrap

22   this up or can you finish this at the precinct to

23   McCoy --

24        A    No.

25        Q    -- in regards to searching or frisking

72

                              MARK PAV

2  her?

3        A    No.

4        Q    Did you ever see McCoy grab her bra --

5        A    No.

6        Q    -- on the side of the road?

7        A    No.

8        Q    Did you ever hear Newkirk protest to stop

9  touching her breasts?

10       A    No.

11       Q    So, now you're in the driver's seat and he,

12  meaning McCoy, is in the passenger seat?

13       A    Correct.

14       Q    Where did you go then?

15       A    To the First Precinct.

16       Q    How long did it take you to get from that

17  scene to the First Precinct?

18       A    I am not exactly sure.  We went over the

19  radio, so it's time stamped.

20       Q    What would you have said over the radio?

21       A    That we were a 32 with a female back to the

22  First, and when we got back to the First, we were

23  Three Six at the First, time stamping the point of

24  our transport and the point of our arrival.

25       Q    Did you stop anywhere?

1                          MARK PAV

2        A    No.

3        Q    About how long did it take?

4        A    I would say about five minutes, depending

5   on traffic.

6        Q    During the five minutes or so, was there

7   any conversation between you, McCoy and Newkirk?

8        A    Yes, I asked her if there was anything else

9   on her that she has that will be found when she's

10  searched.  She said that she has weed in her

11  pocketbook.

12       Q    Where was her pocketbook at that point?

13       A    In the trunk.

14       Q    Why was the pocketbook in the trunk?

15       A    To secure her personal belongings so that

16  weren't in the back seat with her.

17       Q    Other than her telling you there was weed

18  in the pocketbook, anything else that was said in the

19  five minutes or so?

20       A    We asked her, in sum and substance, I don't

21  remember the exact conversation, if she was willing

22  to work as a confidential informant and possibly buy

23  drugs in the Wyandanch area.

24       Q    Anything else that was said?

25       A    Not to my recollection.

74

1                          MARK PAV

2        Q    So she was arrested for warrants, I think

3   you said?

4        A    Correct.

5        Q    What were the warrants for, aggravated

6   license?

7        A    I don't recall exactly what they were for.

8   I believe they were all minor details.

9        Q    All traffic infractions?

10       A    Correct.

11       Q    Or traffic misdemeanors?

12       A    I believe so.

13       Q    She told you she had weed, marijuana,

14   correct --

15       A    Correct.

16       Q    -- in her pocketbook?

17       A    Correct.

18       Q    You then asked her if she was willing to

19   work and buy drugs in Wyandanch?

20       A    Correct.

21       Q    What is it about the arrest or the weed in

22   her pocketbook that lead you to believe that she

23   would be willing or could buy drugs in Wyandanch?

24       A    It's something that we ask all arrestees

25   that we bring in to see if they're --

75

1                        MARK PAV

2      Q    When you say --

3                MR. MITCHELL:  Just let him finish his

4           answer, please.

5                MR. BROWN:  I'm sorry.

6                MR. MITCHELL:  Go ahead.

7      A    -- arrestees to see their willingness to

8  work to possibly buy drugs to lead to a search

9  warrant to lead to a bigger investigation.

10     Q    So anybody you arrest, you ask if they're

11 willing to buy drugs in Wyandanch?

12     A    Anywhere within Suffolk County.

13     Q    So if you pulled me over and I had a

14 warrant for a suspended license, ticket and I was

15 sitting in the back of your car, you would ask me if

16 I would be willing to buy drugs in Wyandanch or

17 anywhere else in Suffolk County for you?

18     A    If there was some sort of drug-related

19 charge, so obviously we know that you were using

20 drugs, so you had some sort of outlet to purchase

21 narcotics or marijuana.

22     Q    But drugs and marijuana are two different

23 things, right?

