MARK PAV

2    no?

3         A    Yes.

4         Q    That, too, would be away from the

5    prisoners?

6         A    Yes, but prisoners could see if you're

7    sitting -- you could see being walked back to the

8    squad room.

9         Q    The uniform squad room?

10        A    The detective squad room.  Is that what

11   you're talking about?

12        Q    If you're in the detective squad room and

13   you want to use their interrogation rooms, is that an

14   option?

15             MR. MITCHELL:  Object.  They're

16             interview rooms.

17             MR. BROWN:  Off the record.

18             (A discussion was held off the

19             record.)

20             MR. BROWN:  Back on.

21        Q    I just want to know about the squad

22   interview rooms, is that accessible you to as well?

23        A    As long as they don't have any cases going

24   on.

25        Q    Do you use those rooms at all?

99

                              MARK PAV

1

2       A     Now we do.

3       Q     Since this incident?

4       A     Yes.

5       Q     So there was a change in protocol because

6    of this incident?

7       A     No.

8                   MR. MITCHELL:  Wait.  I object.

9                   You can answer.

10      A     No.

11      Q     Why do you now?

12      A     We end up using the detective interview

13   room more now than ever because the juvenile laws

14   have changed and we get more juveniles brought in, so

15   if there's a juvenile in the juvenile room, we cannot

16   use it for an interrogation.

17                  MR. MITCHELL:  Or debriefing.

18                  THE WITNESS:  Or debriefing.

19                  MR. MITCHELL:  There you go.

20      Q     The juvenile room, is there a door?

21      A     Yes.

22      Q     Is there a window in the door?

23      A     No.

24      Q     Describe the juvenile room for me, how it

25   looked in March of 2017.

1                           MARK PAV

2        A    It's a smaller room that has a desk, has a

3   computer.  It had lockers in it.  On the back wall of

4   the precinct there's windows and it has a wooden door

5   that does not lock.

6        Q    You said windows, they're not on the door,

7   they're in the room?

8        A    Correct.

9        Q    Can you see in or out?

10       A    Yes.

11       Q    How high are the windows?

12       A    They go up to the ceiling and they're

13  approximately three feet high off the ground.

14       Q    So it starts about three feet off the

15  ground and it runs the length up to the ceiling?

16       A    Correct.

17       Q    Is it the whole wall?

18       A    No.

19       Q    How wide are the windows?

20       A    I would say about approximately the

21  whole window widthwise is about two feet.

22       Q    How many windows are there?

23       A    One, two panes.

24       Q    Is there any video surveillance in that

25  room?

1                              MARK PAV

2          A    No.

3          Q    How about in the precinct as a whole, is

4     there video surveillance?

5          A    At this time?

6          Q    Yes.

7          A    No.

8          Q    So in the room are those two windows.   On

9     the other side of the window, meaning if you're

10    looking out, would that be the parking lot?

11         A    Front parking lot.

12         Q    Front parking lot of the precinct?

13         A    Correct.

14         Q    When you say parking lot, those spaces, are

15    they civilian spots, police officer spots or

16    something else?

17         A    Civilians.

18         Q    From where the window is to the actual

19    front of where the curbing is, how much of a distance

20    do you think it is, if you had to estimate?

21         A    10 feet.

22         Q    So McCoy says I'm going to get Newkirk, in

23    sum and substance, I'm going to start the debriefing

24    without you?

25         A    Correct.

102

MARK PAV

1

2     Q     He doesn't say anything about the juvenile

3     room, but you know that because it's just your

4     practice?

5     A     Correct.

6     Q     He then leaves the basement and goes

7     upstairs?

8     A     Correct.

9     Q     At this time were you wearing uniforms?

10    A     No.

11    Q     What were you wearing on the bottom, was it

12    uniform pants?

13    A     Yes.

14    Q     And your shoes?

15    A     Boots, yes.

16    Q     On top you did not have your shirt on?

17    A     Correct.

18    Q     When I say shirt, your uniform shirt?

19    A     Correct.

20    Q     What were you wearing and what was McCoy

21    wearing?

22    A     I don't remember exactly what I was

23    wearing.

24    Q     But not your uniform?

25    A     Correct.

MARK PAV

1

2     Q     You were wearing a T-shirt, a long-sleeve

3 shirt, something else?

4     A     I don't remember.

5     Q     Was it a shirt that you would have been

6 wearing under your uniform or did you actually

7 change?

8     A     Yes, it was a shirt I would be wearing

9 under my vest, under my uniform.

10    Q     Why do you take your uniform off?

11    A     We secure our guns in our lockers

12 downstairs and we take our vest and uniform shirt off

13 'cause we're in the precinct in a secured location.

14 I guess to get comfortable because we're going to be

15 in the precinct for a while.

16    Q     Is that the same for McCoy?

17    A     Correct.

18    Q     What about if you're going to still be

19 dealing with an inmate, a subject, you don't want to

20 put your uniform back on for that purpose?

21              MR. MITCHELL:  I object to the form.

22              You can answer.

23    A     No, they know who we are.

24    Q     Is that something you always do or just on

25 this occasion?

104

                        MARK PAV

1

2      A    Always.

3      Q    And McCoy as well, while you were working

4    with him?

5      A    Correct.

6      Q    So, do you remember when you went back

7    upstairs to join McCoy, how much time elapsed?

8      A    No.

9      Q    You said you were finishing your

10   paperwork?

11     A    Correct.

12     Q    You don't remember if it was five more

13   minutes, 10 more minutes, an hour?

14     A    It was a short time.  I don't know if it

15   was five, 10, 15 minutes.

16     Q    Did McCoy make any statements about Newkirk

17   to you other than debriefing?

18     A    No.

19     Q    Is there any requirement in terms of rules

20   and regulations that you need to wear your uniform

21   while on duty, that you know of?

22              MR. MITCHELL:  I object.

23              You can answer.

24     A    I don't know the rules and procedures

25   behind the uniform while on duty in the precinct.

105

1                              MARK PAV

2          Q    So now at some point you said you went

3     upstairs?

4          A    Correct.

5          Q    You went to the juvenile room directly or

6     somewhere else?

7          A    The juvenile room.

8          Q    Tell me what you did when you went into the

9     juvenile room.

10         A    I sat -- McCoy was sitting behind the desk.

11    Ms. Newkirk was sitting on the other side of the desk

12    where the prisoners would sit.  I sat next to McCoy,

13    next to him, next to the desk, and we conducted an

14    interview, or I joined in with the interview of the

15    debriefing.

16         Q    When you walked in, was the door closed

17    before you went in?

18         A    I don't remember.

19         Q    I think you said one of the main reasons of

20    using the juvenile room is to avoid anybody else

21    seeing the inmate?

22         A    Correct.

23         Q    So would it be your practice to close the

24    door so nobody else could see?

25         A    My practice is I leave the door cracked

106

MARK PAV

1

2    open at all times, not fully closed.

3        Q    Why do you do that?

4        A    Just if anyone is coming down the hallway,

5    they could see in.  God forbid something is going on,

6    they can hear something, you know, there's rustling

7    or screaming or yelling.  It's easier for them to

8    hear if the door is open.

9        Q    There are no inmates, other than the people

10   you are debriefing, that would come down that way?

11       A    Yes, but they would have to poke their head

12   into the room.

13       Q    In terms of the way they're walking?

14       A    Yeah.

15       Q    So where would they be coming from, the

16   cell or the processing room?

17       A    Either/or.

18       Q    As they pass the juvenile room, they

19   would have to actually turn?  Tell me what they

20   would have to do to see in.

21       A    They would have to open the door more to

22   look in to see what was going on.

23       Q    So you walk in and McCoy is already talking

24   to Newkirk?

25       A    Correct.

107
1                          MARK PAV
2        Q    What is he saying when you first walk in?
3        A    I don't remember the exact extent of the
4    conversation.
5        Q    How long were you in there for?
6        A    I was in there for a short time.
7        Q    When you say short time, how much is a
8    short time?
9        A    I would say around ten minutes, if not
10   less.
11       Q    What time did you leave the juvenile
12   room?
13       A    Close to 2:00.
14       Q    What was the reason for leaving the
15   juvenile room?
16       A    To meet narcotics out in the back parking
17   lot.
18       Q    Was McCoy supposed to join you?
19       A    Yes.
20       Q    Did he leave with you?
21       A    No.
22       Q    Why not?
23       A    He was wrapping up the debrief.
24       Q    When you walked in, you said Newkirk was
25   across from McCoy?

108

1                          MARK PAV

2          A    Correct.

3          Q    Was she handcuffed?

4          A    I don't recall if she was handcuffed or

5    not.

6          Q    What do you normally do when you have a

7    debriefing?  Do you handcuff the inmate or not?

8          A    It depends on the situation and their --

9    what we assess their threat level to be.

10         Q    You said you assessed the threat level here

11   to be zero, right?

12         A    Correct.

13         Q    Is there a spot where you can cuff the

14   inmate to a desk or a wall?

15         A    A wall.

16         Q    So if you were to cuff somebody, would they

17   be cuffed hands together or would they be cuffed one

18   hand to the wall?

19         A    It would be at the discretion of the

20   officer.  There's two cuffs, so their hands can be

21   cuffed together.

22         Q    And still to the wall?

23         A    Correct.

24         Q    So now when you walk in, tell me what you

25   hear in terms of conversation.

1                             MARK PAV

2        A      They were talking about possibly buying

3     marijuana in the Wyandanch area.   After a brief time

4     in there, I personally deemed that her information

5     was not good enough to bring to the next level.

6        Q      What is the next level?

7        A      We have a special operations detective team

8     within the precinct that deals with signing up

9     confidential informants, or our field intelligence

10    officer assigned by criminal intell, one or the

11    other.

12       Q      But you made the decision it wasn't going

13    to go any further?

14       A      My personal feeling was that.

15       Q      Did you speak to McCoy about it?

16       A      After.

17       Q      When did you speak to McCoy about it?

18       A      After the debrief was done.

19       Q      When was the debriefing done?

20       A      When McCoy went upstairs while -- it

21    started sometime after McCoy went upstairs and I was

22    finishing the paperwork to the point where he brought

23    her back to the uniform squad room.

24       Q      When he brought her back to the uniform

25    squad room, were you outside?

110

1                        MARK PAV

2       A    I don't know if I was in the basement or I

3  was outside.  I don't know exactly what time he

4  brought her back.

5       Q    You left at about 2:00?

6       A    Correct.

7       Q    You went outside at 2:00 to that back

8  parking lot?

9       A    Yes.

10      Q    That's where you did your meeting with

11 narcotics?

12      A    Yes.

13      Q    How long did that take?

14      A    I know after -- I sent McCoy a text message

15 after I concluded finding out if we needed to be in

16 uniform or not in uniform, marked car or not marked

17 car, so 10, 15 minutes.

