UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------x
LATOYA NEWKIRK,

                                Plaintiff,                2:17-CV-02960(MKB)(PK)


                  - against -

COUNTY OF SUFFOLK, CHRISTOPHER A. MCCOY, in his
official and individual capacities and MARK PAV, in his official
and individual capacities,

                                Defendants.
--------------------------------------------------------------------------------x




**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS COUNTY OF
SUFFOLK AND MARK PAV'S MOTION FOR SUMMARY JUDGMENT**




**EGAN & GOLDEN, LLP**
*Attorneys for Plaintiff*
96 South Ocean Avenue
Patchogue, NY 11772
(631) 447-8100

*Of Counsel:*
Brian T. Egan, Esq.
Michael J. Brown, Esq.
Christopher A. Bianco, Esq.

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT...................................................................................................1

STATEMENT OF FACTS………...........................................................................................3

STANDARD OF REVIEW.......................................................................................................9

ARGUMENT

POINT I
THERE ARE QUESTIONS OF FACT RELATING TO DEFENDANT PAV'S KNOWLEDGE
OF AND INVOLVEMENT IN THE SEXUAL ASSAULT OF MS. NEWKIRK
………..........................................................................................................................................9

      A. Standard for evaluating similar civil rights claims.......................................................9

      B. Inconsistencies in Pav's testimony and other conduct create questions of fact as to his
      involvement in the sexual assault........................................................................................13

      C. Ms. Newkirk's testimony has been consistent.................................................................16

      D. A reasonable juror could find Pav liable......................................................................17

      E. Pav's stop of the vehicle and search and seizure of the purse were unreasonable........18

POINT II
THERE ARE MATERIAL ISSUES OF FACT AS TO THE COUNTY'S MUNICIPAL
LIABILITY...............................................................................................................................18

POINT III
PAV IS NOT ENTITLED TO QUALIFIED IMMUNITY.......................................................20

CONCLUSION.........................................................................................................................21

# TABLE OF AUTHORITIES

## <u>CASES</u>

*Bah v. City of New York*, 319 F.Supp.3d 698 (S.D.N.Y. 2018) ..............................11

*Batista v. Rodriguez*, 702 F.2d 393 (2d Cir. 1983) .........................................19

*Beyer v. Cty. of Nassau*, 524 F.3d 160 (2d Cir. 2008)...................................9

*Bradway v. Gonzales*, 26 F.3d 313 (2d Cir. 1994)........................................20

*Brown v. Eli Lilly and Co.*, 654 F.3d 347 (2d Cir. 2011).................................9

*Cash v. County of Erie*, 654 F.3d 324 (2d Cir. 2011) ...............................19-20

*Figueroa v. Mazza*, 825 F.3d 89 (2d Cir. 2016) ........................................10

*Gonzalez v. Waterbury Police Dept.*, 199 F.Supp.3d 616 (D. Conn. 2016) .........................11

*Graham v. City of New York*, 928 F.Supp.2d 610 (E.D.N.Y.2013) ........................12

*Harris v. City of Pagedale,* 821 F.2d 499 (8th Cir. 1987) ...............................10

*Iacovangelo v. Correctional Medical Care, Inc.*, 624 Fed.Appx. 10 (2d Cir. 2015) .......................18

*Jackson v. City of New York*, 939 F.Supp.2d 219 (E.D.N.Y. 2013) ......................18, 21

*Jackson v. Tellado*, 236 F. Supp. 3d 636 (E.D.N.Y. 2017)................................11

*Jean-Laurent v. Wilkinson*, 540 F.Supp.2d 501 (S.D.N.Y. 2008) ........................10

*Lennon v. Miller*, 66 F.3d 416 (2d Cir.1995) ............................................20

*Lillard v. Shelby County Bd. of Educ.,* 76 F.3d 716 (6th Cir. 1996) ........................10

*Medina v. Donaldson*, 2014 WL 1010951 (E.D.N.Y. March 14, 2014) ....................11

*Montanez v. City of Syracuse*, 2019 WL 315058 (N.D.N.Y. January 23, 2019) ..................10

*Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123 (2d Cir. 1997) ...........................12

*Russo v. City of Bridgeport*, 479 F.3d 196 (2d Cir. 2007) ...............................20-21

*Russo v. DiMilia*, 894 F.Supp.2d 391 (S.D.N.Y. 2012) .................................12

*Sepulveda v. Ramirez,* 967 F.2d 1413 (9th Cir.1992) ............................................................10

*Sorrell v. County of Nassau*, 162 F.Supp.3d 156 (E.D.N.Y. 2016) ............................................18

*Tatum v. Jackson*, 668 F.Supp.2d 584 (S.D.N.Y. 2009) ............................................................11

*Theodat v. City of New York*, 818 F. App'x 79 (2d Cir. 2020) .........................................10-11

*Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129 (2d Cir. 2010) .........................................18

*TZ Ex Rel. CG v. City of New York*, 635 F.Supp.2d 152 (E.D.N.Y. 2009). ...........................9-10

*Vesterhalt v. City of New York*, 667 F.Supp.2d 292 (S.D.N.Y. 2009). ...............................11-12

*Wray v. City of New York*, 490 F.3d 189 (2d Cir. 2007) .........................................................18-19

## **STATUTES AND REGULATIONS**

Fed. R. Civ. P. 56… ....................................................................................................................9

