

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

*610 Federal Plaza*
*Central Islip, New York 11722*

September 5, 2019

Brian Mitchell
Assistant County Attorney
Suffolk County Department of Law
100 Veterans Memorial Highway
P.O. Box 6100
Hauppauge, New York 11788

        Re:    Touhy Request in <u>Newkirk v. County of Suffolk</u>, 17-CV-2960

Dear Mr. Mitchell:

       Enclosed are the following redacted memoranda of interviews responsive to your request directed to the Federal Bureau of Investigation pursuant to <u>United States ex. rel Touhy v. Ragen</u>, 340 U.S. 462 (1951):

1. Latoya Newkirk, March 27, 2017;
2. Mark Pav, April 6, 2017;
3. Latoya Newkirk, March 29, 2017:
4. Mark Pav, April 25 and April 26 of 2017;
5. Latoya Newkirk, April 4, 2017;
6. Mark Pav, June 9, 2017;
7. Andrew Hope, May 16, 2017;
8. Christopher McCoy, April 6, 2017;
9. Christopher Oddo, May 3, 2017;
10. David Lawrence Cholden, June 15, 2017;
11. Delfina Rivera, May 3, 2017;
12. James V. Burke, May 30, 2017;
13. Joseph Maldonado, May 16, 2017;
14. Lena Mercer, May 11, 2017;
15. Matthew Skulavik, June 2, 2017;
16. Michael Bieber, May 30, 2017;
17. Michael F. Axelson, June 9, 2017;
18. Robert Viscuso, May 30, 2017;
19. Sherly Ritter, May 11, 2017; and

20.     Stephanie Rivas, April 3, 2017.

Very truly yours,

RICHARD P. DONOGHUE
United States Attorney

By:     */s/Diane C. Leonardo*
Diane C. Leonardo
Assistant U.S. Attorney
(631) 715-7854

2

- 1 of 4 -

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry   04/29/2017

On March 27, 2017, LATOYA NEWKIRK, date of birth ████ ███, Social
Security Account Number ███████, address
████████  ████████ cellular telephone number ████████, was
interviewed at 267 Carleton Avenue, Central Islip by Special Agent (SA)
Christine Doyle and SA Michael Weniger. NEWKIRK was being interviewed to
gather information regarding her complaint of sexual assault by a Suffolk
County Police Department (SCPD) Police Officer on March 16, 2017 while in
SCPD custody. After being advised of the identities of the Agents,
NEWKIRK voluntarily provided the following information, in sum and
substance:

On March 16, 2017, NEWKIRK was a passenger in a vehicle being driven by
her friend, ████████ ███████ was pulled over in the vicinity
of ████████, Wyandanch, New York by SCPD
Officers MCCOY (MCCOY) and PAV (PAV). During the initial stop, MCCOY
spoke to NEWKIRK and PAV spoke to ████. NEWKIRK was told that she had
outstanding warrants. At one point, PAV began searching NEWKIRK's
purse. NEWKIRK commented to PAV that she had not granted permission to
PAV to search the purse and reached to retrieve her purse. At that point,
MCCOY told NEWKIRK she was being uncooperative and placed NEWKIRK in
handcuffs. When NEWKIRK was made aware that she was being transported to
the police station, PAV indicated that he would be bringing NEWKIRK's
purse as well and he began to place NEWKIRK's purse in the police
vehicle. NEWKIRK was concerned about having marijuana in her purse, so
she notified PAV and MCCOY that her purse contained a small amount of
marijuana.

While at the rear passenger side of the marked police vehicle, MCCOY told
NEWKIRK she was being transported to the police station and asked NEWKIRK
if NEWKIRK had anything in her bra. NEWKIRK explained to MCCOY that she
usually keeps money in her bra but her money was currently in her
purse. MCCOY instructed NEWKIRK to shake her bra to determine if it
contained anything. NEWKIRK's hands were cuffed behind her back, making
it difficult to shake her bra as instructed by MCCOY, so MCCOY shook
NEWKIRK's bra and placed his hands on NEWKIRK's breasts under NEWKIRK's
bra. Due to the cold weather, NEWKIRK made a noise and jumped when MCCOY
touched her. Once MCCOY removed his hands from the inside of NEWKIRK's

| | | |
|---|---|---|
| Investigation on | 03/27/2017 | at Central Islip, New York, United States (In Person) |

File # 282A-NY-2149893                                           Date drafted 03/28/2017

by DOYLE CHRISTINE ANNE, WENIGER MICHAEL J

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency

FD-302a (Rev 05-08-10)

282A NY 2149893

(U) Interview of LATOYA NEWKIRK on March                03/27
Continuation of FD-302 of 27, 2017                              On    /2017    Page  2 of 4

bra, MCCOY zipped up NEWKIRK's jacket and PAV commented to MCCOY that the
search could be conducted at the station.

Once NEWKIRK arrived at the police station, she was placed in the intake
area before MCCOY transferred NEWKIRK to the mug shot/holding area.  While
in the holding area, MCCOY searched NEWKIRK a second time.  MCCOY took
NEWKIRK's jacket and then placed his hands under NEWKIRK's bra and between
NEWKIRK's legs, over her clothes.  At the same time, MCCOY made the
comment, "I think you liked it when I touched you out there."  NEWKIRK
explained to MCCOY that she made a noise and jumped during the initial
search because of the temperature; it was cold outside.  NEWKIRK was then
handcuffed to a table.  MCCOY departed the holding area and told NEWKIRK
that a female officer would be conducting another search.  At some point,
a female officer conducted a strip search in the bathroom.  MCCOY returned
to the holding area to retrieve NEWKIRK and transfer NEWKIRK to what
NEWKIRK described as an "interrogation room".  The interrogation room
contained a desk and chairs.  There was not a camera in the interrogation
room. NEWKIRK believes MCCOY started paperwork during this time.  At some
point, MCCOY told NEWKIRK to stand up and lock her hands behind her
back.  NEWKIRK placed her hands behind her back using one hand to clasp
the wrist of the other hand, as instructed.  Due to the placement of her
hands, the palm of one hand was open.  MCCOY pushed his penis into
NEWKIRK's open palm and asked NEWKIRK, "did you feel that?"  MCCOY then
told NEWKIRK to "kiss it".  NEWKIRK shook her head no in response.  MCCOY
then told NEWKIRK to "touch it".  MCCOY then unzipped his pants, pulled
out his penis and placed NEWKIRK's hand on his penis.  MCCOY moaned and
then again asked NEWKIRK to touch his penis.  MCCOY then asked NEWKIRK to
"suck on it a little."  NEWKIRK bent at the waist and placed her mouth on
MCCOY's penis at which point MCCOY pushed his penis all the way into
NEWKIRK's mouth.  MCCOY stopped suddenly without ejaculating and put his
penis back into his pants.  NEWKIRK believes MCCOY heard someone outside
the door; the interrogation room door was not locked at the time.  At one
point during the encounter, MCCOY put his finger to his mouth as if to
"shh" NEWKIRK.  NEWKIRK was returned to the mug shot/holding area where
NEWKIRK remained for a time.  NEWKIRK believes PAV entered the mug shot
/holding area at some point.

Eventually, MCCOY and PAV returned NEWKIRK to the interrogation
room.  While in the interrogation room the second time, MCCCOY and PAV
questioned NEWKIRK about individuals NEWKIRK was familiar with and
discussed NEWKIRK's potential cooperation.  NEWKIRK's telephone was also
returned to her.  NEWKIRK used her phone to message ████████████████,

FD 302a (Rev. 05 08 10)

282A NY 2149893

(U) Interview of LATOYA NEWKIRK on March          03/27
Continuation of FD-302 of 27, 2017 _____ . On   /2017  , Page  3 of 4

informing ▮▮▮▮▮▮▮▮ the she (NEWKIRK) was in jail.  NEWKIRK also
called her friend ▮▮▮▮ ▮▮▮▮▮▮ ).  NEWKIRK told ▮▮▮▮▮ that she had
been arrested and asked ▮▮▮▮▮ to pick up ▮▮▮▮▮▮▮▮ .

At approximately 2:00pm, PAV verbally noted the time and exited the
interrogation room.  NEWKIRK stood up and was in the process of placing
her hands behind her back when MCCOY unzipped his pants, pulled out his
penis and put his fingers inside the waistband of NEWKIRK's
leggings.  NEWKIRK believed MCCOY was attempting to pull down her pants,
so NEWKIRK pulled away.  At that point, MCCOY grabbed NEWKIRK's jaw and
pulled NEWKIRK's face towards his penis.  NEWKIRK felt pain when MCCOY
grabbed her jaw; NEWKIRK recently had teeth pulled.  MCCOY put his penis
in NEWKIRK's mouth.  While NEWKIRK was performing oral sex, MCCOY's hand
was on the back of NEWKIRK's neck.  NEWKIRK gagged during the
encounter.  MCCOY told NEWKIRK he was about to ejaculate and NEWKIRK
attempted to pull away.  NEWKIRK's face and sweater were wet from saliva
and semen.  MCCOY cleaned himself and then instructed NEWKIRK to use the
tissue that was on the desk to clean herself.  NEWKIRK was also instructed
to fix her hair before NEWKIRK was returned to the holding area.  While
NEWKIRK was sitting at the table in the holding area, she believes PAV
contacted MCCOY by phone.  MCCOY answered his phone and indicated to the
person on the phone that he was, "coming out now."

At some point, NEWKIRK asked PAV if MCCOY was married.  PAV answered in
the affirmative and then asked NEWKIRK, "why do you think he's
handsome?  Want some white chocolate?"  PAV made the comments in front of
other inmates, to include ▮▮▮▮▮▮▮▮ ▮▮▮▮▮ ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮  The inmates that were present laughed at the
comment.  NEWKIRK asked ▮▮▮▮ and ▮▮▮▮▮▮ if officers were "touchy
feely" with them.  Both responded in the negative.

While at the First Precinct, MCCOY commented to NEWKIRK that because
NEWKIRK is not from Wyntanch, MCCOY would not see NEWKIRK
again.  NEWKIRK's purse remained at the First Precinct after she was
transferred to the Fourth Precinct, so NEWKIRK was forced to return to the
First Precinct after her release to retrieve her purse.  NEWKIRK believes
MCCOY intentionally kept her purse so she would have to return to the
First Precinct.  NEWKIRK was concerned about entering the Precinct alone,
so NEWKIRK's ▮▮▮▮▮▮▮▮ accompanied NEWKIRK when NEWKIRK returned for her
purse.

Once NEWKIRK was transported to the 4th Precinct, NEWKIRK told inmates
that she was searched more than once.  Those inmates informed NEWKIRK that

FD-302a (Rev 05-08-10)

282A NY 2149893

Continuation of FD-302 of (U) Interview of LATOYA NEWKIRK on March 27, 2017 ,On 03/27/2017 ,Page 4 of 4

male officers should not search female inmates. Once NEWKIRK was alone in a cell at the 4th Precinct, she cried as a result of MCCOY's assault.

The following day, NEWKIRK was released. When NEWKIRK returned to her residence, she contacted the Rape Crisis Hotline and an attorney. Both telephone calls were recorded. When she contacted the Rape Crisis Hotline, NEWKIRK was put in touch with an individual that identified himself as a former Police Officer. NEWKIRK was uncomfortable speaking to the individual because of his previous position; NEWKIRK was concerned about who she could trust with the information she wanted to provide. NEWKIRK's purpose for contacting an attorney was to determine how she should proceed with her complaint.

A few days after NEWKIRK's arrest, NEWKIRK received a text messages from telephone number ████████. NEWKIRK did not recognize the telephone number and attempted to identify the sender of the texts. NEWKIRK showed Agents a series of text messages sent between March 19, 2017 and March 21, 2017. (Note: Copies of the screenshots capturing the text messages will be included in the attached 1A.) Once NEWKIRK identified the sender, NEWKIRK was uncertain what to do; NEWKIRK was concerned about repercussions for not responding or ignoring the text messages.

FD-302 (Rev. 5 8 10)

- 1 of 3 -



UNCLASSIFIED//FOUO

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry      04/17/2017

MARK PAV, date of birth (DOB) ████████, was interviewed at ████
████████████, ████████████████████████████████████. After being
advised of the identity of the interviewing Agents and the nature of the
interview, PAV provided the following information:

PAV has been a Police Officer in the Suffolk County Police Department
(SCPD) since 2011. Prior to working for the SCPD, he was a Correction
Officer with the Nassau County Sheriff's Department.

PAV was shown the attached photograph of Latoya Newkirk (hereinafter
"the complainant"). PAV recognized the complainant as a female that he and
his partner, Christopher McCoy, arrested in Wyandanch, NY during a traffic
stop after they discovered she had outstanding warrants for driving
infractions. PAV and McCoy further determined that the complainant had
marijuana in her bag. The complainant was riding with a heavyset male at
the time of the stop.

Upon the complainant's arrest, she was taken to the 1st Precinct and
processed in the uniform squad room, which is open and in the presence of
other officers and arrestees. However, the complainant was later brought
into the "JAS" room for debriefing after the complainant advised PAV and
McCoy that she could provide information about where she could buy
marijuana. The JAS (PAV did not recall what the acronym stood for) is a
room that is used for processing juvenile arrestees; however, when no
juveniles are present, it is often used as a debriefing room so arrestees
can give officers information outside the view of fellow arrestees.

McCoy and PAV were in a marked car and in full uniform at the time of
the complainant's traffic stop and arrest. When they were back at the
precinct, McCoy and PAV wore t-shirts and uniform pants.

McCoy and PAV were debriefing the complainant in the JAS room and
showing her photographs of individuals. At one point, PAV left the JAS
room for a period of time because SCPD narcotics detectives were in need
of assistance and PAV went out to assess if he and McCoy were going to go

UNCLASSIFIED//FOUO

| | | |
|---|---|---|
| Investigation on | 04/06 7201? | at ████████████████████████████████ ) |
| File # | 282A-NY 2149893 | Date drafted     04/10/2017 |
| by | SINGER RYAN, WENIGER MICHAEL J | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//FOUO**

282A NY 2149893

|                                        | (U//FOUO) Interview of and Service of  |      | 04/06 |        |          |
|----------------------------------------|----------------------------------------|------|-------|--------|----------|
| Continuation of FD-302 of | Grand Jury Subpoenas upon MARK PAV |  , On | /2017 | , Page | 2 of 3 |

back out, and whether they would need to be in plain clothes. PAV was out
of the JAS room for a period of 10 20 minutes while McCoy was in there
with the complainant.

PAV did not possess any records of the complainant's arrest or debrief
████████████. There would be an activity log at the precinct
documenting the complainant's arrest and processing. PAV did not believe
the complainant provided any actionable intelligence during her
debrief. As a result, PAV believed it was unlikely any record of the
debrief existed. PAV explained during a debrief like the one done on the
complainant, officers typically jot information down on a piece of scrap
paper, and if there was any information of potential value, the notes
would be handed over to a detective. If information obtained during a
debrief did not have any value, the notes would be discarded.

PAV also stated arrestees were occasionally permitted to have their
cellular phones during the debrief. PAV stated the complainant may have
had her cellular phone while she was being debriefed. Additionally, PAV
stated that the complainant's cellular telephone number may have been
jotted down during the debrief.

After the debrief, the complainant was brought back to the uniform
squad room. PAV and McCoy were not needed by the narcotics detectives, and
McCoy went home at around 3:00 p.m. because he had a personal obligation
to attend to, possibly a doctor's appointment for himself or a family
member.

PAV described the complainant as "giddy", "weird" and "a little off",
and stated that she was acting in a "flirtatious" manner. PAV noted that
the complainant seemed unfazed by the fact that she had just been arrested
and would be spending the night in jail, and seemed to enjoy talking to
the officers.

PAV never observed any inappropriate behavior on the part of McCoy or
the complainant during the traffic stop, arrest, processing or debriefing
of the complainant. Neither McCoy nor PAV searched the complainant's
person. Per SCPD policy, bodily searches of females are to be done by
female officers. While it would be appropriate to search a female's
jacket, PAV does not recall such a search occurring. PAV never heard McCoy
make any inappropriate comments toward or about the complainant. PAV did
not recall hearing the complainant ask PAV, "Isn't he married?", referring
to McCoy. PAV did not recall making a remark about "white chocolate" to
the complainant.

