UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

CIVIL ACTION


IN THE MATTER OF:


LATOYA NEWKIRK


v.


COUNTY OF SUFFOLK, CHRISTOPHER A. MCCOY, in his official duties and individual capacities, and MARK PAV, in his official duties and capacities


Case No. 2:17-cv-02960


REPORT OF EDMUND HARTNETT

LAW ENFORCEMENT POLICY AND PROCEDURES EXPERT/CONSULTANT

AUGUST 18, 2020

# INTRODUCTION

The following report details my analysis of materials related to the sexual assault of Ms. Latoya Newkirk by an on-duty police officer that occurred on March 16, 2017 while she was in custody in the First Precinct station house of the Suffolk County Police Department and the subsequent litigation filed by Ms. Newkirk against Suffolk County and her arresting officers, Christopher A. MCCOY and Mark PAV.

This report was developed by me, Edmund Hartnett, a law enforcement policy and procedure expert/consultant; (see attachment #1, Resume of Edmund Hartnett). I have reviewed all materials forwarded to my office by the attorneys for the plaintiff in this matter, Egan and Golden LLP and Michael J. Brown PC; as well as other source materials. A list of all materials that I have reviewed and relied upon for the formulation of my opinion and in the preparation of this report can be found under the section entitled "Materials Reviewed." The opinions that I have expressed in this report are based upon my detailed review of these materials and my experience, knowledge and training in the generally accepted best practices in law enforcement.

# MATERIALS REVIEWED

In order to render my opinion in this case, I have reviewed the following materials related to this matter:

- Complaint – Newkirk v. Suffolk County, Christopher A. McCoy and Mark Pav; filed May 12, 2017
- Timeline March 16, 2017 through March 17, 2017
- Newkirk FBI interview March 27, 2017
- Newkirk FBI interview March 29, 2017
- Newkirk FBI interview September 5, 2019
- Mark Pav proffer interview April 25-26, 2017
- Mark Pav interview with attorney present June 9, 2017
- Mark Pav deposition March 11, 2020
- Christopher McCoy interview April 17, 2017
- Sergeant Michael Bieber interview May 30, 2017
- Sergeant Michael Bieber deposition March 16, 2020
- Sergeant James Burke interview May 30, 2017
- Sergeant Robert Viscuso interview May 30, 2017
- Shirley Ritter, SCPD Police Detention Attendant, interview May 11, 2017
- Stephanie Rivas, Legal Assistant at Macedonio and Duncan LLP, interview April 3, 2017
- Police Officer Delfina Rivera deposition March 11, 2020
- Police Officer Glenn Gary deposition March 16, 2020
- Police Officer Andrew Hope interview May 16, 2017
- Police Officer Matthew Skulavik interview June 2, 2017
- Detective Matthew Skulavik deposition March 16, 2017
- Police Officer Christopher Oddo interview May 3, 2017
- Police Officer Joseph Maldonado interview May 16, 2017
- Police Officer Michael Axelson interview June 9, 2017
- Police Officer David Cholden interview June 15, 2017
- SCPD form Prisoner Activity Log dated March 16, 2017; outstanding warrant arrest of Latoya Newkirk; central complaint # 17-16154

- **Arrest paperwork for Victoria Harris (arrested by Police Officer Pav at approx. 4 PM on March 16, 2017)**
- **Photographs of the First Precinct taken on July 27, 2020 by Joseph Dominianni**
- **SCPD Department Directive; Order # 16-89 16-103 Holding Facility – Prisoner Safety; amended 12/19/16**
- **SCPD Department Directive; Order # 16-87 Prisoner Transportation Procedures; amended 11/4/16**
- **SCPD Department Directive; Order # 16-88 16-102 Holding Facility – Prisoner Intake & Safety; amended 12/19/16**
- **SCPD Department Directive; Order # 15-47 Vehicle Traffic Stops; effective 9/25/15**
- **SCPD Patrol Division Directive; Order 16-17 Traffic Stop Data Collection (T-STOP); issued 2/29/16**
- **SCPD Training Bulletin - Traffic Stops; issued 3/19/10**
- **SCPD Department Directive; Order # 16-92 16-97 16-98 Arrest Procedures; amended 12/19/16**
- **SCPD Department Directive; Order # 14-70 Field Action/Interview Procedures; amended 12/12/14**
- **SCPD Department Directive; Order # 15-03 Memorandum Books/Daily Record of Activity; amended 1/9/15**
- **SCPD Department Directive; Order # 06-34 Police Mission; effective 3/16/06**
- **SCPD Department Directive; Order # 07-90 Rules and Procedures, Familiarization/Enforcement; effective 11/13/07**
- **SCPD Department Directive; Order # 07-32 Police Officer Duties and Responsibilities; effective 4/25/07**
- **SCPD Department Directive; Order # 14-23 Police Officer – Specific Duties; amended 4/25/14**
- **SCPD Department Directive; Order # 07-13 Desk Supervisor – Specific Duties; effective 3/23/07**
- **SCPD Rules and Procedures; Chapter 1 Organization and Philosophy of the Department Section 7 Standards of Supervision**

- SCPD Rules and Procedures; Chapter 27 Juvenile Procedures Section 2 Criminal Offenses
- SCPD Department Directive; Order # 08-05 08-25 08-44 Rules of Contact; effective 6/26/08
- <u>SCPD Department Directive; Order # 08-15 08-52 Holding Facility and Prisoner Safety; effective 7/18/08</u>
- SCPD Department Directive; Order # 08-56 Command Discipline Procedure; effective 9/10/08
- SCPD Department Directive; Order # 17-06 Patrol Supervisor Duties and Responsibilities; amended 2/24/17
- Commission on Accreditation for Law Enforcement Agencies (CALEA) Chapter 70 Detainee Transportation
- CALEA Standard #'s 70.1.1 through 70.1.3 Transport Operations
- CALEA Chapter 72 Holding Facility
- CALEA Standard # 72.6 Medical and Health Care Services and 72.8.1 Monitoring of Detainees
- New York State Law Enforcement Agency Accreditation Program (NYSLEAP) Overview
- NYSLEAP Section 34 Supervisory Training, Standard 34.1 First-Line Supervisors and Standard 34.2 Annual Supervisory Training
- NYSLEAP Section 47 Traffic, Standard 47.1 Enforcement of Traffic Violations and Standard 47.2 Stopping Violators
- NYSLEAP Section 50 Methods, Standard 50.4 Juvenile Operations
- NYSLEAP Section 64 Prisoner Transport, Standard 64.1 Prisoner Transport and Safety
- Uniform Rules for New York State Trial Courts, Part 205 Uniform Rules for the Family Court, Section 205.20 Designation of a Facility for the Questioning of Children in Custody
- Prison Rape Elimination Act (PREA); 2003
- "What Is PREA? And Why Does It Matter to Law Enforcement?" by Walter A. McNeil; Police Chief Magazine April 2012
- New York State Commission of Correction Adult Lock-Up Management Manual; revised August 2013

- **New York State Criminal Procedure Law Section 120.90 Warrant of Arrest; Procedure After Arrest**
- **Department of Justice Suffolk County Technical Assistance Letter; dated September 13, 2011**

# CASE EXAMINATION PROCESS

In accordance with my experience and training, I conducted a detailed review of all materials provided to me by the plaintiff's counsel, Egan and Golden LLP and Michael J. Brown PC, who retained me in this matter. I also reviewed additional information that I know based on my training and expertise is relevant to the examination of the facts in this case. Documented hereafter throughout my report are excerpts from the aforementioned materials that are critical to the formulation of my opinion in this case.

# INCIDENT SYNOPSIS

At approximately 10:30 a.m. on March 16, 2017, Ms. Newkirk was a passenger in a vehicle travelling on County Route 2 (Straight Path) in Wyandanch, New York when Defendants MCCOY and PAV signaled to the vehicle to pull to the side of the road.

Officers MCCOY and PAV were in their Suffolk County police uniforms in their marked SCPD police vehicle and on duty at the time of the traffic stop.

The driver of the vehicle complied with the Defendants' request and pulled to the side of the road.

When asked by one of the officers, Ms. Newkirk provided identification.

Officer MCCOY went to his police car with Ms. Newkirk's identification and returned to the vehicle containing Ms. Newkirk and the driver several minutes later.

Officer MCCOY told Ms. Newkirk that there were outstanding warrants for her arrest relating to traffic violations.

Officer MCCOY ordered Ms. Newkirk to exit the vehicle.

Ms. Newkirk retrieved court documents that she believed showed the disposition of her traffic cases and complied with Officer MCCOY's request to exit the vehicle.

Officer PAV then entered the vehicle, removed Ms. Newkirk's purse, and began searching the contents of the purse.

Ms. Newkirk verbally objected to Officer PAV's entry into the vehicle and the removal and search of her purse.

Officer MCCOY then handcuffed Ms. Newkirk and began frisking her.

Officer MCCOY then cupped Ms. Newkirk's breasts.

Ms. Newkirk explained that she had nothing in her bra, but Officer MCCOY continued to grope Ms. Newkirk's breasts.

As he was inappropriately touching Ms. Newkirk, Officer MCCOY giggled and asked "Where is it?" to which Ms. Newkirk again responded that there was nothing in her bra.

Officer MCCOY then readjusted Ms. Newkirk's bra and escorted her into the back of the police vehicle.