24     A    To me, no.

25     Q    So when you say drugs, you include

```
 1                        MARK PAV
 2   marijuana in drugs?
 3        A    Yes.
 4        Q    I think she volunteered to you that she had
 5   weed, marijuana, in her pocketbook?
 6        A    Correct.
 7        Q    From that you then went the next step and
 8   asked her if she was willing buy drugs in
 9   Wyandanch?
10        A    Correct.
11        Q    What was her response to you?
12        A    Yes.
13        Q    Anything else that was said?
14        A    Not that I can recall.
15        Q    Did McCoy say anything during the ride?
16        A    I don't remember the extent.  I think we
17   were both talking to her as we were coming in.
18        Q    What was McCoy saying to you?
19        A    I think the same thing along the same
20   conversations.  There was a back and forth.  It
21   wasn't just me talking to you.  It was me and him
22   talking to you, so...
23        Q    I'm trying to gauge what it was McCoy said
24   to her.
25        A    I don't remember how the conversation went
```

77

1                    MARK PAV

2    down, if it was all just me talking, all Chris

3    talking.  I believe it was back and forth, both of us

4    talking to her.  I don't remember the extent of the

5    details of the conversation.

6         Q    All right.

7              When you told Newkirk that she had

8    warrants, she was protesting that she didn't have

9    warrants?  Would you agree with that?

10        A    Yes.

11                  MR. MITCHELL:  Object to the form.

12                  You can answer.

13        A    Yes.

14        Q    Tell me her demeanor when you said "You're

15   under arrest because you have warrants."  What was

16   her demeanor?  What did she say?  I know what she

17   said, "No, no, that's not true," or something to that

18   effect, right?  She wanted to get the pocketbook?

19        A    Correct.

20        Q    What was her demeanor?

21        A    She felt like she didn't have the warrants

22   because they were recalled, but from that point

23   forward after we explained it to her, that the

24   warrants weren't vacated, I expected her to be upset,

25   angry and frustrated the whole time, but she wasn't.

```
 1                        MARK PAV
 2    She was quite the opposite.  She was happy, giddy,
 3    not upset to be under arrest.
 4        Q    So it's your testimony you told her she had
 5    warrants, she told you she didn't have warrants,
 6    right?
 7        A    (Witness nods head.)
 8        Q    Is that right?
 9        A    Correct.
10        Q    She actually goes to her bag to try to
11    produce documents to you and she's placed under
12    arrest?
13        A    She produces documents to us.
14        Q    I know that those aren't warrant recall
15    documents, I understand that, Officer, but she
16    believed that they were the right documents?
17        A    Correct.
18                  MR. MITCHELL:  Object to the form, but
19              you can answer.
20        Q    She produces these documents and you tell
21    her that, in essence, those are not warrant recall
22    documents?
23        A    Correct.
24        Q    Then she's placed in handcuffs --
25        A    Eventually.
```

79

1                          MARK PAV

2         Q    -- after McCoy brings her to the back?

3         A    Some point from when the conversation with

4    the three of us ends to the point that she's put in

5    the back of the car, she's put in handcuffs.  I don't

6    know exactly at what point she is.

7         Q    You say her demeanor is happy, giddy and

8    not upset?

9         A    Correct.

10        Q    What do you mean by giddy?

11        A    Just happy and not --

12        Q    I understand not upset, but failure to be

13   upset --

14        A    Like laughing.

15        Q    What else is she doing?

16        A    Smiling.

17        Q    Was she being flirtatious?

18        A    No.

19        Q    So now you get to the precinct and tell us

20   where you go at the precinct.

21        A    So, we go into the precinct.  Chris McCoy

22   checks in -- brings Ms. Newkirk to the sergeant's

23   window.

24        Q    Let me just stop you a minute, I'm sorry.

25             Where do you park your car?

80

1                          MARK PAV

2        A     In the back of the precinct.

3        Q     How do you get into the precinct?

4        A     Through the back door.

5        Q     Do the two of you go together?

6        A     Yes.

7        Q     So the back door and then what happens when

8   you go through the back door?