18      Q    If I told you that the text was sent at

19 14:13, so 2:13, is that when the meeting ended?

20      A    Yes.

21           MR. MITCHELL:  When you say meeting,

22           referring to the meeting in the parking

23           lot?

24           MR. BROWN:  Yes, the meeting with

25           narcotics.

111

1                          MARK PAV

2        A     The initial debrief with them, yes.

3        Q     Were you in uniform at that point?

4        A     I was in my blue BDU pants and my boots and

5    whatever I was wearing up top, T-shirt, long-sleeve

6    shirt.

7        Q     But you weren't wearing your cop uniform?

8        A     Correct.

9        Q     So you went outside, you had the debriefing

10   and then it ended somewhere around when you texted

11   McCoy?

12       A     Correct.

13       Q     At that point was McCoy still debriefing?

14       A     I don't know where he was in the precinct

15   at that time.  I called him.  He didn't pick up.  I

16   get a text message from him saying "What's up?"  I

17   texted him back "Uniform."  I believe after this he

18   said okay.  At that point I go downstairs and

19   put on my uniform.

20       Q     Did you see McCoy?

21       A     He comes back down to the basement before

22   we go back outside to meet with narcotics.

23       Q     So when you walked into the precinct after

24   that text at around 2:13, how did you get into the

25   precinct, from the back or the front?

112

1                          MARK PAV

2        A      The back.

3        Q      When you come in through the back, are you

4   by the juvenile room?

5        A      No.  So there's stairs go downstairs to our

6   office.  There's three different doors in the back.

7        Q      So you went straight down to the

8   basement?

9        A      Correct.

10       Q      Did you see Newkirk?

11       A      No.

12       Q      You didn't see McCoy?

13       A      No.

14       Q      Then you're down in the basement.  What are

15  you doing down there?

16       A      I'm getting dressed.  I'm putting on my

17  uniform and my gun belt.

18       Q      What was the next thing you did?

19       A      McCoy comes downstairs.  I wait for him to

20  come downstairs.  He gets dressed and we go back

21  outside to meet with narcotics again.

22       Q      When McCoy comes downstairs, did you have

23  any conversations about the debriefing?

24       A      We had some sort of conversation.  I

25  believe I told him -- I don't remember the exact

113

MARK PAV

1

'2     extent of the conversation.

3          Q     Do you remember anything that you said or

4     that McCoy said to you?

5          A     Not -- I know I expressed to him that I

6     felt that the information she was giving wasn't worth

7     it, wasn't vital or worth bringing to the next level.

8          Q     What did he say to you?

9          A     He, from my recollection, agreed.

10         Q     Do you know how long he was in there with

11    her for?

12         A     No.

13         Q     You left at a certain point, right, to go

14    outside?

15         A     Correct.

16         Q     He stayed in that room?

17         A     I don't know where he was when I left.

18    When I left, he was still in the room.

19         Q     He was still talking to her?

20         A     Correct.

21         Q     Before you got there, he was talking to

22    her?

23         A     Correct.

24         Q     So he was in that room with her beyond the

25    ten minutes that you were?

                                                                    114
 1                              MARK PAV

 2          A      Correct.

 3          Q      You felt in just ten minutes that there was

 4     no valuable information?

 5          A      Yes.

 6          Q      When McCoy comes downstairs, gets dressed,

 7     where do the two of you go, if anywhere?

 8          A      Back outside to speak to narcotics.

 9          Q      At that point had you seen Newkirk again?

10          A      No.

11          Q      So you go back outside through that rear

12     door?

13          A      Correct, but the basement door.

14          Q      Okay.

15                 Basement door meaning you have to go up to

16     the main level and then go outside?

17          A      No.

18          Q      There's actually an egress from the

19     basement?

20          A      Yes.  Correct.

21          Q      Is that how you came in as well from when

22     you were outside and came back in?

23          A      Yes.

24          Q      When you meet with narcotics, what happens

25     then?

1                           MARK PAV

2        A     When?

3        Q     The second time with McCoy, you're outside.

4        A     So the drug dealer I guess was running late

5   and the deal wasn't going down until a little bit

6   later.  McCoy had a prearranged appointment that he

7   had to leave work at 3:00, so at that point Chris

8   couldn't go out on the narcotics investigation

9   because the time was running to the point where he

10  had to leave.

11       Q     You had this discussion outside?

12       A     Correct.

13       Q     What does McCoy do?

14       A     He goes inside to leave.

15       Q     He goes back into the basement office?

16       A     Yes.

17       Q     What do you do?

18       A     I walk in with him.  As I'm walking in, I

19  see Sean Clark, who was working 4:00 to 12:00.  He

20  was in early for a court hearing, so I asked him if

21  he could take a ride with me to go do the narcotics

22  investigation, which he said he was free, he would be

23  able to do it, so he gets dressed and we end up going

24  out with narcotics.

25       Q     What time did you leave with narcotics?

1                          MARK PAV
2        A    I'm not sure exactly what time.
3        Q    Did you leave from the basement or you went
4    back up to the main level before you left with
5    narcotics?
6        A    No, everything was through the basement.
7        Q    So from the minute you left that debriefing
8    until you left the precinct to go on this narcotic
9    investigation, you never were on the main level
10   again?
11       A    Correct.
12                 MR. MITCHELL:  Forgive me, Mike, but
13                 when you say the minute you left the
14                 debriefing, you're referring to the
15                 debriefing of Ms. Newkirk?
16                 MR. BROWN:  Yes.  Let me clarify
17                 that.
18       Q    From the minute you said you walked out of
19   the debriefing when McCoy was in the juvenile room
20   until you left for this narcotic investigation, you
21   were never on the main level of the precinct again?
22       A    Correct.
23       Q    And Newkirk was always on the main level of
24   the precinct?
25       A    Correct.

117

MARK PAV

1

2    Q    What time did you return to the precinct

3    after the narcotics investigation?

4    A    We end up making an arrest, a female

5    passenger in the vehicle.  She had --

6              MR. MITCHELL:  What time did you

7              return to the precinct?

8    Q    Brian's right.

9    A    I don't know.  It's noted somewhere.

10   Q    Do you remember what time you left to go

11   out on the narcotics investigation?

12   A    I don't remember.  I don't have exact

13   times.

14   Q    Where did you go for the investigation?

15   A    Lindenhurst, right off of Sunrise

16   Highway.

17   Q    You drove to Lindenhurst, you made an

18   arrest?

19   A    Correct.

20   Q    Then you brought the person back?

21   A    Correct.

22   Q    That's the first time you came back to the

23   precinct?

24   A    Correct.

25   Q    Were you the arresting officer on that

118

1                        MARK PAV

2    case?

3         A    Yes.

4         Q    Do you remember having any conversation

5    with Officer Rivera, the officer who testified

6    earlier?

7         A    I did not recall any conversation with

8    her.

9         Q    Do you remember her coming and searching?

10        A    No.

11        Q    Do you remember seeing her?

12        A    I did not recall seeing her.

13             MR. MITCHELL:  Just for clarification,

14             are you saying you don't remember seeing

15             her or not?

16             THE WITNESS:  Correct.

17             MR. MITCHELL:  Okay.

18        Q    I want to show you what is marked as

19   Plaintiff's Exhibit 2, and you recognize that as a

20   prisoner activity log, right (handing)?

21             (Witness examines document.)

22        A    Correct.

23        Q    This document, you filled out?  Obviously

24   not the whole thing, but you filled portions out,

25   right?

119

1                         MARK PAV

2        A    Correct.

3        Q    Who fills out the initial top half?  Is

4   that the desk sergeant?

5        A    The desk sergeant or the arresting

6   officer.

7        Q    Do you know who filled out the top portion

8   of this?

9        A    No, I do not.

10       Q    To the left under arresting officer, is

11  says PO McCoy and PO Pav.  Do you see that?

12       A    Correct.

13       Q    Were you both the arresting officers?

14       A    Correct.

15       Q    Is that your handwriting?

16       A    No.

17       Q    That McCoy's handwriting?

18       A    I don't know.

19       Q    You don't recognize McCoy's handwriting?

20       A    No, I don't.

21       Q    Who is the sergeant that signed to the

22  right on that, halfway down?

23       A    James Burke.

24       Q    Was he was the desk sergeant at that

25  point?

120

1                          MARK PAV

2          A     Yes.

3          Q     You said you don't recognize McCoy's

4     handwriting?

5          A     No.

6          Q     Is this a prisoner activity log?

7          A     Yes, it is.

8          Q     Who is required to fill this out?  Who

9     initiates it?

10         A     The top part?

11         Q     Yes.

12         A     Desk sergeant.

13         Q     That's during the course of the

14    interview?

15         A     Correct.

16         Q     Where it says "visible emotional

17    condition," what does that mean, how they appear?

18         A     Correct.

19         Q     There's no requirements about what you have

20    to write there other than how they appear, visibly

21    their emotional condition, right?

22         A     Correct.

23         Q     In other words, the police department

24    doesn't tell you you have a choice of four or five

25    things to write, or do they?

 1                         MARK PAV

 2        A    I didn't go to supervisory school.  I can't

 3   answer that question.

 4        Q    Okay.

 5             So now below that, there is a bottom half

 6   of that on the first page?

 7        A    Correct.

 8        Q    Did you participate in filling any of that

 9   out?

10        A    Yes.

11        Q    Your shield is 6174?

12        A    Correct.

13        Q    So looking at that from 11:55 down to

14   17:30, are those your entries?

15        A    Yes.

16        Q    Every one of them?

17        A    Yes.

18        Q    At 11:55 what did you note?

19        A    11:55, sitting.

20        Q    That's in regarding to Ms. Newkirk?

21        A    Yes.

22        Q    Did you see her sitting at 11:55?

23        A    No.

24        Q    Do you know where she was or what she was

25   doing at 11:55?

122

1                           MARK PAV

2        A    No.

3        Q    Why is it that you wrote sitting?

4        A    Because when I got back with the second

5   arrestee, I noticed the log in front of Ms. Newkirk

6   was blank from 11:25 on.

7        Q    So you noticed the log was blank at

8   11:25?

9        A    From 11:25 on.

10       Q    So my question is, why did you write

11  sitting for 11:55?

12       A    Because I assumed that's what she was

13  doing.

14       Q    Are these entries supposed to be made

15  contemporaneous with what you're logging in?

16       A    Yes.

17       Q    So if you were to see her at 11:55 sitting,

18  you would write 11:55 sitting?

19       A    (Witness nods head.)

20       Q    Are you supposed to do it retroactively?

21       A    No.

22       Q    What is the importance or significance of

23  the entries on the prisoner activity log?