**"[P]olice officers are given special powers, unique in our society, to use force, even deadly force, in the furtherance of their duties. Along with that power, however, must come the responsibility of loyalty first to the public the officers serve. That requires that the code of silence not be used as a shield to hide misconduct."**

**-      The "Christopher Commission", writing on the LAPD, 1991, p 170-1**

## PRELIMINARY STATEMENT

Plaintiff LATOYA NEWKIRK submits this Memorandum of Law in opposition to Defendants COUNTY OF SUFFOLK (the "County") and MARK PAV's ("Pav") (collectively the "County Defendants") Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

First, there is no dispute that Ms. Newkirk was the victim of brazen sexual assaults at the hands of Defendant and former police officer CHRISTOPHER MCCOY ("McCoy"). That day Defendant Pav was McCoy's partner. The sexual assault began in the morning on the side of a road under the guise of a traffic stop and continued inside the First Precinct of the Suffolk County Police Department where Defendant McCoy forced Ms. Newkirk to perform oral sex on him. The FBI arrested McCoy, he pleaded guilty to violating the civil rights of Ms. Newkirk, and the District Court sentenced McCoy to federal prison. McCoy has defaulted in this action.

The County Defendants now ask that the Court reward their police department for its blatant lack of transparency and basic police protocol. There is no surveillance footage of the precinct, no body cams, no police car dashcams, no memo books, and no "T-Stop data" for the subject traffic stop. The lack of such evidence is not Ms. Newkirk's fault, and she should not be punished for the County and Officer Pav's ability to exploit the county's absence of protocols to

1

abuse civilians. However, despite such evasion, the record in this action details multiple elements of Officer Pav's involvement and the County's liability which allowed this abuse to occur.

Defendant Pav does not recall why he pulled over the vehicle where Ms. Newkirk was a passenger. Pav failed to record the "T-Stop data" for the traffic stop despite the department's policy that the identity of all those inside the vehicle be recorded, along with the reason for and disposition of the stop. Pav has offered differing accounts to both the FBI and the lawyers in this case about what he saw at the traffic stop when McCoy groped and fondled Ms. Newkirk under the pretense of a search.

Perhaps Pav's most egregious act was his admitted fabrication of entries in Ms. Newkirk's prisoner log so that the log falsely showed that he had observed Ms. Newkirk and found her condition to be okay. The reality was that during these time periods in the log, Defendant McCoy sexually assaulted Ms. Newkirk in an interrogation room in the police precinct. One text message between Pav and McCoy points to coordination between the Defendants as to the falsification of entries in the prisoner log.

Finally, Pav's disregard for women and female arrestees is shown in the callous and disgusting language he used on the date of the incident. Pav asked Newkirk that evening after she had been sexually abused by McCoy whether she liked "white chocolate". That afternoon, after Pav had arrested another female for possession of marijuana, he described the arrest in a text message to McCoy by stating that he pulled the marijuana from the female suspect's "snatch". Summary Judgment for Defendant Pav is simply not appropriate. There are clear questions of fact as to whether Pav knew what was occurring, whether he had the

opportunity to intervene, whether he was a direct participant and whether he conspired with McCoy to cover it all up.

The expert report of retired Chief Edmund Hartnett examines the failures in supervision that emboldened McCoy and the policies with regards to prisoner intake, holding, and supervision that made such a tragic event inevitable.  The County's Motion for Summary Judgment must be denied, and Plaintiff should have her day in Court to allow a jury to test the veracity of the Defendants.

## STATEMENT OF FACTS

Latoya Newkirk commenced this action seeking damages for the deprivation of her civil rights and the assault, battery, false arrest and imprisonment, and infliction of emotional distress she suffered at the hands of Defendants.  (Rule 56.1 Statement1 ¶ 1).  Plaintiff's ordeal began with a traffic stop on March 16, 2017.  (*Id.* at ¶ 2).  She is an African American female, and at the time of the incident she was 30 years old.  (*See* Counter-Statement at ¶ 2).  Plaintiff was the passenger in a vehicle driven by Olanrewaju "Larry" Abiola.  (Rule 56.1 Statement at ¶ 3).  Suffolk County Police Officers Pav and McCoy pulled the car over at approximately 10:30 a.m.  (*Id.* at ¶ 2).  Pav was driving the police vehicle and McCoy was the passenger.  (*Id.* at ¶ 4).

McCoy approached the passenger side of Mr. Abiola's car where Ms. Newkirk was sitting and asked Ms. Newkirk for identification.  (*Id.* at ¶ 7).  Officer Pav approached the driver.  (*Id.*).  One of the officers ran Ms. Newkirk's identification and determined that she had outstanding warrants.  (Counter-Statement at ¶ 1; Rule 56.1 Statement ¶ 10).  Notably, the

---

[1] Citations to the "Rule 56.1 Statement" are to the County Defendants' Rule 56.1 Statement. Citations to the "Counter-Statement" are to the Additional Statement of Undisputed Facts set forth at the end of the Plaintiff's Rule 56.1 Response.

traffic-related charges for which warrants were issued would ultimately be dismissed.  (Counter-Statement at ¶ 2).  When McCoy returned to Ms. Newkirk in the vehicle, he told her of the outstanding warrants, to which Ms. Newkirk replied that she had documentation showing that the warrants were no longer active.  (Rule 56.1 Statement ¶¶ 11-12).  McCoy then told Ms. Newkirk that the paperwork did not show that the warrants were no longer active and asked her to exit the vehicle.  (Rule 56.1 Statement ¶ 14).  At this time Pav then reached into the vehicle and grabbed Ms. Newkirk's purse and Ms. Newkirk then told him he did not have permission to take her purse or go into the car.  (*Id.* at ¶ 15).