Case 2:17-cv-02960-MKB-PK  Document 41-6  Filed 04/02/21  Page 9 of 63 PageID #: 1333

FD 302a (Rev. 05 08 10)

282A NY 2149893

(U//FOUO) Interview of and Service of                      04/06
Continuation of FD-302 of  Grand Jury Subpoenas upon MARK PAV          , On    /2017     , Page   3 of 3

PAV never observed the complainant proposition McCoy. PAV noted that,
while arrestees who provide valuable information could potentially work
off charges, the complainant was told that she would have to spend the
night in jail no matter what, due to her outstanding warrants.  PAV stated
he told all individuals arrested for outstanding warrants that they would
have to spend the night in jail.

McCoy never discussed the complainant with PAV at any point after the
night of her arrest. PAV is not aware of McCoy having any subsequent
contact with the complainant. PAV has McCoy's telephone number in his cell
phone contacts as ▊▊▊▊▊▊▊▊▊.

PAV has known McCoy for six or seven years, which is the period of time
they have been on the same squad. They have been partners since the
beginning of September 2016. PAV described McCoy as a happily married man
with three children who would not throw away his marriage and his career
by engaging in inappropriate sexual conduct with an arrestee. PAV stated
that McCoy just does not strike him as the kind of person who would engage
in such behavior. PAV further stated that he would never cover for such a
person and put his career at risk, noting that he has to support both
himself and his wife, ▊▊▊▊▊▊▊▊▊▊▊▊▊. PAV and McCoy typically
did not socialize with one another outside of work.

At the conclusion of the interview, the Agents served PAV with two
grand jury subpoenas issued by the US District Court for the Eastern
District of New York (EDNY): one subpoena directs PAV to appear at EDNY to
testify before the grand jury; the other directs PAV to produce his memo
book covering the time period 3/1/17   present.

FD-302 (Rev. 5-8-10)

- 1 of 4 -



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry       05/16/2017

On March 29, 2017, LATOYA NEWKIRK (NEWKIRK), date of birth (DOB) ███
██ ████, social security account number (SSAN) ███████████, residence
address ███████████████ ████ ██████████████        ██████████████, was
interviewed by Federal Bureau of Investigation (FBI) Special Agent (SA)
Michael J. Weniger and FBI SA Christine Doyle at 267 Carleton Avenue,
Central Islip, New York 11722.  After being advised of the identities of
the interviewing Agents and the nature of the interview, NEWKIRK provided
the following information:

  NEWKIRK was arrested on March 16, 2017, by Suffolk County Police
Department (SCPD) Officers MARK PAV (PAV) and CHRISTOPHER MCCOY
(MCCOY).  NEWKIRK believed she (NEWKIRK) was arrested for outstanding
warrants.  These warrants related to a traffic issue and two (2) failure
to appear charges.  Upon reviewing the paperwork she (NEWKIRK) received
after her release from custody on March 17, 2017, NEWKIRK discovered the
March 16, 2017 arrest was actually for one count of Unlawful Possession of
Marijuana.  [Agent's Note:  The paperwork NEWKIRK received from Suffolk
County Authorities on March 16, 2017 and March 17, 2017 was photocopied by
the Interviewing Agents.  This paperwork is attached to this document in a
1A Envelope.]

  NEWKIRK stated she was sexually assaulted twice on March 16, 2017 while
in the custody of the SCPD.  Both sexual assaults were committed by
MCCOY.  NEWKIRK stated both sexual assaults occurred in the SCPD's First
Precinct Interrogation Room (hereafter referred to as "the Interrogation
Room").  During the first sexual assault, MCCOY used his (MCCOY's) hand to
apply pressure to NEWKIRK's shoulder.  MCCOY used this pressure to force
NEWKIRK towards his (MCCOY's) exposed penis.

  NEWKIRK stated the second sexual assault occurred around approximately
14:02 on March 16, 2017.  At that time, NEWKIRK was in the Interrogation
Room with PAV and MCCOY.  PAV and MCCOY were attempting to debrief NEWKIRK
on possible information she (NEWKIRK) had related to other crimes in the
First Precinct of Suffolk County.  NEWKIRK recalled the specific time (14:
02) because she (NEWKIRK) saw the time on her (NEWKIRK's) cellular
telephone.  NEWKIRK explained she (NEWKIRK) was permitted to utilize her

Investigation on   03/29/2017   at  Central Islip, New York, United States (In Person)

File #  282A NY 2149893                                      Date drafted   03/30/2017

by  WENIGER MICHAEL J, DOYLE CHRISTINE ANNE

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

282A-NY 2149893

(U) Interview of LATOYA NEWKIRK on March

Continuation of FD-302 of  29, 2017 _____ , On  03/29/2017 , Page  2 of 4

cellular telephone by PAV and MCCOY in order to assist in the debriefing
process.

Around this time, PAV told MCCOY that "it's 2:00 already." PAV then
left the Interrogation Room. After PAV left the Interrogation Room, MCCOY
told NEWKIRK that it was time to return to an open holding area with
tables that had locations where detainees could be cuffed. In response,
NEWKIRK stood up and turned around in order to be handcuffed. MCCOY
proceeded to place his (MCCOY's) fingers inside the waistband of NEWKIRK's
leggings. NEWKIRK instinctively pulled away from MCCOY. NEWKIRK believed
MCCOY was attempting to pull down her (NEWKIRK's) leggings.

Next, MCCOY undid his (MCCOY's) pant zipper and leaned his (MCCOY's)
back against the Interrogation Room's door. MCCOY then grabbed NEWKIRK's
jaw and pulled her (NEWKIRK) down towards his genitals. NEWKIRK stated
she (NEWKIRK) was in a squatting position after MCCOY pulled her
downwards. MCCOY did not say anything to NEWKIRK as this
occurred. NEWKIRK noticed MCCOY had on bright blue boxer briefs. NEWKIRK
explained the color reminded her (NEWKIRK) of the shade of blue worn by
Superman.

NEWKIRK was then forced to perform oral sex on MCCOY. NEWKIRK stated
that as she (NEWKIRK) was forced to perform oral sex she (NEWKIRK) began
to gag. This gagging caused NEWKIRK to cry. Eventually, MCCOY stated
that he was about to ejaculate. NEWKIRK attempted to pull away but MCCOY
pulled NEWKIRK back to his (MCCOY's) penis. NEWKIRK stated MCCOY
ejaculated into her (NEWKIRK's) mouth and surrounding area. NEWKIRK
explained the sweater she (NEWKIRK) was wearing at the time was exposed to
spit, tears, and semen. The sweater was lavender in color. NEWKIRK
stated the sweater was completely wet on her (NEWKIRK's) upper left chest
near her (NEWKIRK's) heart after MCCOY ejaculated. Nevertheless, the
sweater did not appear discolored or wet because of the sweater's
material.

After MCCOY ejaculated, he (MCCOY) told NEWKIRK to clean up using a
roll of tissue paper that was on the Interrogation Room desk. NEWKIRK
used the tissue paper to wipe off her face. MCCOY intently watched
NEWKIRK clean up and throw away the tissue paper. MCCOY also used tissue
paper to clean himself (MCCOY) off. NEWKIRK did not believe MCCOY used
the same roll of tissue paper as NEWKIRK. MCCOY also threw away his
(MCCOY's) used tissue paper into the Interrogation Room's trash
can. MCCOY ensured NEWKIRK was presentable and then asked her (NEWKIRK)
if she (NEWKIRK) was ready.

FD-302a (Rev. 05 08-10)

282A NY 2149893

(U) Interview of LATOYA NEWKIRK on March
Continuation of FD-302 of  29, 2017 _____   __     ___ .On  03/29/2017  . Page  3 of 4

MCCOY then took NEWKIRK back to the open holding area. At that time,
MCCOY received a telephone call from an individual she (NEWKIRK) believed
was PAV. After answering the call, MCCOY stated words to the effect of
"I'm on my way." After securing NEWKIRK in the open holding area, MCCOY
left NEWKIRK's vicinity.

NEWKIRK described the Interrogation Room as small with windows, a desk
and computer, a trash can, another table and chairs, and a door. NEWKIRK
stated the door did not have a window. Further, the only windows in the
room overlooked outside. In other words, there were no windows or vantage
points into the Interrogation Room from inside the Precinct. Also, the
door had a bolt lock. NEWKIRK believed the bolt lock was never actually
locked throughout the day on March 16, 2017.

After NEWKIRK was arraigned in Suffolk First District Court on March
17, 2017, she contacted a Rape Hotline and an attorney, ROBERT MACEDONIO
(MACEDONIO). NEWKIRK stated MACEDONIO assisted her (NEWKIRK) in
contacting Federal Authorities regarding the events of March 16, 2017,
while NEWKIRK was in the custody of the SCPD.

NEWKIRK stated she (NEWKIRK) never spoke with MCCOY on the
telephone. NEWKIRK acknowledged she called a telephone number ( ████ ███
████ ) that she (NEWKIRK) later came to believe belonged to MCCOY. NEWKIRK
called the number ███████████ ) because she (NEWKIRK) had received a
number of text messages from the number and was unaware of the sender. As
a result, NEWKIRK called the number in order to see who answered the
telephone. NEWKIRK explained no one answered the telephone when she
called the number.

NEWKIRK did not believe she (NEWKIRK) received any telephone calls from
the number ███████████████ on March 19, 2017 or any other dates.

NEWKIRK stated she (NEWKIRK) had an application on her telephone that
recorded all of her incoming and outgoing telephone calls. NEWKIRK
explained the application had a feature that allowed the user, in this
case NEWKIRK, to set a specific period of time that needed to elapse
during telephone calls in order for the calls to be saved. NEWKIRK stated
she (NEWKIRK) had the application set for only saving calls that lasted
longer than twenty-five (25) seconds.

[Agent's Note: At the request of the Interviewing Agents, NEWKIRK agreed
to make efforts to contact ███████████████ , a telephone number known to the
Interviewing Agents to belong to MCCOY. NEWKIRK sent MCCOY two (2) text
messages in the presence of the Interviewing Agents. The first text

FD 302a (Rev. 05-08-10)

282A NY 2149893

Continuation of FD 302 of (U) Interview of LATOYA NEWKIRK on March
29, 2017 _____ On 03/29/2017 , Page 4 of 4

message was sent at approximately 17:05 and read, "Hey.  How does this
stuff usually go with possession charges?".  The second text message was
sent at approximately 17:26 and read, "Hello?".  While in the presence of
the Interviewing Agents, NEWKIRK did not receive a response.  NEWKIRK
provided a screen shot of the text messages in an e-mail sent to SA
Weniger.  The e-mail and screen shot are attached to this document in a 1A
Envelope.]

FD-302 (Rev 5 8 10)                     - 1 of 10 -



## FEDERAL BUREAU OF INVESTIGATION

Date of entry        05/18/2017

On April 25th and 26th, 2017, MARK PAV, date of birth (DOB) ,
was interviewed, pursuant to a proffer agreement, by Federal Bureau of
Investigation (FBI) Special Agent (SA) Michael J. Weniger, FBI SA
Christine Doyle, and Eastern District of New York (EDNY) Assistant United
States Attorney (AUSA) Lara Gatz at the EDNY United States Attorney's
Office (USAO) located in Central Islip, New York.  Also present during the
interview was PAV's attorney, TONY LA PINTA (LA PINTA).  After being
advised of the identities of the interviewing Officials and the nature of
the interview, PAV provided the following information:

PAV has worked for the Suffolk County Police Department (SCPD) for
approximately seven (7) years.  Prior to working for the SCPD, PAV worked
for Nassau County Corrections.  PAV worked for Nassau County Corrections
from October 2006 to June 2010.

PAV's current assignment with the SCPD is with Command 120 in the
SCPD's 1st Precinct Crime Section, which was previously called the
Community Support or COPE Unit.  PAV explained the Crime Section
essentially functioned as an Anti Crime Unit.  The Crime Section was
distinct from Patrol in that the Crime Section was not expected to respond
to 911 calls.  Further, the Crime Section was not assigned particular
sectors within the 1st Precinct.

PAV explained the Crime Section had both a day and a night tour.  The
Section was divided into two (2) teams, which rotated between the day and
night tours.  PAV's team consisted of PAV, CHRISTOPHER MCCOY (MCCOY),
CHRISTOPHER ODDO (ODDO), MATTHEW SKULAVIK (SKULAVIK), and MICHAEL BIEBER
(BIEBER).  PAV and MCCOY were partners.  ODDO and SKULAVIK were also
partners.  BIEBER was the team's sergeant.

PAV and MCCOY became partners in September 2016 when PAV was initially
assigned to the Crime Section.  PAV stated MCCOY's former partner with the
SCPD was ANDREW HOPE (HOPE).  MCCOY and HOPE worked together in Wyandanch,
New York.  PAV stated HOPE was currently assigned to the 1st Precinct's
Gang Unit.  MCCOY also partnered with JOSEPH MALDANADO.  PAV stated MCCOY
was also friendly with SCPD officer JOHN WHIDDEN.

Investigation on   04/26/2017   at  Central Islip, New York, United States (In Person)

File #  282A-NY-2149893                              Date drafted   05/01/2017

by  WENIGER MICHAEL J, DOYLE CHRISTINE ANNE

This document contains neither recommendations nor conclusions of the FBI  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

282A NY 2149893

Continuation of FD-302 of  (U) Proffer of MARK PAV _____ , On  04/26/2017 , Page  2 of 10

**MARCH 16, 2017**

On March 16, 2017, PAV and MCCOY worked the day tour.  On that day,
they (PAV and MCCOY) were initially in uniform and drove a marked SCPD
vehicle.  At approximately 10:00, PAV and MCCOY were driving around
Wyandanch.  At that time, they (PAV and MCCOY) observed a vehicle parked
in the vicinity of a known drug house.  PAV and MCCOY followed the
vehicle, a sedan, as it pulled away.  PAV stated the sedan committed a
vehicle traffic law (VTL) violation while PAV and MCCOY were following
it.  As a result, PAV and MCCOY pulled the sedan over using their
emergency lights and sirens.

When the sedan was pulled over, PAV was driving the SCPD vehicle and
MCCOY was riding in the passenger's seat.  Once the sedan was pulled to
the side of the road, PAV and MCCOY exited their SCPD vehicle and
approached the sedan.  PAV approached the sedan's driver and MCCOY
approached the sedan's passenger.  PAV and MCCOY engaged with the
occupants of the sedan.  MCCOY identified the passenger as LATOYA NEWKIRK
(NEWKIRK).

PAV stated he (PAV) never dealt with NEWKIRK prior to March 16,
2017.  Further, MCCOY did not mention to PAV any dealings he (MCCOY) had
with NEWKIRK prior to March 16, 2017.  MCCOY did, however, tell PAV that
he (MCCOY) was familiar with NEWKIRK's father, MARTY NEWKIRK (M.
NEWKIRK).  PAV stated M. NEWKIRK had prior dealings with the SCPD.

PAV explained that the driver and NEWKIRK were run through law
enforcement databases.  While the driver was clean, NEWKIRK had three (3)
outstanding warrants.  As a result, MCCOY asked NEWKIRK to step out of the
sedan.  NEWKIRK complied with MCCOY's request and exited the sedan.  PAV
stated NEWKIRK was not handcuffed at this time because she (NEWKIRK) did
not appear to be a threat.  During her (NEWKIRK's) interaction with PAV
and MCCOY, she (NEWKIRK) seemed hesitant.  Additionally, NEWKIRK was
somewhat argumentative regarding the warrants.

While outside of the sedan, NEWKIRK told MCCOY that she had paperwork
in her purse that proved the warrants were void.  At the time, NEWKIRK's
purse was on the sedan's passenger side floor.  NEWKIRK was permitted to
pick up her purse and retrieve the paperwork.  In fact, the paperwork did
not address the outstanding warrants.  At that time, NEWKIRK was placed
under arrest.

PAV stated MCCOY rear cuffed NEWKIRK.  MCCOY did so at the hood of the
SCPD vehicle they (PAV and MCCOY) were driving.  PAV believed NEWKIRK was
wearing a black jacket at the time she (NEWKIRK) was placed in

FD-302a (Rev. 05-08-10)

282A NY 2149893

Continuation of FD-302 of  (U) Proffer of MARK PAV                          ,On  04/26/2017  ,Page  3 of 10

handcuffs.  After NEWKIRK was handcuffed, MCCOY walked NEWKIRK to the SCPD
vehicle.  NEWKIRK was then placed inside the backseat of the SCPD vehicle.