Officer PAV witnessed these events while seated in the police cruiser.

While being transported to the First Precinct of the Suffolk County Police Department Ms. Newkirk suffered an anxiety attack.

The Officers and Ms. Newkirk arrived at the First Precinct station house at approximately 11 a.m. (See Attachment 10 for photograph of the lobby).

Officer MCCOY escorted Ms. Newkirk to the mug shot area of the police precinct, uncuffed her, and removed her coat.

Officer MCCOY then told Ms. Newkirk "I think you liked getting searched out there."

Officer MCCOY then began groping Ms. Newkirk and touched her vaginal area over her leggings while telling Ms. Newkirk that "her breasts were nice."

No mug shot was taken and Officer MCCOY escorted Ms. Newkirk to a bench in the Uniform Squad Room where he handcuffed her to a table. (See Attachments 12 through 22).

At approximately 11:25 a.m. Officer MCCOY returned, now in plainclothes, and un-cuffed and escorted Ms. Newkirk to what appeared to be an interrogation room, in full view of other officers and detectives. This room was the juvenile interrogation room. Photographs of the juvenile interrogation room can be found in attachments three through nine with a photograph of the exterior of the window to the juvenile detention room in attachment 11.

At approximately 11:27 a.m., with the permission of Officer MCCOY, who was the only other individual in the interrogation room, Ms. Newkirk made a phone call to her friend Candice and told her to pick up her daughter.

At approximately 11:34 a.m. Ms. Newkirk used her cell phone to access Facebook Messenger to send a message to her friend Nicole that read "In Jail".

Ms. Newkirk was not in handcuffs while in the interrogation room and the one door to the room was shut.

Officer MCCOY then explained to Ms. Newkirk that he would be escorting her to inmate holding.

As Officer MCCOY moved Ms. Newkirk towards the door of the interrogation room he pushed himself against the back of Ms. Newkirk.

When Ms. Newkirk felt a bulge from Officer MCCOY's genital area, Officer MCCOY asked Ms. Newkirk "Do you feel that?"

Now panicked and terrified of Officer MCCOY, Ms. Newkirk remained silent and still.

Officer MCCOY then unzipped his pants, removed his penis, and told Ms. Newkirk to kiss his penis.

Officer MCCOY then placed a finger to his lips to motion to Ms. Newkirk to remain quiet.
Ms. Newkirk looked away from Officer MCCOY in revulsion and shook her head to indicate that she did not want to engage in any sexual act with Officer MCCOY.

Officer MCCOY then grabbed Ms. Newkirk's hand, placed it on his penis, and said "come on, just a kiss."

Officer MCCOY's continued physical and verbal intimidation left Ms. Newkirk fearing for her safety and convinced she would be incarcerated for resisting arrest if she did not comply with Officer MCCOY's demands.

Ms. Newkirk lowered her head to Officer MCCOY's genital area at which time Officer MCCOY grabbed Ms. Newkirk's head, pushed it towards his penis, and demanded "put it in your mouth just for a little while."

Ms. Newkirk resisted and attempted to raise her head away from Officer MCCOY's genital area.

Officer MCCOY forced Ms. Newkirk's head back down to his genital area.

Ms. Newkirk, fearing for her safety and attempting to avoid further physical abuse from Officer MCCOY, placed her mouth around Officer MCCOY's penis.

Officer MCCOY thrust his entire penis into Ms. Newkirk's mouth.

When Officer MCCOY heard someone walk past the room, he removed his hold on Ms. Newkirk's head and zipped his pants.

Officer MCCOY placed Ms. Newkirk in handcuffs and walked her to the holding area.

At some point thereafter Officers PAV and MCCOY escorted Ms. Newkirk back to the interrogation room where they asked if Ms. Newkirk could help them with any pending matters and criminal cases that were noted on the bulletin board in the Precinct.

A female officer then escorted Ms. Newkirk outside of the room and conducted a search and pat-down of Ms. Newkirk.

The female officer returned Ms. Newkirk to the interrogation room and shortly thereafter, at approximately 2:00 p.m., Officer PAV left the room.

Once again, Ms. Newkirk was left alone in the room with Officer MCCOY.

Officer MCCOY ordered Ms. Newkirk to stand up and then began groping her waist area and placing his fingers inside of her waistband.

Ms. Newkirk resisted and pulled away and avoided eye contact with Officer MCCOY in an attempt to avoid angering him.

Officer MCCOY then grabbed Ms. Newkirk's jaw and violently pressed down on it leaving Ms. Newkirk in pain.

Officer MCCOY then forced Ms. Newkirk's head down to his genital area and moved himself and Ms. Newkirk toward the door of the room.

Officer MCCOY, now with his back against the door, grabbed Ms. Newkirk's jaw, removed his penis from his pants and forced her down again toward his penis.

Officer MCCOY then demanded "Let's go, don't make this hard!"

Again, fearing for her safety, Ms. Newkirk complied and after performing oral sex on Officer MCCOY, he ejaculated in Ms. Newkirk's mouth.

Officer MCCOY then told Ms. Newkirk to fix her hair and use the tissues in the room to clean her face.

Officer MCCOY then handcuffed Ms. Newkirk and brought her back to the holding area.

Officer PAV then thanked Ms. Newkirk for being cooperative with the officers.

At no point during her encounter with Officer MCCOY did Ms. Newkirk consent to any sexual act or any touching or groping of her body.

Now in holding, Ms. Newkirk began suffering a panic attack.

Ms. Newkirk's jaw ached, her breathing was labored and her body was sweating and shaking uncontrollably.

Ms. Newkirk asked officers in the holding area to take her to the hospital for treatment, where she also planned to request a rape kit. She was denied.

Given Officer PAV's casual disregard for Officer MCCOY's inappropriate and illegal touching and their continual breach of proper police protocol, Ms. Newkirk reasonably feared retaliation from the other officers should she inform them of the sexual assault.

Despite asking twice, Ms. Newkirk was refused the opportunity to go to a hospital.

Ms. Newkirk was told that she could not go to the hospital because she would miss her court date scheduled for the next day.

At one point while in holding, an exasperated and traumatized Ms. Newkirk asked Officer PAV whether Officer MCCOY was married, to which Officer PAV replied "Yeah why, you want white chocolate?"

The next morning Ms. Newkirk was arraigned in court and released.

On Sunday March 19, 2017, just three days after the events described herein, Officer MCCOY sent a text message to Ms. Newkirk that read "Hey".

Ms. Newkirk had not provided Officer MCCOY her cell phone number and did not know the identity of the messenger and did not respond to the text until the next morning when she asked who the messenger was.

Officer MCCOY responded by texting vague statements hinting at his identity to which Ms. Newkirk responded that she had not given her number to anyone.

Officer MCCOY then texted "I put you [sic] handcuffs. . .remember now?" and then sent an "emoji" of a police officer followed by "easier now?"

Officer MCCOY continued to harass Ms. Newkirk by text message.

Fearing that the Suffolk County Police Department would do nothing if she reported the crime, or worse retaliate against her, Ms. Newkirk contacted the Federal Bureau of Investigation.

The FBI commenced a formal investigation into the incidents described herein.

Officer MCCOY was separated from employment with the Suffolk County Police Department in August 2018.

Officer MCCOY was subsequently sentenced in July 2019 to one year in prison in connection with this matter after pleading guilty to a single federal count of deprivation of civil rights under color of law.

# CONTEXT

Based on my training and experience, I realize that it is critical that facts be examined in their proper context in order to ensure that an accurate analysis is conducted. Based on the foregoing, my examination of the facts in this case and my subsequent findings are broken into five categories as follows:

1) The initial encounter (traffic stop) that led to the arrest of Ms. Newkirk

2) Ms. Newkirk's arrest processing at the First Precinct station house

3) An analysis of lapses in SCPD supervision in connection with this matter

4) Violations of SCPD policies and procedures and law enforcement accreditation standards

5) Flawed SCPD policies

6) Officer misconduct

It is important to note that some aspects of the foregoing case examination will be included in multiple areas listed above. For example, misconduct by the officers may also be cited in the categories covering the traffic stop and supervision.

# CASE EXAMINATION

1) Traffic Stop that led to the Arrest of Ms. Newkirk

At approximately 1030 AM, on March 16, 2017, Ms. Latoya Newkirk was a passenger in a vehicle that was pulled over by then-Suffolk County Police Officer Christopher MCCOY and Suffolk County Police Officer Mark PAV on County Road 2 (Straight Path) in Wyandanch NY, within the confines of Suffolk County Police Department (SCPD) First Precinct. Officers MCCOY and PAV were in uniform in a

marked SCPD police car.  Officer PAV was the operator of the police vehicle; Officer MCCOY was seated next to him.  There were two passengers in the auto that was stopped; Ms. Newkirk was in the front passenger seat.

Following standard police procedure, Officer PAV approached the stopped vehicle and spoke with the driver while Officer MCCOY came up to the car on the passenger side.  Officer PAV requested the license and registration from the driver; Officer MCCOY engaged Ms. Newkirk in conversation.  For reasons that remain unclear, Officer MCCOY requested and obtained identification from Ms. Newkirk, the passenger in the vehicle.  Officer PAV then ran a warrant check on Ms. Newkirk and found that she apparently had an active traffic warrant.