9        A     We enter a sally port area, hallway.

10       Q     Sally port?

11       A     The hallway.

12       Q     Okay.

13       A     (Continuing) We make a left.  Chris brings

14   Ms. Newkirk to the sergeant's window to log her in.

15   I make another left.  There's a hallway right there,

16   and I go into the computer room to search her bag for

17   the marijuana that she claims that she had.

18       Q     Did you search her bag?

19       A     Yes.

20       Q     How long did that search take?

21       A     About a minute.

22       Q     What did you find?

23       A     The marijuana in her bag.

24       Q     Where was the marijuana in her bag?

25       A     In the main --

1                        MARK PAV

2        Q    I don't mean that.  I mean what was it

3    in?

4        A    I don't recall exactly what it's in.

5        Q    So you see marijuana somewhere in her

6    bag?

7        A    Correct.

8        Q    You don't know if it was a plastic

9    container?  You don't know if it was an envelope?

10   You don't remember?

11       A    No, I don't.

12       Q    It wasn't a joint, it was just weed?

13       A    It's some form of marijuana.  I don't

14   remember exactly.

15       Q    Did you submit that to the crime lab?

16       A    Yes.

17       Q    Did it come back, you know, the lab

18   results?

19       A    I don't know.

20       Q    Did you do any test there at the precinct

21   to see if it was weed?

22       A    No.

23       Q    Do you have that ability?

24       A    I don't myself.  I don't.  I don't have the

25   training to test it.

1                    MARK PAV

2        Q    So after this minute, you find the weed.

3   What do you do with the weed?

4        A    I sign it out in evidence recovery bag,

5   which is in the same room, and I put the marijuana

6   into the evidence recovery bag.

7        Q    What do you do with that bag?

8        A    I seal the bag and I bring the bag down to

9   our office and do the property and evidence invoice

10  for it.

11       Q    Where?

12       A    In the basement.

13       Q    When you say your office, you mean the

14  crime --

15       A    Community support, yeah.

16       Q    From the minute you went into the computer

17  room until you went to your office, which is in the

18  basement, did you see McCoy or Newkirk?

19       A    I don't see Newkirk again until later.

20       Q    We'll get there, but I want to focus on

21  this time period.

22       A    No.

23       Q    When you go to the basement, do you have to

24  pass the desk sergeant?

25       A    No.

83

1                      MARK PAV

2        Q    How far from this computer room --

3        A    I'm sorry.  Yes, we do pass the desk

4   sergeant's office.  I don't have to pass where

5   the -- the prisoner window is right by the uniform

6   squad room.  I don't have to pass that.

7        Q    Did you pass it?

8        A    The uniform squad room?

9        Q    Yes.

10       A    No, I did not.

11       Q    So when you got this envelope and you went

12   to the basement, you did not see McCoy or Newkirk?

13       A    No.

14            MR. MITCHELL:  No, you did not?

15       A    No, I did not.

16       Q    So you said you went to the basement.  What

17   time did you get to the basement?

18       A    I don't have an exact time.

19       Q    Do you remember what time you arrived at

20   the precinct?

21       A    No, I do not.

22       Q    Let me just ask you to look at Plaintiff's

23   Exhibit 1.

24            MR. BROWN:  Brian, that's the

25            Violation Information.

84

1                          MARK PAV

2        Q    Do you recognize that document (handing)?

3              (Witness examines document.)

4        A    Yes.

5        Q    What do you recognize that document to

6   be?

7        A    It's a violation information for the

8   multiple possession of marijuana that was found in

9   her pocketbook.

10       Q    That's your violation information?

11       A    Correct.

12       Q    The location of the violation was at the

13  precinct; am I correct?

14       A    Yes.

15       Q    What time was the violation?

16       A    11:00 a.m.

17       Q    Is that the time that you found the

18  marijuana?