24       A    So you can document their demeanor at the

25  time that you see them and what they're exactly

```
1                        MARK PAV
2    doing.
3         Q    What is important about that?
4         A    Recordkeeping.
5         Q    At 17:30, I'm going to go to the end of
6    this, Officer, it says sitting.  Did you see her
7    sitting at 17:30?
8         A    Yes, I did.
9         Q    At 17:00 did you see her sitting?
10        A    Yes.
11        Q    How about at 16:30?
12        A    I'm not sure exactly what time I got back
13   to the precinct.
14        Q    How about at 16:00?
15        A    Not sure exactly what time I was back at
16   the precinct.
17        Q    How about at 15:30?
18        A    I don't believe I was in the precinct.
19        Q    So you can sit here today and tell us that
20   from 11:55 until 15:30, each one of those entries was
21   not witnessed by you?
22        A    Correct.
23        Q    There are nine entries from 11:55 until
24   15:30, would you agree?
25        A    I'm sorry.  Say that one more time.
```

124

1                          MARK PAV

2        Q    I counted nine entries from 11:55 to 15:30.

3        A    Correct.

4        Q    Each one of those are fabricated entries?

5              MR. MITCHELL:  I object to the form.

6              You can answer.

7        A    Yes.

8        Q    You fabricated those?

9              MR. MITCHELL:  I object to the form.

10             You can answer.

11       A    Yes.

12       Q    When you knew that this was going to be

13   submitted for this case or not?

14             MR. MITCHELL:  I object to the form.

15             You mean the criminal case at that time?

16             MR. BROWN:  Yes.

17             MR. MITCHELL:  I object to the form,

18             but you can answer.

19       A    At the time that I filled it out?

20       Q    When you fill out a prisoner activity log,

21   what do you expect is going to happen with that, is

22   it going to be submitted to the police department?

23   What happens with these forms?

24       A    It goes with the commander arrest

25   package.

125

1                         MARK PAV

2          Q     Where does that go?

3          A     In the filing cabinet in the admin

4     office.

5          Q     It gets filed with the police department?

6          A     Yes.

7          Q     Each one of the entries about sitting,

8     property and searching are all fictitious --

9          A     Correct.

10         Q     -- from 11:55 to 15:30?

11         A     Correct.

12         Q     At 14:00 you wrote the word searched, E-D,

13    right?

14         A     Searched, yeah.

15         Q     Why did you change from sitting to searched

16    at 14:00 hours?

17         A     There was a text message with me and McCoy.

18    I think he just tells me who searched.

19         Q     That's regarding Officer Rivera, right?

20         A     Correct.

21         Q     Do you recall the text message saying

22    13:30?

23         A     Now I do.

24         Q     You had your phone with you when you filled

25    this out?

126

1                          MARK PAV

2        A    No.

3        Q    You didn't have your cell phone with you?

4        A    No.

5        Q    Where was your cell phone?

6        A    Downstairs in the office.

7        Q    So when you wrote 14:00 searched, why did

8   you write searched for 14:00 hours?

9        A    I don't remember why.

10       Q    In other words, you had sitting, sitting,

11  sitting, property, sitting, searched?

12       A    Correct.

13       Q    I'm just trying to gauge why it is that you

14  changed the pattern from sitting to searched?

15       A    I don't remember why.

16       Q    Okay.

17            How about when you wrote property at 13:25,

18  why did you change sitting, sitting, sitting and then

19  to property?

20       A    I don't remember why.

21       Q    I mean --

22       A    I did her property.  I might have done her

23  property at that time.

24       Q    Didn't you get the property when you first

25  went to the computer room?

127

1                          MARK PAV

2        A    Excuse me?

3        Q    Did you have her bag?

4        A    Yes.

5        Q    That was at 11:00 or so?

6        A    Correct.

7        Q    That's her property, right?

8        A    Correct.

9        Q    That's what you mean by property?

10       A    Correct.

11       Q    Okay.

12            So 13:25 is 1:25 in the afternoon?

13       A    Correct.

14       Q    That's almost an hour and a half (sic)

15   after you had done her property?

16       A    I didn't do her property at that point.

17       Q    You searched her pocketbook?

18       A    Correct.

19       Q    So when you say property, what do you mean

20   by that?

21       A    That's the property that she had on her

22   person that goes out to court.

23       Q    What would you do with it?

24       A    I put it in a prisoner property bag.  I

25   fill out a prisoner property receipt with all the

128

1                           MARK PAV

2      contents of whatever property she had on her.

3          Q    But you're saying at 1:25 in the afternoon

4      you didn't do that?

5          A    I don't know what time I ended up doing the

6      prisoner property receipt.  It might have been that

7      time.

8          Q    So that would be shown on the prisoner

9      property receipt she got?

10         A    Correct.

11         Q    That's when you note what time you do it?

12         A    Correct.

13         Q    So you don't know if that's fictitious or

14     true?

15         A    Correct.

16         Q    The 13:55 sitting, you know that's

17     fictitious, right?

18         A    Correct.

19         Q    12:55, you know that's fictitious?

20         A    Correct.

21         Q    The 12:25, you know that's fictitious?

22         A    Correct.

23         Q    And the 11:55, you know that's

24     fictitious?

25         A    Correct.

129

1                          MARK PAV

2          Q    And the 14:00 hours of searching, you know

3     that's fictitious?

4                    MR. MITCHELL:   I object to the form.

5                    You can answer.

6          A    Yes.

7          Q    The 14:30, that's fictitious?

8          A    Correct.

9          Q    The 15:00, that's fictitious?

10         A    Correct.

11         Q    The 15:30 entry, you know that's

12    fictitious?

13         A    Correct.

14         Q    At 16:00 you wrote sitting, correct?

15         A    Correct.

16         Q    You don't know if that's true or not?

17         A    Correct.

18         Q    Same goes with the 16:30, correct?

19         A    Correct.

20         Q    And the 17:00, do you know if that's true

21    or not?

22         A    I have to see what time I came back with

23    the other arrestee.

24         Q    That may be true, you don't know?

25         A    Correct.

130

MARK PAV

1

2    Q    Same goes with the 17:30?

3    A    Correct.

4    Q    So I want to go back.  I asked you why it

5    is you filled this out.  McCoy was the one who was

6    with Ms. Newkirk during this period?

7    A    Yes.

8    Q    He was your partner?

9    A    Yes.

10   Q    He was also the arresting officer?

11   A    Yes.

12   Q    So why didn't you give this to Mr. McCoy

13   and let him fill it out?

14   A    He was gone for the day.

15   Q    Were you back on shift the next day?

16   A    Yes.

17   Q    So why didn't you hold it for the next

18   day?

19   A    Because this follows her, for any arrestee

20   wherever they go.  So, she's a female.  She has to go

21   to the Fourth.  This has to be filled out before she

22   goes to the Fourth.

23   Q    Did you consult with McCoy about these

24   times before you filled it out?

25   A    No.

131

1                          MARK PAV

2        Q    So the reason you filled this out and made

3   up these entries was because it has to follow her?

4        A    Correct.

5        Q    Have you done this before?

6        A    I can't recall if I have or haven't.

7        Q    As you sit here today, Officer, you don't

8   know if you are falsified a prisoner activity log

9   before?

10                  MR. MITCHELL:  Object to form.

11                  You can answer.

12       A    I can't recall if I have or haven't.

13       Q    You know this is based on your personal

14  observations, right?

15       A    Correct.

16       Q    I would assume if something was not based

17  on personal observations and you falsified an entry,

18  you would remember it?

19                  MR. MITCHELL:  Objection to the form.

20                  You can answer it.

21       A    I'm sorry.  Say that again.

22       Q    Yes.  If something is based on personal

23  observations and you falsified it in the past on

24  another date, you would remember doing that?

25                  MR. MITCHELL:  I object to the form.

132

1                           MARK PAV

2                    You can answer.

3        A     Correct.

4        Q     So my question is have you ever done this

5   before?

6                    MR. MITCHELL:  I object to the form.

7                    You can answer.

8        A     Not that I can recall if I have or

9   haven't.

10       Q     Do you know if this constitutes a felony?

11                   MR. MITCHELL:  Object to the form.

12                   You can answer.

13       A     I have no idea.

14       Q     Do you know what offering a false

15   instrument for filing is?

16                   MR. MITCHELL:  I object to the form.

17                   You can answer.

18       A     No.

19       Q     You've been a police officer for 10

20   years?

21       A     Yeah.

22       Q     Did you ever have a conversation with McCoy

23   about this prisoner activity log either before,

24   during or after you filled it out?

25       A     The only conversation was the text message.

1                    MARK PAV

2        Q    All right, but this text message, and we'll

3   get to it, but that's the only communication you had

4   with him about the prisoner activity log?

5        A    That I can recall, yes.

6        Q    In other words, afterwards did McCoy ever

7   have a conversation with you or ask you about who

8   filled it out or what you wrote or anything like

9   that?

10       A    No.

11       Q    I want to go to Plaintiff's 3, Officer.

12  Plaintiff's 3, is that the text message you talked

13  about (handing)?

14                   (Witness examines document.)

15       A    Yes.

16       Q    Is it says on top Chris McCoy.  Whose phone

17  is this?

18       A    This is my phone.

19       Q    Is Chris McCoy a contact in your phone?

20       A    Yes.

21       Q    To the left it says "What's up?"

22       A    Yes.

23       Q    Who is that?

24       A    That's Chris McCoy.

25       Q    To you?

134

1                              MARK PAV

2          A     Yes.

3          Q     What is the date and time of that?

4          A     Thursday, March 16th at 14:13, 2:13 p.m.

5          Q     2017, right?

6          A     Correct.

7          Q     What did you respond?

8          A     "Uniform."

9          Q     What does he say?

10         A     "Okay, on my way."

11         Q     What is that in reference to?

12         A     I guess him coming downstairs to get

13    dressed and get ready to go out with narcotics.

14         Q     When you say uniform, you were referring to

15    whether he wears a uniform or plain clothes?

16         A     Yes.

17         Q     Now, who wrote the next entry?  Who texted

18    the next entry, is that McCoy?

19         A     The searched by?

20         Q     Yes.

21         A     Yes.

22         Q     He says searched by 6542 at 13:30.  Is that

23    the tin number?

24         A     Yes.

25         Q     13:30 is the time?

135
```
 1                        MARK PAV
 2        A    Correct.
 3        Q    So what is he telling you here?
 4        A    That at 13:30, whoever the 6542 is, it was
 5   a female search.
 6        Q    He said "I left it on the table, too."
 7   What does that mean?
 8        A    The activity log.
 9        Q    Now, why is he telling you about leaving
10   the activity log on the stable?
11                   MR. MITCHELL:  I object to the form.
12                   You can answer.
13        A    I don't know.
14        Q    You don't know why he's telling you this?
15        A    No.
16        Q    Do you know why he's texting you about 6542
17   searching at 13:30?
18        A    Now I do.
19        Q    Why?
20        A    Because it wasn't filled in.
21        Q    Do you know where the prisoner activity log
22   was during the time that he was in the room with
23   her?
24        A    No, I do not.
25        Q    Then he said, "Let me know how that
```

136

1                          MARK PAV

2   clusterfuck goes."  What is he referring to, if you

3   know?