Ms. Newkirk exited the vehicle and while Officer Pav then went through Ms. Newkirk's purse, McCoy placed Ms. Newkirk in handcuffs.  (*Id.* at ¶¶ 17-18).  McCoy handcuffed Ms. Newkirk when she objected to the search of her purse.  (*Id.* at ¶ 19).  Ms. Newkirk continued to object to Pav's search of the purse.  (*Id.* at ¶ 19).  McCoy began searching Ms. Newkirk by the rear passenger side of Mr. Abiola's car.  (*Id.* at ¶¶ 21-22).  The search began with McCoy reaching in to her pockets.  (Counter-Statement at ¶ 3).  Sometime near the start of the search, Pav told Mr. Abiola that he could leave and Mr. Abiola pulled away.  (Rule 56.1 Statement at ¶ 26).  There is no T-Stop data[2] recorded for the subject traffic stop, nor could Pav articulate a reason for the stop.  (Counter-Statement at ¶ 24).

McCoy then brought Ms. Newkirk toward the passenger side of the police vehicle.  (Rule 56.1 Statement at ¶ 34).  McCoy asked Ms. Newkirk to shake out her bra to which she replied that she was handcuffed and could not do so.  (*Id.* at ¶ 27-28).  McCoy then reached into Ms. Newkirk's bra, put his hands under her sweater from underneath and held his

---

[2] "T-Stop data" is required by the Suffolk County Police Department for all traffic stops and it requires entry of "the person you pulled over and the reason why you pulled them over and the disposition for it."  (Counter-Statement at ¶ 25).

hands on her breasts.  (*Id.* at ¶ 35).  Ms. Newkirk was close enough to the police vehicle that if she fell backwards her back would land on the car.  (*Id.* at ¶ 37).  McCoy had his hands on Ms. Newkirk's breasts for a while and Ms. Newkirk jumped when he felt her nipples.  (Counter-Statement at ¶¶ 4-5).  McCoy giggled when Ms. Newkirk jumped.  (*Id.* at 6).  While McCoy was groping Ms. Newkirk's breasts Pav was initially putting Ms. Newkirk's purse in the trunk of the police vehicle and then sat in the driver's seat of the police vehicle.  (Rule 56.1 Statement at ¶ 39).  When Defendant Pav was in the driver's seat of the police vehicle, he had a clear line of sight to McCoy groping Ms. Newkirk's breasts.  (Counter-Statement at ¶ 7).  McCoy then zipped up Ms. Newkirk's jacket and with the sound of the jacket zipping, Pav said "we can search her at the precinct."  (Rule 56.1 Statement at ¶ 51).  The officers then took Ms. Newkirk directly to the Suffolk County First Precinct.  (*Id.* at ¶ 62).

In the car, Ms. Newkirk suffered a panic attack and asked the officers to lower the windows of the vehicle to which they complied.  (*Id.* at ¶ 63).  They arrived at the precinct at approximately 11:00 a.m.  (*Id.* at ¶ 66).  In the mug shot area of the precinct McCoy continued his sexual assault of Ms. Newkirk by placing his hands up Ms. Newkirk's shirt and inside her leggings while telling Ms. Newkirk that he thought she liked it.  (*Id.* at ¶ 70; Counter-Statement at ¶ 8).  Ms. Newkirk would be brought to the juvenile interrogation room twice (Rule 56.1 Statement at ¶¶ 74-75).  The first time Ms. Newkirk was brought to the juvenile room McCoy sexually abused her by forcing Ms. Newkirk to touch his penis and perform oral sex on him, when they were alone.  (Rule 56.1 Statement at ¶ 80; Counter-Statement at ¶ 9).  Pav had been in the juvenile room with McCoy and Ms. Newkirk for a short time but was not present for the sexual assault.  (Rule 56.1 Statement at ¶¶ 81-82).  When McCoy heard a noise outside the door,

he stopped the first sexual assault.  (Rule 56.1 Statement at ¶ 85).  McCoy escorted Ms. Newkirk back to the prisoner holding area.  (*Id.* at ¶ 87).

At approximately 2:00 p.m. Ms. Newkirk was brought back to the juvenile interrogation room.  (*Id.* at ¶ 88).  At some point after her return to the interrogation room, Ms. Newkirk was taken out of the room to be searched by Officer Delfina Rivera.  (*Id.* at ¶ 89).  Officer Pav was inside the juvenile interrogation room when he exited the room and flagged Officer Rivera to search Ms. Newkirk.  (Counter-Statement at ¶ 10).  Ms. Newkirk was returned to the juvenile interrogation room where soon after, McCoy again sexually assaulted Ms. Newkirk.  (Rule 56.1 Statement at ¶ 104).  During the second sexual assault in the interrogation room, Defendant McCoy attempted to pull down Ms. Newkirk's waistband, and then pulled Ms. Newkirk's head down to his penis and forced her to perform oral sex on him.  (*Id.*; Counter-Statement at ¶ 11).  Defendant McCoy pulled her face down with enough force to "really hurt [Ms. Newkirk's] jaw".  (*Id.*).  When Ms. Newkirk resisted, Defendant McCoy told her "don't make it hard."  (*Id.*).  Defendant McCoy ejaculated in her mouth and face and some of the ejaculate ended up on her sweater.  (*Id.*).  Pav was not present for the second assault.  (Rule 56.1 Statement at ¶ 106).