PAV did not witness MCCOY search or conduct a pat down of NEWKIRK.  PAV
stated he (PAV) did not search or pat down NEWKIRK.  PAV did take
NEWKIRK's purse and put the purse into the trunk of the SCPD vehicle.  PAV
stated he (PAV) did not search the purse prior to placing it into the SCPD
vehicle.  Nonetheless, PAV believed NEWKIRK's telephone was inside of the
purse.  PAV did not recall NEWKIRK making any telephone calls during the
duration of the traffic stop.

After NEWKIRK was arrested her (NEWKIRK's) demeanor was "unusual".  PAV
stated NEWKIRK was not fazed by her arrest.  In fact, NEWKIRK seemed happy
or giddy.  PAV did not have any reason to believe NEWKIRK was high on
drugs at the time of her (NEWKIRK's) arrest.  PAV later stated NEWKIRK was
friendly but not flirtatious with PAV and MCCOY during her (NEWKIRK's)
arrest.  PAV would not describe NEWKIRK's behavior throughout her arrest
as anxious.  PAV was asked why, during his (PAV's) initial interview with
the FBI (on April 6, 2017), he (PAV) characterized NEWKIRK's behavior as
"flirtatious".  PAV stated "flirtatious" was a poor word choice.

While NEWKIRK was being transported from the scene of the arrest to the
1st Precinct, NEWKIRK, PAV and MCCOY engaged in some discussion.  NEWKIRK
told PAV and MCCOY that she had a small amount of marijuana in her
purse.  NEWKIRK told PAV and MCCOY that she purchased the marijuana in
Wyandanch.  NEWKIRK explained she (NEWKIRK) took two (2) buses and a train
to get to Wyandanch.  Further, NEWKIRK indicated a willingness to
cooperate in future drug investigations.  Finally, NEWKIRK mentioned that
she (NEWKIRK) had a child.  As a result, NEWKIRK needed to arrange for
childcare since she had been arrested.

When they (PAV, MCCOY, and NEWKIRK) arrived at the 1st Precinct,
NEWKIRK was brought inside.  NEWKIRK was presented to the Desk Sergeant,
FNU BURKE, at a window.  At that point, PAV searched NEWKIRK's purse and
discovered a small amount of marijuana inside of the purse.  PAV stated
NEWKIRK's cellular telephone was also inside the purse.  NEWKIRK's
cellular telephone had a pink cell phone cover surrounding the phone.

NEWKIRK was then taken into the Uniformed Squad Room or Holding
Area.  PAV explained that the Holding Area had tables and benches used to
hold arrestees.  There was a ring on the table that allowed SCPD personnel
to handcuff arrestees to the table.  NEWKIRK was handcuffed to the table
at this time.

PAV stated NEWKIRK was not searched once they (PAV, MCCOY, and NEWKIRK)
arrived at the 1st Precinct.  PAV explained arrestees were typically

FD-302a (Rev 05-08-10)

282A NY 2149893

Continuation of FD-302 of  (U) Proffer of MARK PAV _____ , On  04/26/2017 , Page  4 of 10

searched upon arrival, but NEWKIRK was not searched because PAV and MCCOY
were unable to locate a female police officer.

Later in the afternoon, MCCOY sent a text message to PAV indicating the
time NEWKIRK was searched and shield number of the female SCPD officer
that searched NEWKIRK.  PAV later discovered the female officer that
searched NEWKIRK was DELFINA RIVERA.  The text was sent to PAV so PAV
could properly update NEWKIRK's Prisoner Activity Log (Log).  PAV
explained he (PAV) was not with MCCOY and NEWKIRK when the female SCPD
officer searched NEWKIRK.  PAV was unable to recall any other arrests
where MCCOY sent Log related information (search time, officer name, and
shield number) to PAV via text message.  Still, PAV did not find MCCOY's
actions unusual.

PAV stated NEWKIRK was not fingerprinted or photographed after arriving
at the 1st Precinct.  NEWKIRK was required to provide a single fingerprint
for purposes of identification, but she (NEWKIRK) did not have to provide
ten (10) prints.

After NEWKIRK was handcuffed to the table inside of the Holding Area,
PAV and MCCOY went downstairs to the Crime Section's office space.  Both
PAV and MCCOY began processing NEWKIRK's arrest paperwork.

PAV stated the warrants and marijuana possession arrests were split up
amongst PAV, MCCOY, ODDO, and SKULAVIK.  PAV processed the marijuana
arrest, which required more paperwork than the warrants, because he (PAV)
had located the marijuana in NEWKIRK's purse.  MCCOY processed the warrant
arrests and divided them amongst his fellow team members.

PAV stated most of the paperwork completed after NEWKIRK's arrest was
computerized.  PAV explained that much of the information needed for the
computerized paperwork was pre-populated because NEWKIRK had prior
contacts with the SCPD.  PAV stated he (PAV) only updated NEWKIRK's
address.  PAV did not update NEWKIRK's tattoos or phone numbers.

PAV estimated he (PAV) went to the Crime Section office space with
MCCOY around lunch time.  PAV and MCCOY remained in the Crime Section
office space for approximately one (1) hour.  PAV stated MCCOY may have
left the Crime Section office space.  Still, PAV did not have a clear
recollection regarding any point when MCCOY may have left the area.

Around 12:30 or 12:45, PAV and MCCOY ate lunch with ODDO and SKULAVIK
in the Crime Section office space.

PAV stated he and MCCOY later returned to the Holding Area.  MCCOY
removed NEWKIRK from her handcuffs and escorted her into the Juvenile

FD-302a (Rev. 05-08-10)

282A NY 2149893

Continuation of FD-302 of (U) Proffer of MARK PAV _____ , On 04/26/2017 , Page 5 of 10

Room.  PAV explained the Juvenile Room was used to debrief arrestees that
agreed to provide information.  As opposed to the Holding Area, the
Juvenile Room had a door and offered privacy.  PAV stated the Juvenile
Room had lockers, windows (that faced the parking lot), a desk and
computer, chairs, and a chain bolted to the wall.  PAV explained there was
typically a roll of brown tissue paper on the desk in the Juvenile Room.

PAV and MCCOY debriefed NEWKIRK while inside of the Juvenile
Room.  NEWKIRK told them (PAV and MCCOY) that she (NEWKIRK) could purchase
marijuana in Wyandanch.  NEWKIRK also provided other information regarding
drugs in Suffolk County.  PAV and MCCOY appreciated NEWKIRK's willingness
to cooperate, but felt that she was not a particularly good candidate for
cooperation.  PAV explained NEWKIRK lived a significant distance from the
area where she (NEWKIRK) could purchase drugs.

PAV did not recall whether NEWKIRK provided PAV and MCCOY with her
(NEWKIRK's) phone number while she was being debriefed.  PAV stated they
(PAV and MCCOY) occasionally obtained telephone numbers from arrestees
that expressed a willingness to cooperate.  PAV explained that NEWKIRK may
have provided her cellular telephone number to PAV and MCCOY even if her
(NEWKIRK's) arrest paperwork did not reflect her current telephone number.

While NEWKIRK was being debriefed by PAV and MCCOY, NEWKIRK's behavior
was "normal".  PAV stated NEWKIRK was friendly but not
flirtatious.  Further, NEWKIRK was not treating PAV or MCCOY
differently.  In other words, NEWKIRK's demeanor did not change depending
upon which of them (PAV or MCCOY) was dealing with her (NEWKIRK).  PAV
stated NEWKIRK did not make any sexual advances towards MCCOY in his
(PAV's) presence.  NEWKIRK did not ask MCCOY out on a date or make any
other propositions.

PAV stated he (PAV) and MCCOY changed out of their SCPD uniforms after
returning to the 1st Precinct with NEWKIRK.  PAV explained both of them
(PAV and MCCOY) wore t shirts and their uniform pants after returning to
the 1st Precinct.

Around 14:00, PAV left the Juvenile Room in order to make contact with
officers from the 1st Precinct Narcotics Unit.  PAV explained they (PAV
and MCCOY) had been asked to assist with a ██████████████  ██
██████████████████████ was made by BIEBER, who had a friend
in the Narcotics Unit.  PAV left MCCOY with NEWKIRK in order to obtain
additional details on the ███████████████ .  PAV agreed to fill MCCOY
in on the details after PAV met with the Narcotics officers.

PAV was only aware of NEWKIRK being taken to the Juvenile Room on one
(1) occasion during her (NEWKIRK's) time at the 1st Precinct.

FD 302a (Rev 05 08 10)

282A-NY 2149893

Continuation of FD-302 of (U) Proffer of MARK PAV _____ , On 04/26/2017 , Page 6 of 10

After leaving the Juvenile Room to speak with Narcotics officers, PAV called MCCOY. At that time, MCCOY did not answer PAV's phone call. MCCOY then sent a text message to PAV. In the text message, MCCOY stated, "What's up". PAV believed this text message was sent at approximately 14: 15. [Agent's Note: PAV provided the interviewing Officials with a screen shot of his communications with MCCOY on March 16, 2017. A copy of this screen shot is attached to this document in a 1A Envelope.]

Shortly after the above mentioned text messages were exchanged, MCCOY and PAV went outside to the 1st Precinct parking lot to meet with the Narcotics officers. PAV stated MCCOY was unable to fully participate in the Narcotics operation because he (MCCOY) had a previously scheduled doctor's appointment at 15:00. PAV was able to find another partner to accompany him (PAV) for the Narcotics operation. PAV stated he (PAV) partnered with SCPD officer SEAN CLARK (CLARK) for the Narcotics operation.

During the Narcotics operation ███████████████████ ) was arrested. PAV brought ██████ back to the 1st Precinct and began processing her ██████ . At that time, NEWKIRK was still in the Holding Area. MCCOY, however, had left the 1st Precinct for the day. At that time, NEWKIRK may have asked PAV whether MCCOY was married. PAV did not believe NEWKIRK's comment was sexual in nature.

PAV stated that if he (PAV) used the term "white chocolate" it would have been after ██████ was brought to the 1st Precinct. Still, PAV was unable to specifically recall using this term.

After ██████ was arrested and at the 1st Precinct, PAV informed (via text message) MCCOY of her ██████ arrest. MCCOY responded to PAV's text message with a photograph of an individual that appeared to be ██████ .

PAV stayed at the 1st Precinct until approximately 18:00 on March 16, 2017.

PAV stated NEWKIRK also had medication inside of her (NEWKIRK's) purse. PAV explained the Desk Sergeant called him (PAV) after he (PAV) had left the 1st Precinct. The Desk Sergeant informed PAV that they (PAV and MCCOY) should have separated NEWKIRK's medication from her other property and completed an Emergency Log/Incident Report, which documents the existence of medication. PAV stated the Desk Sergeant completed this report after NEWKIRK complained of tooth pain. PAV recalled NEWKIRK mentioning that she (NEWKIRK) had a vicodin prescription due to a dental issue. At the time when NEWKIRK told PAV about the dental issue, NEWKIRK did not request the medication.

FD-302a (Rev. 05-08-10)

282A NY 2149893

Continuation of FD-302 of (U) Proffer of MARK PAV _____ , On 04/26/2017 , Page 7 of 10

    PAV was uncertain as to whether BIEBER was present at the 1st Precinct on March 16, 2017.

**PRISONER ACTIVITY LOG**

    PAV stated he (PAV) and MCCOY were supposed to complete a Prisoner Activity Log (hereafter referred to as "Log") for all arrests. PAV and MCCOY kept a Log for NEWKIRK's arrest. [Agent's Note: The Prisoner Activity Log for the March 16, 2017 arrest of NEWKIRK is attached in a digital 1A Envelope]. PAV and MCCOY were expected to update the Log every half hour. PAV acknowledged they (PAV and MCCOY) did not check on NEWKIRK every half hour. Therefore, some of the entries on NEWKIRK's Log were not necessarily accurate.

    PAV was shown the Prisoner Activity Log from March 16, 2017. PAV was asked about the entry listing a telephone number. PAV stated this entry reflected the telephone number NEWKIRK called after arriving at the 1st Precinct. PAV was unable to recall whether NEWKIRK placed this call when she (NEWKIRK) was with PAV, MCCOY, or both of them (PAV and MCCOY). PAV stated the telephone call could have been made from either the Juvenile Room or the Holding Area. PAV stated his (PAV's) practice was to not allow arrestees to make phone calls from their own cellular telephones. PAV explained the Log entry was made by MCCOY. PAV based this conclusion on the fact that MCCOY's shield number appeared next to the entry.

    PAV was asked about the entry regarding NEWKIRK's property. PAV stated the entry was made in real time and had not been completed after the fact. The entries made by PAV after the 13:25 Property entry were not in "real time".

    PAV stated the entry regarding the search of NEWKIRK was incorrect. Based upon the text message sent by MCCOY, the search of NEWKIRK occurred at 13:30.

    PAV stated the Log should have reflected any movement of NEWKIRK, to include when NEWKIRK was taken into the Juvenile Room.

    After PAV left the Holding Area to make contact with the Narcotics officers, MCCOY should have handled the Log. When MCCOY left the Holding Area, he (MCCOY) should have handed the Log to the Desk Sergeant. PAV stated MCCOY did not provide the Log to the Desk Sergeant because when PAV returned to the Holding Area the Log was on the table next to NEWKIRK.

FD 302a (Rev. 05-08-10)

282A NY 2149893

Continuation of FD-302 of (U) Proffer of MARK PAV _____ , On 04/26/2017 , Page 8 of 10

PAV stated MCCOY was bad at record keeping.  Typically, PAV handled any
record keeping responsibilities when they (PAV and MCCOY) worked as
partners.

PAV stated MCCOY never asked him (PAV) to make any false entries on a
Log, to include on March 16, 2017.

## MCCOY'S PERSONALITY

PAV stated MCCOY seemed to have a heightened sex drive.  PAV explained
MCCOY frequently discussed how he (MCCOY) watched pornography and
masturbated on a daily basis.  Additionally, MCCOY frequently commented on
attractive women that they (PAV and MCCOY) encountered throughout their
work day.  MCCOY also attempted to look up, on Instagram and other social
media sites, attractive women that he (MCCOY) and PAV pulled over.  Still,
PAV was unaware of any infidelity committed by MCCOY.  PAV never saw MCCOY
engage in inappropriate behavior with female police officers, arrestees,
or others.  Moreover, PAV never felt alarmed by MCCOY's comments.

PAV stated MCCOY mentioned backpage.com in the context of work.  PAV
never witnessed MCCOY searching backpage.com.

PAV was unable to recall any interactions between MCCOY and female
arrestees that gave him (PAV) pause or concern.

PAV was unable to recall any occasions where MCCOY made sexual
references related to female arrestees.

PAV was unable to recall any female arrestees that asked PAV about
MCCOY after they (female arrestees) had been arrested.

PAV never witnessed, nor had knowledge of, any criminal activity
engaged in by MCCOY.

PAV had no knowledge regarding whether MCCOY was interested in African
American women.

## PHOTOGRAPHS

PAV was shown six (6) photographs of various women.  PAV was unable to
recognize any of the women.  [Agent's Note:  The above mentioned
photographs are attached to this document in a digital 1A Envelope].

## MISCELLANEOUS

FD-302a (Rev. 05-08 10)

282A NY 2149893

Continuation of FD-302 of  (U) Proffer of MARK PAV _____ , On  04/26/2017  , Page  9 of 10

PAV explained a routine day tour to the interviewing Officials.  PAV
stated his unit was expected to arrive at the precinct between 07:30 and
08:00.  The first hour of their shift was typically spent working out or
reviewing tour reports from the prior shift/day.  By 09:00 or 09:30 the
team was expected to be out of the office and on the road.

PAV explained the towns covered by the SCPD 1st Precinct.  PAV stated
the 1st Precinct included Babylon, East Farmingdale, Wyndanch, Deer Park,
Lindenhurst, Copiague, and Amityville.

PAV stated he (PAV) and MCCOY did not use memo books.  Instead, they
(PAV and MCCOY) completed tour reports.  These tour reports were
computerized and contained the information that would typically be found
in a memo book.  Both PAV and MCCOY did, however, carry and use personal
notebooks to record information obtained during their daily tours.

**CONFIDENTIAL INFORMANTS**

PAV was asked about confidential informants (CIs).  PAV stated the
Crime Section did not work CIs.  Instead, PAV and MCCOY debriefed
arrestees and others in an effort to vet their usefulness and willingness
to cooperate.  If PAV and MCCOY deemed a particular arrestee of possible
value, they (PAV and MCCOY) passed the arrestee's information to
detectives.