Ms. Newkirk was then placed under arrest and taken to the First Precinct for processing.  The further actions of Officers MCOY and PAV at the scene of the arrest will be examined later in this report under the heading of Violations of SCPD Policies and Procedures.

- In his interviews and in his deposition, Officer PAV gave no articulable reason for the traffic stop.  He suggested that perhaps the stop was made due to proximity of a nearby drug location but he did not provide any additional pertinent information to justify stopping the vehicle; e.g., numerous drug complaints from the community on the location, history of drug arrests at the location, documented reports of drug-related violence emanating from the location, distance of the subject vehicle from the alleged drug location, etc.

- SCPD Department Directive Order # 15-47 entitled "Vehicle Traffic Stops" effective date 9/25/15 on Page One states: "Traffic stops must be performed in accordance with the precepts of both the United States and New York State Constitutions and case law."  On the same page of the same procedure, it further reads: "Vehicle Stops – Must be based on at least reasonable suspicion of criminal activity or a violation of the VTL." This is repeated in SCPD Department Directive Order # 14-70 entitled "Field Action/Interview Procedures", effective date 12/12/14 on Page Two.  Reasonable suspicion is made clear on Page Two of Order # 15-47 stating:  "Reasonable Suspicion/Belief exists when the information known to the officer is of such weight and persuasiveness as to make an officer,

depending on the officer's judgment and experience, reasonably suspect that a person may have committed, is committing, or is about to commit a crime."

- In addition, Officer PAV did not give a plausible explanation of why he ran Ms. Newkirk for outstanding warrants. She was a passenger in the vehicle and therefore incapable of committing a traffic violation in the Vehicle and Traffic Law (VTL). There was no indication when the officers stopped the vehicle that the officers recognized her as being wanted for past crimes or that she was a fugitive from justice. Running passengers in an auto for outstanding warrants during a traffic stop, absent additional information, is contrary to standard police procedure.

- SCPD procedure requires that officers make a T-Stop entry on the Mobile Digital Terminal (MDT) in their police vehicle. SCPD Patrol Division Memorandum Order # 16-17 entitled "Traffic Stop Data Collection (T-STOP) – Points To Remember" dated February 29, 2016 states that the program "…is mandated by the Department and must be diligently adhered to by all officers. Officers must ensure that T-Stops are accurately recorded in this manner." The memorandum further requires the following: "Before exiting the patrol vehicle, or as soon as possible, officers should push the 'T-STOP' button and input the following information: Vehicle plate number, location of the traffic stop, description of vehicle." There is no indication that either Officer MCCOY or Officer PAV took this simple and mandated action at any time during this vehicle stop. This procedure is also covered in SCPD Training Bulletin # 10-02 issued 3/19/10 entitled "Traffic Stops", in SCPD Department Directive Order # 15-03 entitled "Memorandum Books/Daily Record of Activity" effective 1/9/15, Page Three, sub D 1 and in previously cited Department Directive Order # 15-47, Page Six, sub 3h. "If possible, select the T-Stop Button and collect the four data points prior to exiting the vehicle."

- SCPD Department Directive Order # 17-06 entitled "Patrol Duties and Responsibilities" effective date 2/24/17 reinforces the agency's Traffic Stop Data Entry policy as follows on Page Eight, point 12: "A supervisor shall ensure that their subordinates follow the Traffic Stop Data Collection

procedures."

- Aforementioned SCPD Department Directive Order # 15-03 "Memorandum Books/Daily Record of Activity", created 10/16/01 and amended 1/9/15, Page One, states the following: "It is the policy of the Suffolk County Police Department to have members prepare and maintain a permanent record of their daily activities during their assigned tours of duty." On Page Two, part C, the procedure further requires: "The paper Memorandum Book will be used to record all activities, duties, and actions performed by the member. A member is required to make entries at the time the pertinent information is received or an incident/event occurs." In accordance with this policy, Officers MCCOY and PAV were required to record all the details of the traffic stop in their Memorandum Books. There is no record of Officer MCCOY making such entries. And Officer PAV failed to produce his Memorandum Book when he was deposed.

- The Suffolk County Police Department is an accredited law enforcement agency under the New York State Law Enforcement Accreditation Program (NYSLEAP). The department's accreditation status is listed on SCPD forms and on decals on their marked police vehicles. The SCPD is clearly proud of their accredited status. Most SCPD department directives list the applicable NYSLEAP standards on the last page. In order to maintain their status, accredited police departments are required to demonstrate that their members are adhering to the various mandated standards. NYSLEAP Section 47 covers police standards related to Traffic. Standard # 47.2 entitled "Stopping Violators" states: "The courtesy and positive image that is shown by the officer will not only make this contact less confrontational but will also enhance the image of the officer and the agency." The actions of Officers MCCOY and PAV in initiating this traffic stop and in the subsequent sexual assault of Ms. Newkirk clearly violated this standard and tarnished the image of their department.

In summary, based on my review of the fact pattern connected to the traffic stop and after an analysis of SCPD policies, law enforcement accreditation standards and the court documents, this traffic stop was not conducted in a manner consistent with law enforcement best practices. There was no

articulated reason and no apparent legal justification to stop the vehicle in question. There was no stated or credible reasonable suspicion in this instance. Simply put, the stop had all the earmarks of a hunting expedition on the part of Officers MCCOY and PAV. The fact that there was no T-Stop entry made by the officers and no available Memorandum Book to review would lead a reasonable person to believe that the officers did not want to make a permanent record of this encounter. In addition, based on my experience, much of it spent on patrol and in investigative and enforcement assignments, the fact that the officers obtained the identification of Ms. Newkirk who was riding in the auto as a passenger and conducted a warrant search on her is highly irregular and not consistent with good policing.


### 2) Ms. Newkirk's Arrest Processing at the First Precinct Station House

At the scene of the traffic stop, Ms. Newkirk was informed by Officer MCCOY that, due to outstanding traffic warrants, she was being placed under arrest. Officer MCCOY told her to exit the vehicle. Ms. Newkirk disputed the outstanding warrants claiming that the matter had been resolved. However, she offered no resistance and complied with Officer MCCOY's orders. As she exited the vehicle, Officer PAV began to peruse the contents of her purse eventually finding one bag of alleged marihuana.

Officer MCCOY handcuffed Ms. Newkirk and then began frisking her. He then cupped and groped her breasts. Officer PAV was seated in the radio car with a clear view of the frisk. She was then taken to the First Precinct for processing. While in route to the Ms. Newkirk experienced an anxiety attack.
Upon arrival at the Precinct, Ms. Newkirk was taken into a holding area where she was uncuffed and her coat was removed. Officer groped her and touched her vaginal area over her leggings. She was then placed on a bench and handcuffed to a table.

At approximately 11:25 am, Officer MCCOY, having changed into plainclothes, uncuffed Ms. Newkirk and escorted her to an interrogation room in full view of other SCPD officers. It was later learned that this room is the state designated room for the exclusive use of interviewing juveniles. Ms. Newkirk is an adult.

Ms. Newkirk was brought to the room by Officer MCCOY; Officer PAV was not present at the time. Officer MCCOY closed the door.

In this room, Ms. Newkirk was subjected to unwanted sexual advances from Officer MCCOY including rubbing his genital area against her back and being forced to put her mouth around his penis. Ms. Newkirk feared for her safety and complied with Officer MCCOY's demands.

She was then briefly removed from the room and brought back to the holding area.

She was later returned to the juvenile room, this time escorted by both Officer MCCOY and Officer PAV. The officers questioned Ms. Newkirk regarding any assistance she could provide on criminal matters in the Precinct.

After being removed and properly searched by a SCPD female officer, Ms. Newkirk was returned to the juvenile room at approximately 2:00 pm. Officer PAV left the room, leaving Ms. Newkirk alone with Officer MCCOY.

Officer MCCOY grabbed Ms. Newkirk by the jaw and forced her head down towards his genital area. With Officer MCCOY's back to the closed juvenile room door, fearing for her safety, Ms. Newkirk complied and performed oral sex on him.

Officer MCCOY then handcuffed her and brought her back to the holding area.

While in the holding area, Ms. Newkirk, in addition to suffering from an injured jaw, had another panic attack.

She repeatedly asked officers in the holding area for medical treatment and was denied.

She was later transported by other SCPD officers for overnight lodging at the Fourth Precinct. She was arraigned in court the next morning and released.

- SCPD Department Directive Order # 16-89 16-103 entitled "Holding Facility – Prisoner Detention and Safety" effective 12/19/16, on Page One, III A, defines a Holding Facility as "A temporary confinement facility for which the custodial authority is usually less than seventy-two (72) hours are held pending release, arraignment, or transfer to another facility." On Page Nine, Section H, of the same directive, the safety of prisoners in custody is clearly placed upon the Officer in Charge/Desk Supervisor as follows: "While all members of the Service are responsible for the humane treatment, observation and safekeeping of a prisoner in their custody or detained in a building, or part thereof or detention area over which they have supervision, the Desk Supervisor is immediately responsible for the safekeeping of prisoners, the holding facility and the subordinate members assigned to that facility." Department Directive Order # 07-13 entitled "Desk Supervisor – Specific Duties" effective date 3/23/07 lists the various duties and responsibilities of the Desk Supervisor. Page Two, Section A 9, reads: "Prisoners – He is in immediate control of the incarceration, safekeeping and humane treatment of prisoners in custody in the detention cells."