19       A    Yes.

20       Q    So how long did it take you to go

21  downstairs after you secured in the envelope and

22  walked to the basement office?

23       A    Minutes.

24       Q    Two minutes, five minutes?

25       A    Five minutes.

```
 1                          MARK PAV
 2       Q    When you got to the basement, what did you
 3   do in the basement?
 4       A    I called in -- I started the arrest
 5   paperwork.
 6       Q    So this would have been approximately
 7   11:05?
 8       A    Correct.
 9       Q    When you went to the basement office, was
10   anybody else there?
11       A    I don't recall.
12       Q    Do you have your own desk in the office?
13       A    No.
14       Q    What is it, just a large community area?
15       A    Yeah, it's a large office.
16       Q    And you started doing the arrest
17   paperwork?
18       A    Correct.
19       Q    Your arrest was specifically what, the
20   marijuana charge, the warrants, both or neither?
21       A    Marijuana charge.
22       Q    How long did it take you to do that?
23       A    The whole arrest paperwork?
24       Q    You're saying you're in your office and now
25   you're doing the arrest paperwork?
```

1                          MARK PAV

2        A    Correct.

3        Q    I assume you went straight through to do

4    your arrest paperwork?

5        A    Yes.

6        Q    How long did it take you to do the

7    paperwork you were working on?

8        A    I would say about two hours.

9        Q    The paperwork that you're doing is a

10   prosecution worksheet?

11       A    That's what this is, correct?

12       Q    No, that's the violation information.

13       A    Sorry.

14       Q    You did the violation information, which is

15   Plaintiff's Exhibit 1?

16       A    Yes.

17       Q    You did an arrest report?

18       A    Yes.

19       Q    Prosecution worksheet?

20       A    Yes.

21       Q    You did an evidence receipt for the weed?

22       A    Property invoice and evidence analysis,

23   yes.

24       Q    Anything else?

25       A    (No verbal response.)

1                          MARK PAV

2          Q     Who started the prisoner activity log?

3          A     The desk sergeant or whoever logged in the

4     prisoner.  Whatever sergeant or lieutenant.  Whatever

5     supervisor was in.

6          Q     The supervisor starts the prisoner activity

7     log?

8          A     Right.

9          Q     So it took you two hours to do all the

10    paperwork we just talked about?

11         A     Correct.

12         Q     From approximately 11:05 when you were in

13    the basement until you finished the paperwork, did

14    you ever leave the basement office?

15         A     I might have, I might not have.  I don't

16    remember.

17         Q     You said you went down to the basement to

18    finish the paperwork?

19         A     Okay.

20         Q     I'm just asking you.  I want to be clear

21    about this.

22         A     Yes.

23         Q     It took you about two hours, you said, to

24    do the paperwork you just talked about?

25         A     Yes.

1                         MARK PAV

2       Q    So from about 11:05 to about 1:00, did you

3  ever leave your office while you were completing the

4  paperwork?

5                 MR. MITCHELL:  I'm going to object.

6                 You can answer.

7       A    I can't give you definite answer if I did

8  or did not.

9       Q    If you left, where would you have gone?

10      A    I would have went to the bathroom.

11      Q    Is there a bathroom in the basement?

12      A    Yes.

13      Q    Where else would you have gone?

14                MR. MITCHELL:  I object to the form.

15                You can answer.

16      A    I could have gone anywhere in the precinct.

17  I could have went and gotten something to eat.  I

18  could have went out to the car to get paperwork out

19  of the car.

20      Q    What paperwork would have been in the

21  car?

22      A    The car information off the MDC.

23      Q    The car information in regards to the

24  driver?

25      A    Yes.

1                          MARK PAV

2        Q    But he wasn't arrested, right?

3        A    Correct.

4        Q    He wasn't charged with anything?

5        A    Correct.

6        Q    All right.

7             Why else would you have left the basement

8   office?