4        A     The narcotics buy that we were supposed go

5   out on.

6        Q     Do you know why he referred to it as a

7   clusterfuck?

8              MR. MITCHELL:  I object to form.

9              You can answer.

10       A     Because it was supposed to happen at 2:00

11   and the drug dealer wasn't getting back to them.

12   There were, I guess, some of sort issues going on

13   with getting in contact.

14       Q     So it wasn't working on schedule?

15       A     No.

16       Q     Then you said, "You got it"?

17       A     Yep.

18       Q     That's in regards to what?

19       A     His previous message.

20       Q     Thursday, March 16th at 15:53, who's text

21   is that?

22       A     That is mine.

23       Q     What did you say?

24       A     "It went good.  Some kid from Bay Shore,

25   female pass," meaning passenger, "had warrants, so we

137

1                    MARK PAV

2    took her and weed in her snatch at the precinct."

3        Q    When you used the word snatch, what does

4    that mean?

5        A    In her pants.

6        Q    Why did you write snatch as opposed to

7    in her pants?

8        A    I guess that's how I referred to where the

9    weed was.

10       Q    I understand that you referred to in this

11   text, but I'm just asking why you used the word

12   snatch as opposed to in her pants?

13       A    Because it was in the front of her pants.

14       Q    So when you are referencing somebody's

15   front of their pants, you use the word snatch?

16       A    I did in this text.

17       Q    Is that normally how you refer to the front

18   of someone's pants?

19       A    No.

20       Q    So in this particular case, why did you use

21   the word snatch?

22       A    I don't recall exactly why, I just did.

23       Q    How often do you use the word snatch?

24       A    I don't know.  Not that often.

25       Q    When you say not that often, you used it on

138

1                      MARK PAV

2     Thursday, March 16, 2017?

3          A    Yes.

4          Q    How many times did you use that word on

5     that day?

6          A    I don't know.

7          Q    Did you ever refer to Ms. Newkirk when you

8     talked about her with Officer McCoy and use the word

9     snatch?

10         A    Not that I recall.

11         Q    How about the day before, did you use the

12    word snatch?

13         A    I don't recall.

14         Q    How about the day after, did you use the

15    word snatch?

16         A    I don't recall.

17         Q    The next entry is "Nice.  What are the

18    names?"  Who is that, McCoy to you?

19         A    Yes.

20         Q    Or you to McCoy?

21         A    That's McCoy to me.

22         Q    Then you respond with the names of two

23    females?

24         A    No.  The first name is the male that they

25    did the narcotics transaction with and the second

```
 1                        MARK PAV

 2    name is the female who had the warrant and had the

 3    marijuana on her.

 4         Q    So Ulysses Williams and Victoria Harris?

 5         A    Correct.

 6         Q    By the way, have you ever heard McCoy use

 7    the word snatch?

 8         A    I don't recall if he has or hasn't.

 9         Q    You don't recall if he uses the word

10    snatch?

11                   MR. MITCHELL:  I object to the form.

12                   You can answer again.

13         A    No, I --

14         Q    No.

15              What we see as Plaintiff's 3, Officer, this

16    is from your phone?

17         A    Yes.

18         Q    Your cell phone?

19         A    Correct.

20         Q    What was the number of your cell phone at

21    the time?

22         A    My cell phone number?

23         Q    Yes.

24         A    (516) 445-0751.

25         Q    How did we get this screen shot, did you
```

140
1                          MARK PAV
2    take it?
3         A    Yes.
4         Q    Why did you take this screen shot?
5         A    The FBI asked me if there was any
6    conversation that day between myself and McCoy.
7         Q    You took the screen shot?
8         A    Yes.
9         Q    Plaintiff's 3, which is what we're looking
10   at, is that the screen shot of your phone that you
11   took for the FBI?
12        A    Yes.
13        Q    I just want you to look at Plaintiff's
14   Exhibit 4 for a minute.  Is this part of your arrest
15   paperwork (handing)?
16                  (Witness examines document.)
17        A    Yes.
18        Q    This specifically is the arrest report,
19   right?
20                  MR. MITCHELL:   Prosecution
21             worksheet.
22        Q    Is that what it is, Officer?
23        A    Yes.
24                  MR. MITCHELL:   That's what it says.
25        Q    I just want to direct your attention to

141

                            MARK PAV

1

2      drugs recovered under "Evidence Description."  Do you

3      see that?

4          A    Yes.

5          Q    Again, that's referring to the weed?

6          A    Correct.

7          Q    You don't differentiate between narcotics

8      and weed?

9          A    No.

10         Q    So when you use the word drugs, that is

11     inclusive of weed?

12         A    Correct.

13         Q    Now, Officer, you had a meeting or meetings

14     with the FBI; am I correct?

15         A    Yes.

16         Q    Do you remember the first meeting being

17     April 6th of 2017?

18         A    Yes.

19         Q    Where was that, at your home?

20         A    Yes.

21         Q    Was anybody else present with you?

22         A    No.

23         Q    Were you married at the time?

24         A    Yes.

25         Q    Was your wife there?

142

```
 1                        MARK PAV
 2        A    No.
 3        Q    Was she home?
 4        A    No.
 5        Q    So you were the only person in the house at
 6   that time?
 7        A    Correct.
 8        Q    All right.
 9             Were the agents male, female,
10   combination?
11        A    Two males.
12        Q    When they spoke to you, were you being
13   truthful with them?
14        A    Yes.
15        Q    Did they ask you to describe Ms. Newkirk in
16   terms of her demeanor?
17        A    Yes.
18        Q    Did you describe her as being weird?
19        A    Yes.
20        Q    What do you mean by being weird?
21        A    Usually an arrestee isn't happy, giddy,
22   smiley, so that to me, in my experience of making
23   arrests, that's weird to me.  That's out of the
24   norm.
25        Q    When you say she's happy, giddy and smiley,
```

143

1                          MARK PAV

2      what point during the day that you spent with her was

3      she happy, giddy and smiley?

4          A    Every point except the one point where she

5      questioned the warrants.

6          Q    So it's your testimony that other than

7      objecting to the warrants, she was happy, giddy and

8      smiley?

9          A    Correct.

10         Q    And obviously you were truthful with them,

11     correct?

12         A    Yes.

13         Q    You also described her as being flirtatious

14     during the April 6, 2017 meeting?

15         A    Yes, but like I told them before, that was

16     a poor choice of words.  She wasn't flirtatious.

17         Q    But they didn't suggest that word to you,

18     did they?

19         A    No.

20         Q    You gave them that word out of your own

21     vocabulary, right?

22         A    Correct.

23         Q    At the time when you said flirtatious, what

24     did you mean?

25         A    Like I said, it was a bad choice of words.

```
 1                          MARK PAV
 2   Her whole demeanor was weird, and like I said,
 3   flirtatious was a bad word used there.  She wasn't
 4   flirtatious.  She was just happy, giddy, smiley.
 5        Q    So when you said flirtatious, you didn't
 6   mean flirtatious?
 7        A    No.
 8        Q    Did the FBI ask you about whether or not
 9   McCoy or yourself searched Ms. Newkirk at the
10   scene?
11        A    Yes.
12        Q    Do you recall telling the FBI that neither
13   you or McCoy searched Ms. Newkirk?
14        A    Yes, I recall that.
15        Q    Is that true?
16        A    From my knowledge, I didn't search her and
17   I have no recollection of Chris searching her.
18        Q    In other words, you didn't see if McCoy did
19   or did not search Ms. Newkirk, correct?
20        A    Correct.
21        Q    So when you said to the FBI that neither
22   you nor McCoy searched Ms. Newkirk, that wasn't true,
23   right?
24                    MR. MITCHELL:  I object to the form.
25                        You can answer?
```

145

1                            MARK PAV

2        A    From my knowledge, nobody searched her.  I

3   didn't search her; he didn't search her.

4        Q    We spent some time, and I don't want to put

5   words in your mouth, about when you turned around and

6   you went back to the driver's side of that vehicle

7   that you had pulled over.

8        A    Correct.

9        Q    And there was a period of time you said

10  that you didn't see McCoy and you didn't see

11  Newkirk?

12       A    Correct.

13       Q    The next thing you saw was Newkirk being

14  placed in the back of the car?

15       A    Correct.

16       Q    When you told the FBI that McCoy did not

17  search Newkirk, that wouldn't be true or it would be

18  true or something else?

19                 MR. MITCHELL:  Object to the form.

20                 You can answer.

21       A    It could be true, it could not be true.

22  From my knowledge, I didn't see him search her.

23       Q    You didn't see him search her, but you

24  don't know if he did or did not search her?

25       A    Correct.

146

1                         MARK PAV

2          Q    Now in that same interview on April 6th of

3    2017, do you recall the FBI asking you about whether

4    comments were made regarding McCoy being married?

5          A    Yes.

6          Q    Do you recall telling the FBI that you did

7    not recall hearing Newkirk ask you if McCoy was

8    married?

9          A    Correct.

10         Q    Do you recall that she did ask you that?

11         A    She might have, she might not have.  I

12   don't recall the exact conversation I had with

13   Ms. Newkirk later in the day.

14         Q    So as you sit here today, you have no

15   recollection of her asking you if McCoy was

16   married?

17         A    Correct.

18         Q    Now, when you spoke to the FBI in April of

19   2017, do you recall them asking you whether you made

20   a comment about white chocolate to Ms. Newkirk?

21         A    Correct.

22         Q    Did you recall making a comment about white

23   chocolate?

24         A    I might of, I might not of.  I don't

25   remember the conversation exactly that I had with

147

1                        MARK PAV

2    her.

3        Q    I understand you don't remember the exact

4    conversation, but did you use the word white

5    chocolate?

6        A    No.

7        Q    So if you had used the word white

8    chocolate, is that something you would have

9    remembered?

10       A    Yes.

11                 MR. MITCHELL:  I object.

12                 You can answer.

13       A    Yes.

14       Q    Do you recall saying white chocolate?

15       A    Not that I recall.

16       Q    During the same interview with the FBI, do

17   you remember telling the agents that McCoy did not

18   strike you as the kind of person who would engage in

19   such behavior, specifically what the subject of this

20   lawsuit is?

21       A    Correct.

22       Q    Do you stand by that today?

23       A    Yes.

24       Q    The FBI re-interviewed you on several

25   different days, correct?

148

1                              MARK PAV

2          A    Yes.

3          Q    That was April 25th and April 26th

4     of 2017?

5          A    Yes.

6          Q    At that time did they interview you under a

7     proffer agreement?

8          A    Yes.

9          Q    What was your understanding of a proffer

10    agreement?

11                   MR. MITCHELL:  I object to the form.

12                   You can answer.

13         A    That I sat down with my attorney and went

14    over the count of the day of the incident.