Sometime around 2:36 p.m. Pav left the precinct to participate in a narcotics operation.  (Counter-Statement at ¶ 20).  At approximately 3:50 p.m. Pav returned to the precinct with arrestee Victoria Harris.  (Rule 56.1 Statement at ¶¶ 141-142).  Shortly after returning to the precinct, Pav described the search and arrest of Ms. Harris in a text message to McCoy: "I'd went good some kid from Bayshore female pass had warrant so we took her and weed in her snatch at thenpct".  (Counter-Statement at ¶ 21).  Later that evening in the holding area, when Ms. Newkirk asked Officer Pav if McCoy was married, Officer Pav replied "Why? You like

white chocolate?"  (Rule 56.1 Statement at ¶ 113).  Pav told the FBI that he did not believe Ms.

Newkirk's question "was sexual in nature."  (Counter-Statement at ¶ 22).

The prisoner activity log for Ms. Newkirk includes nine entries, admittedly fabricated by Defendant Pav, covering the time period of 11:55 a.m. to 3:30 p.m. that day. (Counter-Statement at ¶ 12; Rule 56.1 Statement at ¶ 145).  The purpose of the prisoner activity log is to document the prisoner's demeanor and condition at the time of observation.  (Counter-Statement at ¶ 13).  The entries are supposed to be made every half-hour, contemporaneously with observation of the prisoner.  (*Id.* at ¶ 14).  Each entry should reflect what the prisoner is doing and/or how they are feeling.  (*Id.* at ¶ 15).  Pav admitted in his deposition that he made the nine entries covering the period from 11:55 a.m. to 3:30 p.m. despite not having observed Ms. Newkirk during these times.  (*Id.* at ¶ 16; Rule 56.1 Statement at ¶ 145).  In these false entries, Pav indicated in seven that Ms. Newkirk was "sitting", in one that she was "searched", and in another that she was in "property".  (Counter-Statement at ¶ 17).  These entries covered the entire period during which Ms. Newkirk was sexually assaulted in the juvenile interrogation room.  (*Id.*)  When presented with a screenshot of text messages between himself and McCoy on the subject day, Pav admitted when McCoy texted him "Searched by 6542 at 1330, I left it on the table too", it was reference to McCoy leaving the prisoner log for him to fill in.  (Counter-Statement at ¶ 19).

Soon after Ms. Newkirk's release from custody, Defendant McCoy continued to harass Ms. Newkirk through text messages.  (Counter-Statement at ¶ 33).  Ultimately, the FBI conducted an investigation into the incident.  (*Id.* at ¶ 23).  The United States of America filed a criminal complaint against Defendant McCoy on July 26, 2017 in the United States District

Court for the Eastern District of New York (2:18-cr-00530-GRB[3]).  (*Id.* at ¶ 33).  The criminal complaint sets forth, in sum and substance, the allegations set forth by Plaintiff in this action. The United States of America alleged that Defendant McCoy, acting under color of the laws of the United States, "knowingly and willfully deprive[d] Jane Doe, an individual whose identity is known to the FBI, of a right and privilege secured and protected by the Constitution and laws of the United States, to wit: the right to bodily integrity, which includes the right to be free from aggravated sexual abuse by one acting under color of law, by causing Jane Doe to engage in a sexual act, as defined in Title 18, United States Code, Section 2246(2)(B), to wit: contact between the mouth and penis, by using force against Jane Doe, which resulted in bodily injury." (*Id.*).  On October 9, 2018 Defendant McCoy pleaded guilty to one count of violation of civil rights.  (*Id.* at ¶ 34).  In his allocution, Defendant McCoy stated

> "On or about March 16, 2017 during my duties as a Suffolk County New York Police Officer I arrested Jane Doe in Suffolk County. She was the subject of several open arrest warrants. I transported her to the 1st Precinct in Babylon. There while acting under color of law I knowingly and willfully deprived Ms. Doe of her right to bodily integrity, a right protected by the U.S. Constitution and laws of the U.S. I used my position as a police officer to persuade her to cause her mouth to make contact with my penis while in custody at the precinct and she felt she did not have a choice."

(*Id.*).  When pressed by the U.S. Attorney, Defendant McCoy expressly admitted that he did not have the consent of Plaintiff when he acted.  (*Id.*).

The Internal Affairs Bureau of the Suffolk County Police Department conducted an investigation of the incident.  (Counter-Statement at ¶ 26).  It found that "[t]he [deposition]

---

[3] The criminal case was initially commenced under Magistrate Case Number: 2:17-mj-00674-AYS.

transcript corroborates Newkirk's account of the incident as she described in her FBI interviews." (*Id.*)

## STANDARD

An order granting a Motion for Summary Judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.  The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," and "may not rely on conclusory allegations or unsubstantiated speculation." *Brown v. Eli Lilly and Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citations omitted).  "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Id.* Evidence is viewed in the light most favorable to the non-moving party and reasonable inferences are drawn in favor of the non-moving party.  *Id.*  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008).