PAV stated that if they (PAV and MCCOY) determined an arrestee was of
value, they (PAV and MCCOY) could use a specified cellular telephone
shared by the Crime Section to communicate with the possible CI.  As a
general matter, the Crime Section officers only used this phone to contact
prior arrestees if they (Crime Section officers) were unable to contact a
detective prior to the arrestee's release and needed to gauge whether the
arrestee remained willing to assist.

PAV stated he (PAV) and MCCOY never provided arrestees and possible CIs
with their (PAV and MCCOY) personal telephone numbers.

PAV stated they (PAV and MCCOY) did not keep "off the book" CIs.

**POST MARCH 16, 2017**

On April 6, 2017, PAV was interviewed by FBI Agents regarding
allegations made by NEWKIRK.  After the FBI Agents left his (PAV's)
residence, PAV contacted his union delegate, CHRISTOPHER WOLF (WOLF).  PAV
informed WOLF of the content of his (PAV's) interview with the FBI.  Later

FD 302a (Rev. 05-08-10)

282A NY 2149893

Continuation of FD-302 of  (U) Proffer of MARK PAV _____ ,On  04/26/2017  , Page  10 of 10

in the day, WOLF contacted PAV's sergeant and told him that "this goes
deeper than we thought".

At approximately 16:00 the same day, he (PAV) went to work at the 1st
Precinct. Upon arriving at the 1st Precinct, PAV saw MCCOY sitting in his
(MCCOY's) personally owned vehicle. PAV approached MCCOY and immediately
noticed that MCCOY's eyes were red. PAV believed MCCOY had been
crying. MCCOY told PAV, "I'm fucked. I can't tell you what's going
on. I'm sorry." After PAV went inside the 1st Precinct everyone seemed
to be "in a panic".

Later, PAV was put in touch with the union's law firm, DAVIS &
FERBER. PAV stated DAVIS & FERBER had a contract with the Suffolk County
Police Benevolent Association (PBA). Eventually, PBA representative LOU
TUTONE contacted LA PINTA. PAV and LA PINTA explained PAV was required by
the PBA to sign a promissory note that triggered a financial obligation if
PAV acknowledged any wrongdoing. PAV stated he (PAV) was not interviewed
by anyone from the PBA.

PAV stated WOLF was aware of PAV's proffers with the Government. PAV
has not received expressed or implied pressure from anyone regarding the
FBI's investigation.

PAV stated the majority of police officers from the 1st Precinct were
surprised about the allegations. Further, there were a number of rumors
floating around the 1st Precinct. One of the rumors was that NEWKIRK made
a statement at her (NEWKIRK's) arraignment. According to the rumor, the
arraignment judge read off the charges against her (NEWKIRK). Allegedly,
after she (NEWKIRK) heard the charges, she (NEWKIRK) was
incredulous. NEWKIRK apparently stated, in sum and substance, "he said I
wouldn't be charged with that if I gave him a blowjob. He even came on
me."

PAV stated nothing NEWKIRK said or did allowed him (PAV) to conclude
that NEWKIRK was a prostitute.

FD-302 (Rev. 5-8-10)

- 1 of 3 -



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry     05/16/2017

On April 4, 2017, LATOYA NEWKIRK, date of birth ████ ████, Social
Security Account Number ██████████, address ██ ██ ██
████████████ ██████ cellular telephone number ██████████, was
interviewed at the United States Attorney's Office (USAO) Eastern District
of New York (EDNY), 100 Federal Plaza, Central Islip, New York, by EDNY
Assistant United States Attorney (AUSA) Lara Gatz, Special Agent (SA)
Christine Doyle, and SA Michael Weniger.  NEWKIRK was being interviewed to
gather additional information regarding her complaint of sexual assault by
a Suffolk County Police Department (SCPD) Police Officer on March 16, 2017
while in SCPD custody.  After being advised of the identities of the
interviewers, NEWKIRK voluntarily provided the following information, in
sum and substance:

NEWKIRK was shown photos of CHRISTOPHER MCCOY (MCCOY) and MARK PAV (PAV)
for identification purposes.  NEWKIRK confirmed identification by signing
and dating each photo.  (Note:  copies of the signed photos will be
included in the attached 1A.)

When NEWKIRK was enroute to the First Precinct after her arrest, NEWKIRK
inquired about the possible charge for possession of marijuana and a
marijuana grinder.  MCCOY responded by saying, "don't worry about it."

While in the First Precinct, NEWKIRK was required to provide her
fingerprints when she arrived.  A uniformed Police Officer, described as
an older white male, was positioned behind a partition with a window.  The
Police Officer handed a fingerprint reader through a window to NEWKIRK.

During the second search of NEWKIRK, that took place in the First
Precinct, MCCOY rubbed his hand across NEWKIRK's vagina, over her
pants.  MCCOY also commented to NEWKIRK that she had nice breasts.

NEWKIRK was searched a third time, immediately before the second incident
with MCCOY, by a female Hispanic described as approximately 5'4" tall and
approximately 28 or 29 years old.  NEWKIRK did not want to tell the female
officer about the first incident with MCCOY because NEWKIRK was still in
the Precinct; NEWKIRK did not know who she could confide in.

| Investigation on | 04/04/2017 | at | Central Islip, New York, United States (In Person) |
| --- | --- | --- | --- |
| File # | 282A-NY-2149893 | | Date drafted     04/07/2017 |
| by | DOYLE CHRISTINE ANNE, WENIGER MICHAEL J | | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05 08-10)

282A NY 2149893

(U) Interview of LATOYA NEWKIRK on April
Continuation of FD-302 of 4, 2017 _____ On 04/04/2017 , Page 2 of 3

NEWKIRK was asked to verify information included on documentation from
NEWKIRK's arrest.  NEWKIRK indicated that the "███" phone number is a T
Mobile phone number that NEWKIRK had a few years ago.  In addition, the
documentation did not include all of NEWKIRK's current tattoos.  NEWKIRK
was not asked about her tattoos when arrested on March 16, 2017.

When MCCOY allowed NEWKIRK to have a telephone call, NEWKIRK called her
friend ████████ ████████ ).  NEWKIRK provided MCCOY with ████████s telephone
number and her (NEWKIRK's) own telephone number.  NEWKIRK believes MCCOY
wrote down both numbers in his memo book.

As discussed previously, MCCOY asked NEWKIRK to touch and kiss his penis
during NEWKIRK's first encounter with MCCOY in the interrogation
room.  MCCOY held NEWKIRK's wrist while NEWKIRK grabbed MCCOY's
penis.  MCCOY's hand remained on NEWKIRK's wrist until NEWKIRK bent over
to put her mouth on MCCOY's penis, at which point MCCOY used his hand to
keep NEWKIRK in the bent over position.  MCCOY pushed his penis in and out
of NEWKIRK's mouth.

During the second incident with MCCOY, NEWKIRK told MCCOY that she was
going to get saliva on his pants.  MCCOY responded by saying, "that's how
I like it."

NEWKIRK intentionally spit some of MCCOY's semen on her shirt.  NEWKIRK
had been raped in 2006 and tried to report the incident to Suffolk County
Police (SCPD).  NEWKIRK recounted the incident, explaining that she had
been drinking with her friend ████ ████ ████████ ████████ ████
████████ ████████ ████████ ".  At some point, NEWKIRK passed
out.  The next morning, when she went to shower, she realized something
had happened.  NEWKIRK was told by a neighbor that the neighbor had heard
NEWKIRK screaming the night of the incident.  NEWKIRK reported the
incident to the SCPD.  Detectives asked NEWKIRK why she waited to report
the rape.  NEWKIRK explained that she was embarrassed by the
situation.  Additionally, NEWKIRK was asked if she had evidence of the
rape.  NEWKIRK wanted to ensure she was not put in the same situation of
not having proof she was assaulted, so she spit some of MCCOY's semen on
her sweater.

NEWKIRK reviewed past interactions with law enforcement.  NEWKIRK recalled
being involved in a situation where she collected money for rent from an
acquaintance of her ex boyfriend.  The rent was for an apartment that
neither NEWKIRK nor her ex-boyfriend owned.  NEWKIRK eventually returned
the money to the acquaintance.

FD 302a (Rev. 05-08 10)

282A NY 2149893

(U) Interview of LATOYA NEWKIRK on April
Continuation of FD-302 of 4, 2017 ___ ___ .....                     .On 04/04/2017 .Page 3 of 3

As discussed previously, PAV made a comment to NEWKIRK about NEWKIRK
wanting "white chocolate" in reference to MCCOY.  NEWKIRK believes ██████
████ ███ ███████ an inmate, was present when the comment was made.

NEWKIRK has been recording her telephone calls for some time.  NEWKIRK had
an issue with a past boyfriend, which prompted her to download the
application to record her calls.

FD-302 (Rev. 5-8-10)  - 1 of 2 -  

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    07/19/2017

On June 9, 2017 MARK PAV, date of birth █████████ ████████, was interviewed by Special Agent (SA) Christine Doyle and SA Michael Weniger at the Eastern District of New York located at 100 Federal Plaza, Central Islip, New York. Also present was Tony La Pinta, attorney for PAV. PAV had been interviewed previously and was familiar with the identities of the interviewing Agents. PAV was being interviewed to gather information regarding individuals he and his former partner, CHRISTOPHER MCCOY (MCCOY), had arrested or interacted with during the course of their duties as SUFFOLK COUNTY POLICE DEPARTMENT (SCPD) Police Officers (POs). PAV provided the following information:

PAV is familiar with ███ ████████ ██████) as PAV and MCCOY arrested ██████ ██████████████████████████. PAV does not recall the specific day █████ was arrested; however, estimated that it was one or two weeks after LAYTOYA NEWKIRK (NEWKIRK) was arrested. PAV recalls ██████ leaving the ████████████████████) when PAV and MCCOY conducted a vehicle stop. ███████ was the passenger in the vehicle. █████████████████ ██████████████████ provided her sister's name when questioned after the vehicle stop. PAV does not recall ██████'s sister's name; however, noted that both █████ and her sister had outstanding warrants, so █████ was transported to the precinct. Once at the precinct, █████ provided a thumb print, which confirmed her identity. At the precinct █████ was placed in the Uniform Squad Room (USR). █████ was high when she was arrested. PAV does not recall debriefing █████ and described the interaction between █████ and MCCOY as normal.

Generally, POs in PAV's unit will search for individuals with outstanding warrants, such as ████████, and concentrate on arresting those individuals. In an effort to locate █████, someone in PAV's unit, possibly MATTHEW SKULAVIK (SKULAVIK) attempted to locate ████████████████████. PAV does not recall the location of the residence other then it was located in Amityville. In addition, PAV and MCCOY conducted a surveillance of a residence associated with █████████ ████████ ██████ ██████ ████████. While conducting

Investigation on  06/09/2017  at  Central Islip, New York, United States (In Person)

File #  282A-NY-2149893                    Date drafted  06/11/2017

by  DOYLE CHRISTINE ANNE, WENIGER MICHAEL J

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev 05-08-10)

282A NY 2149893

Continuation of FD-302 of <u>(U) Interview of MARK PAV on June 9, 2017</u>, On <u>06/09/2017</u>, Page <u>2 of 2</u>

said surveillance, PAV and MCCOY encountered a ███████████ ██████. In speaking to ████, PAV and MCCOY learned that the residence they were watching was associated with drugs and prostitution.

At some point, MCCOY had learned that ██████ was associated with the residence at ████████████. Separate from ████████'s warrant, MCCOY was assigned a NITS complaint regarding ████████████. As is practice, NITS complaints are divided among POs. The assigned PO is responsible for following up on the complaint. During the course of background research on the residence, MCCOY discovered ████████ was associated with the residence. Supposedly, █████████████ ████████) was "pimping out" ████████ from the residence.

In an effort to located an individual with an outstanding warrant, PAV would not call the person or an associate of the person. PAV did not know MCCOY to call individuals with outstanding warrants. During the course of searching for ████████, MCCOY told PAV that he (MCCOY) had ████████s phone number from "a while ago" but was uncertain if the number was in service. PAV does not know why MCCOY had ████████ telephone number.



With regard to telephone calls, PAV generally does not allow prisoners to use their own telephone when making a call unless it is during a debriefing, which would take place in the Juvenile Room (JR). When telephone calls are made outside of a debriefing, they are made from the Uniform Squad Room (USR). If a prisoner was moved to the JR for a telephone call, a note would be made on the Prisoner Activity Log. If a prisoner made a call from the USR, there might not be an entry on the log.

FD-302 (Rev 5-8-10)

- 1 of 1 -

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry    06/09/2017

On May 16, 2017, ANDREW HOPE, a Police Officer with the Suffolk County Police Department (SCPD), was interviewed at his ███████ █ ███████ ███████ ███████, by Special Agent (SA) Christine Doyle and SA Michael Weniger. HOPE was being interviewed to gather information regarding CHRISTOPHER MCCOY (MCCOY). After being advised of the identities of the interviewing Agents and the nature of the interview, HOPE provided the following information:

HOPE and MCCOY worked as partners in the SCPD First Precinct for approximately three or four years. HOPE and MCCOY were patrol partners before both were transferred to the Crime Section where they remained partners until HOPE was transferred to the Gang Section. HOPE contacted MCCOY after MCCOY's suspension to inquire about MCCOY's well-being. HOPE continues to maintain contact with MCCOY.

HOPE described MCCOY as a good guy and a good cop. During the time that HOPE was partners with MCCOY, HOPE did not witness MCCOY act inappropriately towards female arrestees or females encountered by HOPE and MCCOY while on duty. HOPE never observed MCCOY request a female's telephone number while on duty. HOPE never observed MCCOY attempt to contact a female that HOPE and MCCOY had encountered while working.

HOPE believes that MCCOY and MCCOY's wife had a good relationship. To HOPE's knowledge, MCCOY did not have a mistress nor was MCCOY involved with prostitutes.

While on duty, HOPE never experienced a situation in which MCCOY's behavior troubled HOPE or in which MCCOY's behavior was considered by HOPE to be unusual or concerning.

Investigation on  05/16/2017  at  ███████████████████████)

File #  282A NY-2149893                          Date drafted  05/17/2017

by  DOYLE CHRISTINE ANNE, WENIGER MICHAEL J

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302 (Rev. 5-8-10)

-1 of 3-

**OFFICIAL RECORD**
Document participants have digitally signed
All signatures have been verified by a
certified FBI information system

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    04/18/2017

On April 6, 2017, CHRISTOPHER MCCOY, date of birth ▮▮▮▮▮▮ ▮▮▮▮,
address ▮▮ ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮ ▮▮▮▮, cellular telephone number
▮▮▮▮▮▮▮, was interviewed outside his residence by Special Agent
Christine Doyle and SA Elliot McGinnis.  MCCOY was being interviewed to
gather information regarding the complaint of LATOYA NEWKIRK, in which
NEWKIRK alleged MCCOY, a Suffolk County Police Officer, sexually assaulted
NEWKIRK while NEWKIRK was in the custody of the Suffolk County Police
Department (SCPD).  After being advised of the identities of the
interviewing Agents and the nature of the interview, MCCOY voluntarily
provided the following information, in sum and substance:

MCCOY acknowledged arresting NEWKIRK; MCCOY believes NEWKIRK was arrested
for outstanding warrants.  MCCOY was shown photos of NEWKIRK and
identified NEWKIRK in the photos. (Note: Copies of the photos shown to
MCCOY will be included in the attached 1A.)  Agents explained that there
was a complaint alleging that NEWKIRK performed oral sex on MCCOY while
NEWKIRK was in custody.  MCCOY denied the allegation.  When asked to
explain his interaction with NEWKIRK, MCCOY advised that he was involved
in a vehicle stop in which NEWKIRK was a passenger.  MCCOY conducted a pat
down of NEWKIRK and, just prior to placing NEWKIRK in the rear passenger
seat of the police vehicle, asked NEWKIRK if there was anything on her
person.  NEWKIRK indicated she had money in her bra.  When MCCOY requested
NEWKIRK shake out her bra, NEWKIRK pulled her shirt down and exposed her
breasts to MCCOY.  MCCOY did not see anything in NEWKIRK's bra.  MCCOY's
partner, MARK PAV (PAV), was in the front driver's seat of the vehicle and
did not witness the interaction.