- Regarding prisoners requiring medical attention, the same directive requires that members of the service are required to notify the Desk Supervisor when a prisoner "…is in apparent need of medical attention." (Page 18, Section O). As previously cited, the SCPD is a New York State accredited agency under the provisions of the NYS Law Enforcement Accreditation Program (NYSLEAP). Section 64.1 sub D of this program requires that accredited agencies "Prescribe procedures for transporting/handling sick, injured or impaired prisoners…" In addition, while the SCPD is not federally accredited by the Commission on Accreditation for Law Enforcement Agencies (CALEA), the department manual cites CALEA often throughout its various policies and procedures usually on the last page under "Accreditation Reference Standards." Previously cited Order 07-13 entitled "Desk Officer – Specific Duties" is one example. CALEA Standard 70 entitled Detainee Transportation, om Page One states: "As law enforcement personnel perform detainee transport, they should be prepared to provide for the safety and security of the detainee, the transporting personnel, and the public." CALEA Standard 72 provides guidelines for holding facilities. Standard 72.6

includes various sections that require the police to provide medical assistance to prisoners in need of treatment.

- SCPD Department Directive Order # 16-88 16-102 entitled "Holding Facility – Prisoner Intake & Safety", effective date 12/19/16, on Page One, provides "…clear guidelines for uniform procedures regarding prisoner intake, safety, security, humane treatment, personal property, individual rights, and health care."

- The same procedure mandates the preparation of the SCPD form entitled Prisoner Activity Log.  This form is initiated by a ranking officer for each prisoner.  Entries are required to be made to record all movement of the prisoner throughout his/her processing.  It is usually the arresting officers who make the Prisoner Activity Log entries recording prisoner movement to and from the holding facility, but the SCPD process is vague here.  On Pages Eight-Nine of Order 16-88 16-102 Section H 2a(5), the procedure requires that all prisoner movement within the precinct be "…shall be recorded on the Prisoner Activity Log."  But the policy does not specify who should make the entries.  The wording, and therefore the procedure, is flawed; this will be addressed further in this report

- In addition, the same directive, on Page 10, Section I 3, requires that an entry in the Prisoner Activity Log be made to document the searching of each prisoner in custody as follows:  "An entry concerning all thorough searches of prisoners and the results thereof, as well as the signatures of the member(s) of the Department conducting the search shall be entered on the Prisoner Activity Log prepared for the prisoner."  Ms. Newkirk was searched by female SCPD Officer Delfina RIVERA at approximately 2:00 pm without incident.  But Officer RIVERA's name does not appear on the Prisoner Activity Log.  Officer PAV made the "Searched" entry in the log.  In his deposition, Officer PAV admitted that he made fraudulent entries in the Prisoner Activity Log, even though he was not present during the various moves of Ms. Newkirk throughout the Precinct.

- A review of the Prisoner Activity Log prepared in connection with the arrest of Ms. Newkirk and Officer PAV's deposition reveals glaring

violations in SCPD policy. As indicated, Officer PAV admitted that he made numerous entries on the log that were fraudulent from 11:55 am onward. SCPD policy requires that entries be made on the form to properly record the officer's observations of the physical wellbeing of the prisoner. There is an entry at 1400 hours indicating that Ms. Newkirk was searched. As previously indicated, female officer Delfina RIVERA searched the prisoner and therefore should have made the entry. Also, Officer PAV stated that he was attending a meeting with narcotics officers at this time and therefore could not have been present the holding area. In addition, Officer PAV was out in the field for much of this time. He arrested Ms. Victoria Harris at 1540 hours on apparently similar charges as Ms. Newkirk (a small amount of marihuana and a possible warrant) and returned to the station house at approximately 4:00 pm. He was then involved in processing the arrest of Ms. Harris. It should be noted that Officer PAV's fraudulent entries in this official police department record coincide with the times of the two separate sexual attacks by Officer MCCOY on Ms. Newkirk.

- Part 205 of the Uniform Rules for the Family Court of New York Section 205.20 entitled "Designation of a facility for the questioning of children in custody (juvenile delinquency)" mandates that rooms in police facilities be set aside for the exclusive purpose of interviewing juveniles and their family members. As indicated by several SCPD officers interviewed in this matter, the room designated as the Juvenile Room in the First Precinct was used for a variety of purposes unrelated to its original intent. The statute clearly states: "Any facility recommended for designation as suitable for the questioning of children shall be separate from areas accessible to the general public and adult detainees." The Juvenile Room in the First Precinct was apparently routinely used as an area to question and debrief adult prisoners and potential informants, as a locker room and changing area and, in the case of Officer MCCOY, a room with a door that was used to conceal his sexual attacks on Ms. Newkirk.

- In 2003, the Prison Rape Elimination Act (PREA) was signed into federal law. As per the US Bureau of Justice Assistance website: "The goal of PREA is to eradicate prisoner rape in all types of correctional facilities in this country." The PREA includes holding facilities in police precincts and

it covers all types of sexual assault, not just the crime of rape.  Also, it is not limited to prisoner-on-prisoner attacks.  It also applies to assaults by staff on prisoners, including police officer attacks on prisoners.  In short, the sexual attack by Officer MCCOY on Ms. Newkirk was a violation of this federal statute.  In an article in the International Association of Chiefs of Police (IACP) publication, Police Chief Magazine, April 2012 edition, entitled "What Is PREA?  And Why Does It Matter to Law Enforcement?", the author, Walter A. McNeil, writes: "Preventing sexual abuse in confinement is an ethical and legal obligation, and it is also an important step in protecting your agency from liability."

In summary, based on my review of the fact pattern regarding the arrest of Ms. Newkirk as well the corresponding SCPD procedures and the various depositions of the officers involved, it is clear that there were several policy violations related to prisoner processing procedures as well as actions not in keeping with the department's state accreditation status.  Putting aside the two separate sexual assaults committed by Officer MCCOY on Ms. Newkirk (they will be covered later in this report), there was clearly inappropriate groping of Ms. Newkirk by Officer MCCOY at the scene of her arrest.  Officer MCCOY tried to mask it as a routine frisk for weapons but the fact that Ms. Newkirk was already in handcuffs negated the need for an extensive search in her bra for concealed weapons.  Also, there were several SCPD policies that make it clear that the safety and humane treatment of prisoners in custody in the holding area of the precinct is the responsibility of the Desk Supervisor.  The fact that Ms. Newkirk was sexually assaulted twice during her time at the First Precinct clearly indicates that this policy was not followed.  In the same vein, Ms. Newkirk repeatedly requested medical treatment and was denied.  She had two separate panic attacks as well as jaw pain from Officer MCCOY grabbing her face during the second sexual assault.  She was repeatedly refused proper medical attention.  In addition, as noted, the Prisoner Activity Log which is used to record prisoner movement during processing as well as the arresting officers' observations of her physical and emotional wellbeing, was not properly completed as per SCPD policy.  Ms. Newkirk's movement to and from the holding area to the Juvenile Room were not recorded.  Nor was her search by Officer Delfina RIVERA.  And, as previously stated, Officer PAV admitted falsifying this official department record by adding erroneous time and

observation entries for reasons that still remain unclear.  These false time entries coincided with the times of the two sexual attacks on Ms. Newkirk.  Also, it is clear that the Family Court guidelines regarding the designation of a room in the station house devoted solely to the use of interviews of juveniles were routinely violated.  Lastly, the assaults on Ms. Newkirk were clear violations of the Prison Rape Enforcement Act, a federal statute since 2003 designed to protect those in custody from sexual attack.

3) **Analysis of lapses in SCPD supervision in connection with this matter**

Throughout my analysis and review of this incident, I have noted a pattern of lax and, at times, seemingly non-existent supervision.  From the traffic stop, through the prisoner processing procedure to the sexual attacks on Ms. Newkirk there was basically no supervisory involvement.

- The deposition of Sgt Michael BIEBER revealed some of these aforementioned supervisory lapses as well as insights into his management style.  Sgt BIEBER was appointed to the SCPD in June 1995; he was promoted to Sgt in July 2015; and he was assigned to the First Precinct Crime Section Unit (CSU) in February 2017; just one month before the arrest of Ms. Newkirk.  In policing, span of control usually refers to the number of subordinates assigned to each supervisor.  In most patrol settings the span of control is often one Sergeant in charge of 8 to 12 officers.  In specialized units, like the CSU, that span is often smaller.  In this case, Sgt BIEBER was in charge of four team members; Officers ODDO, SKULAVIK, PAV and MCCOY.  Sgt BIEBER had been in the unit for approximately one month on March 16, 2017.  On Page 11 of his deposition, he described Officer MCCOY as "a good worker" and "a regular guy" with a good demeanor.  This is a very positive evaluation of a subordinate after one month as his supervisor.  On Pages 13-14, when asked about how to take formal disciplinary action against an officer, Sgt BIEBER seemed unclear on how to proceed.  He mentioned that he had never seen the form that the SCPD uses to document formal discipline.  This is hard to fathom coming from a Sergeant with two years in rank and over twenty years with the agency.  On Pages 38-39, Sgt BIEBER confirms

that the Juvenile Room is consistently used for non-juvenile purposes, in clear violation of the Family Court Act. On Pages 19-20, Sgt BIEBER was asked about Officers MCCOY and PAV's assignment on March 16, 2017, the date of the arrest of Ms. Newkirk. His reply was somewhat vague. He said that the two officers had "no specific assignment that day." He further stated that, on some days, the officers would have specific duties. But on other days, he said: "…they would go out, okay, and just look for activity based on tips they get. Just looking to – anything where there is crime. That specific day, I did not give them any specific assignment…." When asked where he was at the time of the arrest of Ms. Newkirk, Sgt BIEBER stated: "I was out on the road, so when I got back into the precinct, I did see them (indicating MCCOY and PAV) come downstairs into the CSU office and I saw them at that time." Regarding his time in the field that morning, the Sergeant further stated that he was "patrolling my usual near Straight Path and, like, Merritt. We had a lot of problems in those areas. So my daily routine would be to go up there and that's where I was." When asked for the approximate time that he saw the two officers at the Precinct, Sgt BIEBER was not sure but said: "It could have been 11:30 (AM) but I'm not sure." At 11:30, Ms. Newkirk was in either the holding area or the Juvenile Room. During his interview, Sgt BIEBER gave no indication of any supervisory action in relation to the arrest made by two of his four officers even though he was in the building for a period of time while Ms. Newkirk was being processed.