9                  MR. MITCHELL:  I object to the form.

10                 You can answer.

11       A    There's a ton of reasons.  I don't remember

12  if I left the office or not.

13                 MR. MITCHELL:  He's just asking for

14                 some examples.  Am I right?

15                 MR. BROWN:  Correct.

16                 MR. MITCHELL:  Do you have any other

17                 examples other than what you would have

18                 given him already?

19       Q    You said you may have left for food, you

20  may have left to go to the bathroom, you may have

21  left to get the driver's information on the car.  Any

22  other reasons why you would have left the basement

23  office?

24       A    To check on the prisoner.

25       Q    After 11:05 when you started completing the

1                         MARK PAV

2    police paperwork, what is the next thing you remember

3    about this?

4         A    We had a narcotics detail we were supposed

5    to help narcotics.  I know McCoy and I spoke about

6    debriefing Newkirk because she was willing to buy

7    drugs.

8         Q    When did you speak about debriefing

9    Newkirk?

10        A    Sometime after we arrived at the

11   precinct.

12        Q    Do you remember when you spoke about it?

13        A    No.

14        Q    Did McCoy ever come down to the basement

15   office?

16        A    Yes.

17        Q    When did he come to the basement office?

18        A    I don't know specific times.

19             MR. MITCHELL:  Mike, when you feel

20             appropriate, can we just take a short

21             break?

22             MR. BROWN:  Sure, we'll take a break.

23             (Recess from 12:19 p.m. until

24             12:36 p.m.)

25             MR. BROWN:  Can you read back the last

91

1                          MARK PAV

2              question and answer.

3                    (The requested portion of the record

4              was read by the reporter.)

5    CONTINUED EXAMINATION BY

6    MR. BROWN:

7         Q    Officer, we're trying to focus on the time

8    you arrived, which was around 11:05 or so in the

9    basement.  I'm trying to ascertain when, if at all,

10   you left the basement for the first time.  Do you

11   have any recollection of when you left the basement

12   for the first time, after getting there at 11:05?

13        A    No.

14        Q    Do you remember being upstairs at all?

15        A    Yes.

16        Q    At what point were you upstairs?

17        A    That day we had to help out narcotics with

18   doing an ID of a suspect dealing drugs.  The timing

19   was around 2:00 we were supposed to meet narcotics in

20   the back parking lot.  I know it was getting close to

21   that time and we wanted to sit down and debrief

22   Ms. Newkirk, see if she had any valuable information

23   and worth trying to use as an informant.  So it was

24   anywhere around in between 1:00 and 2:00.

25        Q    Between 1:00 and 2:00 is when you went

92

1                         MARK PAV

2     upstairs?

3          A    Correct.

4          Q    That you can remember?

5          A    Correct.

6          Q    When you say it was between 1:00 and 2:00,

7     was it closer to 1:00, closer to 2:00?

8          A    I believe it was closer to 2:00.

9          Q    You have no recollection of what time it

10    was?

11         A    No.

12         Q    What do you remember doing, going

13    upstairs?

14         A    Yes.

15         Q    Where did you go upstairs?

16         A    So, I was finishing up the arrest paperwork

17    between my marijuana arrest and the three warrants,

18    getting them printed up and signed -- well, mine had

19    to be signed by the sergeant, so McCoy and I had some

20    sort of conversation about debriefing Ms. Newkirk,

21    and he mentioned he will start the debrief and I will

22    wrap up the paperwork and meet him upstairs.

23         Q    The conversation you had with McCoy about

24    this debriefing, where did that take place?