15         Q    But a proffer agreement specifically, did

16    they give you any type of protection?

17                   MR. MITCHELL:  I object to the form.

18                   You can answer.

19         A    I don't know the exact details behind a

20    proffer agreement.

21         Q    Did you sign a proffer agreement?

22         A    Yes.

23         Q    Did you look at the agreement before you

24    signed it?

25         A    Yes.

1                         MARK PAV

2          Q     Was Mr. LaPinta your attorney at the

3     time?

4          A     Yes.

5          Q     Was he sitting beside you?

6          A     Yes.

7          Q     Where were those two interviews, at the FBI

8     or U.S. Attorney's office?

9          A     Yes.

10         Q     He was with you the entire time?

11         A     Correct.

12         Q     This proffer agreement, did you have an

13    opportunity to review it with Mr. LaPinta, just the

14    two of you?

15         A     I believe so.

16         Q     In other words, the agents stepped out and

17    you and Mr. LaPinta sat and reviewed the document?

18         A     I believe so.

19         Q     Did he answer any questions you would have

20    had?

21                    MR. MITCHELL:  I object.

22                    Don't answer the question other than

23                    yes or no based on privilege, but go ahead.

24         Q     Yes, I'm not going to get into the

25    conversation, but did he answer any questions that

150

MARK PAV

1

2    you may have had?

3         A    Yes.

4         Q    Did the agents then return to the room?

5         A    Yes.

6         Q    Now, did McCoy tell you at any point that

7    he was familiar with Newkirk's family?

8         A    Yes.

9         Q    When did he tell you that?

10        A    Sometime throughout the day.  I don't

11   remember exactly what time, but he mentioned he knew

12   Marty Newkirk.

13        Q    Did he tell you that before or after she

14   was arrested?

15        A    I don't remember.

16        Q    So it could have been before she was

17   actually placed in handcuffs?

18             MR. MITCHELL:  I object to the form.

19             You can answer.

20        A    It could be.  It could be after also.

21        Q    What did he tell you about his knowledge of

22   Martin Newkirk?

23        A    That he's dealt with him in the past.

24        Q    Did he give you any more details?

25        A    Not that I remember off the top of my head.

151

1                          MARK PAV

2           Do you mind if we take a quick break?

3                  MR. MITCHELL:   Sure.

4                  (Recess taken from 1:34 p.m. until

5           1:43 p.m.)

6    CONTINUED EXAMINATION BY

7    MR. BROWN:

8           Q    Officer, I just want to redirect your

9    attention for a moment to Plaintiff's Exhibit 2,

10   which was the prisoner activity log.  There's a

11   portion halfway down where it says prisoner activity

12   and it says "List all movement of prisoner both

13   within and outside precinct."  Do you see that

14   (handing)?

15                  (Witness examines document.)

16          A    Yes.

17          Q    How many of these prisoner activity logs

18   have you filled out over your career?

19          A    Hundreds.

20          Q    When it says "List all movement of prisoner

21   both within and outside precinct," what does that

22   mean?

23          A    If they get moved to the bathroom, if they

24   get lodged, if they're brought to an interview

25   room.

152

1                        MARK PAV

2       Q    Is the juvenile room a movement, if they

3   were brought into that room?

4       A    Yes.

5       Q    Is there a reason that that wasn't noted

6   anywhere on the prisoner activity log?

7       A    No.

8       Q    Is that something that would have been

9   required to have been noted?

10      A    Yes.

11      Q    So what was your reason for not putting

12  that time period when she was in the juvenile room on

13  the prisoner activity log?

14      A    So, when I got back with the other arrestee

15  and I saw the prisoner activity log in front of

16  Ms. Newkirk and saw it was empty, I was under the

17  assumption since my partner at the time, Christopher

18  McCoy, was dealing with her, the whole log would be

19  filled out since he was dealing with her at specific

20  times.

21      Q    But it wasn't filled out?

22      A    Correct.  So in a rush because I was on

23  overtime with the other arrestee and saw the log, I

24  just went down and pre-filled in the activity log.

25      Q    You had personal observation of her being

153

1                          MARK PAV

2     in the juvenile facility room?

3          A    Correct.

4          Q    That's something you actually knew?

5          A    Correct.

6          Q    So why wouldn't you have put that as an

7     entry?  At least that would have been truthful,

8     correct?

9                     MR. MITCHELL:  Object to the form.

10                    You can answer.

11         A    Correct.

12         Q    So why wouldn't you have put that as a

13    legitimate entry?

14         A    It was an oversight.  I was in a rush --

15    like I said, I was on overtime -- just to fill out

16    the form to be able to hand it off to the desk crew,

17    which should have been done prior.

18         Q    It's true, is it not, that McCoy actually

19    had conversations with you about filling this out?

20         A    Just the text message about what time she

21    was searched.

22         Q    That was a communication he had with you?

23         A    Correct.

24         Q    Okay.

25                    I want to go back to where we left off,

154

1                          MARK PAV

2    Officer.  We were talking about Martin Newkirk and

3    the conversations that McCoy had with you.  Do you

4    remember that?

5         A    Correct.

6         Q    During the interview with the FBI on April

7    6th of 2017, you also described Ms. Newkirk as being

8    hesitant.  Do you remember saying that to them?

9         A    I don't recall saying that as we're sitting

10   here.

11        Q    Do you remember saying that the interaction

12   that you and McCoy had, that she appeared hesitant?

13        A    I don't recall saying that.

14        Q    Do you remember telling them that she was

15   somewhat argumentative regarding the warrants?

16        A    Yes.

17        Q    This is the same person who you have

18   described throughout the remaining portion of this

19   arrest as giddy, happy and smiley?

20        A    Yes.  The arguments about the warrant, as I

21   described before, was during the traffic stop, and

22   that was the last time it came up about the

23   warrants.

24        Q    Do you remember telling the FBI that McCoy

25   handcuffed Ms. Newkirk at the hood of the Suffolk

155

1                          MARK PAV

2    County Police Department vehicle?

3          A    I don't recall telling them that.

4          Q    Did you believe Newkirk to be high on drugs

5    or anything else at that time?

6          A    No.

7          Q    When you re-interviewed with the FBI on

8    April 25th and 26th, that was your second and third

9    interview, right?

10         A    Correct.

11         Q    That was when you retracted the word

12   flirtatious?

13                   MR. MITCHELL:  I object to the form.

14                   You can answer.

15                   MR. BROWN:  I'll withdraw it.

16         Q    Did you retract the word flirtatious at any

17   point in time with the FBI?

18                   MR. MITCHELL:  I'm going to object to

19              the form.

20                   You can answer.

21         A    Yes.

22         Q    When was that done?

23         A    When I sat down with them on April -- at

24   the U.S. D.A.'s office.

25         Q    That was after you had hired a lawyer or

156

1                        MARK PAV

2    before?

3         A    After.

4         Q    Before you went into the April 26th

5    interview, had you spoken to any PBA trustees?

6         A    Yes.

7         Q    Who would that have been?

8         A    Chris Wolf.

9         Q    How many times did you speak with Chris

10   Wolf?

11        A    I spoke to him the day that the FBI came to

12   my house on April 6th, and I don't know any other

13   conversations I had with him after that.

14        Q    Prior to the proffer on April 26th,

15   did you have a meeting at Mr. LaPinta's office?

16        A    Yes.

17        Q    How many of those did you have, without

18   telling us the content?

19        A    One.

20        Q    Did you also tell the FBI that typically

21   you search an arrestee upon arrival at the

22   precinct?

23        A    Yes.

24        Q    Is that your protocol and practice?

25        A    Male arrestee, not female.

1                          MARK PAV

2        Q     Did you tell the FBI that Newkirk was not

3    searched because you were unable to locate a female

4    police officer?

5        A     Yes.

6        Q     So going back to the question whether it's

7    a male or female, is it your protocol to search them

8    upon arrival?

9                    MR. MITCHELL:  I object to the form.

10                   You can answer.

11       A     What do you mean by search?  If I bring in

12   a female arrestee, are you saying that it's my

13   protocol to search?

14       Q     No.  I understand what you're saying, but

15   is it your protocol to have them searched?  Obviously

16   you can't search the female, but would you make all

17   efforts to have them searched upon arrival at the

18   precinct?

19       A     Yes.

20       Q     What would the reason be to search them

21   upon arrival at the precinct as opposed to the

22   delay?

23       A     The safety and security of the prisoner and

24   the officers in the building.

25       Q     Who is it that reached out to get a female

158

 1                         MARK PAV

 2    to search Ms. Newkirk?

 3         A    I don't know.

 4         Q    Did you?

 5         A    No.

 6         Q    So it would have been the arresting

 7    officer, right?

 8                   MR. MITCHELL:  Object to the form.

 9                   You can answer.

10                   MR. BROWN:  I'll withdraw.

11         Q    Who would put in the request to search a

12    female arrestee?

13         A    Desk sergeant.

14         Q    Not the arresting officer?

15         A    No.

16         Q    Do you know why there was a delay or there

17    was a delay in the desk sergeant requesting a female

18    to search Ms. Newkirk?

19         A    I don't know.

20         Q    Do you know when Ms. Newkirk was

21    searched?

22         A    It was after I left the juvenile room to go

23    meet up with narcotics.

24         Q    So it was after 2:00?

25         A    Yes.

159
1                          MARK PAV

2          Q    Do you know when Ms. Newkirk arrived at the

3     precinct?

4          A    According to this (indicating) --

5          Q    Looking at the prisoner activity log?

6          A    Yes.  11:00.

7          Q    So there was a three-hour delay when that

8     female was searching her?

9          A    Correct.

10         Q    Did you or McCoy have any role in that

11    delay?

12         A    No.

13         Q    Were there any females police officers

14    walking around the precinct during the period from

15    11:00 to 2:00?

16         A    I don't know.

17         Q    Did you tell the FBI during your meeting

18    that the texts that were sent to you from McCoy was

19    done so that you can properly update Newkirk's

20    prisoner activity log?

21         A    I might have said it, I might have not.  I

22    don't remember.

23         Q    Would you consider what you did properly

24    updating her prisoner activity log?

25         A    No.

1                      MARK PAV

2          Q     The crime section office space, that's

3     downstairs, right?

4          A     No, the crime section office where I work

5     now is in the back of the precinct.

6          Q     No, I don't mean now.  Sorry.

7                In March of 2017, this incident date, was

8     it downstairs?

9          A     The CSU office, community support office,

10    yes.  The unit I was assigned to, yes, the office is

11    downstairs in the basement.

12         Q     The crime section office?

13         A     Two different offices.

14         Q     Did you tell the FBI that you and McCoy

15    went downstairs to the crime section's office space

16    at some point?

17         A     Yes.

18         Q     And that McCoy processed the arrest for the

19    warrants and you processed the marijuana arrest?