## ARGUMENT

### POINT I

### THERE ARE QUESTIONS OF FACT RELATING TO DEFENDANT PAV'S KNOWLEDGE OF AND INVOLVEMENT IN THE SEXUAL ASSAULT OF MS. NEWKIRK

*a) Standard for evaluating similar civil rights claims.*

"A § 1983 claim against an individual has two elements: (1) the defendant acted under color of state law; and (2) as a result of defendant's conduct, plaintiff suffered a denial of a federal statutory or constitutional right or privilege."  *TZ Ex Rel. CG v. City of New York*, 635

F.Supp.2d 152, 181 (E.D.N.Y. 2009). "The Second Circuit has recognized a constitutional right to bodily integrity that is violated by a sexual assault by a state actor." *Id.* at 177; *Montanez v. City of Syracuse*, 6:16-cv-00550, 2019 WL 315058 (N.D.N.Y. January 23, 2019) ("Courts have recognized a police officer's use of his position to coerce sex as a violation of a right to bodily integrity that violates substantive due process.") *see also Harris v. City of Pagedale,* 821 F.2d 499, 508 (8th Cir. 1987) (city liable under section 1983 when police officer sexually fondled and raped a woman); *Lillard v. Shelby County Bd. of Educ.,* 76 F.3d 716, 727 (6th Cir. 1996) (teacher's fondling a student's breast may violate the substantive due process right to bodily integrity); *Sepulveda v. Ramirez,* 967 F.2d 1413, 1415–16 (9th Cir.1992) (parole officer not entitled to qualified immunity for depriving woman of clearly established due process right to bodily privacy by entering a bathroom stall and watching her urinate).

In addition to a direct theory of liability, a plaintiff in a civil rights claim may prove her case by showing that a police officer failed to intervene when her civil rights were being violated.  A police officer has an affirmative duty to intervene on behalf of an individual whose civil rights are being violated when that officer is in a position to and has the ability to stop the assault or deprivation.  *Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016); *Jean-Laurent v. Wilkinson*, 540 F.Supp.2d 501, 512 (S.D.N.Y. 2008).  To prevail on a claim for failure to intervene, the plaintiff must demonstrate that "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Jean-Laurent v. Wilkinson*, 540 F.Supp.2d 501, 512 (S.D.N.Y. 2008). "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless,

considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Theodat v. City of New York*, 818 F. App'x 79, 82 (2d Cir. 2020) *quoting Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994).

A plaintiff may support her civil rights claim with circumstantial evidence. *Vesterhalt v. City of New York*, 667 F.Supp.2d 292, 297-298 (S.D.N.Y. 2009) (denying defendant's motion for summary judgment despite plaintiff not being able to identify which officer used excessive force since "all of the individual defendants were present either inside the apartment or directly outside the door [and] [t]herefore, it is possible that all of the officers saw what happened to [plaintiff] when the door was thrown open and she was thrown to the ground, but failed to intervene on her behalf."); *Gonzalez v. Waterbury Police Dept.*, 199 F.Supp.3d 616, 621-623 (D. Conn. 2016) (circumstantial evidence may be used to support direct participation or failure to intervene theories. In fact, circumstantial evidence alone may support a jury verdict against an officer for violation of plaintiff's civil rights. *Jackson v. Tellado*, 236 F. Supp. 3d 636, 666 (E.D.N.Y. 2017) (permitting a jury to "infer a defendant's involvement in use of excessive force based on circumstantial evidence" alone).

Further, inconsistent or implausible testimony from a defendant officer can itself be persuasive circumstantial evidence of a civil rights violation. *See, e.g., Medina v. Donaldson*, 2014 WL 1010951 at *8-9 (E.D.N.Y. March 14, 2014) (denying judgment as a matter of law and holding that "the jury may have inferred that Defendant was involved in the use of excessive force based on particular inconsistencies in his testimony."); *Bah v. City of New York*, 319 F.Supp.3d 698, 708 (S.D.N.Y. 2018) (upholding verdict against officer for excessive force where officer's testimony "was inconsistent both internally and with other evidence in the case."); *Tatum v. Jackson*, 668 F.Supp.2d 584, 593 (S.D.N.Y. 2009).

The close proximity of officers during an alleged deprivation of constitutional rights even where plaintiff cannot identify who directly engaged in the use of excessive force or battery creates genuine issues of fact as to officers' failure to intervene.   *Vesterhalt*, 667 F.Supp.2d at 297-298; *Graham v. City of New York*, 928 F.Supp.2d 610, 622 (E.D.N.Y.2013).   A defendant's falsification of documents in an attempt to cover another defendant's earlier deprivation can be used as evidence of a failure to intervene.   *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997) (summary judgment on failure to intervene claim inappropriate since falsification of records by certain defendants could support claim that they cooperated or failed to intervene in another officer's earlier false arrest).   *Ricciuti* is especially pertinent because it points to a supporting officer's falsification of documents after the constitutional deprivation as evidence in support of a claim that the officer failed to intervene:

> Applying those principles to this case we agree with plaintiff that summary judgment was inappropriately granted. Crediting plaintiffs' evidence, a jury could find that Watson [the arresting officer] did not tell Lopez or Wheeler that Daniel [the arrestee] had participated with Alfred in the assault; that Lopez and Wheeler [supporting officers] believed Watson was arresting Daniel in the station house without cause; and that they then falsified evidence to make it appear that Daniel had been arrested at an earlier time, in a different place, and by Lopez, instead of Watson.