NEWKIRK was transported to the First Precinct.  MCCOY was with his partner
the entire time and was never alone with NEWKIRK.  MCCOY did not have any
type of sexual contact with NEWKIRK at precinct or at any other time or
place.  MCCOY advised that he did not have any issues with NEWKIRK,
further explaining that he believed he and NEWKIRK had "good
chemistry".  MCCOY believes he attempted calling NEWKIRK at some point
after the arrest.  MCCOY attempted to call NEWKIRK because NEWKIRK had
agreed to work for MCCOY by purchasing marijuana.  When asked to
explain his attempted contact with NEWKIRK, MCCOY said he sent texts to
NEWKIRK.  MCCOY did not want to provide his name to NEWKIRK when making

Investigation on  04/06    at ▮▮▮▮▮▮ ▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮
                  72017

File #  282A-NY-2149893                              Date drafted   04/07/2017

by  DOYLE CHRISTINE ANNE, MCGINNIS ELLIOT C

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FD 302a (Rev. 05 08 10)

282A NY 2149893

(U) Interview of CHRISTOPHER MCCOY on
Continuation of FD-302 of April 6, 2017 _____   ____     ___ , On 04/06 /2017   Page 2 of 3

contact because he was uncertain who had access to NEWKIRK's phone; MCCOY
was trying to identify himself to NEWKIRK without giving his name.  MCCOY
does not recall if PAV was present when MCCOY was attempting to make
contact with NEWKIRK.  Even though NEWKIRK had agreed to assist
MCCOY, MCCOY did not want to pass NEWKIRK's information to SCPD
Detectives for vetting until he was certain NEWKIRK would cooperate; MCCOY
did not want to waste the detectives time.  MCCOY explained that many
times people in custody agree to work for the police and then change their
mind once they are released.

When asked if there would be any reason MCCOY's DNA would be found in the
areas of the precinct he and NEWKIRK had been or on NEWKIRK's person,
MCCOY responded in the negative.  Agents explained that DNA swabs would be
collected from MCCOY.  Additionally, Agents explained to MCCOY that the
FBI was in possession of the sweater worn by NEWKIRK on the day of her
arrest;  MCCOY was shown a photo taken of a lavender sweater under an
alternative light source. (Note:  Photo is included in the attached
1A.)  At that point, MCCOY was asked again if there would be any reason
his DNA would be found.  MCCOY responded by saying, "maybe".  Agents asked
MCCOY to explain what happened between him and NEWKIRK.  At that point,
MCCOY told Agents that he might want to speak to someone.  Agents told
MCCOY that he was allowed to speak to whomever he wanted.

MCCOY remained outside of his residence, paced back and forth and made
comments such as, "I'm fucked", "I'm going to lose my job, my
kids".  MCCOY then said, "ok, let's start over.  Forget the first 10
minutes."  MCCOY indicated that he did not want to lie to the FBI and
asked that Agents not make the situation more difficult for him.  Agents
explained that they would make note of both versions of his account.

MCCOY indicated that the initial part of his account regarding his
interaction with NEWKIRK was true; NEWKIRK did expose her breasts to MCCOY
just prior to MCCOY placing NEWKIRK in the police vehicle for transport to
the First Precinct.  MCCOY indicated that he might have made a comment to
PAV about NEWKIRK exposing her breasts.  Once MCCOY and NEWKIRK were at
the First Precinct, he and NEWKIRK flirted back and forth.  While in the
processing room, NEWKIRK was rubbing into MCCOY and MCCOY commented to
NEWKIRK that NEWKIRK did not really have anything in her shirt earlier and
only pulled her shirt down to show MCCOY her breasts.   PAV was not
present in the processing room and MCCOY does not know if PAV witnessed or
noticed the flirting.

At some point around 2:00pm, or between the hours of 1:00pm and 3:00pm,
NEWKIRK, MCCOY and PAV, entered the Juvenile Room to discuss possible

FD-302a (Rev. 05-08-10)

282A NY 2149893

(U) Interview of CHRISTOPHER MCCOY on

Continuation of FD-302 of April 6, 2017 _____   _____   . On   04/06
/2017  . Page   3 of 3

cooperation with NEWKIRK.  MCCOY, PAV and NEWKIRK were in the Juvenile
Room for approximately 20 to 30 minutes.  After about 20 minutes, PAV
exited the room to talk to the Narcotics Unit.  NEWKIRK and MCCOY
continued to flirt while working.  MCCOY described the work they were
doing as searching for houses from which NEWKIRK would be able to purchase
marijuana.  MCCOY was seated on one side of the desk, facing the doorway
and NEWKIRK was on the other side of the desk, facing a window to the
outside.  NEWKIRK again pulled down her shirt and asked MCCOY if he liked
her "tits".  At some point, MCCOY walked around the desk to view NEWKIRK's
telephone; NEWKIRK was looking at photos of the aforementioned
houses.  MCCOY recalls looking at a house on ██████  ████████████
██████████████ and looking at a satellite view of a house on ████████
While standing next to NEWKIRK, NEWKIRK began rubbing MCCOY's thigh and
crotch area.  NEWKIRK then unzipped MCCOY's pants, pulled out MCCOY's
penis and performed oral sex on MCCOY.  NEWKIRK was sitting in a chair
before moving to a squatting position.  MCCOY's back was to the door and
NEWKIRK was in front of MCCOY, facing the door.  MCCOY ejaculated in
NEWKIRK's mouth.  MCCOY did not provide NEWKIRK with anything to clean
herself up with nor did NEWKIRK use anything to clean herself.  MCCOY and
NEWKIRK did not speak or make any comments during the entire
encounter.   This was the only time NEWKIRK and MCCOY were in the Juvenile
room.

Just prior to the encounter, NEWKIRK provided MCCOY with her telephone
number.  MCCOY wrote the number on a piece of paper.  MCCOY does not know
what happened to the piece of paper but believes he disposed of the piece
of paper.  When NEWKIRK provided her number to MCCOY, NEWKIRK intimated
that MCCOY and NEWKIRK should meet again at some point.  When MCCOY
contacted NEWKIRK, via text, it was with the intention of "hooking up"
with NEWKIRK.  MCCOY acknowledged that Agents likely already read his text
messages and advised that the text message from MCCOY to NEWKIRK that
read, "I owe you a favor" is in reference to the oral sex NEWKIRK
performed on MCCOY.

Case 2:17-cv-02960-MKB-PK  Document 41-6  Filed 04/02/21  Page 33 of 63 PageID #: 1357

FD-302 (Rev. 5 8-10)

- 1 of 3 -

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry    05/18/2017

On May 3, 2017, CHRISTOPHER ODDO (ODDO), residence address
███████ ██████████████████ █████████████, telephone number ██████
████ was interviewed by Federal Bureau of Investigation (FBI) Special
Agent (SA) Michael J. Weniger and FBI SA Christine Doyle at ODDO's
residence. After being advised of the identities of the interviewing
Agents and the nature of the interview, ODDO provided the following
information:

**BACKGROUND**

ODDO has been employed with the Suffolk County Police Department (SCPD)
for approximately sixteen (16) years. ODDO's present assignment is with
the 1st Precinct Crime Section Unit (CSU), also known as the COPE
Unit. ODDO stated his (ODDO's) team consists of four (4) police officers
and one (1) sergeant. ODDO stated his partner was MATTHEW SKULAVIK
(SKULAVIK). The other members of his (ODDO's) team were CHRISTOPHER MCCOY
(MCCOY) and MARK PAV (PAV). Their sergeant was MICHAEL BIEBER
(BIEBER). ODDO stated all five (5) of the above mentioned individuals
(ODDO, SKULAVIK, MCCOY, PAV, and BIEBER) were on duty on March 16, 2017.

**MARCH 16, 2017**

On March 16, 2017, ODDO and SKULAVIK were scheduled for a training
day. ODDO stated they (ODDO and SKULAVIK) drove to the SCPD's range in
West Hampton. After arriving at the range, ODDO and SKULAVIK were
informed that there was an error in scheduling. As a result, ODDO and
SKULAVIK had to return to the 1st Precinct.

ODDO stated they (ODDO and SKULAVIK) arrived at the 1st Precinct at
approximately 10:00. ODDO was unable to recall whether he (ODDO) saw
MCCOY and PAV when he (ODDO) arrived at the 1st Precinct. ODDO explained
he (ODDO) went to the CSU office space in the building's basement after
arriving at the 1st Precinct.

ODDO and SKULAVIK later left the 1st Precinct and patrolled the
area. During their tour, ODDO and SKULAVIK made an arrest. ODDO was
unable to recall the name of their arrestee, FNU LNU. ████████████████

---

Investigation on    05/03/2017    █ ████████████ ██ ██ ██ ██ ██ █

File #  282A-NY-2149893                                    Date drafted    05/04/2017

by  WENIGER MICHAEL J, DOYLE CHRISTINE ANNE

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency. it and its contents are not
to be distributed outside your agency

FD-302a (Rev 05-08-10)

282A-NY-2149893

Continuation of FD-302 of (U) Interview of CHRISTOPHER ODDO .On 05/03/2017 , Page 2 of 3

███ ████████ ████████ ████████ █████████ ███████ ██████████
███ ██████ ████████ ██████████
██████████ .

   After ODDO and SKULAVIK returned to the 1st Precinct with FNU LNU, ODDO
saw MCCOY and PAV with an arrestee. ODDO explained MCCOY and PAV also
made an arrest at some point on March 16, 2017. ODDO learned MCCOY and
PAV arrested LATOYA NEWKIRK (NEWKIRK)for marijuana possession and several
outstanding warrants.

   ODDO explained he (ODDO) briefly interacted with NEWKIRK while in the
1st Precinct Uniform Squad Area, also known as the Holding Area. During
this interaction, ODDO asked NEWKIRK whether she (NEWKIRK) was related to
MARTY NEWKIRK Sr. (M. NEWKIRK) or MARTY NEWKIRK Jr. (JR). NEWKIRK told
ODDO that she (NEWKIRK) was related to both of them (M. NEWKIRK and
JR). ODDO was familiar with M. NEWKIRK and JR because both men had prior
dealings with the SCPD.

   ODDO was asked about NEWKIRK's behavior and demeanor on March 16,
2017. ODDO stated NEWKIRK was "not happy to be there". Nonetheless,
NEWIRK answered the questions ODDO posed about her (NEWKIRK's) family.

   Later in the day, ODDO saw PAV inside the 1st Precinct. ODDO did not
see MCCOY.

   ODDO was unable to recall whether he (ODDO) saw MCCOY alone with
NEWKIRK. ODDO was unable to recall any unusual or concerning interactions
between MCCOY and NEWKIRK on March 16, 2017.

   ODDO never saw MCCOY, PAV, or NEWKIRK inside of the 1st Precinct's
Juvenile Room.

   ODDO was unable to recall whether he (ODDO) had lunch with MCCOY and
PAV on March 16, 2017.

**CHRISTOPHER MCCOY**

   ODDO stated MCCOY was a good police officer. MCCOY was friendly and
funny. ODDO stated MCCOY seemed to be a good family man. ODDO explained
he (ODDO) did not regularly socialize with MCCOY outside of the work
environment.

   ODDO witnessed MCCOY interact with female arrestees in the past. ODDO
never witnessed any actions by MCCOY that were odd or strange.

FD 302a (Rev. 05 08 10)

282A NY 2149893

Continuation of FD 302 of <u>(U) Interview of CHRISTOPHER ODDO</u> , On <u>05/03/2017</u> , Page <u>3 of 3</u>

 

ODDO was surprised when he (ODDO) learned of the allegations made against MCCOY. ODDO explained the hallway outside of the 1st Precinct's Juvenile Room was well traveled. Moreover, the Juvenile Room had windows that overlooked the 1st Precinct parking lot. Due to these facts, the allegations were "mind boggling" to ODDO.

## MISCELLANEOUS

ODDO stated male police officers were limited in the types of searches they could perform. ODDO explained male police officer were permitted to conduct limited pat down searches on females. Male police officers were not permitted to search the pockets, shirts, and other areas of female arrestees.

ODDO stated he (ODDO) contacted MCCOY after NEWKIRK's allegations came to light. ODDO sent MCCOY a text message. ODDO explained he (ODDO) was merely checking on MCCOY to see how he (MCCOY) was doing.

ODDO heard rumors that something happened inside the 1st Precinct's Juvenile Room between MCCOY and NEWKIRK. ODDO heard that MCCOY either received a "blowjob, handjob, or jerked off onto her [NEWKIRK]". ODDO never received any further details regarding the incident.

ODDO denied the existence of a contest within the 1st Precinct where SCPD police officers tried to gain the attention of individuals they deemed to be unattractive.

FD-302 (Rev 5-8-10)

- 1 of 3 -



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    06/30/2017

On June 15, 2017, DAVID LAWRENCE CHOLDEN (CHOLDEN), date of birth (DOB) ██████ ███, residence address ████████ █
████████ ████, cellular telephone number ████████, was interviewed, pursuant to a proffer agreement, by Federal Bureau of Investigation (FBI) Special Agent (SA) Michael J. Weniger, FBI SA Christine Doyle, and Eastern District of New York (EDNY) Assistant United States Attorney (AUSA) Lara Gatz at the EDNY United States Attorney's Office (USAO) in Central Islip, New York. Also present during the proffer session was CHOLDEN's attorney, David Smith. After being advised of the identities of the interviewing Officials and the nature of the interview, CHOLDEN provided the following information:

**BACKGROUND**

CHOLDEN was hired by the New York City Police Department (NYPD) in approximately 2014. While employed by the NYPD, CHOLDEN worked in the 90th Precinct. In approximately 2015, CHOLDEN took a position with the Suffolk County Police Department (SCPD). CHOLDEN's shield number with the SCPD was 6470. Presently, CHOLDEN works as a patrol officer in the SCPD's 1st Precinct. CHOLDEN stated he (CHOLDEN) was assigned to the 105 car. CHOLDEN stated he (CHOLDEN) did not have a steady partner at work.

**CHRISTOPHER MCCOY**

Until recently, CHOLDEN was unfamiliar with SCPD Police Officer (PO) CHRISTOPHER MCCOY (MCCOY). Further, CHOLDEN was unfamiliar with the SCPD POs working in the 1st Precinct's Crime Section Unit (CSU). It was not until allegations were made regarding MCCOY's behavior on March 16, 2017 that CHOLDEN became aware of MCCOY.

CHOLDEN never heard anything negative regarding MCCOY until the current allegations were made.

CHOLDEN never heard anything negative regarding the 1st Precinct's CSU.

**MARCH 16, 2017**

| Investigation on | 06/15/2017 | at | Central Islip, New York, United States (In Person) |
| --- | --- | --- | --- |

File # 282A-NY-2149893                    Date drafted  06/16/2017

by  WENIGER MICHAEL J, DOYLE CHRISTINE ANNE

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency

FD 302a (Rev. 05-08-10)

282A NY 2149893

Continuation of FD-302 of (U) Proffer of DAVID CHOLDEN _____ , On 06/15/2017 , Page 2 of 3

On March 16, 2017, CHOLDEN was partnered with PO MICHAEL AXELSON (AXELSON). During their shift, CHOLDEN and AXELSON were called off the road and asked to return to the 1st Precinct. When CHOLDEN and AXELSON arrived at the 1st Precinct, the 1st Precinct Desk Sergeant directed them (CHOLDEN and AXELSON) to transport two (2) African American female prisoners (hereafter referred to as "the prisoners") to the 4th Precinct.

CHOLDEN and AXELSON took both of the prisoners to the 4th Precinct. CHOLDEN recalled the prisoners talked amongst themselves during transport. CHOLDEN stated he (CHOLDEN) may have engaged the prisoners in some type of conversation. CHOLDEN explained he (CHOLDEN) usually tried to make small talk with prisoners in order to avoid confrontations. Still, CHOLDEN was unable to recall the substance of any conversations that occurred during the transport on March 16, 2017.

When they (CHOLDEN, AXELSON, and the prisoners) arrived at the 4th Precinct, CHOLDEN and AXELSON signed the prisoners over to the 4th Precinct Desk Sergeant. CHOLDEN stated they (CHOLDEN and AXELSON) brought the property of both prisoners to the 4th Precinct from the 1st Precinct. CHOLDEN and AXELSON also escorted the prisoners to the 4th Precinct holding cells where the prisoners were searched by two (2) female cell attendants. Throughout the transportation assignment, CHOLDEN was continuously with AXELSON.