In his deposition, Officer PAV confirms what Sgt BIEBER state regarding no specific assignment for the two officers on March 16, 2017. Officer PAV stated: "There was no community events that day so we would just go out in the road, patrolling the Town of Babylon area." When asked who made the decision to patrol that area, he replied: "We did." In addition, when asked one month after the date of the attack on Ms. Newkirk, Officer PAV could not recall if Sgt BIEBER was present that day.

- On Pages 185-186, Officer PAV stated that there were times that Sgt BIEBER permitted him not to maintain his Memorandum Book as required by SCPD policy.

- In his deposition, Sgt Burke, the Desk Supervisor, also confirmed that the Juvenile Room is routinely used for non-juvenile purposes.

- As previously cited earlier on this report, SCPD Department Directive Order # 16-89 16-103, entitled "Holding Facility – Prisoner Detention and Safety", Page Nine, Section H, places the safety of prisoners in custody is upon the Officer in Charge/Desk Supervisor as follows:  "While all members of the Service are responsible for the humane treatment, observation and safekeeping of a prisoner in their custody or detained in a building, or part thereof or detention area over which they have supervision, the Desk Supervisor is immediately responsible for the safekeeping of prisoners, the holding facility and the subordinate members assigned to that facility."

- SCPD Department Directive Order # 16-88 16-102 entitled "Holding Facility – Prisoner Intake and Safety, effective 12/19/16, on Page 8, Section H sub 2a5 reads: "All prisoner movement within the precinct/command during arrest processing, to include physical checks of the prisoner's well-being while lodged in detention cells, shall be recorded on the Prisoner Activity Log."

- In Chapter One of the SCPD Rules and Procedures entitled "Organization and Philosophy, Section Seven, "Standards of Supervision, under the Policy segment, point B states: "Each supervisor is responsible for the performance and conduct of his subordinates.  Point C in the same segment reads: "The supervisor's primary responsibility is to influence and direct his subordinates in the accomplishment of the police mission." Point D on the same page states: "The supervisor's position within the Department is critical to the accomplishment of the police mission, none more so than the first line supervisor who has the responsibility of ensuring that the job is done properly."  On Page Two of the same policy, under Rules and Regulations, point A2 reads: "Inspection – The supervisor is responsible for ensuring compliance with the Rules and Procedures, and all authorized orders.  This is accomplished by keeping his subordinates informed and through the use of positive or, when necessary, negative discipline."  On the same page, point A6 states: "The supervisor must

serve as a role model to his subordinates as well as others in the Department. A supervisor should make every effort to exhibit excellence, and thereby epitomize the virtues associated with professional policing: integrity, courage, loyalty, selflessness, honesty and honor." An argument could be made that none of the above standards of supervision were achieved by Sgt BIEBER on the day of Ms. Newkirk's arrest. In addition, a reasonable person might think that Sgt BIEBER's lax supervisory style may have emboldened Officer MCCOY on that day.

- The duties of a supervisor are reinforced several times in SCPD Department Directive Order # 17-06 entitled "Patrol Supervisor Duties and Responsibilities", effective date 2/24/17. Page One, under Policy, states: "Field supervision begins with the sergeant as the first line of supervision of the Department and it is upon the sergeant that the responsibilities of training, guidance, motivation and ethical decision making rests." On Page Two, a supervisor is defined as follows: "A supervisor is responsible for the performance and conduct of their subordinates. As such the supervisor is granted commensurate authority to fulfill these responsibilities and is held accountable for the use of this authority." On Page Four of the same directive, the policy states that supervisor is responsible for "…the critical supervision of subordinates." The policy further states that the supervisor "…is charged with exacting the proper performance of police duty from members subject to their supervision." On Page 5 of the same policy, in the subheading entitled "Monitors Activities of Subordinates", it states: "A supervisor monitors activities of subordinates throughout the tour of duty to insure the accomplishment of the police mission." The policy goes on to list a number of specific duties conducted by officers that the supervisor should monitor including uniforms and equipment, radio communications, training, strikes and labor disputes and arrests. In the Arrests segments, it reads: "A supervisor shall ensure subordinates properly arrest and transport prisoners." Lastly in this directive, on Page Eight, under "Traffic Stop Data Entry", it reads: "A supervisor shall ensure that their subordinates follow the Traffic Stop Date Collection procedures."

- SCPD Department Directive Order # 08-05 08-25 08-44 effective date 6/26/08, entitled "Rules of Conduct", Page One under Policy, provides

guidance that is seemingly contradictory to the previously cited Standards of Supervision as follows: "As most police work is necessarily performed without close supervision, the responsibility for the proper performance of an officer's duty lies primarily with the officer." Admittedly, most police work is done without the presence of a supervisor. However, the supervisor cannot be permitted to abdicate responsibility for the actions of his/her subordinates.

Based on my review of the fact pattern, the time line, court documents, applicable SCPD Rules and Procedures directive, accreditation standards, my thirty years of law enforcement experience and my extensive background in providing police consulting to several agencies, there were clearly lapses in supervision in connection with the arrest of Ms. Newkirk on March 16, 2017. It is my belief that these deficiencies in basic police management and supervision likely contributed to the incidents that followed.

As Desk Supervisor, as noted in the directives cited above, Sgt BURKE was responsible for the safety of Ms. Newkirk during her arrest processing. Also, as noted, both Sgt BURKE and Sgt BIEBER acknowledged that the Juvenile Room was routinely utilized for non-juvenile purposes in violation of the Family Court Act. Had this room not been available to Officer MCCOY, he might not have had the opportunity to sexually assault Ms. Newkirk that day. However, it should be noted that the misuse of this room for non-juvenile purposes is apparently an informal First Precinct policy.

In his deposition, Sgt BIEBER provided much insight into his style of supervision which is appears to be lax and hands off. In spite of the fact that, on the date in question, he only had four officers under his command, he had paid no attention to the arrest that Officers MCCOY and PAV made that morning. The fact that he stated that he "patrols regularly" offers a glimpse into his management style. Sergeants are paid to supervise their members; not to go out on solo patrol. And the fact that Sgt BIEBER was totally unaware of how to initiate negative discipline if required is mind boggling coming from a police veteran with 22 years experience with the department. Also, Sgt BIEBER admits to briefly seeing Officers MCCOY and PAV in the station house at approximately 11:30 am that morning. Yet he never took it upon himself to ask them any specific questions about their arrest nor did he use the opportunity to look in on

their prisoner.  The sergeant was in the building for a period of time before Ms. Newkirk was assaulted.  There might have been a different outcome had he taken the time to insert himself into the situation.  Also, Sgt BIEBER admitted that he gave the officers no direction that day on what to do or where to patrol during their tour of duty, leaving it up to Officers MCCOY and PAV to go wherever they chose. Later that day, Officer PAV met with Narcotics Unit members, went out and effected an arrest very similar to the Ms. Newkirk's all apparently unbeknownst to Sgt BIEBER.  The Crime Section Unit, under Sgt BIEBER, seems to have an inordinate amount of latitude.  In addition, it is possible that Sgt BIEBER's lack of hands on and vigilant supervision might have emboldened Officer MCCOY.

In addition, the SCPD Rules and Procedures manual devotes several sections to the duties and responsibilities of front-line supervision.  As most police executives will agree, sergeants are the backbone of any police department.  The actions (or inactions) of Sgt BIEBER on the date of the arrest of Ms. Newkirk clearly violated the supervisory provisions of his agency's manual as follows:

- He gave no direction to Officers MCCOY and PAV throughout the entire tour.

- He did not ensure that they properly complied with department directives.

- He did not ensure that they followed proper arrest and prisoner processing procedures.

- He failed to properly supervise Officers MCCOY and PAV.

- He did not exact proper performance from Officers MCCOY and PAV.

- He did not provide critical supervision as required.

- And he clearly did not monitor the activities of Officers MCCOY and PAV.