25         A    In the basement, in the CSU office.

93

```
 1                      MARK PAV
 2        Q    Do you remember what time that was?
 3        A    Not specific times, no.
 4        Q    Was that in that 1:00 to 2:00 p.m.
 5   window?
 6        A    Yes.
 7        Q    Was that the first time you saw McCoy since
 8   you went down there at 11:05?
 9        A    No, we ended up eating lunch together,
10   so...
11        Q    What time did you eat lunch together?
12        A    I don't know.  It was before he went
13   upstairs to start the debriefing.
14        Q    Did you go up to do the debriefing
15   together?
16        A    He went and started to debrief as I
17   finished up the paperwork.
18             MR. MITCHELL:  Were you still
19             downstairs when you finished the paperwork?
20             THE WITNESS:  Yes.
21             MR. MITCHELL:  So listen to his
22             question.  He asked did you go up together.
23             Just listen to his question, answer his
24             question.
25        A    No.
```

94

1                    MARK PAV

2        Q    So we have 11:05 you started the

3   paperwork?

4        A    Correct.

5        Q    We have that.  You had a lunch break at

6   some point, you know that, right?

7        A    Correct.

8        Q    At some point closer to 2:00, you say you

9   went upstairs to do the debriefing?

10       A    Correct.

11       Q    So the lunch break, was that in the

12   basement?

13       A    Yes.

14       Q    Was anybody else there?

15       A    Yes.

16       Q    Who was there?

17       A    McCoy and I believe at some point during

18   the lunch Chris Otto and Matt Schulovich (phonetic

19   spelling) come into the office.

20       Q    Are they on your team?

21       A    Yes.

22       Q    Do they have any involvement in this

23   case?

24       A    No.

25       Q    So it was you and McCoy by yourselves

1                         MARK PAV

2    before Otto and Schulovich came?

3         A    With what?

4         Q    In other words, when you were having lunch,

5    was it just you and McCoy for a bit and then the

6    other officers joined you or something else?

7         A    I don't remember if we all sat down at the

8    same time or if they ended up joining us.

9         Q    How long was your lunch break?

10        A    We're entitled up to an hour.  I don't

11   know.

12        Q    I'm asking how long you were sitting there

13   for.

14        A    I don't know.

15        Q    You have no recollection?

16        A    No.

17        Q    You have no recollection of when it started

18   and when it finished?

19        A    No.

20        Q    Did you bring lunch with you or you had to

21   go out and get it, order it or something else?

22        A    No, I didn't bring lunch with me.

23        Q    What were you eating?

24        A    I don't know.

25        Q    I'm wondering if you went out to get lunch,

1                       MARK PAV

2     if it was delivered.

3          A     I don't remember.

4          Q     You have no recollection?

5          A     I don't remember.

6          Q     Do you always eat with McCoy?

7          A     Yes.

8          Q     At some point you had a conversation with

9     McCoy about the debriefing?

10         A     Correct.

11         Q     Was that during the lunch break?

12         A     I don't know when exactly that conversation

13    happened.

14         Q     Do you know when McCoy came down to lunch

15    and when he left lunch?

16         A     No.

17         Q     You don't know times either?

18         A     No.

19         Q     So now at some point you said McCoy went

20    back upstairs?

21         A     Correct.

22         Q     You then at some point went upstairs as

23    well?

24         A     Correct.

25         Q     From when McCoy went upstairs until you

97

1                          MARK PAV

2    went upstairs, do you know how much time elapsed?

3         A    No.

4         Q    So McCoy, what did he say to you about

5    going upstairs?  Did he have a conversation about him

6    going up to deal with Newkirk?

7         A    We had some sort of the conversation.  He

8    was going to start the debriefing because we were

9    getting close to running out of time to sit down and

10   talk to her because of the narcotics investigation at

11   two o'clock.

12        Q    So did he say I'll start or I'll take her

13   or anything like that?

14        A    Yes, he said I'll go start the debrief

15   and when you're done about the paperwork -- this is

16   sum and substance -- when you're done with the

17   paperwork, come upstairs.

18        Q    Did he tell where you he was going to do

19   the debriefing?

20        A    We always did our debriefing in the

21   juvenile room as long as it was available.

22        Q    Why would you do it there?

23        A    Because it's away from any other

24   prisoners.

25        Q    Do you have access to the squad room, or