20         A     I'm not exactly sure the conversation that

21    I had with the FBI about who processed what.

22         Q     Is that true, that you processed the

23    marijuana arrest and McCoy processed the warrant

24    arrest?

25         A     I know I processed the marijuana arrest.  I

161

1                          MARK PAV

2    can't remember if I processed the warrant arrest or

3    if Chris processed the warrant arrest.

4         Q    Do you know how long McCoy was with you in

5    the crime section office doing this?

6         A    No.

7         Q    Did you tell the FBI that he was there for

8    about one hour with you?

9         A    I might of, I might not of.

10        Q    Do you recall him being there for one hour

11   with you?

12        A    He was there with me for a period of time.

13   I don't know if it was one hour.  I don't know if it

14   was 15 minutes.

15        Q    Do you recall telling the FBI that you and

16   McCoy returned to the holding area and that McCoy

17   returned Newkirk and escorted her into the juvenile

18   room?

19        A    I don't recall telling them that.  I wasn't

20   with McCoy at any time when Newkirk was brought out

21   of the uniform squad room or brought back into the

22   uniform squad room.

23        Q    You said you made a phone call to McCoy

24   after you spoke with narcotics?

25        A    Correct.

162

1                              MARK PAV

2          Q     Was that just in regards to whether it was

3    uniform or non-uniform?

4          A     Yes.

5          Q     When you returned from the narcotics

6    arrest, did you see where Newkirk was?

7          A     Yes.

8          Q     Where was she?

9          A     She was sitting in the uniform squad

10   room.

11         Q     Is that called the holding area?

12         A     Yes.

13         Q     Was she handcuffed to anything?

14         A     Yes.

15         Q     To what?

16         A     To the bench.  So, there's handcuffs that

17   are bolted into the bench to secure a prisoner.

18         Q     Had McCoy already left for the day at that

19   point?

20         A     Yes.

21         Q     At that point did you have a conversation

22   with Newkirk at all?

23         A     There was some sort of conversation back

24   and forth.  I don't remember exactly the content of

25   the conversation.

163

1                     MARK PAV

2        Q    Do you recall anything about McCoy being

3   married?

4        A    No.

5        Q    Do you recall telling the FBI that if you

6   used the word white chocolate, it would have been

7   after Newkirk was --

8             MR. BROWN:  Withdrawn.

9        Q    Do you recall telling the FBI that if you

10  used the term white chocolate, it would have been

11  after you brought this narcotic arrest to the

12  precinct?

13       A    Yes, I recall that.

14       Q    Why is it that it would have been done

15  after you brought that new arrest to the First

16  Precinct?

17       A    Because that was the -- I don't know.

18       Q    Do you recall whether Newkirk had

19  medication in her purse?

20       A    Yes.

21       Q    Do you recall if Newkirk complained of

22  tooth pain?

23       A    I recall that she stated that she had

24  dental work done, some sort of the dental work

25  done.

164

1                          MARK PAV

2          Q     Do you recall if she was using painkillers

3     because of the pain from the dental work?

4          A     Yes.

5          Q     Did you know McCoy's personality?

6          A     Yes.

7          Q     Did you recall telling the FBI that McCoy

8     had a heightened sex drive?

9          A     I recall having a conversation with the FBI

10    about -- they asked me if he had a heightened sex

11    drive, and I recall having a conversation with them

12    about it.

13         Q     Well, did they ask you specifically if he

14    had a heightened sex drive?

15         A     They asked if we talk about pornography and

16    masturbation at work.

17         Q     Before we get there, you said that they

18    asked about whether he had a heightened sex drive?

19         A     Correct.

20         Q     Did they use those words to you?

21         A     Yes.

22         Q     Did you say that he did seem to have a

23    heightened sex drive?

24         A     I can't recall if I said that, those

25    particular words.

165

1                          MARK PAV

2          Q    Was it your opinion that he had a

3     heightened sex drive?

4          A    No, he was a normal guy.

5          Q    Would McCoy frequently discuss with you how

6     he watched pornography and masturbated on a daily

7     basis?

8          A    Not that he masturbated and watched porn on

9     a daily basis.  On a daily basis we would talk about

10    it, but not that he masturbated every day or watched

11    porn every day.

12         Q    I see.  On a daily basis he would talk

13    about it, but that didn't necessarily mean he did

14    it every day?

15         A    Correct.

16         Q    Okay.

17              Did he tell you about what kind of

18    pornography he watched?

19         A    No.

20         Q    Well, you had a discussion with him about

21    pornography, you said?

22         A    Right.

23         Q    What was the discussion about?  What did he

24    say to you?

25         A    Not specifics.  I don't remember any

166

1                          MARK PAV

2    specifics.

3        Q    He talked to you about this on a daily

4    basis?

5        A    Yeah.

6        Q    So he would talk about pornography with you

7    and masturbation on a daily basis?

8        A    Sure, yes.

9        Q    You don't remember any of the specifics

10   that he talked to you about?

11       A    No.

12       Q    How long did these conversations last

13   for?

14       A    Brief moments.  Not that long.

15       Q    So each tour would be eight hours?

16       A    Correct.

17       Q    If you worked overtime, you would work

18   overtime together?

19       A    Yes.

20       Q    How many days, tours, did you work overtime

21   on a weekly basis, out of the five shifts?

22       A    At least two days a week, I guess.

23       Q    When you work overtime, it's anywhere from

24   an hour to maybe four hours, right?

25       A    Correct.

1                         MARK PAV

2          Q    So you were with him on a weekly basis,

3     would you agree, at least 50 hours or more?

4          A    I would say less, but...

5          Q    Well, each shift is eight hours?

6          A    Yeah.

7          Q    And you did five days a week?

8          A    Uh-huh.

9          Q    So that's 40 hours regular time?

10         A    Correct.

11         Q    With overtime where would you put that

12    number, closer to 50 hours?

13         A    No, I think it would be less, but Chris

14    didn't always stay for all arrests.  He had child

15    care and stuff like that.

16         Q    So a minimum of 40 hours and maybe more?

17         A    Correct.

18         Q    During those forty hours, every day he

19    would talk to you about pornography and

20    masturbation?

21         A    Not every day.

22         Q    I thought you said on a daily basis he

23    would talk about it?

24         A    I didn't say every day.  We've talked about

25    it on a daily basis meaning not every day, maybe two

168

1                    MARK PAV

2    days a week, three days a week.

3         Q    Do you remember telling the FBI that you

4    frequently discussed how McCoy watched pornography

5    and masturbated on a daily basis?

6         A    Frequent.  They asked me about pornography,

7    masturbation and, yeah, frequent, but I believe

8    that's everyone's different interpretation.  It's not

9    every day, okay, 8:00 in the morning oh, this is time

10   to talk about porn and masturbating.  It would come

11   up.

12        Q    I opened the questioning about the subject

13   about how often you'd do it, meaning talk about it,

14   and I asked you if it was done on a daily basis and I

15   think you said to me, I don't want to put words in

16   your mouth, that he didn't necessarily do it on a

17   daily basis, but you would talk about it on a daily

18   basis?

19        A    Correct.  I guess my interpretation of a

20   daily basis, and I apologize --

21        Q    What is your interpretation of a daily

22   basis?

23        A    Not every day we talked about it.  Daily

24   basis, two, three times a week it would come out.  It

25   wasn't something out of the norm.

1                           MARK PAV

2          Q    Did you also tell the FBI that McCoy would

3    frequently comment on attractive women the two of you

4    encounter throughout your workday?

5          A    We would make comments back and forth, but

6    frequent?  If we saw a pretty woman or whatever,

7    yeah, we would comment back and forth, locker room

8    talk.

9          Q    Did you do it frequently?

10         A    What do you consider frequent?

11         Q    Did you tell the FBI that McCoy frequently

12   commented on attractive women that the two of you

13   would pull over or encounter throughout your workday?

14   Did you tell the FBI that?

15                   MR. MITCHELL:  Object to the form.

16                   You can answer.

17         A    We have conversations about attractive

18   women.

19         Q    But did you frequently comment on

20   attractive women?

21                   MR. MITCHELL:  I object to the form.

22                   You can answer.

23         A    I don't know what you consider frequent.

24                   MR. MITCHELL:  Did you use the word

25                   frequently to the FBI?

170

1                          MARK PAV

2                    THE WITNESS:  Yes.

3        Q    So it's not about what I consider frequent.

4   Those were your words, right?

5        A    Yes.

6        Q    I'm not looking to put words in your mouth,

7   Officer.

8        A    I know.

9        Q    Now, when you said encountered throughout

10  the workday, in what aspect of encountering these

11  women were you talking about?

12       A    Driving down the road and see someone on

13  the side of the road.  Driving next to somebody, see

14  somebody's pretty.

15       Q    How about if you made an arrest or gave

16  them a summons, for instance, would that be included

17  in encountering them?

18       A    Yes.

19       Q    Did McCoy also attempt to look up on social

20  media sites attractive women that you and he pulled

21  over?

22       A    I saw him do it once or twice.

23       Q    This was on Instagram and other social

24  media sites?

25       A    Correct.

171

1                          MARK PAV

2        Q    So, in other words, McCoy would pull

3   somebody over and then try to gather information on

4   them?

5        A    I don't know what he was doing on the

6   sites.  I know he looked them up on public sites.

7        Q    When you say looked them up, what would he

8   do?

9        A    Search on public sites.

10       Q    What sites would these be?

11       A    Social media.  I don't know.  I don't have

12   social media.

13       Q    But you know he did this, right?

14       A    Yes.

15       Q    You were with him when he did it?

16       A    I'm not sure if I was with him.

17       Q    How would you know that he did it?

18       A    I guess I was with him.

19            MR. MITCHELL:  Don't guess.  I don't

20            want to you guess.  He doesn't want you to

21            guess.  He asked you were you with him.  Do

22            you know if you were with him or not?

23       A    I know he has looked up people on social

24   media because when I sent out the name Victoria

25   Harris of the arrest, he sent me a picture of her, I

1                          MARK PAV

2    guess, Instagram or whatever her social media was and

3    asked me if that was the person, so I've known him to

4    search people on public social media.

5         Q    Is Victoria Harris attractive?

6         A    I think that's all relative.

7                   MR. MITCHELL:   Do you think she's

8              attractive?

9                   THE WITNESS:   No.

10        Q    My question is do you remember telling the

11   FBI that McCoy attempted to look up on the social

12   media sites attractive women that you and he pulled

13   over?   Do you remember telling the FBI that?

14        A    I know we had a conversation about that and

15   they asked me if he has, and I know he's also looked

16   up numerous people.

17        Q    You indicated Victoria Harris is not

18   attractive in your opinion, right?

19        A    Correct.

20        Q    So when you told the FBI that McCoy would

21   look up attractive women on social media that he had

22   pulled over, Victoria Harris is not part of that

23   group; am I correct?