*Id.*   In sum, on a motion for summary judgment, Lopez and Wheeler, the supporting officers, could not simply claim ignorance as to Officer Watson's false arrest.   A reasonable jury could find that their subsequent falsification of evidence in support of the arrest was proof that they were aware it was a false arrest.

"Even when a plaintiff has relied exclusively on his own testimony, courts have denied summary judgment to defendants, as long as the plaintiff's testimony was not contradictory or rife with inconsistencies such that it was facially implausible."   *Russo v. DiMilia*, 894 F.Supp.2d 391, 410 (S.D.N.Y. 2012).

*b) Inconsistencies in Pav's testimony and other conduct create questions of fact as to his involvement in the sexual assault.*

   A reasonable juror could infer from Pav's inconsistent testimony on material issues as well as his conduct that day and subsequently, that Pav assisted McCoy in the carrying out the sexual assault or was in a position to and had the ability to stop the assault.

   First, Pav and the County have failed to provide a justification for the traffic stop or T-Stop data showing the reason for and disposition of the stop.  (Counter-Statement at ¶ 24).  As noted by the Plaintiff's police procedure expert, the combination of "no reasonable suspicion to stop the vehicle", "no T-Stop entry", a missing memo book, and "an inexplicable warrant check done on a passenger in the car" point to a "hunting expedition" under the guise of a traffic stop.  (Counter-Statement at ¶ 31).

   Pav's shifting story of what occurred at the stop has changed materially to remove himself from any observation of the arrest, search, or assault of Ms. Newkirk.  In his April 26, 2017 interview with the FBI, Pav told investigators that McCoy handcuffed Ms. Newkirk at the hood of the police vehicle and walked her to the back of the vehicle and placed her inside.  (Counter-Statement at ¶ 29).  In his deposition testimony he offers two different accounts of what transpired at the stop.  Pav initially testified that after Ms. Newkirk attempted to show papers that she thought cleared her of the warrants: "[a]t that point I'm not exactly sure what transpires from that point. She's eventually brought back to the back of our vehicle."  (See Response to Rule 56.1 Statement at ¶ 53).  When asked again about what occurred "before [McCoy] eventually brought [Ms. Newkirk] to the back of the car" he confirms "I don't recall exactly what was going on." (*Id.*).  Yet, just two questions later, when asked if "[McCoy] put her in handcuffs yet" he responded "no" and when asked whether anybody had frisked or searched her, he testified that

nobody had done so.  (*Id.*).  Later in the deposition, Defendant Pav testifies that at the time of the

incident he did not know whether Ms. Newkirk had been frisked or searched:

> Q: Just so I understand, you don't know at this point, meaning when you go back
> to the car, whether she was actually frisked?
> A: Correct.
> Q: Or searched?
> A: Correct.

(*Id.*).

Pav's testimony is inconsistent on what he saw after Ms. Newkirk exits Mr.

Abiola's vehicle.  He offers two versions: one where he can't recall what occurred from the point

when Ms. Newkirk showed her papers to when she is inside the police car and another version

where he observed McCoy and Newkirk on his way back to Mr. Abiola but did not see Ms.

Newkirk placed in cuffs or searched at any point.  Both versions also contradict what he told the

FBI.  Again, when interviewed by FBI, he said he had witnessed Ms. Newkirk being cuffed on

the hood of the police car and placed in the back seat of the police vehicle.  (Counter-Statement

at ¶ 29).

The other issues with Pav's testimony and statements to the FBI also point to

credibility issues and material issues of fact.  In his first interview with the FBI, Pav described

Ms. Newkirk as "flirtatious" but in his second interview and in his deposition, he admits that she

was not flirtatious.  (Counter-Statement at ¶ 28).  Further, in his deposition testimony, he says he

never saw or spoke to Officer Rivera that day, but Officer Rivera testified that Pav exited the

juvenile interrogation room and called her in to take Ms. Newkirk out for a search sometime in

the afternoon.  (Counter-Statement at ¶¶ 10 & 30).  The contradictory testimony shows another

attempt by Pav to distance himself from McCoy and Ms. Newkirk's location.  Finally, the IAB

report noted that Pav's statement to investigators contradicted prior statements to the FBI

regarding where he was when the desk sergeant interviewed Ms. Newkirk when she arrived at the precinct.  (Counter-Statement at ¶ 27).  Again, Pav's latest statements attempt to place him in a location away from McCoy and Ms. Newkirk.