CHOLDEN recalled an issue arising over paperwork. CHOLDEN explained the 4th Precinct Desk Sergeant told them (CHOLDEN and AXELSON) that there was some arrest/processing paperwork missing for the prisoners. CHOLDEN was unable to recall what specific paperwork was missing. The 4th Precinct Desk Sergeant asked CHOLDEN and AXELSON to contact the 1st Precinct Desk Sergeant in order to have the missing paperwork faxed to the 4th Precinct. Ultimately, the missing paperwork arrived at the 4th Precinct.

CHOLDEN was unable to recall medication being administered to the prisoners. Moreover, CHOLDEN was unable to recall any discussion regarding medication for the prisoners. CHOLDEN was shown the Prisoner Activity Log for LATOYA NEWKIRK (NEWKIRK). CHOLDEN was unable to recall AXELSON providing medication to NEWKIRK. A copy of the Prisoner Activity Log for NEWKIRK on March 16, 2017 is attached in a 1A Envelope.

## MISCELLANEOUS

CHOLDEN heard that MCCOY was alleged to have received oral sex from a prisoner. CHOLDEN heard that the prisoner provided oral sex in exchange for the dismissal of a charge. CHOLDEN was unable to recall who provided this information to him (CHOLDEN).

FD-302a (Rev. 05-08-10)

282A-NY 2149893

Continuation of FD-302 of (U) Proffer of DAVID CHOLDEN , On 06/15/2017 , Page 3 of 3

    CHOLDEN was shown a schematic of the 1st Precinct.  CHOLDEN noted certain areas of the Precinct.  CHOLDEN labeled these areas with a pen.  A copy of the marked up schematic is attached in a 1A Envelope.

    CHOLDEN stated SCPD policy permitted limited searches of female detainees and arrestees.  CHOLDEN stated male POs were permitted to conduct limited searches of female detainees and arrestees if the individual presented a safety concern.  Nonetheless, CHOLDEN believed the best practice was to have a female PO search female detainees and arrestees.

FD 302 (Rev 5 8-10)                     - 1 of 2 -



## FEDERAL BUREAU OF INVESTIGATION

Date of entry    06/09/2017

On May 3, 2017, DELFINA RIVERA, date of birth ███████ ███ , ███
███████████ ███████     cellular telephone number ███████████ , was
interviewed by Special Agent (SA) Christine Doyle and SA Michael Weniger
at her residence. After being advised of the identities of the
interviewing Agents and the nature of the interview, RIVERA voluntarily
provided the following information, in sum and substance:

RIVERA has been employed with the Suffolk County Police Department (SCPD)
for approximately one and one half years.  During the course of her
employment, RIVERA has conducted two female searches on behalf of Officer
CHRISTOPHER MCCOY (MCCOY) and Officer MARK PAV (PAV).

RIVERA reviewed her memo book entries and confirmed that one of the two
searches took place on March 16, 2017.  RIVERA recalls searching a black
female (UF) on said date.  RIVERA was shown a photo of LATOYA NEWKIRK
(NEWKIRK) but was unable to recall if the individual in the photo was the
same individual RIVERA searched on March 16, 2017.

With the aid of her memo book, RIVERA was able to determine that on March
16, 2017 at 1340, RIVERA was contacted by dispatch to report to the
precinct for female searches.  RIVERA was on patrol in sector 101 at the
time.  RIVERA estimated, based on her location, that it took her
approximately 5 7 minutes to arrive at the precinct.  Once at the
precinct, RIVERA stored her weapon and taser.  As RIVERA was storing her
weapon and taser, PAV noticed RIVERA and told RIVERA, "she's in there"
referring to the juvenile room.  PAV was exiting the juvenile room at the
time.

When RIVERA entered the juvenile room, UF was handcuffed to the desk and
MCCOY was standing on the opposite side of the desk.  RIVERA uncuffed UF
and transferred UF to the search area.  The search area consists of two
cells with bathrooms in each cell.  Once RIVERA completed the search,
RIVERA returned UF to the juvenile room and cuffed UF to the desk in the
juvenile room.  MCCOY was in the room when RIVERA returned.  UF and MCCOY
remained in the juvenile room after RIVERA exited.

| Investigation on | 05/03/2017 | at | ████████ ████ ████████ ███████ ) |  |
|---|---|---|---|---|

File #  282A-NY-2149893                                    Date drafted    05/05/2017

by   DOYLE CHRISTINE ANNE, WENIGER MICHAEL J

This document contains neither recommendations nor conclusions of the FBI  It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency

FD-302a (Rev. 05-08-10)

282A NY 2149893

(U) Interview of DELFINA RIVERA on May 3,
Continuation of FD-302 of 2017 _____ . On  05/03/2017 , Page  2 of 2

RIVERA initially described UF's demeanor as very happy.  RIVERA explained
that her description of UF's demeanor was based on RIVERA's interaction
with other arrestees.  UF was not laughing and joking but was not what
RIVERA would describe as upset.  UF discussed the reason for her arrest
with RIVERA.  In contrast, the female RIVERA had searched previously for
MCCOY and PAV required RIVERA to enlist the assistance of another female
officer due to the female's lack of cooperation; the female was yelling
and making derogatory comments to officers.

RIVERA was required to search a second female on March 16, 2017 for the
detective squad, which she conducted immediately after searching
UF.  According to RIVERA's memo book, RIVERA returned to patrol at 1423.

FD-302 (Rev 5-8-10)

- 1 of 3 -

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry    07/19/2017

On May 30, 2017, JAMES V. BURKE, date of birth ▆▆▆▆▆▆▆▆▆ ▆▆▆, ▆
▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆, was interviewed
pursuant to a proffer agreement by Federal Bureau of Investigation (FBI)
Special Agent (SA) Christine Doyle, FBI SA Michael Weniger and Eastern
District of New York (EDNY) Assistant United States Attorny (AUSA) Lara
Gatz at the United States Attorney's Office (USAO) located at 100 Federal
Plaza, Central Islip, New York.  BURKE's attorney, Paul Linzer was also
present.  BURKE was being interviewed to obtain information regarding his
interaction with the subject and victim of captioned case.  After being
advised of the identities of the interviewers and the nature of the
interview, BURKE voluntarily provided the following information:

BURKE has been employed by the Suffolk County Police Department (SCPD) for
25 years.  BURKE is currently the Desk Sergeant at the First
Precinct.  BURKE works the 7:00am to 3:00pm shift.

As the Desk Sergeant, BURKE is responsible for interviewing persons
entering the precinct following their arrest.  During the normal course of
business, police officers (POs) entering the precinct with a recent
arrest, enter through the rear door, lock their weapons in a lock box and
then present the arrestee to BURKE at the sergeant's window. BURKE asks
the arrestee a series of questions included on the activity log,
specifically, those contained on the top portion to include whether the
arrestee has physical injuries or medication.  In addition, BURKE is
responsible for taking a live scan of the arrestee's thumb print.  The
live scan allows BURKE to verify the arrestee's identity and determine if
the arrestee has recently been arrested.  A larger live scan machine is
located in the Uniform Services Room (USR); however, POs are not required
to obtain fingerprints and photos from individuals arrested on a warrant.

POs are required to fill out an arrest worksheet, which is
computerized.  Old information, such as addresses, tattoos and phone
numbers are pre-populated from prior arrests.  The information remains on
the worksheet unless the PO updates the information.  POs fingerprint and
photograph individuals arrested on a misdemeanor offense but not on a

| Investigation on | 05/30/2017 | at | Central Islip, New York, United States (In Person) |
| --- | --- | --- | --- |

File # 282A-NY-2149893                                          Date drafted  05/30/2017

by DOYLE CHRISTINE ANNE, WENIGER MICHAEL J

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency. it and its contents are not
to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

282A NY 2149893

(U) Interview of James Burke on May 30,
Continuation of FD-302 of 2017 _____ . On 05/30/2017 . Page 2 of 3

violation.  For example, a PO would not fingerprint and photograph an
individual that was given a violation for a small amount of marijuana.

March 16, 2017

BURKE was shown the Prisoner Activity Log from LATOYA NEWKIRK's
arrest.  BURKE recalls making notes on NEWKIRK's Prisoner Activity Log
with regard to "Visible Physical Condition Upon Initial Interview",
"Visible Emotional Condition" and "Prisoner Claims Pain, Injury or
Illness".  BURKE believes he marked "no" and then "yes" for the question
regarding whether the prisoner is on medication.  BURKE believes that the
prisoner did not have medication when the prisoner initially arrived at
the precinct but was later brought medication.  BURKE assumes someone
known to the prisoner brought medication because the prisoner did not have
medication upon arrival to the precinct.  The arresting POs would have
told BURKE that the prisoner had medication, if that were the
case.  Normal practice dictates that the Sergeant verify the medication by
checking the marking on the medication with information contained on drugs.
com. BURKE advised that it is common for people to drop off medications
for prisoners.  There is usually not a record noting when medications are
dropped off.  Sergeant RENE GARCIA (GARCIA) relieved BURKE as the Desk
Sergeant and is the Sergeant that verified the prisoner's medication.

BURKE was shown a photo of LATOYA NEWKIRK and indicated he did not
recognize NEWKIRK.  When recalling the events from March 16, 2017, BURKE
was thinking of a different prisoner.  BURKE indicated that the name
NEWKIRK sounds familiar but LATOYA NEWKIRK is not a "regular" at the
precinct.

BURKE does not recall seeing MCCOY moving the prisoner on March 16, 2017.

Miscellaneous

Other than the Juvenile Room (JR), the interview rooms in the squad area
are the only other rooms a PO would take a prisoner for debriefing
purposes.  If taken to the squad interview rooms, a Detective would likely
be in the room conducting the debrief.

BURKE first heard of the allegations against MCCOY when Sergeant BIEBER
(BIEBER) brought MCCOY's taser to BURKE instructing BURKE to send the
taser to the range.  BURKE believes it was the same day Internal Affairs
Bureau (IAB) was at the precinct.  BIEBER told BURKE that MCCOY was in
"big trouble" but did not give BURKE specifics.

BURKE later found out the full extent of the allegations from Union
Delegate TERRY FANNING (FANNING).  FANNING told BURKE that the incident

FD 302a (Rev. 05 08 10)

282A NY 2149893

(U) Interview of James Burke on May 30,
Continuation of FD-302 of ___2017_____   On _05/30/2017_ , Page _3 of 3_

took place in the JR which surprised BURKE considering the location of the
JR and the proximity to the Lieutenant's office and the Sergeants
area.  In addition, the JR is in the busiest hallway in the
precinct.  FANNING also told BURKE that MCCOY admitted to the
allegation.  BURKE finds the allegation hard to believe because it is so
out of character for MCCOY.

BURKE only knows MCCOY professionally; BURKE does not socialize with
MCCOY.  From what BURKE knows of MCCOY, MCCOY is a good cop, a good person
and has a good reputation.  MCCOY did not strike MCCOY as a
womanizer.  MCCOY worked out often and seemed to be concerned about his
appearance.

MCCOY's former partner is ANDREW HOPE (HOPE).  HOPE and MCCOY were
partners for a couple of years.

BURKE has not talked to MARK PAV (PAV).  PAV is not allowed on the street
and mopes around the precinct.  PAV has "dumped" a prisoner on BURKE in
the past.  PAV is more concerned about getting another arrest than about
the prisoner he has in custody.

With regard to transporting prisoners, the policy is two male officers or
one female officer to transport a female prisoner.  With regard to
debriefing, there is no policy regarding a male officer being in the room
alone with a female prisoner; however, it is considered bad
practice.  BURKE indicated that PAV should have been more thorough and
should not have left the JR unless it was necessary.

There is not usually paper towels, tissues or a paper towel dispenser in
the JR; however, there is a janitor's closet across from the JR that might
contain paper towels.

A prisoner's cellular telephone should be contained in the prisoner's
property bag but sometimes POs allow prisoners to use their cellular
phones.

There is a bulletin board next to the Sergeant's desk containing bulletins
regarding vehicles and individuals of interest to the police department.

Since the incident with MCCOY, all POs must have a sergeant verify all
prisoner movement.  In addition, there are now cameras in the precinct.

FD 302 (Rev 5 8 10)                              - 1 of 1 -

### FEDERAL BUREAU OF INVESTIGATION



Date of entry     06/09/2017

On May 16, 2017, JOSEPH MALDONADO, a Police Officer (PO) with Suffolk
County Police Department (SCPD) was interviewed at ████████████
██ ████ ████████████ ██████ ████████ by Special Agent (SA) Christine
Doyle and SA Michael Weniger.  MALDONADO was being interviewed to gather
information regarding CHRISTOPHER MCCOY (MCCOY).  After being advised of
the identities of the interviewing Agents and the nature of the interview,
MALDONADO provided the following information:

MALDONADO and MCCOY were patrol partners from approximately 2013 to
approximately 2015.  MALDONADO described MCCOY as a good cop and a family
guy.  MALDONADO keeps in contact with MCCOY approximately one time per
week.  MALDONADO contacted MCCOY after MCCOY was suspended because
MALDONADO was concerned for MCCOY's well being.  MALDONADO continues to
contact MCCOY to inquire about MCCOY's welfare.

When MALDONADO and MCCOY worked together, they had a system when dealing
with arrestees; MALDONADO handled the arrestee and MCCOY handled the
paperwork.  At no time while working together did MALDONADO witness MCCOY
behave in an inappropriate manner towards an arrestee.

While on duty, MALDONADO never witnessed MCCOY act inappropriately towards
an individual MALDONADO and MCCOY encountered.

MALDONADO never witnessed MCCOY provide his (MCCOY's) number to an
individual MALDONADO and MCCOY encountered during the course of their
duties.

MALDONADO was not aware of MCCOY viewing the website backpage.com or of
MCCOY visiting prostitutes.

MALDONADO was very surprised when he discovered the reason for MCCOY's
suspension.  MALDONADO does not know the details of MCCOY's situation but
heard a rumor that MCCOY did something sexual with an arrestee at the
precinct.  MALDONADO believes that whatever MCCOY did was a one time
occurrence.

---

Investigation on    05/16/2017    at ████████ ████████ ████████    ████████

File#  282A NY 2149893 ELA                                Date drafted   05/17/2017

by   DOYLE CHRISTINE ANNE, WENIGER MICHAEL J

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency: it and its contents are not
to be distributed outside your agency

FD-302 (Rev 5-8-10)

- 1 of 1 -

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry        05/18/2017

On May 11, 2017, LENA MERCER (MERCER), residence address ⬛⬛⬛⬛ ⬛⬛⬛⬛ ⬛⬛⬛⬛ ⬛⬛⬛⬛ ⬛⬛ ⬛⬛⬛⬛, was interviewed by Federal Bureau of Investigation (FBI) Special Agent (SA) Michael J. Weniger and FBI SA Michael Lever at MERCER's residence.  After being advised of the identities of the interviewing Agents and the nature of the interview, MERCER provided the following information:

MERCER works as a Police Detention Attendant (PDA) for the SUFFOLK COUNTY POLICE DEPARTMENT (SCPD).

MERCER was shown photographs of LATOYA NEWKIRK (NEWKIRK) and a Prisoner Activity Log related to NEWKIRK's March 16, 2017 arrest by the SCPD.  MERCER was unable to specifically recall NEWKIRK or the events of March 16, 2017.  MERCER explained there was nothing memorable about that particular date.  MERCER was, however, familiar with the last name "Newkirk".  MERCER was unable to recall why or how she (MERCER) was familiar with the name "Newkirk".

While reviewing the Prisoner Activity Log from NEWKIRK's March 16, 2017 arrest, MERCER stated NEWKIRK did not present any problems.  MERCER based this conclusion upon the contents of the Log.  MERCER explained the Log should reflect any behavioral or emotional issues observed while NEWKIRK was in the SCPD's custody.

[Agent's Note:  The photographs and Prisoner Activity Log shown to RITTER are attached in a digital 1A Envelope].