**4) Violations of SCPD policies and procedures**

As noted throughout this report, separate from the substantiated criminal conduct of Officer MCCOY, there were numerous violations of the Suffolk County Police Department Rules and Procedures and law enforcement accreditation standards in connection with the arrest of Latoya Newkirk in the First Precinct on March 16, 2017 as follows:

- There was no articulable reason given for the traffic stop that eventually led to the arrest of Ms. Newkirk. There was no stated reasonable suspicion.

- There was no T-Stop entry made by either Officer MCCOY or Officer PAV as required by department policy.

- There was no valid reason given for running the passenger (Ms. Newkirk) in the stopped vehicle for warrants. She had not engaged in any violation of any kind in the officers' presence.

- Officer MCCOY engaged in appropriate conduct by groping the breasts of a handcuffed female while searching her bra.

- Ms. Newkirk requested and was denied medical attention on at least two occasions during her arrest processing in violation of department policy.

- The movement of Ms. Newkirk between the holding area and the Juvenile Room were not recorded in the Prisoner Activity Log as required by SCPD policy.

- The search of Ms. Newkirk by Officer Delfina RIVERA was not documented in the Prisoner Activity Log as mandated by department policy.

- Officer PAV admitted in his deposition to falsifying department records, to wit the Prisoner Activity Log, by making numerous erroneous entries

on the form.  These false entries were times and remarks on observations of Ms. Newkirk's location and physical appearance.  It should be noted that the sexual assaults on Ms. Newkirk occurred during these fraudulently entered time checks.

- The Desk Supervisor failed to provide for the safety of Ms. Newkirk during her arrest processing.

- The Juvenile Room was utilized in a manner that violated the Uniform Rules for Family Courts and department policy.  This room is where Officer MCCOY closed the door and sexually assaulted Ms. Newkirk.  Had this room not been at his disposal perhaps these attacks may not have taken place.

- Officer PAV could not produce his Memorandum Book when requested.  This official department record is required to be carried by officers on patrol to document all activities during their tour of duty.

- As noted, there were several lapses in supervision on the part of Sgt BIEBER.  This was made more flagrant by the fact that he only had four officers under his command on the date in question.

As noted, the SCPD is an accredited law enforcement agency.  In the New York State Law Enforcement Agency Program (NYSLEAP) Overview, it states: "The New York State Law Enforcement Agency Program was established as a voluntary program that would provide law enforcement agencies with a mechanism to evaluate and improve the overall effectiveness of their agency and the performance of their staff.  Accreditation is formal recognition that an agency's policies and practices meet or exceed the standards established by the council in the areas of administration, training, and operations."  Putting aside the criminal conduct by Officer MCCOY, the ambiguous circumstances surrounding the arrest of Ms. Newkirk, the absence of the required T-Stop entry, the improper field search of a handcuffed prisoner, the undocumented movement of the prisoner within the Precinct, Officer PAV's missing Memorandum Book, the falsified Prisoner Activity Log, the inappropriate use of the Juvenile Room and the numerous breakdowns in basic supervision are all

**not in keeping with police best practices and standards which are the benchmarks of the New York State Law Enforcement Accreditation Program.**

**5) Flawed Suffolk County Police Department Policies**

**Analysis of the numerous SCPD directives in the agency's Rules and Procedures manual in connection with this matter revealed flawed and/or ambiguous policies that may have contributed to the events on March 16, 2017; as follows:**

- **SCPD Order # 16-88 16-102 entitled "Holding Facility – Prisoner Intake and Safety" effective 12/19/16 and SCPD Order 08-15 08-52 entitled "Holding Facility and Prisoner Safety" effective7/18/08 each mention the requirement for the initiation and ongoing entries be made in the Prisoner Activity Log. Order # 16-88 16-102, Pages Eight-Nine, Section H 2a(5) reads: "All prisoner movement within the precinct/command during arrest processing, to include physical checks of the prisoner's wellbeing while lodged in detention cells, shall be recorded on the Prisoner Activity Log." The policy does not clearly designate who should be conducting the aforementioned "physical checks of the prisoner's wellbeing". With no person or position in the command identified as mandated to conduct these checks then it is not surprising that no one on the Precinct checked on Ms. Newkirk's wellbeing or physical condition after she had been observed by the Desk Supervisor when she was first brought in to the First Precinct by Officers MCCOY and PAV. In addition, the same section of the policy requires that all prisoner movement "…shall be recorded on the Prisoner Activity Log." But, again, the policy does not identify who should make these mandated entries. The same ambiguous direction appears in Order # 08-15 08-52, Page Three, Section D (1) as follows: "All subsequent prisoner movement during arrest processing, to include physical checks of the subject's well being while lodged in detention cells, will be recorded on the Prisoner Activity Log." Similar to the prior cited order, this policy does not identify who is required to make the log entries nor does it specify who should check on the prisoner's physical wellbeing.**

- **SCPD Order # 16-87 entitled "Prisoner Transportation Procedures" effective date 11/4/16, previously cited in this report, On Page Five, Section H(1) correctly mandates the following: "Member transport of female prisoners – A male member of the Service shall not transport a prisoner of the opposite sex unless: a) Accompanied by another police officer or detention attendant or b) the transport vehicle is followed by another police vehicle operated by a police officer who will monitor the transport." This policy clearly was designed to protect female prisoners from the possibility of unwanted advances from male officers during transport from precinct to precinct and/or to and from court. The policy also protects the agency from liability in the event of false accusations of inappropriate conduct lodged by prisoners. The SCPD has obviously gone to great lengths in ensuring that that the transport of female prisoners is being done with prisoner safety and agency liability in mind. But this begs the question: If the SCPD has such a sound prisoner transport policy in place, why wasn't the same vigilance demonstrated for female prisoners at the arrest processing stage? As per this SCPD policy that was in effect on March 16, 2017, Officer MCCOY would have been forbidden to take Ms. Newkirk by himself in a department vehicle for overnight lodging at the Fourth Precinct; Ms. Newkirk was eventually transported there for lodging along with another female prisoner by two male SCPD Officers AXELSON and GARY in accordance with department policy. Yet it was apparently acceptable on the date of occurrence for Officer MCCOY to be alone in a room behind closed doors with a female prisoner with no supervision and no SCPD supervisor checking on her wellbeing resulting in the sexual assaults on Ms. Newkirk.**

## 6) Officer Misconduct

Officer MCCOY clearly engaged in egregious criminal conduct in his two separate sexual assaults on Ms. Newkirk. He violated the New York State Penal Law as well federal civil rights statutes. And needless to say, his actions were not

consistent with the oath he swore to when he became a police officer. By any standard, he exhibited conduct unbecoming a police officer.

But, aside from Officer MCCOY's criminal behavior on March 16, 2017 and the SCPD policy violations previously noted herein, there were other actions that fall into the category of police misconduct in my view.

- The traffic stop was apparently a hunting expedition. There was no reasonable suspicion to stop the vehicle. There was no T-Stop entry made by either officer. Officer PAV's Memorandum Book is missing. And there was an inexplicable warrant check done on a passenger in the car

- As noted, Officer MCCOY's actions in forcing a prisoner to engage in sex acts clearly violate the federal Prisoner Rape Elimination Act.

- In addition, Officer MCCOY initially lied to the FBI agents that initially interviewed him, saying that the sex acts between him and Ms. Newkirk were consensual. It was only after he realized that the agents were in possession of Ms. Newkirk's sweater bearing his DNA that he recanted his story and confessed to his actions.

- Also, it was confirmed that Officer MCCOY texted Ms. Newkirk soon after her release from jail. This was apparently an attempt to "hook up." In one of his text, Officer MCCOY said: "I owe you a favor." Ms. Newkirk believes that this implied a payback for complying with his demands for oral sex while she was in custody at the First Precinct.

- In addition, the actions of Officer PAV in this matter should be viewed in their totality. It is suspected that he acted as an enabler in this incident or was part of an attempted coverup after the fact; as follows:

- He did not make the T-Stop entry to properly document the traffic stop as required.

- He left the Juvenile Room for extended periods leaving Ms. Newkirk alone with Officer MCCOY; both sex acts occurred while Officer PAV was out of the room.

- He intentionally did not properly record Ms. Newkirk's movement within the Precinct on the Prisoner Activity Log.  A review of the form would give the impression that she remained in the holding area the entire time. Accordingly, there is no written record of Ms. Newkirk being brought to the Juvenile Room, the location where her attacks took place.

- He admitted to making fraudulent entries in the Prisoner Activity Log regarding Ms. Newkirk's physical wellbeing.  Again, anyone reviewing the log would assume that she was safe and secure in the holding area.

- There is no way of knowing if Officer PAV made the appropriate entries in his Memorandum Book for the date in question because he has conveniently misplaced it.

Based on my knowledge, training and experience, it is clear to me that several acts of misconduct on the part of Officer MCCOY and Officer PAV contributed significantly to the events that occurred that day.

## CONCLUSION

Officer Christopher MCCOY admitted to violating the civil rights of Ms. Newkirk by sexually attacking her twice while she was a prisoner in his custody.

Based on my experience, knowledge, training and my examination of the various materials identified in this report, it is my opinion that, on March 16, 2017, there was a confluence of actions, omissions, flawed processes, blatant flaunting of the rules, mismanagement, lax supervision and misconduct that created an environment that apparently made Officer MCCOY feel comfortable in sexually assaulting his prisoner in the First Precinct station house on a Thursday late morning/early afternoon.