24        A    Correct.

25        Q    So there's other women he's looked up that

```
1                       MARK PAV
2    you thought were attractive on social media; am I
3    right?
4              MR. MITCHELL:  I object to the form.
5              You can answer.
6    A     Yes.
7    Q     You told this to the FBI?  I'm not putting
8    words in your mouth, right?
9              MR. MITCHELL:  I object to the form.
10             You can answer.
11   Q     Did you tell this to the FBI?
12   A     We had a conversation about it.  However
13   they wrote it down on that paper if they asked me if
14   I ever saw him look up people on the social media
15   before.
16   Q     Did the word attractive women come out
17   during that conversation?
18   A     They asked attractive, yes.
19   Q     Did you agree that he looked up attractive
20   women?
21   A     Yes.
22   Q     When he looked up the attractive women, how
23   did he do that?  What websites did he go on?
24   A     Social.  I don't have it.  I don't know.
25   Q     I know you don't have it, but you were with
```

174

1                    MARK PAV

2    him when he did it?

3              MR. MITCHELL:  I object to the form.

4         Q    Were you with him when he did it?

5         A    Yes.

6         Q    Tell us what it is that he did.

7         A    I don't know.  I didn't have his phone.

8         Q    What were the results?  What did you see on

9    the screen, or what did he tell you were the

10   results?

11        A    He would show me his phone.  I don't know

12   what social media site it was on.

13        Q    Okay.

14        A    (Continuing) Or like when he sent the text

15   message of Victoria Harris, I can't tell you today

16   what website that's from.

17        Q    You keep saying Victoria Harris.  She's not

18   one of the attractive women you referred to, right?

19        A    Correct.

20        Q    Did he also talk about backpage.com with

21   you?

22        A    Not to my knowledge.

23        Q    Do you remember telling the FBI that McCoy

24   mentioned backpage.com to you?

25        A    No, I don't.  I don't know if I did or

```
 1                      MARK PAV
 2   didn't, and if he didn't mention backpage, I know we
 3   have looked at backpage before -- and when say "we,"
 4   I mean as like a department or a unit -- to see if
 5   there's any -- there's multiple ads at a certain
 6   hotel or something like that which frequents criminal
 7   activity so we can sit on and possibly make an arrest
 8   and cultivate some information, but not for personal
 9   use, though.
10        Q    Okay.
11             Those things that we just talked about, the
12   masturbation, the pornography, looking up people that
13   he would pull over, attractive women, did that cause
14   any alarm to you in regards to McCoy?
15        A    No.
16        Q    Did you feel that you had any obligation to
17   report that type of conduct to a supervisor?
18        A    No.
19        Q    Why not?
20        A    Because it wasn't just attractive women
21   that he was looking up.  He would be able to search
22   through Instagram, Facebook, Snapchat, whatever these
23   outlets are, for not just attractive women, other
24   people, too, on other social media websites, so it
25   didn't strike me as something out of abnormal to look
```

176

```
 1                         MARK PAV

 2    at someone's social media website.

 3        Q    People that you pulled over, though?

 4        A    Yeah.

 5        Q    I just want to understand.  You and McCoy

 6    are pulling over people under the authority of being

 7    a law enforcement officer, right?

 8        A    Correct.

 9        Q    And after you pull them over, McCoy is

10    searching them, attractive women that you pulled

11    over --

12        A    Not just attractive.

13        Q    Okay, so he goes onto social media websites

14    for what purpose?

15        A    That's something you would have to ask

16    him.

17                   MR. MITCHELL:  Do you know the purpose

18              that he goes on social media?

19                   THE WITNESS:  No.

20                   MR. MITCHELL:  Okay, so answer his

21              question.

22        Q    You didn't feel McCoy's actions of using

23    the information he gathered from pulling over the

24    women and searching the websites to be

25    inappropriate?
```

1                         MARK PAV

2        A     No.

3        Q     Or against department rules?

4        A     No.

5        Q     And as a result, that did not cause you to

6   speak or tell a supervisor about those actions?

7        A     Correct.

8        Q     Now, did you also tell the FBI on April

9   26th that on April 6, 2017 you went to the precinct

10  at about 4:00 and that everybody seemed to be in a

11  panic?  Do you remember that?

12       A     Yes.

13       Q     What do you mean by that?

14       A     There was an uneasy feeling.  I guess the

15  information got out about this incident.

16       Q     When you say everyone seemed to be in a

17  panic, what do you mean by that?

18       A     Uneasy.  There was just an uneasy feeling

19  at the precinct, no one knew what to expect.

20       Q     Did you ever hear McCoy say to Newkirk,

21  quote, "I think you liked it when I touched you out

22  there," unquote?

23       A     No.

24       Q     Or anything close to that?

25       A     No.

1                    MARK PAV

2        Q    Prior to going into the juvenile room the

3   one time that you mentioned that you did, right,

4   because it was approximately a ten-minute period you

5   were in there?

6        A    Correct.

7        Q    Had you ever prior to that on the same day

8   tried to open the door or tried to enter that

9   juvenile room?

10       A    Prior to that?

11       Q    Prior to you going in for that ten-minute

12  period.

13       A    No.

14       Q    Is there any protocol in terms of

15  interviewing a female as a male officer in a room?

16                 MR. MITCHELL:  I object to the form.

17                 You can answer.

18       A    At this time?

19       Q    Yes.

20       A    No.

21       Q    Has it changed?

22       A    Yes.

23       Q    What is the new protocol?

24       A    Two officers for any female inmate,

25  prisoner.

179

1                          MARK PAV

2          Q     In terms of debriefing and things of that

3     nature?

4          A     Yes.

5          Q     Is that department-wide or just in the

6     First or something else?

7          A     Department-wide.

8          Q     Prior to this incident there was no

9     protocol in effect?

10         A     Not that I know of.  There might be, there

11    might not be.  I'm not aware.

12         Q     But you're aware that since the incident

13    there is a rule?

14         A     Correct.

15         Q     Was there any protocol in place for

16    transporting female inmates as a male officer?

17         A     Prior to the event?

18         Q     Yes.

19         A     No.  Besides taking them to the bathroom,

20    you would need a female officer to take them to the

21    bathroom or being searched, but besides that, no.

22    I'm sorry.  If they're transported outside the

23    precinct, you would need either a female officer, a

24    single female officer or two male officers either in

25    the same car or one officer in one car and another

180

MARK PAV

1

2    officer following.

3        Q    That would be precinct to precinct?

4        A    Correct.

5        Q    Precinct to court?

6        A    Yes.

7        Q    Hospital?

8        A    Correct.

9        Q    That was in effect prior to this date?

10       A    Correct.

11       Q    And it is still in effect?

12       A    Correct.

13       Q    In terms of search, you indicated it has to

14   be a female searching a female?

15       A    Correct.

16       Q    Could two males search a female?

17       A    No.

18       Q    Also in terms of the cells of the females,

19   are there any rules or regulations regarding where

20   they're lodged?

21       A    Yes.

22       Q    What is that rule?

23       A    There's two female cells in the First

24   Precinct and we have a female holding facility in the

25   Fourth Precinct.

181

1                          MARK PAV

2        Q     Over night?

3        A     Correct.

4        Q     I just want to go over some of the internal

5     affairs charges with you, Officer.  On April 8th of

6     2014, are you familiar with an internal affairs

7     complaint regarding Douglas Mooney?

8        A     Yes.

9        Q     What was that about?

10       A     I don't recall the whole incident.  I know

11    he was an aided case, and I don't remember what the

12    complaint was.

13       Q     Do you remember an internal affairs

14    allegation or report from September 30, 2014

15    regarding a Unique Palmer?

16       A     Yes.

17       Q     What that was about?

18       A     She claimed that we used excessive force on

19    her son that she had locked up, her juvenile son, and

20    kicked out the back window of our PD and continuously

21    fought with us and had to be brought to Southside

22    Hospital via ambulance.

23       Q     For what reason?

24       A     Psych evaluation.

25       Q     To Southside or to Stony Brook?

MARK PAV

1

2      A      Southside.

3      Q      Other than those two internal affairs

4  complaints, are you familiar with other complaints

5  made against you?

6      A      Just this one.

7      Q      Was this a complaint, or was this just an

8  investigation?

9             MR. MITCHELL:  What are you referring

10            to?

11     Q      You said just this one.

12     A      The Newkirk one.

13     Q      Is Newkirk a complaint or an investigation?

14  Is there a difference?

15     A      I know I had to go out for an interview, so

16  my answer is I don't know.

17            MR. BROWN:  All right, give me one

18            brief minute guys.

19            (A short recess was taken.)

20            MR. BROWN:  I just have a few more

21            questions, Officer.

22  CONTINUED EXAMINATION BY

23  MR. BROWN:

24     Q      After the incident that brings us here, it

25  appears as though there were 15 tours until the FBI

183

1                          MARK PAV

2    got involved; is that right?  April 6th or so?

3         A    I don't know exact number, but yes.

4         Q    Approximately.

5              During those three weeks or so, were you

6    still working with McCoy as a partner?

7         A    Yes.

8         Q    That was every day that you had a shift?

9         A    Yes.

10        Q    Was there any conversation with McCoy about

11   the Newkirk arrest?

12        A    No.

13        Q    Was there any conversation with McCoy about

14   anything that McCoy did to Newkirk?

15        A    No.

16        Q    Did McCoy ever discuss any contact that he

17   had with Newkirk --

18        A    No.

19        Q    -- with you?

20        A    No.

21        Q    During these 15 tours, did you continue to

22   discuss pornography and masturbation with McCoy?

23              MR. MITCHELL:  Object to the form.

24              You can answer.

25        A    Yes.

1                    MARK PAV

2         Q    During this type of conversation, at no

3    point did McCoy discuss any of the acts that he

4    committed here with you?

5         A    No.

6         Q    In the precinct, was there any discussion

7    ever about McCoy and the female officers on the

8    force --

9         A    No.

10        Q    -- both before, during or after this

11   incident?

12        A    No.

13        Q    So you've never heard any females or males

14   discuss McCoy and how he treats or handles female

15   officers?

16        A    No.

17        Q    You went to the academy when, in 2010

18   or '09?

19        A    '10.

20        Q    And McCoy, was he in the academy with

21   you?