Outside of the issues relating to testimony, Pav's conduct that day also creates issues of fact as to the degree of his knowledge and/or involvement in McCoy's assault on Ms. Newkirk.  As detailed in the Statement of Facts, Pav fabricated the nine entries from 11:55 a.m. to 3:30 p.m. on Ms. Newkirk's prisoner log.  (Plaintiff's Mem. of Law at 8).  Pav was not present to observe Ms. Newkirk's condition during this time despite the entries that she was "sitting", "searched", or in "property".  (*Id.*)  The log is especially important here since Pav's false entries were made on the day of the sexual assault and include the period in which Mr. McCoy sexually assaulted Ms. Newkirk in the interrogation room.  (*Id.*)  Pav also admitted that McCoy was supposed to fill out the log.  (Counter-Statement at ¶ 18).  The County attempts to minimize the impact of the prisoner log by arguing that Pav merely filled it in after McCoy left for the day.  (Rule 56.1 Statement at ¶ 143).  However, the text message from McCoy to Pav at 2:13 p.m. implies prior coordination between the partners regarding entries in the log: "Searched by 6542 at 1330, I left it on the table too".  (Counter-Statement at ¶ 19).  Pav admitted in his deposition testimony that the "it" refers to the prisoner log and "searched by 6542 at 1330" refers to a search of Ms. Newkirk by Officer Rivera at 1:30 p.m.  (*Id.*).  It is reasonable to infer from this short text message and the lack of a question in response from Pav, that Pav already knew what "it" was and what McCoy expected him to do with the log.  A reasonable jury could conclude there was a prior arrangement between McCoy and Pav to falsify the log so that it would appear Ms. Newkirk was okay when in fact she was being repeatedly sexually assaulted by McCoy.

15

The callous and racially tinged remark Pav made to Ms. Newkirk later in the evening also demonstrates the utter disregard Pav had for Ms. Newkirk's safety and dignity. When Ms. Newkirk asked whether McCoy was married, Pav responded "Why? You like white chocolate?" (Rule 56.1 Statement at ¶ 113). It is important to note that Pav told the FBI that he did not believe Newkirk's question regarding McCoy's marital status "was sexual in nature." (Counter-Statement at ¶ 22). Pav's disregard and contempt for female arrestees is also seen in the way he described to McCoy the search and arrest of Victoria Harris that very same day:

> "I'd went good some kid from Bayshore female pass had warrant so we took her and weed in her snatch at thenpct".

(Counter-Statement at ¶ 21). That Pav would think nothing of using such a derogatory term in an official police communication only bolsters the Plaintiff's argument that Pav was a tacit collaborator in McCoy's assault.

*c) Ms. Newkirk's testimony has been consistent.*

In contrast to Defendant Pav's shifting testimony, Ms. Newkirk's testimony and statements to the FBI have been consistent. The County, in its IAB report admitted the same: "[t]he [deposition] transcript corroborates Newkirk's account of the incident as she described in her FBI interviews." (Counter-Statement at ¶ 26). The arrest, prosecution, and guilty plea of McCoy also lends credence to Ms. Newkirk's credibility. Ms. Newkirk's testimony places Pav just a few feet away from her with a clear line of sight when she was subjected to McCoy's sexual assault at the traffic stop. (Counter-Statement at ¶ 7). While Pav was in the driver seat, Ms. Newkirk was close enough to the police vehicle on the passenger side that if she fell backwards her back would land on the car. (Rule 56.1 Statement at ¶ 37). McCoy had his hands on Ms. Newkirk's breasts for a while and Ms. Newkirk jumped when he felt her nipples.

16

(Counter-Statement at ¶¶ 4-5).  McCoy also giggled when Ms. Newkirk jumped.  (*Id.* at ¶ 6).  McCoy then zipped up Ms. Newkirk's jacket and with the sound of the jacket zipping, Pav said "we can search her at the precinct."  (Rule 56.1 Statement at ¶ 51).

Even assuming all of the inconsistencies in his testimony and his conduct that day do not evidence direct participation or a failure to intervene, Ms. Newkirk's testimony is credible evidence that Pav witnessed and ignored the sexual assault at the traffic stop despite the opportunity and his duty to protect her.  Pav continued his deliberate indifference to Ms. Newkirk's nightmare when he left Ms. Newkirk alone with McCoy in the precinct.  This is not a matter in which Pav had no opportunity to intervene.  He had multiple opportunities to intervene when the officers arrived at the precinct and processed Ms. Newkirk.

*d) A reasonable juror could find Pav liable.*

Given Pav's inconsistencies on what happened at the traffic stop, lack of T-stop data, the fabrication of the prisoner log, the text message from McCoy to Pav indicating coordination to falsify the log, the text message using the term "snatch" to refer to another female suspect that very day, the reference to "white chocolate", and Ms. Newkirk's consistent testimony placing Pav feet away from the roadside sexual assault, a reasonable juror could conclude that Pav is lying to protect himself and knew what was occurring to Ms. Newkirk.  Further, because the assault on Ms. Newkirk occurred in three discrete instances throughout the day in custody, a reasonable juror could conclude that even if Pav were not directly assisting McCoy, there was plenty of opportunity for Pav to intervene and prevent the assault.

*e) Pav's stop of the vehicle and search and seizure of the purse were unreasonable.*

The Defendants admit in their Statement that Pav pulled the purse from the vehicle and began searching its contents before the arrest of Ms. Newkirk.  (Rule 56.1 Statement at ¶¶ 15 & 17).  This, at the very least, raises a question of fact as to the reasonableness of the search.  *See Sorrell v. County of Nassau*, 162 F.Supp.3d 156, 168 (E.D.N.Y. 2016).  Further, as detailed above, Pav has failed to articulate a reason for the traffic stop and no recorded data exists to justify the stop.  Defendants were not justified in stopping the vehicle, let alone arresting Plaintiff, and this directly started the awful chain of events.  *See Jackson v. City of New York*, 939 F.Supp.2d 219, 233 (E.D.N.Y. 2013).