---

Investigation on    05/11/2017      at  ⬛⬛ ⬛⬛ ⬛⬛ ⬛⬛ ⬛⬛ ⬛⬛⬛)

File #  282A-NY 2149893                                        Date drafted    05/12/2017

by   WENIGER MICHAEL J, LEVER MICHAEL W

This document contains neither recommendations nor conclusions of the FBI  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302 (Rev 5-8-10)

- 1 of 5 -

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry    06/15/2017

On June 2, 2017, MATTHEW SKULAVIK (SKULAVIK), date of birth (DOB) ███
██ █ █ ███████████████ ███████████, was interviewed, pursuant to a
proffer agreement, by Federal Bureau of Investigation (FBI) Special Agent
(SA) Michael J. Weniger and Eastern District of New York (EDNY) Assistant
United States Attorney (AUSA) Lara Gatz at the EDNY United States
Attorney's Office in Central Islip.  Also present during the proffer was
SKULAVIK's attorney Joseph A. Gentile.  After being advised of the
identities of the interviewing Officials and the nature of the interview,
SKULAVIK provided the following information:

**BACKGROUND**

   SKULAVIK was hired by the Suffolk County Police Department (SCPD) in
2002.  Prior to his (SKULAVIK's) employment with the SCPD, SKULAVIK was a
Captain in the United States Army.  After being hired by the SCPD,
SKULAVIK worked in the 1st Precinct.  Initially, SKULAVIK worked in
Wyandanch, New York.  Approximately two (2) years ago, SKULAVIK moved to a
position in the 1st Precinct's Crime Section Unit (CSU), formerly known as
the COPE Unit.

   SKULAVIK explained the CSU conducted traffic enforcement, community
policing, and narcotics enforcement.  The CSU did not respond to 911
calls.  The 1st Precinct CSU was compromised of two (2) teams.  SKULAVIK's
team consisted of SKULAVIK, CHRISTOPHER ODDO (ODDO), MARK PAV (PAV),
CHRISTOPHER MCCOY (MCCOY), and MICHAEL BIEBER (BIEBER).  ODDO was
SKULAVIK's partner.  SKULAVIK stated he (SKULAVIK) had partnered with ODDO
for approximately eleven (11) years.  PAV and MCCOY were also
partners.  BIEBER was the Sergeant that supervised the team.  The other
team was supervised by Sergeant SCOTT CAREY (CAREY).

**CHRISTOPHER MCCOY**

   SKULAVIK met MCCOY in approximately 2006, when MCCOY was assigned to
the 1st Precinct.  Initially, SKULAVIK and MCCOY both work in the
Wyandanch area.  While on patrol, MCCOY was initially partnered with
JOSEPH MALDONADO (MALDANADO) and later ANDREW HOPE (HOPE).  SKULAVIK moved

| | | |
|---|---|---|
| Investigation on | 06/02/2017 | at |

Central Islip, New York, United States (In Person)

File #  282A-NY-2149893

Date drafted  06/05/2017

by  WENIGER MICHAEL J

This document contains neither recommendations nor conclusions of the FBI It is the property of the FBI and is loaned to your agency  It and its contents are not
to be distributed outside your agency.

FD 302a (Rev 05 08-10)

282A NY 2149893

Continuation of FD-302 of <u>(U) Proffer of MATTHEW J. SKULAVIK</u> , On <u>06/02/2017</u> , Page 2 of 5

to the 1st Precinct CSU a few years ago. When MCCOY was transferred to the CSU, they (MCCOY and SKULAVIK) were already familiar with one another.

SKULAVIK stated he (SKULAVIK) considered MCCOY a "good friend" and a good police officer. Still, SKULAVIK and MCCOY did not socialize outside of the workplace. SKULAVIK and MCCOY did, however, attend off hour work functions together, such as SCPD sponsored baseball games and picnics.

SKULAVIK did not know MCCOY to be a pervert. SKULAVIK had the impression that MCCOY may have cheated on his (MCCOY's) wife at some point in time. SKULAVIK had this impression because MCCOY was rarely permitted to go to CSU outings. Still, SKULAVIK did not know MCCOY to have a secret phone to contact women other than his (MCCOY's) wife.

SKULAVIK did not know MCCOY to be a hyper-sexualized individual. SKULAVIK did not believe MCCOY frequented prostitutes. MCCOY used backpage.com for work related activities. SKULAVIK did not know of MCCOY using backpage.com for personal reasons.

SKULAVIK stated MCCOY occasionally used Facebook and Instagram to look up attractive women. SKULAVIK stated some of these women may have been individuals that MCCOY met through his (MCCOY's) employment with the SCPD.

SKULAVIK stated MCCOY did not arrest a disproportionate number of females. Further, SKULAVIK was unfamiliar with any complaints against MCCOY made by female police officers.

## MARCH 16, 2017

On the morning of March 16, 2017, SKULAVIK and ODDO were scheduled to qualify at an SCPD range. When SKULAVIK and ODDO arrived at the range they (SKULAVIK and ODDO) found that it was closed. SKULAVIK and ODDO then returned to the SCPD 1st Precinct. SKULAVIK and ODDO spoke with BIEBER and decided to go out on the road.

That same morning, SKULAVIK and ODDO noticed a suspicious looking male on the street. SKULAVIK and ODDO approached the male and began speaking with him. They (SKULAVIK and ODDO) learned that the man's name was ████ ████ ████ SKULAVIK stated ████ was in possession of marijuana and mushroom. Additionally, ████ was in possession of a New York City Police Department (NYPD) Detective's shield. As a result, ████ was brought to the 1st Precinct for questioning. Specifically, ████ was taken to an interview room in the 1st Precinct's Detective Squad Area. SKULAVIK stated ████ was processed in the 1st Precinct's Uniform Squad Room. ████



FD-302a (Rev. 05-08-10)

282A NY 2149893

Continuation of FD-302 of (U) Proffer of MATTHEW J. SKULAVIK _____ , On 06/02/2017 , Page 3 of 5

Sometime that afternoon while in the Uniform Squad Room, SKULAVIK saw MCCOY. SKULAVIK explained MCCOY and PAV had also made an arrest that morning. MCCOY was with the individual he (MCCOY) arrested, LATOYA NEWKIRK (NEWKIRK). SKULAVIK was unfamiliar with NEWKIRK. He (SKULAVIK) was, however, familiar with NEWKIRK's family. SKULAVIK explained NEWKIRK was related to MARTY NEWKIRK (MARTY) and MARTY NEWKIRK JR. (JR.). MARTY and JR. were familiar names to SKULAVIK because they (MARTY and JR.) had been arrested by the SCPD previously.

SKULAVIK stated MCCOY did not make any comments regarding NEWKIRK to SKULAVIK other than informing SKULAVIK that NEWKIRK was from the Wyandanch area.

Once SKULAVIK learned that NEWKIRK was related to MARTY and JR., SKULAVIK engaged NEWKIRK in conversation. SKULAVIK described NEWKIRK's behavior and demeanor as "normal". SKULAVIK stated NEWKIRK was talkative and compliant but not overly friendly.

SKULAVIK did not see MCCOY with NEWKIRK inside the 1st Precinct's Juvenile Room on March 16, 2017. SKULAVIK explained the Juvenile Room was used to debrief misdemeanor arrestees who showed a willingness to cooperate. The Juvenile Room was located off of the Uniform Squad Room and provided a space of isolation from the Uniform Squad Room, which housed individuals that had been arrested. SKULAVIK stated the Juvenile Room was unsecured and was in a well-traveled area of the 1st Precinct. Sometimes when CSU members wanted to ensure confidentiality when interviewing individuals in the Juvenile Room, the CSU members would situate the arrestee immediately in front of the door so the door could not be opened from the outside.

SKULAVIK was unaware of the last time he (SKULAVIK) saw MCCOY on March 16, 2017. SKULAVIK stated he (SKULAVIK) stayed with ▆▆▆ three (3) to four (4) hours after his (SKULAVIK's) shift ended. SKULAVIK's shift was from 08:00 to 16:00.



## CONFIDENTIAL INFORMANTS

SKULAVIK stated the CSU teams helped develop informants for the 1st Precinct Detective Squad. The CSU teams found individuals willing to provide information and possibly work with the 1st Precinct

FD-302a (Rev. 05-08-10)

282A NY 2149893

Continuation of FD-302 of (U) Proffer of MATTHEW J. SKULAVIK ,On 06/02/2017 ,Page 4 of 5

Detectives. Informants were "signed up" by the 1st Precinct Detective Squad members after CSU members vetted the potential informants. Nonetheless, the CSU members typically remained in contact with informants they had developed.

SKULAVIK stated informants were contacted via a single cellular telephone stored in the CSU office. SKULAVIK did not store the names and telephone numbers of informants in his (SKULAVIK's) personal cellular telephone. SKULAVIK explained the CSU team members were not issued SCPD cellular telephones, expect the CSU Sergeants.

**MARK PAV**

SKULAVIK did not believe PAV was aware of MCCOY's actions on March 16, 2017. SKULAVIK stated PAV was morally upright. Further, SKULAVIK described PAV as a "shake box". SKULAVIK explained PAV was overly nervous and unlikely to engage in criminal or moral misbehavior.

**MISCELLANEOUS**

SKULAVIK was unaware of a contest amongst 1st Precinct officers where the officers placed a bet on which officer could receive oral sex from the ugliest woman.

SKULAVIK was shocked by the allegations made by NEWKIRK. Still, SKULAVIK believed MCCOY received oral sex from NEWKIRK. SKULAVIK heard MCCOY admitted to the allegations.

SKULAVIK has not heard anything about NEWKIRK since her (NEWKIRK's) allegations against MCCOY came to light. SKULAVIK initially thought NEWKIRK was making the allegations for monetary reasons. SKULAVIK did not believe MCCOY forced NEWKIRK to perform oral sex on him (MCCOY).



SKULAVIK was asked about ███████ ███████ ███████ ███████. SKULAVIK stated ███████ was a prostitute in Wyandanch and a source of information for the CSU team. ███████ was seen by members of the CSU team exiting a ███████████████. ███████ was with ███████ at the time. ███████ had warrants. As a result, SCPD eventually found ███████ and arrested her ███████. SKULAVIK was unsure of which SCPD officers arrested ███████.

FD-302a (Rev 05-08-10)

282A NY 2149893

Continuation of FD-302 of (U) Proffer of MATTHEW J. SKULAVIK _____ , On 06/02/2017 , Page 5 of 5

 

    SKULAVIK last spoke to MCCOY approximately one (1) month ago.  SKULAVIK did not discuss the allegations made against MCCOY.  Instead, SKULAVIK called MCCOY to ask about his (MCCOY's) wellness and mental state.

FD 302 (Rev 5 8-10)

- 1 of 4 -



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry      06/15/2017

On May 30, 2017, MICHAEL BIEBER (BIEBER), date of birth (DOB) ███████████ ██████  ██████  ██████  ██████, was interviewed, pursuant to a proffer agreement, by Federal Bureau of Investigation (FBI) Special Agent (SA) Michael J. Weniger, FBI SA Christine Doyle, and Eastern District of New York (EDNY) Assistant United States Attorney (AUSA) Lara Gatz at the EDNY United States Attorney's Office in Central Islip. Also present during the proffer was BIEBER's attorney Paul Linzer. After being advised of the identities of the interviewing Officials and the nature of the interview, BIEBER provided the following information:

## GENERAL

BIEBER is a Sergeant for the Suffolk County Police Department (SCPD). In February 2017, BIEBER was assigned to the SCPD 1st Precinct Community Support Unit (CSU), formerly known as the COPE Unit. BIEBER stated he (BIEBER) replaced Sergeant RICHIE CONNELL (CONNELL). In this position, BIEBER supervised four (4) police officers (POs), PO CHRISTOPHER MCCOY (MCCOY), PO MARK PAV (PAV), PO MATTHEW SKULAVIK (SKULAVIK), and PO CHRISTOPHER ODDO (ODDO). BIEBER stated his (BIEBER's) unit worked in both plain clothes and in uniform. During the work day, BIEBER worked both on the road with his subordinates and also in the office.

## CHRISTOPHER MCCOY

BIEBER stated MCCOY was already working in CSU when he (BIEBER) arrived at the Unit. MCCOY was productive at work and known as an active PO. BIEBER stated MCCOY seemed "normal". MCCOY never discussed utilizing the social media website Facebook to contact individuals. Additionally, MCCOY did not seem to constantly be on his (MCCOY's) cellular telephone. BIEBER did not know MCCOY to be a womanizer or philanderer.

BIEBER stated the number of female arrests made by MCCOY was not disproportionate to the number of male arrests made by MCCOY. Moreover, the number of female arrests made by MCCOY was not "abnormal" when compared to others in the CSU.

| | | | |
|---|---|---|---|
| Investigation on | 05/30/2017 | at | Central Islip, New York, United States (In Person) |
| File # 282A NY 2149893 | | | Date drafted 05/31/2017 |
| by WENIGER MICHAEL J, DOYLE CHRISTINE ANNE | | | |

This document contains neither recommendations nor conclusions of the FBI It is the property of the FBI and is loaned to your agency. It and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

282A NY 2149893

Continuation of FD-302 of  (U) Proffer of MICHAEL BIEBER _____ , On _05/30/2017_ , Page _2_ of _4_

    BIEBER never noticed anything odd when observing MCCOY's interactions with females.

## MARCH 16, 2017

    On March 16, 2017, BIEBER was at work.  BIEBER recalled MCCOY and PAV made an arrest that morning.  The arrestee was a female that was in possession of marijuana and had outstanding warrants.  BIEBER stated MCCOY likely came into the CSU area, which was located in the 1st Precinct basement, to remove some of his (MCCOY's) duty uniform.  BIEBER stated it was common for his (BIEBER's) team to remove a portion of their uniform after an arrest in order to get comfortable.

    BIEBER explained his (BIEBER's) team usually split up responsibilities after an arrest was made.  One PO typically dealt with the arrestee and the other PO completed the arrest paperwork.  BIEBER explained one (1) PO was always supposed to be with the arrestee.  BIEBER stated this rule was not always followed provided the arrestee was compliant, restrained, and there was another PO in the Uniform Squad Room, where arrestees were held.

    BIEBER stated he (BIEBER) was not focused on the individual arrested by MCCOY and PAV.  BIEBER explained SKULAVIK and ODDO also made an arrest on March 16, 2017.  The individual arrested by SKULAVIK and ODDO was in possession of a New York City Police Department (NYPD) badge.  As a result, the individual arrested by SKULAVIK and ODDO took priority over MCCOY and PAV's arrestee.

    BIEBER stated nothing that occurred on March 16, 2017 was remarkable.  Outside of the two (2) arrests made by his (BIEBER's) team, ████████████████████████████████████████████████████

████████████████████████████████ . ████████████ Around 14:00, PAV came out to the 1st Precinct Parking Lot but MCCOY did not.  BIEBER believed MCCOY was finishing up with arrest related activities.

    MCCOY never ended up coming outside to the 1st Precinct Parking Lot to assist with ████████████████ ████████████████████████████

████████████████████████████ ████████████████████████

████████████████ █ ████████████████████████████████

████████████████ .

    BIEBER last saw MCCOY on March 16, 2017 at approximately 13:00.

## EVENTS OCCURRING AFTER MARCH 16, 2017

FD-302a (Rev. 05-08-10)

282A NY 2149893

Continuation of FD-302 of  (U)  Proffer of MICHAEL BIEBER _____ , On  05/30/2017 , Page  3 of 4

      BIEBER learned of the allegations against MCCOY as he was coming into
work one morning.  BIEBER received a telephone call from Inspector MATT
LEWIS (LEWIS).  LEWIS told BIEBER that MCCOY was in trouble and would be
suspended.  As a result, BIEBER needed to repossess certain SCPD issued
equipment from MCCOY.  Later in the day, BIEBER learned the FBI had been
to MCCOY's residence.  [Agent's Note: The FBI made contact with MCCOY on
April 6, 2017.]  BIEBER also learned that an allegation of a sexual nature
was made against MCCOY.  After learning of the allegation, BIEBER was
"shocked".  BIEBER stated he (BIEBER) never had anyone make complaints
related to MCCOY or PAV.

      On the same day, BIEBER saw MCCOY in the 1st Precinct parking
lot.  MCCOY was with his (MCCOY's) union delegate, CHRIS WOLF
(WOLF).  BIEBER and another SCPD employee approached MCCOY in order to
retrieve his (MCCOY's) SCPD issued equipment.  BIEBER stated MCCOY refused
to make eye contact with BIEBER during this interaction.  BIEBER stated
"the look on his [MCCOY's] face" led BIEBER to believe that the
allegations made against MCCOY were factual.

## MISCELLANEOUS

      BIEBER stated PAV was a hard worker and good cop.  BIEBER stated it was
unlikely PAV knew of MCCOY's conduct when it occurred on March 16,
2017.  BIEBER stated that during the hours when the misconduct allegedly
occurred the 1st Precinct was extremely busy with a large amount of
supervision.