As stated, Officer MCCOY admitted his criminal conduct.  But, as noted throughout this report, the actions of other members of the SCPD First Precinct

contributed in various ways to this "perfect storm" of misconduct and unprofessional behavior.

The supervision in the First Precinct that day was clearly lacking.  Sgt BIEBER seemed unable or unwilling to properly supervise the four officers under his command.  He provided no direction to Officers MCCOY and PAV which led them to patrol the area free from any form of supervision.  It seems evident that Officers MCCOY and PAV were not concerned that their supervisor might check on them while they were on patrol.  In addition, Sgt BIEBER felt that it was more important for him to go on solo patrol than it was for him to monitor the activities of his small group of officers.  At no point in his deposition, did Sgt BIEBER mention meeting with or monitoring the actions of his officers in the field.  Also, it was learned that Sgt BIEBER briefly encountered Officers MCCOY and PAV while they were in the Precinct station house processing the arrest of Ms. Newkirk.  But apparently the sergeant did not see the need to inquire about the arrest or look in on the prisoner.  Had Sgt BIEBER shown any interest in proper supervision of his subordinates that day, the attacks on Ms. Newkirk may have been averted.  Simply stated, Sgt BIEBER failed to properly supervise Officers MCCOY and PAV that day and his negligence likely contributed to the events that later occurred.

The Desk Supervisor is ultimately responsible for the safety of all prisoners during arrest processing while in the Precinct.  The fact that Ms. Newkirk was sexually attacked twice behind the closed door of the Juvenile Room, a room that was being utilized in conflict with state statute, is clear indication that the Desk Supervisor failed in his responsibilities in providing the prisoner with safe and humane treatment.

While Officer PAV did not directly participate in the attacks on Ms. Newkirk, his actions that day raise several questions.

Why was there no T-Stop entry made during the traffic stop?  It requires the simple pressing of a button on the radio car's mobile digital terminal.

Where is Officer PAV's Memorandum Book?  It would have been helpful in the investigation of this matter but it is conveniently not available. It is my experience that officers who fail to produce their Memorandum Books during

an official investigation often claim to have lost them so as not to provide potentially damaging information from therein. Were there notes in his book that would have brought additional scrutiny and possible disciplinary action to Officer PAV? Were there notes in the book that were potentially damaging to Officer MCCOY? Would these notes have provided a clearer picture of the events that occurred on March 16, 2017? It is unclear if Officer PAV received formal discipline for failure to produce his book as required for an official investigation.

Why did Officer PAV leave Officer MCCOY alone for extended periods of time during the processing of Ms. Newkirk? He stated that he did have a scheduled meeting with Narcotics Unit members in the parking lot at 2:00 pm but, other than that, it is unclear why he was away from his partner much of the time during the arrest processing of Ms. Newkirk.

Why didn't Officer PAV properly record the movement of Ms. Newkirk to and from the holding area and the Juvenile Room in the Prisoner Activity Log as required by policy? And why didn't he make entries in the Prisoner Activity log recording the movement of Ms. Newkirk and his observations of her physical wellbeing during her arrest processing as mandated by department directives? He later admitted playing catch up and making false entries to fill in the times and observation remarks. But the remarks on the form are not supposed to be viewed as simply filling in the blanks. They are supposed to be visual observations of the physical condition of each arrestee. Filling them in later and erroneously defeats the purpose of the policy. Officer PAV's misconduct in failing to properly record the movement of the prisoner, his filling in the times later and his intentional falsification of the observations of Ms. Newkirk's condition could be viewed as suspicious and possibly willful misconduct. Anyone reviewing the Prisoner Activity Log would assume that Ms. Newkirk was never in the Juvenile Room, that she was in good physical condition and that she safe and sound sitting in the holding area. This was clearly not the case.

Taken in their totality, it is very possible that these were not simple mistakes or administrative oversights on the part of Officer PAV. It is suspected that they were part of a pattern of enabling behavior and/or an attempt to cover up for the actions of Officer MCCOY.

Lastly, it seems that the culture of the First Precinct contributed to this incident. There seemed to be a lack of vigilance regarding supervision and prisoner processing. And the previously mentioned flawed policies contributed to the events later in the day. Officers MCCOY and PAV moved Ms. Newkirk freely throughout the Precinct with no interference from any supervisor. They were regularly permitted to use the Juvenile Room against state law for interviews of adult prisoners apparently often behind closed doors. Ms. Newkirk was refused medical treatment at least twice, another example of subpar and potentially liable prisoner processing. And, at no point in the processing of Ms. Newkirk, did any First Precinct supervisor physically check on her after her initial check in with the Desk Supervisor. As noted, it is further believed that Sgt BIEBER's lax supervision of Officers MCCOY and PAV contributed significantly to this incident.

In conclusion, based on the foregoing, it is clear that Officer MCCOY's conduct was criminal and that he willfully and intentionally engaged in numerous violations of SCPD policies and procedures.

In addition, while there is no indication that Officer PAV actively participated in the sexual assaults on Ms. Newkirk, his conduct in this matter was clearly prejudicial to the good working order of the Suffolk County Police Department. As stated previously, Officer PAV may have acted as an enabler in this incident and evidence strongly suggests that he was involved in a coverup. The fabrication of entries in the Prisoner Activity Log and his seemingly lost Memorandum Book are consistent with the orchestration of a conspiracy or at least coordination with Officer MCCOY. Regardless, his actions from the inexplicable traffic stop to the failure to record the movement of his prisoner within the Precinct to his fraudulent entries in the Prisoner Activity Log to his failure to produce his SCPD Memorandum Book during an official investigation are examples of conduct unbecoming a police officer and not in keeping with sound and accepted law enforcement best practices.

## EXPERT/CONSULTANT EXPERIENCE

I retired from law enforcement at the end of 2011 after having served thirty-two years; twenty-seven years with the New York Police Department, retiring as a Deputy Chief; and five years as the Police Commissioner for the City of Yonkers, New York. I have testified numerous times in court during my career. I have been a police consultant on teams led by former NYPD Police Commissioner Bill Bratton that conducted comprehensive assessments of five police agencies in the United States. In addition, I have been contracted by the New York State Sheriffs Association to provide consulting services. I served in a subject matter expert capacity for the Port Authority New York New Jersey in their labor negotiations with the PBA. I have provided expert witness consulting on four prior litigations.

## STATEMENT OF COMPENSATION

As the expert/consultant retained by counsel for the plaintiff in this matter, I have been or will be compensated at a rate of $250.00 per hour for my services to this case.

Respectfully, submitted,

8/17/2020

Edmund Hartnett

President, Edmund Hartnett Risk Management LLC

## SCHEDULE OF ATTACHMENTS

Attachment 1    Resume of Edmund Hartnett
Attachment 2    Holding Cell (where Plaintiff was searched)
Attachment 3    Juvenile Room
Attachment 4    Juvenile Room
Attachment 5    Juvenile Room
Attachment 6    Interior of Juvenile Room
Attachment 7    Interior of Juvenile Room
Attachment 8    Interior of Juvenile Room
Attachment 9    Exterior of Juvenile Room
Attachment 10   Lobby of First Precinct
Attachment 11   Exterior of Window to Juvenile Room
Attachment 12   Uniform Squad Room Instruction Poster
Attachment 13   Interior Uniform Squad Room
Attachment 14   Interior Uniform Squad Room
Attachment 15   Interior Observation Window
Attachment 16   Interior Observation Window
Attachment 17   Interior Uniform Squad Room
Attachment 18   Interior Uniform Squad Room
Attachment 19   Interior Uniform Squad Room
Attachment 20   Interior Observation Window
Attachment 21   Hallway outside Juvenile Room and Uniform Squad Room
Attachment 22   Uniform Squad Room Entrance

# ATTACHMENT # 1 (EDMUND HARTNETT RESUME)

## EDMUND HARTNETT

EPHARTNETT@AOL.COM

**PROFILE**

Five years of executive management experience as the Police Commissioner of Yonkers, New York; twenty-two years of police management and supervisory experience in the NYPD; retired as a Deputy Chief; thirty-two years total public safety experience. Served as Commanding Officer of NYPD units such as: the Intelligence Division, the Drug Enforcement Task Force, the 109th Precinct, Narcotics Borough Bronx and the Quality Assurance Division. Awarded 36 NYPD citations, graduate of the FBI National Academy with a Master's Degree in Public Administration. Worked extensively with the FBI, DEA, US Secret Service and the New York State Police. Extensive law enforcement network across the country. Public sector consulting experience with former NYPD Commissioner Bill Bratton in police agencies in Los Angeles, Oakland CA, Detroit, Baltimore and St Louis County. Prior experience as Subject Matter Expert on police policies and procedures and the CompStat process.

**COMPETENCIES**

| | |
|---|---|
| Public Safety and Security | Event Planning and Management |
| Crime Reduction Strategies | Police Policies and Procedures |
| Safety and Security Assessments | Investigations |

**WORK EXPERIENCE**

**PRESIDENT, EDMUND HARTNETT RISK MANAGEMENT LLC**

**2012 – PRESENT**

**SUBJECT MATTER EXPERT**

- Consulted with several law firms on police policies and procedures including the wrongful death of a police officer, police pursuits and crime analysis data; provided knowledge and expertise on police policies to the Port Authority NYNJ during labor negotiations; provided expertise to police agencies on the CompStat process.