22        A    No.

23        Q    Do you know when he went to the academy?

24        A    Before me.

25        Q    Are you familiar with any discussions about

```
 1                         MARK PAV
 2   McCoy in the academy?  When I say in the academy, I
 3   mean how he treated women and how he dealt with women
 4   in the academy.
 5                  MR. MITCHELL:  I'm going to object to
 6           the form.
 7                  You can answer.
 8        A    No.
 9                  MR. BROWN:  I have nothing further.
10                  Thank you for your time.
11                  MR. MITCHELL:  I just have a few.
12   EXAMINATION BY
13   MR. MITCHELL:
14        Q    Officer Pav, you were asked in the
15   beginning of your deposition, or at some point, about
16   keeping a memo book on the day of the event.  Do you
17   recall being asked those questions?
18        A    Yes.
19        Q    Were you required to keep a memo book?  In
20   your position on that day, were you required to keep
21   a memo book?
22        A    Yes.
23        Q    At the time who was your supervisor?
24        A    Sergeant Bieber.
25        Q    When you were assigned to Sergeant Bieber's
```

186

MARK PAV

 1
 2     unit, did Sergeant Bieber require you to keep a memo
 3     book?
 4          A     Yes.
 5          Q     But were there times when Sergeant Bieber
 6     was supposed to ensure you were keeping a memo
 7     book?
 8          A     Yes.
 9          Q     Was there ever a time when Sergeant Bieber
10     knowing that you hadn't kept a memo book permitted
11     you to continue to do that?
12          A     Yes.
13          Q     Did you have a memo book for the day before
14     this event?
15          A     No.
16          Q     Did you have a memo book for the day after
17     this event?
18          A     No.
19          Q     Did there come a time when the FBI asked
20     you to go and search for your memo book for this
21     day?
22          A     Yes.
23          Q     At that time did you tell the FBI what memo
24     books you had and didn't have?
25          A     Yes.

187

1                          MARK PAV

2          Q    Again, in addition to this day, you didn't

3     have memo books for other days before and after; is

4     that right?

5          A    Correct.

6          Q    But again, you were required to do so?

7          A    Yes.

8          Q    Is it fair to say that Sergeant Bieber did

9     not discipline you for not having a memo book?

10         A    Correct.

11         Q    I think the date is April 6th.  April 6th

12    of 2016 was the day when you first --

13                    MR. BROWN:  '17, Brian.

14                    MR. MITCHELL:  Is it '16 or '17?

15         A    '17.

16         Q    Sorry.  '17 was the date that the FBI came

17    to your home; is that right?

18         A    Yes.

19         Q    That's the first time you spoke with

20    them?

21         A    Yes.

22         Q    Did you know they were coming?

23         A    No.

24         Q    Is it fair to say they came unannounced?

25         A    Yes.

```
 1                      MARK PAV

 2        Q    Is it fair to say that that was the first

 3   time since March 16th of 2017 that you became aware

 4   that there were any type of allegations of misconduct

 5   by McCoy --

 6        A    Yes.

 7        Q    -- in other words, when the FBI was there

 8   at your home?

 9        A    Correct.

10        Q    When they spoke to you at your home, did

11   you have any police paperwork with you?

12        A    No.

13        Q    When they spoke to you at your home, did

14   you tell them your recollection of the events to the

15   best of your ability?

16        A    Yes.

17        Q    When you spoke to them, did you tell them

18   things that you believed to be truthful?

19        A    Yes.

20        Q    When you spoke to them, in fact, did they

21   ask you about whether you had gone out on a narcotics

22   assignment that day?  Did that come up?

23        A    Yes.

24        Q    When you spoke to them, did you tell them

25   that there was a narcotics assignment, but you in
```

189

1                          MARK PAV

2     fact thought you didn't go out on it?

3          A    Yes.

4          Q    Did it turn out that that was actually

5     incorrect?

6          A    Yes.

7          Q    When you told them, did you tell them what

8     your true memory was on that day?

9          A    Yes.

10         Q    After April 6th, did there come a time that

11    you spoke to the FBI again?

12         A    Yes.

13         Q    Before you spoke to them again, did you

14    have an opportunity to review the paperwork or focus

15    on this event in a different manner than you did on

16    the morning of April 6th?

17         A    Yes.

18         Q    Based upon that, did you then make some

19    changes or corrections to information that you had

20    told them earlier on April 6th?

21         A    Yes.

22         Q    Okay.

23              Now, Mr. Brown has asked you about some of

24    the things that are in this document that the FBI

25    agents filled out.  Is that a document that you've

190

1                          MARK PAV

2    seen before?

3          A    Yes.

4          Q    There's several of them; am I correct?

5          A    Yes.

6          Q    Essentially what they are is they're notes

7    from an FBI agent of interviews that they had with

8    you; is that right?

9          A    Yes.

10         Q    They're not your writings, correct?

11         A    Correct.

12         Q    Are there things in those documents, those

13   notes or those memorandums that are written by FBI

14   agents that you believe are incorrect?

15         A    Yes.

16         Q    For example, Mr. Brown asked you about

17   whether you told the FBI that Mr. McCoy had a

18   heightened sex drive.  Do you recall them asking you

19   that?

20         A    Yes.

21         Q    Do you actually say to the FBI that

22   Mr. McCoy had a heightened sex drive?

23         A    No.

24         Q    In one of the documents it indicated -- and

25   Mr. Brown actually read to you from the document.

1                    MARK PAV

2    Essentially he read to you that it indicated the FBI

3    in one of those documents claims that you said to the

4    FBI that Mr. McCoy masturbated and watched

5    photography on a daily basis.  Do you recall

6    Mr. Brown asking you that question?

7         A    Yes.

8         Q    Did you ever tell the FBI that Mr. McCoy

9    masturbated and watched porn on a daily basis?

10        A    No.

11        Q    I believe you explained the context of that

12   to Mr. Brown; is that right?

13        A    Yes.

14        Q    Would you agree with me what the FBI wrote

15   down in that document was incorrect?

16        A    Yes.

17        Q    When you spoke to the FBI on April 6th at

18   your home, if you know, did they record that

19   conversation?

20        A    No, they did not.

21        Q    You spoke to them more than one time; am I

22   right?

23        A    Correct.

24        Q    There's times that you spoke to them at the

25   United States Attorney's office; is that right?

192

1                          MARK PAV

2         A    Yes.

3         Q    When you were there at the United States

4    Attorney's office, during those interviews, did they

5    record those interviews?

6         A    Not to my knowledge.

7         Q    If you know, have you ever heard any

8    recordings of those interviews?

9         A    No.

10        Q    Mr. Brown asked some questions about your

11   communications with the FBI, things that you said to

12   them, and you answered the questions that some of the

13   things you didn't remember whether you had said it to

14   the FBI or not; is that correct?

15        A    Correct.

16        Q    If you had a recording of those interviews,

17   do you think it would be helpful to you to help you

18   remember what you actually said to the FBI?

19        A    Yes.

20        Q    You've used the phrase uniform squad room

21   here during your testimony.  When you spoke to the

22   FBI, when you spoke about the area that's the uniform

23   squad room, is that the phrase you used, uniform

24   squad room?

25        A    I believe so.

1                      MARK PAV

2          ·Q    The documents sometimes use the phrase

3    holding area, Is that a phrase that you would have

4    used to the FBI?

5          A    No.

6          Q    So when the documents used phrase holding

7    area, is that a term of art that the FBI used?

8          A    Yes.

9          Q    But you told them uniform squad room; is

10   that right?

11         A    Correct.

12         Q    On March 16th of 2017, if I'm correct, if

13   you can just tell me how many times were you in the

14   juvenile squad room --

15         A    One.

16         Q    Wait.

17              -- with Officer McCoy and Ms. Newkirk?

18         A    Once.

19         Q    Do you recall what time you left the

20   uniform squad room?

21         A    Right around 2:00.

22         Q    What leads you to be able to tell us that

23   you left around 2:00?

24         A    We had a narcotics investigation that I had

25   to be outside to meet them at 2:00.

194

1                          MARK PAV

2          Q    Before you left, did you say anything to

3    Officer McCoy about the impending narcotics

4    investigation?

5          A    I would let him know if we need to be in

6    uniform, not uniform, marked car, unmarked car.

7          Q    When you left, you believe it was around

8    2:00?

9          A    Correct.

10         Q    At that point had Ms. Newkirk been searched

11   yet?

12         A    No.

13         Q    To the best of your knowledge, was she

14   searched after that?

15         A    Yes.

16         Q    When you filled out the prisoner activity

17   log, at that time when you left, which was closer to

18   2:00, at that point in time, had Ms. Newkirk been

19   searched at 1:30?

20         A    No.

21         Q    There came a time you received a text from

22   Officer McCoy; am I right?

23         A    Yes.

24         Q    He indicated that she was in fact searched

25   at 1:30 in the text?  The text said she was searched

195

1                           MARK PAV

2     at 1:30; is that right?

3          A     Correct.

4          Q     When you got the text, did you know that

5     1:30 was not?

6          A     Yes.

7          Q     Why?

8          A     'Cause she wasn't searched before I left

9     the juvenile room, before the narcotics

10    investigation, and I left the juvenile room like

11    around 2:00 'cause that was the time I had to meet

12    the narcotics detectives outside.

13         Q     Officer Pav, on March 16, 2017, at any time

14    during that day, were you ever aware, or did you ever

15    become aware, that Officer McCoy sexually abused or

16    committed any misconduct to Ms. Newkirk?

17         A     No.

18         Q     You had no knowledge of that on that day at

19    all?

20         A     Correct.

21               MR. MITCHELL:  I don't have anything

22               further.

23               MR. BROWN:  Mr. Mitchell, we have

24               nothing further.

25               Thank you, Officer.

196

1                           MARK PAV
2                   MR. MITCHELL:  Thank you.
3                   Thank you, madam reporter.
4                           -oOo-
5                   (Time noted: 2:35 p.m.)
6
7     _____
8     MARK PAV
9
10    Subscribed and sworn to
      before me this _____ day
11    of _____ 2020.
12
13    _____
                  NOTARY PUBLIC
14
15
16
17
18
19
20
21
22
23
24
25

Enright Court Reporting      (631) 589-7788

197

1

2                           I N D E X

3    WITNESS                 EXAMINATION BY                PAGE

4    Mark Pav                Mr. Brown                     4

5                            Mr. Mitchell                  185

6

                             E X H I B I T S

7

     PLAINTIFF'S             DESCRIPTION                   PAGE

8

     1        Violation Information                        4

9

     2        Suffolk County Prisoner Activity Log         4

10

     3        Emails                                       4

11

     4        Suffolk County Prosecution Worksheet         4

12

13

14

15

16

17

18

19

20

21

22

23

24

25

198

1
2                    C E R T I F I C A T E
3
4    STATE OF NEW YORK    )
                          :   SS:
5    COUNTY OF NASSAU     )
6
7          I, LISA CONWAY, a Shorthand Reporter and
8    Notary Public within and for the State of New York,
9    do hereby certify:
10         That MARK PAV, the witness whose deposition is
11   hereinbefore set forth, was duly sworn by me, and
12   that such deposition is a true record of the
13   testimony given by such witness.
14         I further certify that I am not related to any
15   of the parties to this action by blood or marriage,
16   and that I am in no way interested in the outcome of
17   this matter.
18         IN WITNESS WHEREOF, I have hereunto set my
19   hand this 11th day of March, 2020.
20
21
22
23                         _Lisa Conway_
24                          LISA CONWAY
25