## POINT II

### THERE ARE MATERIAL ISSUES OF FACT AS TO THE COUNTY'S MUNICIPAL LIABILITY

To establish municipal liability under 42 U.S.C. § 1983 a plaintiff must establish that "(1) an official policy or custom. . .(2) cause[d] the plaintiff to be subjected to (3) a denial of a constitutional right."  *Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 139 (2d Cir. 2010).  "To plead a *Monell* claim, a plaintiff must allege the existence of a formal policy which is officially endorsed by the municipality, or a practice so persistent and widespread that it constitutes a custom or usage of which supervisory authorities must have been aware, or that a municipal custom, policy, or usage can be inferred from evidence of deliberate indifference of supervisory officials to such abuses."  *Iacovangelo v. Correctional Medical Care, Inc.*, 624 Fed.Appx. 10, 13 (2d Cir. 2015).

"The failure to train or supervise city employees may constitute an official policy or custom if the failure amounts to 'deliberate indifference' to the rights of those with whom the

city employees interact." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007). "[M]unicipal inaction such as the persistent failure to discipline subordinates who violate civil rights could give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of *Monell*." *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983). A plaintiff must show that the municipal policymaker acted with deliberate indifference. *Wray*, 490 F.3d at 195. "[W]here the need for more or better supervision to protect against constitutional violations was obvious, but the policymaker failed to make meaningful efforts to address the risk of harm to plaintiffs," deliberate indifference "may be inferred." *Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011).

Here, the need for better supervision was known and obvious. As noted by the Plaintiff's police procedure expert, the police department has a formal policy that prohibits the transport of a female prisoner in a police vehicle by a single male officer. (Counter-Statement at ¶ 32). The male officer must be "accompanied by another police officer or detention attendant" or the transport vehicle has to be followed by another police vehicle. (*Id.* (p.32)). However, no such similar policy exists for female arrestees during interrogation or processing at the precinct. The County was well aware of the risks associated with female prisoners being left alone in vehicles with male officers, and yet it deliberately ignored the very same risk to female arrestees and detainees in the precinct. (*Id.*)

Serious lapses in supervision at the First Precinct directly contributed to the events on March 16, 2017. These issues included Pav and McCoy's supervisors demonstrating a complete lack of knowledge on the procedure for formally disciplining an officer, sanctioning the use of the juvenile room for non-juvenile purposes in violation of the New York Family

Court Act, failing to check in on Ms. Newkirk, allowing officers to choose where to patrol, and allowing Pav to work without maintaining a memo book.  (*Id.* (pp. 23-27)).

A reasonable juror could infer that the County deliberately ignored the risk of sexual assault to female arrestees with its policy of permitting one male officer to interrogate a female suspect or arrestee.  Further, a reasonable jury could find that the supervisory lapses were so obvious that deliberate indifference could be inferred.  *See Cash*, 654 F.3d at 334; (Counter-Statement at 32 (p. 34) "there was a confluence of actions, omissions, flawed processes, blatant flaunting of the rules, mismanagement, lax supervision and misconduct that created an environment that apparently made Officer MCCOY feel comfortable in sexually assaulting his prisoner in the First Precinct").


## POINT III

## PAV IS NOT ENTITLED TO QUALIFIED IMMUNITY

The doctrine of qualified immunity shields public officials performing discretionary functions from civil liability insofar as their conduct does not violate clearly established statutory or constitutional rights. . .or insofar as it was objectively reasonable for them to believe that their acts did not violate those rights." *Bradway v. Gonzales*, 26 F.3d 313, 317–18 (2d Cir. 1994).  Summary judgment in favor of defendant officers is appropriate under the doctrine of qualified immunity if "the only conclusion a rational jury could reach is that reasonable officers would disagree about the legality of the defendant['s] conduct under the circumstances." *Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir.1995).

The constitutional right to bodily integrity and to be free from sexual assault is undoubtedly not in question.  If Officer Pav directly participated in or failed to intervene in the

sexual assault, the defense of qualified immunity is simply unavailable.  *Russo v. City of Bridgeport*, 479 F.3d 196, 211-212 (2d Cir. 2007).  The same may be said of the unlawful stop of the vehicle and search and seizure of the purse.  *Id.*; *See Jackson v. City of New York*, 939 F.Supp.2d 219, 233 (E.D.N.Y. 2013).

## CONCLUSION

For the reasons set forth herein, the Motion for Summary Judgment of Defendants Mark Pav and the County of Suffolk must be denied.

Dated:  Patchogue, New York
          March 19, 2021                              Respectfully submitted,

                                                      **EGAN & GOLDEN, LLP**
                                                      *Attorneys for Plaintiff*


                                                      /s/_____

                                                      Brian T. Egan
                                                      Christopher Bianco
                                                      96 South Ocean Avenue
                                                      Patchogue, New York 11772
                                                      631.447.8100
                                                      egan@egangolden.com

                                                      MICHAEL J. BROWN, P.C.
                                                      *Attorneys for Plaintiff*
                                                      Courthouse Corporate Center
                                                      320 Carleton Avenue, Suite #2000
                                                      Central Islip, New York 11722
                                                      631.232.9700