      BIEBER stated it was not necessarily common practice to take arrestees
into the 1st Precinct's Juvenile Room.  Still, the Juvenile Room was
frequently used to debrief arrestees if they (the arrestee) wanted to
provide information.  BIEBER explained this was done in order to separate
the cooperating arrestee from others that were arrested and held in the
Uniform Squad Room.

      BIEBER stated SCPD policy did not require two (2) POs to be present in
an interview room with a female arrestee.  Nonetheless, the best practice
was to have two (2) male POs with a female arrestee when inside of an
interview room.

      BIEBER stated MCCOY should have completed the Prisoner Activity Log
during periods when he (MCCOY) was interacting with the arrestee.  BIEBER
stated both partners were responsible for the Prisoner Activity Log
regardless of which officer started the Log.

FD-302a (Rev 05-08-10)

282A NY 2149893

Continuation of FD-302 of (U) Proffer of MICHAEL BIEBER                    , On  05/30/2017 , Page  4 of 4

        BIEBER stated the SCPD only issued cellular telephones to those in the
position of sergeant or above.  As a result, BIEBER and his (BIEBER's)
team generally communicated using their personal cellular telephones.

        BIEBER stated MCCOY was close with the other CSU team members: PAV,
SKULAVIK, and ODDO.  MCCOY was also close with his (MCCOY's) former
partner, ANDREW HOPE (HOPE).

        BIEBER heard rumors around the 1st Precinct that the alleged victim set
up MCCOY.

FD 302 (Rev. 5 8 10)                              - 1 of 2 -

## FEDERAL BUREAU OF INVESTIGATION

Date of entry     07/20/2017

On June 9, 2017 MICHAEL F. AXELSON (AXELSON), ███████████
█████ ████████          ████████████      █████████ ████████ , was
interviewed by Special Agent (SA) Christine Doyle, SA Michael Weniger and
Assistant United States Attorney (AUSA) Lara Gatz at the Eastern District
of New York located at 100 Federal Plaza, Central Islip, New York.  Also
present was John Carman, attorney for AXELSON.  AXELSON was being
interviewed to gather information regarding his interaction with LATOYA
NEWKIRK (NEWKIRK) on March 16, 2017.  After being advised of the
identities of the interviewing Agents and the nature of the interview,
AXELSON provided the following information:

AXELSON has been employed with the Suffolk County Police Department (SCPD)
since 1993.  AXELSON is currently assigned to the Marine Bureau after
serving in the First Precinct from 1993 to 2002.

### Interaction with NEWKIRK

On March 16, 2017, AXELSON was working in a two man patrol car in the
First Precinct.  As is standard practice, Police Officers assigned to the
Marine Bureau are required to work for a three week period in one of the
precincts during what is considered the slow season for the Marine
Bureau.  AXELSON normally asks to be assigned to the First because he is
familiar with the First and he prefers to be active.

On the above date, AXELSON was partnered with DAVID CHOLDEN (CHOLDEN).  At
some point during their shift, AXELSON and CHOLDEN were called into the
precinct to transport two female prisoners from the First Precinct to the
Fourth Precinct.  AXELSON described the two females he and CHOLDEN
transported as young and black.  AXELSON recalls the two females were
chatty with each other and appeared as if they knew each other prompting
AXELSON to ask CHOLDEN whether the two females had been arrested
together.  The two females attempted to engage in conversation with
AXELSON and CHOLDEN.  One of the females was very interested in becoming a
Police Officer and inquired as to whether her arrest would hinder her
chances of becoming one.

---

| Investigation on | 06/09/2017 | at | Central Islip, New York, United States (In Person) |
|---|---|---|---|

File # 282A NY-2149893                                      Date drafted    06/11/2017

by DOYLE CHRISTINE ANNE, WENIGER MICHAEL J

This document contains neither recommendations nor conclusions of the FBI  It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency

FD-302a (Rev. 05-08-10)

282A NY 2149893

(U) Interview of MICHAEL F. AXELSON on
Continuation of FD-302 of June 9, 2017 _____ , On 06/09/2017 , Page 2 of 2

Once at the Fourth Precinct, the females were placed in the processing area. At some point, one of the females asked for her medication. AXELSON does not recall having a conversation with the female about the medication; AXELSON only recalls being given instructions regarding the medication. AXELSON does not recall giving the female her medication but AXELSON thinks he might have been asked to do so by the desk sergeant.

AXELSON recalls there being an issue with the paperwork of the female that requested the medication. While searching the female's property, medication was found; however, there was no corresponding paperwork. The lack of paperwork and discovery of the medication resulted in AXELSON and CHOLDEN remaining at the precinct with the female until the situation was resolved.

**MCCOY**

AXELSON does not know MCCOY or MCCOY's former partner MARK PAV. with regard to rumors, AXELSON initially heard that someone from the First Precinct was processing an arrest, took the arrestee into the "JAS" room or Juvenile Room and received oral sex. Early on, AXELSON heard that the interaction was consensual; however, pointed out that from a police officer's point of view, the interaction could not have been consensual. AXELSON also heard that the female wanted bail in exchange for giving MCCOY oral sex.

AXELSON was contacted by the union and reminded that he has a right to representation when being questioned regarding the investigation. The union representative, CHRIS WOLFE, told AXELSON that his (AXELSON) name was discussed with regard to the MCCOY investigation.

AXELSON heard that MCCOY willingly spoke to the government without representation. AXELSON indicated that MCCOY's actions prompted the Union to reach out the him (AXELSON) to remind AXELSON that he has a right to have representation present.

FD-302 (Rev. 5-8-10)

- 1 of 3 -

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry   06/13/2017

On May 30, 2017, ROBERT VISCUSO (VISCUSO), ▮▮▮▮▮▮▮
▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ was interviewed, pursuant to a
proffer agreement, by Federal Bureau of Investigation (FBI) Special Agent
(SA) Michael J. Weniger, FBI SA Christine Doyle, and Eastern District of
New York (EDNY) Assistant United States Attorney (AUSA) Lara Gatz at the
EDNY United States Attorney's Office in Central Islip.  Also present
during the proffer was VISCUSO's attorney Paul Linzer.  After being
advised of the identities of the interviewing Officials and the nature of
the interview, VISCUSO provided the following information:

**BACKGROUND**

VISCUSO is a Sergeant with the Suffolk County Police Department
(SCPD).  VISCUSO's shield number is ▮▮▮▮.  VISCUSO began working for the
SCPD in September 2006.  Presently, VISCUSO is a Desk Sergeant at the SCPD
4th Precinct.

**4TH PRECINCT LODGING**

VISCUSO stated the 4th Precinct offered overnight lodging for female
prisoners arrested throughout Suffolk County.  Most of the other SCPD
precincts did not offer this service.  In these situations, the 4th
Precinct Desk Sergeant did not generate paperwork when prisoners were
brought to the 4th Precinct for overnight lodging by SCPD Officers from
other SCPD Precincts.  Instead, the original Prisoner Activity Log was
used to make additional entries.

As a general matter, prisoners that were brought to the 4th Precinct
from other Precincts were interviewed quickly.  VISCUSO estimated these
interviewed typically lasted between one (1) and four (4)
minutes.  VISCUSO explained these prisoners had already been interviewed
after their arrest.  As a result, the reinterview consisted of going over
questions that had already been asked to the prisoner.  VISCUSO stated the
transporting officers were also present during reinterviews.

Investigation on   05/30/2017   at   Central Islip, New York, United States (In Person)

File #  282A-NY 2149893                                      Date drafted   06/01/2017

by  WENIGER MICHAEL J, DOYLE CHRISTINE ANNE

This document contains neither recommendations nor conclusions of the FBI  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

282A-NY 2149893

Continuation of FD-302 of (U) Proffer of ROBERT VISCUSO _____ , On 05/30/2017 , Page 2 of 3

VISCUSO stated the personal property belonging to prisoners generally came with the prisoner if they were transported to the 4th Precinct for overnight lodging.  VISCUSO stated medications were typically brought with a prisoner's personal property.  Still, there were occasions where some of a prisoner's personal property remained at the Precinct where the prisoner was initially taken after their arrest.

## PRISONER ACTIVITY LOG FOR LATOYA NEWKIRK

On March 16, 2017, VISCUSO worked a night tour at the 4th Precinct.  VISCUSO was shown the Prisoner Activity Log for prisoner LATOYA NEWKIRK dated March 16, 2017.  VISCUSO's attention was directed to the entry made at 21:05 stating, "Reinterviewed  ok".  VISCUSO stated he (VISCUSO) had a vague recollection of NEWKIRK and the events described in the 21:05 entry.

After reviewing the Prisoner Activity Log for NEWKIRK, VISCUSO stated he (VISCUSO) reinterviewed NEWKIRK upon her (NEWKIRK's) arrival at the 4th Precinct.  VISCUSO stated he (VISCUSO) asked NEWKIRK a number of questions regarding her (NEWKIRK's) current physical and mental condition.  The majority of these questions had already been asked by the 1st Precinct Desk Sergeant.  VISCUSO also reviewed an addendum to NEWKIRK's Prisoner Activity Log which indicated NEWKIRK was prescribed medication.  The addendum was commonly referred to as a Mental Health Screen.

## CHRISTOPHER MCCOY

VISCUSO was familiar with CHRISTOPHER MCCOY (MCCOY).  VISCUSO and MCCOY were in the same SCPD Police Academy class.  VISCUSO and MCCOY attended the SCPD Police Academy approximately ten (10) years ago.  MCCOY and VISCUSO did not socialize during the Academy or otherwise.  VISCUSO and MCCOY were both in the 1st Precinct prior to VISCUSO's assignment to the 4th Precinct.  VISCUSO explained he (VISCUSO) was transferred to the 4th Precinct approximately two (2) years ago.  VISCUSO believed the last time he (VISCUSO) saw MCCOY was around the time that he (VISCUSO) was transferred.

VISCUSO stated he (VISCUSO) knew very little about MCCOY.  VISCUSO stated MCCOY was previously a police officer with the New York City Police Department (NYPD).  MCCOY also attended Clemson University.  VISCUSO never learned that MCCOY was a womanizer.

## RUMORS

FD-302a (Rev 05-08 10)

282A NY 2149893

Continuation of FD-302 of  (U) Proffer of ROBERT VISCUSO                    , On  05/30/2017  , Page  3 of 3


    VISCUSO stated the workplace rumor was MCCOY received oral sex from a
prisoner in the 1st Precinct's Juvenile Room.  VISCUSO stated he (VISCUSO)
heard these rumors from some of his (VISCUSO's) friends that worked out of
the 1st Precinct.  These friends included ██ █████ ███████████ █████.

FD 302 (Rev 5 8-10)

- 1 of 2 -

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry    05/18/2017

On May 11, 2017, SHERLY RITTER (RITTER), date of birth ███████
███ ████ ████████ ████████ ████████ was interviewed by
Federal Bureau of Investigation (FBI) Special Agent (SA) Michael J.
Weniger and FBI SA Michael Lever at RITTER's residence.  After being
advised of the identities of the interviewing Agents and the nature of the
interview, RITTER provided the following information:

   RITTER works as a Police Detention Attendant (PDA) for the SUFFOLK
COUNTY POLICE DEPARTMENT (SCPD).  RITTER typically works a 16:00 to 24:00
shift.

   RITTER was shown photographs of LATOYA NEWKIRK (NEWKIRK) and a Prisoner
Activity Log related to NEWKIRK's March 16, 2017 arrest by the
SCPD.  RITTER was unable to specifically recall NEWKIRK or the events of
March 16, 2017.  RITTER explained there was nothing memorable about that
particular date.

   RITTER described the process for female arrestees brought to the 4th
Precinct.  First, arrestees were interviewed by the Desk Sergeant.  After
the interview, arrestees were taken into the Detention Area and their
property was inventoried.  Then, arrestees were taken to the Cell
Area.  Arrestees were searched while in the Cell Area by two (2)
PDAs.  After being searched, the arrestees were placed into cells.

   RITTER explained PDAs continued to monitor arrestees after the
arrestees were placed into cells.  RITTER stated PDAs remained at desks in
the Cell Area.  From the desks, PDAs were able to see into the
cells.  Additionally, the 4th Precinct had CCTV that monitored the cells.

   After reviewing the Prisoner Activity Log, RITTER stated she (RITTER)
was "Pda 101".  Further, RITTER observed the events noted in the log entry
at 21:13 on March 16, 2017.

   RITTER stated arrestees that were extremely emotional and possibly
suicidal were considered Direct Observation Prisoners (DOPs).  DOPs were
constantly monitored.  According to the Prisoner Activity Log, NEWKIRK was

Investigation on   05/11/2017   at   ███ ████ ████ ████ ██ ████

File #   282A-NY-2149893                          Date drafted   05/12/2017

by   WENIGER MICHAEL J, LEVER MICHAEL W

This document contains neither recommendations nor conclusions of the FBI  It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

282A NY 2149893

Continuation of FD-302 of (U) Interview of SHERLY RITTER _____ , On 05/11/2017 , Page 2 of 2

not considered a DOP.  Moreover, the Prisoner Activity Log did not reflect
any unusual behavior by NEWKIRK while at the 4th Precinct.

[Agent's Note:  The photographs and Prisoner Activity Log shown to RITTER
are attached in a digital 1A Envelope].

FD 302 (Rev 5 8 10)

OFFICIAL RECORD

FEDERAL BUREAU OF INVESTIGATION

Date of entry 04/07/2017

On April 3, 2017, STEPHANIE RIVAS (RIVAS), [redacted] was telephonically interviewed by Federal Bureau of Investigation (FBI) Special Agent (SA) Michael J. Weniger and Eastern District of New York (EDNY) Assistant United States Attorney (AUSA) Lara Gatz. After being advised of the identities of the interviewing Officials and the nature of the interview, RIVAS provided the following information:

RIVAS is employed as a Legal Assistant at the law offices of MACEDONIO & DUNCAN LLP (M&D). RIVAS has been employed by MACEDONIO & DUNCAN LLP for approximately two (2) years and six (6) months.

On Friday March 17, 2017, at approximately 1:30 PM, LATOYA NEWKIRK (NEWKIRK) called M&D. RIVAS stated NEWKIRK spoke with M&D employee IRIS ORTIZ (ORTIZ). During the call, NEWKIRK requested a return phone call. NEWKIRK told ORTIZ a summary of the events that occurred on March 16, 2017. Specifically, NEWKIRK informed ORTIZ that she (NEWKIRK) had been arrested by the police on March 16, 2017. NEWKIRK explained that while she (NEWKIRK) was in police custody, she (NEWKIRK) was assaulted by a police officer.

Over the next several days, RIVAS communicated with NEWKIRK. During these telephone calls, NEWKIRK again provided a brief description of her (NEWKIRK's) situation. Additionally, NEWKIRK informed RIVAS that she (NEWKIRK) had written a log, or chronology, of the events that occurred on March 16, 2017. RIVAS stated she (RIVAS) had not asked NEWKIRK to prepare the log. Nonetheless, RIVAS asked NEWKIRK to fax the log to M&D. NEWKIRK also told RIVAS that she (NEWKIRK) had received text messages from the police officer that assaulted her (NEWKIRK). RIVAS asked NEWKIRK to e-mail screenshots of the text messages to her (RIVAS).

During one of the above mentioned telephone calls with NEWKIRK, RIVAS scheduled NEWKIRK for an appointment at the M&D Office. On March 22, 2017, NEWKIRK came to the M&D Office. NEWKIRK brought the sweater she (NEWKIRK) was wearing when she (NEWKIRK) was arrested on March 16,

Investigation on 04/03/2017 at New York, New York, United States (Phone)

File # 282A-NY-2149893 Date drafted 04/07/2017

by WENIGER MICHAEL J

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev 05-08-10)

282A NY 2149893

Continuation of FD-302 of (U) Interview of STEPHANIE RIVAS _____, On 04/03/2017 , Page 2 of 2

2017.  The sweater was placed into a paper bag and locked in the M&D storage closet.

On March 23, 2017, ROBERT MACEDONIO (MACEDONIO) called the EDNY United States Attorney's Office in Central Islip regarding the allegations made by NEWKIRK.

NEWKIRK told RIVAS that she (NEWKIRK) was referred to M&D by her (NEWKIRK's) father, MARTY NEWKIRK (M. NEWKIRK).  RIVAS stated M. NEWKIRK was a former client of M&D.

RIVAS stated she (RIVAS) spoke to NEWKIRK on several occasions.  During these conversations, NEWKIRK never mentioned anything about filing a lawsuit.