**CONSULTANT, THE BRATTON GROUP**

- Worked with former NYPD Police Commissioner and former LAPD Police Chief Bill Bratton on police consulting projects in Los Angeles, Oakland CA, Detroit and Baltimore.

**CONSULTANT, TENEO HOLDINGS**

- Recently assigned to a comprehensive assessment and analysis of the St Louis MO County Police Department with Commissioner Bratton.

**CONSULTANT, WRAP TECHNOLOGIES INC.**

- Currently contracted in a marketing and consulting capacity by Wrap Technologies, a company that specializes in innovative non-lethal technology to assist law enforcement and the military in safely controlling potentially violent encounters.

**CONSULTANT, CRITICAL RESPONSE GROUP INC.**

- Currently providing consulting services to the Critical Response Group (CRG), a provider of technology products that assist first responders in public safety planning and preparation and emergency operations.

**PRINCIPAL / PAST PRESIDENT, BROSNAN RISK CONSULTANTS LTD**

**2013 - 2019**

- As Principal, in 2019, oversaw business development and client relations.
- Served as President of Brosnan Risk Consultants (BRC) from 2013 through 2019; oversaw a wide range of services including security, investigations, threat assessments, risk management, emergency response, executive protection, training, active shooter response, event planning, business intelligence and corporate due diligence.
- During tenure as President, BRC grew from a $10 million firm to a projected $100 million company in 2019.
- Oversaw and coordinated the review and revision of all aspects of the Port Authority New York and New Jersey Police Department training program.
- Coordinated an analysis of the security procedures of Madison Square Garden as well as numerous religious and sensitive locations.

**POLICE COMMISSIONER, YONKERS POLICE DEPARTMENT,** Yonkers, NY

**2006 - 2011**

- Served as Police Commissioner of Yonkers, the fourth largest city in New York State, population 200,000, with an annual budget of over $78 million and command of over 700 officers, detectives, supervisors and civilians; from 2006 through 2011 overall crime in Yonkers was reduced by 16%; shooting incidents were dramatically reduced.
- Interfaced and partnered with federal, state and local law enforcement agencies including the Federal Bureau of Investigation, Drug Enforcement Administration, US. Secret Service, New York Police Department, New York State Police and the Westchester County Department of Public Safety.
- Reorganized the Yonkers Police Department (YPD) into three separate and distinct bureaus, improving efficiency, effectiveness and accountability.  Instituted and implemented the CompStat process.
- Partnered with the community and local agencies to introduce holistic, multi-pronged and non-traditional approaches to problems such as gangs, truancy and homelessness.
- Upgraded technological capabilities of the agency in the area of records management, integration of security cameras and gunshot detection systems.

**DEPUTY CHIEF / NYPD NARCOTICS DIVISION,** New York, NY

**2004 - 2006**

- Supervised the daily citywide deployment, training, organization and administration of over 1800 Narcotics Division members.

- Created and implemented new strategies and tactics to combat increases in illegal narcotic activity on a precinct-by-precinct basis which led to a marked increase in the quality of narcotics arrests and investigations.
- Implemented Narcostat, a management tool designed to improve and monitor citywide narcotic conditions and provide guidance, training and support to narcotics enforcement and investigative units.
- Appointed by the Police Commissioner to serve on a select committee tasked with re-engineering the strategic vision of the Narcotics Division.
- Analyzed and improved integrity controls of the NYPD Organized Crime Control Bureau.

**DEPUTY CHIEF / COMMANDING OFFICER / NYPD NARCOTICS BOROUGH BRONX,** Bronx, NY

**2002 - 2004**

- Designated as Commanding Officer of a staff of over 500 detectives, supervisors and civilian employees dedicated to combating illegal narcotics trafficking in Bronx County.
- As a result of the implementation of new strategies and tactics, an increase in narcotic arrests and drug gangs dismantled were achieved with fewer personnel resulting in reductions in local crime and overtime costs.

**DEPUTY CHIEF / COMMANDING OFFICER / NYPD INTELLIGENCE DIVISION,** New York, NY

**2000 - 2002**

- Served as Commanding Officer and managed a staff of 650 select detectives and supervisors tasked with gathering criminal intelligence concerning high-profile, confidential investigations in New York, in the US and overseas.
- Coordinated security and protective measures for the President of the United States and visiting foreign government leaders and officials, high-threat individuals, the Mayor of New York and other elected officials.
- NYPD liaison to the US Secret Service, US State Department and the United Nations.
- Coordinated threat assessment reviews of sensitive and critical locations throughout New York City.
- Prepared and executed security planning for major New York City events i.e., the United Nations General Assembly, New Year's Eve in Times Square, the World Series, Fleet Week and various high-profile parades and demonstrations.
- Responded to and coordinated the Intelligence Division's efforts at the World Trade Center during and after the 9/11 attacks.
- Directed the Criminal Intelligence Section in assisting the FBI and other investigative bodies in the aftermath of the 9/11 attacks.

**EDUCATION**

- Marist College - Master's in Public Administration
- Columbia University Graduate School of Business - Certificate, Police Management
- Fordham University - Bachelor of Arts, Political Science

**SPECIAL TRAINING**

- NYPD Criminal Investigation Course, New York, NY
- FBI National Academy, Quantico, Va.
- DEA Drug Unit Commanders Academy, Washington, DC
- US Secret Service Dignitary Protection School
- Citywide Incident Management Systems Training, New York, NY
- FBI National Executive Institute, Washington, DC
- Executive Leaders Program, Ctr for Homeland Defense and Security, Naval Postgraduate School, Monterey CA
- Law Enforcement Exchange Program in Israel with the Israeli National Police

**LAW ENFORCEMENT / PRIVATE SECURITY AFFILIATIONS**

- FBI National Academy Associates (FBINAA)
- FBI National Executive Institute Associates (FBINEIA)
- International Association of Chiefs of Police (IACP)
- American Academy of Professional Law Enforcement (AAPLE)
- Police Management Institute (PMI) Alumni Association
- Police Executive Research Forum (PERF)
- American Society for Industrial Security (ASIS)
- NYPD Honor Legion
- Terrorist Information New York Group (TINYg



ATTACHMENT 2





ATTACHMENT 3





ATTACHMENT 4



ATTACHMENT 5



ATTACHMENT 6



ATTACHMENT 7





ATTACHMENT 8





ATTACHMENT 9



JUVENILE ROOM

Please clean up
after yourselves,
do not leave
food and
garbage in the
room. There is a
family of ants
waiting to eat it.

ANDERSON

PARELLA



ATTACHMENT 10





ATTACHMENT 11



ATTACHMENT 12



# Prisoner Transport
## To First District Court
### CHECKLIST

➢ All prisoners being transported will be listed on the Prisoner Transmittal Sheet (PDCS-2031). All boxes on the Prisoner Transmittal Sheet will be filled in for each prisoner.

➢ All prisoners will be transported with the Sheriff's copy of the Arrest Report (PDCS-1045).

➢ Two (2) copies of NYSPIN File 5 & 6 inquires, even if the inquiries are negative, will be attached to the Sheriff's copy of the Arrest Report, one marked "Sheriff" and the other marked "Court".

➢ A prisoner's right thumbprint will be on a Thumbprint Card, which will be attached to the Sheriff's copy of the Arrest Report.

➢ A prisoner's property will be inventoried on the Prisoner Property Receipt (PDCS-2021). One (1) sealed Prisoner Personal Property Bag, with required information complete, will be transported with the prisoner. The Prisoner Property Receipt, pink and blue copies, will be attached to the sealed Prisoner Personal Property Bag.

➢ A Prisoner Bracelet, to include the prisoner's name, PIN number and Property Receipt number, will be affixed to the prisoners left wrist.

❖ For prisoners not on the original Prisoner Transmittal Sheet, an "Add On", a full arrest package must be brought with the prisoner in addition to the above items.

## If A Want Is Found

If a want is found (ICE / Probation / Parole / Warrant) the arresting Officer contacts the originating agency to determine if the want is still active and if the prisoner should be held for the originating agency. The arresting Officer will document the contact person and the particulars on a Supplementary Report. If an ICE want is found, a detainer is required. For Probation / Parole / County Court Warrants an original warrant is required. If there is a hold, a copy of the Supplementary Report will be affixed to the Prisoner Transmittal Sheet (PDCS-2031).

## Property NOT Allowed In First District Court

Firearms – Ammunition – Knives – Razors – Tools – Handcuff Keys – Scissors – Ice Pick – Mace / Pepper Spray – Needles – Cameras – Lighters – Matches – Nail Clippers – Tobacco, Alcohol, or Food Products – No Clothing Other Than What the Prisoner is Wearing – Unsealed Property Bags – Items Not in a Property Bag – Items To Large for a Property Bag – Cell Phones Unless the Battery is Removed – All Other Unsuitable Items

**Officers must transport prisoners, with completed paperwork, to the First District Court prior to 1300 hrs on weekdays and 1100 hrs on weekends and holidays. Sheriff's Department 853-4913 First District Court Detention Area**



ATTACHMENT 13





ATTACHMENT 14





ATTACHMENT 15





ATTACHMENT 16





ATTACHMENT 17





ATTACHMENT 18





ATTACHMENT 19





ATTACHMENT 20





ATTACHMENT 21





ATTACHMENT 22

